UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
ALICE ANN FRIENDS,              )
          Plaintiff,            )
                                )
          v.                    )
                                )   06-CV01762-ESH
JOANNE B. BARNHART,             )
          Defendant.            )
                                )
_____)


PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT


     Plaintiff moves for summary judgment in her favor on count 1 of her complaint.  She leaves for trial issues of damages, as well as liability on count 2 of her complaint.  She relies in support of this motion on the accompanying memorandum, statement of facts not in dispute, and exhibits.


Respectfully submitted,

/s/

Phillip R. Kete
General Counsel, AFGE Local 1923
G-314 West Highrise
6401 Security Blvd.
Baltimore, MD  21235
D.C. Bar No. 375724
(410) 966-6500                      December 20, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
ALICE ANN FRIENDS,            )
        Plaintiff,            )
                              )
        v.                    )
                              )   06-CV01762-ESH
JOANNE B. BARNHART,           )
        Defendant.            )
                              )
_____)


ORDER


     Upon consideration of plaintiff's motion for partial
summary judgment, defendant's opposition, and the entire
record in this case, it is this _____ day of _____,
2006, ORDERED, that plaintiff's motion for partial summary
judgment is granted.



_____
ELLEN SEGAL HUVELLE
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                 )
ALICE ANN FRIENDS,               )
         Plaintiff,              )
                                 )
         v.                      )
                                 )  06-CV01762-ESH
JOANNE B. BARNHART,              )
         Defendant.              )
                                 )
_____)


MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT


Phillip R. Kete
General Counsel, AFGE Local 1923
G-314 West Highrise
6401 Security Blvd.
Baltimore, MD  21235

D.C. Bar No. 375724

(410) 966-6500


December 20, 2006

TABLE OF CONTENTS

INTRODUCTION ............................................... 1

STATEMENT OF THE CASE ...................................... 2

ARGUMENT .................................................. 11

I   FOR MS. FRIENDS TO BE ENTITLED TO JUDGMENT, THE
UNDISPUTED FACTS MUST SHOW A DENIAL OF REASONABLE
ACCOMMODATION TO A QUALIFIED DISABLED EMPLOYEE. .......... 11

   A.   SUMMARY JUDGMENT IS PROPER WHEN THERE ARE NO MATERIAL
   FACTS IN GENUINE DISPUTE AND THE PLAINTIFF IS ENTITLED TO
   JUDGMENT AS A MATTER OF LAW. ........................... 11

   B.   TO PREVAIL, MS. FRIENDS MUST PROVE THAT SHE WAS A
   QUALIFIED INDIVIDUAL WITH A DISABILITY WHOSE REQUEST FOR A
   REASONABLE ACCOMMODATION WAS DENIED. ................... 13

II   MS. FRIENDS WAS A DISABLED EMPLOYEE WHOSE REQUEST FOR
ACCOMMODATION TO HER INABILITY TO HEAR CLAIMANTS' SPEECH
WAS DENIED. .............................................. 18

III  MS. FRIENDS WAS A QUALIFIED DISABLED EMPLOYEE. ...... 18

   A.   DEFENDANT DID NOT SUCCEED IN LIMITING MS. FRIENDS'
   POSITION TO PEOPLE WHO CAN UNDERSTAND SPOKEN ENGLISH
   WITHOUT AN ASL INTERPRETER. ........................... 19

   B.   ENFORCEMENT OF THE RIGHT TO ACCOMMODATIONS NECESSARY
   TO PERFORMING ESSENTIAL FUNCTIONS OF A JOB DOES NOT DEPEND
   ON SUCCESSFUL COMPLETION OF A TWO-YEAR PROBATIONARY
   PERIOD. ............................................... 21

IV   THE REQUESTED ACCOMMODATION WAS REASONABLE. ......... 24

V   DEFENDANT HAS NO EVIDENCE TO PROVE UNDUE HARDSHIP..... 25

CONCLUSION ............................................... 26

INTRODUCTION

The complaint in this case has two counts.  The first alleges a violation of Ms. Friends' right under law and regulation to a reasonable accommodation of her deafness when being trained and in her job assignments during and following training.  The second count alleges that those violations resulted in defendant illegally firing Ms. Friends from her position.

Because litigation of the second count will require discovery,[1] this motion covers only the first count.

We will set forth first the undisputed facts, and then the legal argument showing that those facts entitle Ms. Friends to judgment on count 1 as a matter of law.

---

[1]    A number of facts related to count 2 are, of course, undisputed. First, the parties agree that one cannot perform the duties of Ms. Friends' position without being able to comprehend what speaking claimants said.  Second, they agree that Ms. Friends could not comprehend what speaking claimants said without an ASL interpreter. Third, they agree that Ms. Friends did not have an ASL interpreter, and thus was unable to perform the duties of her position.  Finally, the parties agree that defendant's stated reason for firing Ms. Friends was that she was unable to perform the duties of her position.

Defendant claims, however, that Ms. Friends' inability to perform her job was unrelated to her inability to comprehend claimants' speech. Thus, according to defendant, she would have fired Ms. Friends for poor performance in September 2004 even if Ms. Friends had been able to understand what claimants were saying to her.  Discovery will focus on the truth and the correctness of this claim.

STATEMENT OF THE CASE

Alice Ann Friends is a profoundly deaf person with a
bachelor's degree and a master's degree.  Fact ¶ 1.  Her
deafness substantially limits her ability to hear, Fact ¶
2, which is a major life activity.  29 C.F.R. § 1630.2(i).
Ms. Friends can read and write English well.  Fact ¶ 3.
She speaks English fluently, albeit without full control
over intonations. Fact ¶ 4.

Defendant hired Ms. Friends in September 2002 as a GS
9 "Social Insurance Specialist/Claims Representative
(Bilingual)" in the Washington Field Office.  Fact ¶ 5.
She was hired under 5 C.F.R. § 213.3102(u), Fact ¶ 6,
designed to bring severely disabled people into the
government.  When offering the job to Ms. Friends, the
manager referred specifically to the fact that, "Our office
is located in the Gallaudet University servicing area
which, as you can imagine, gives us the opportunity to
provide service to many deaf people."  Fact ¶ 38.
Defendant knew Ms. Friends was deaf when she was hired.
Fact ¶ 9.

Although the formal job offer stated explicitly that
"This is a permanent Career-Conditional Appointment," Fact
¶ 39, which implies a one year probationary period (5

C.F.R. § 315.801), defendant insists that the appointment was subject to a two year probationary period.  Fact ¶ 7. Ms. Friends' own understanding at the time she was hired was that there would be a one-year probationary period. Fact ¶ 8.

Ms. Friends was given six months of formal training. Fact ¶ 10.  During that training, she explained that she could not comprehend what was being told her orally and, as a result, for the last two months of the training the agency did provide her an American Sign Language interpreter so she could understand what was said.  Fact ¶ 11.

After successful completion of the formal training, Ms. Friends was given six months of on-the-job training. Fact ¶ 12.  Her requests for an ASL interpreter during this period were denied, albeit not in writing.  Fact ¶ 13. Upon conclusion of her on-the-job training, management officially certified that she had performed satisfactorily as a GS 9 during the year ending September 2003.  Fact ¶ 14.  In October, management promoted her to GS 11, which is the full-performance level of the position.  Fact ¶ 15.

The essential functions of the claims representative job included the following:

(1)  conducting interviews with claimants to

– 3 –

obtain, clarify, and verify information about
individual applicants' initial and continuing
eligibility for various benefit programs
administered by the agency; (2) adjudicating
claims for benefits and eligibility to all
programs administered by the agency; (3)
authorizing payment of claims for benefits; and
(4) conducting interviews, developing,
investigating, and resolving post entitlement
actions which may involve suspension, resumption,
or termination of eligibility or payments.

Fact ¶ 16.

The Social Security Administration has correctly told

the EEOC that the interviewing function cannot be performed

by deaf people without the accommodation of an ASL

interpreter:

The [Social Security Administration] stated that
grievant was not accommodated and thus was not
placed in the Svce Rep position because she could
not perform an essential function of the
position, i.e., face-to-case interviewing.
Specifically, the agency stated that grievant
would need a full-time sign language interpreter
to successfully perform the above-stated
essential function because (1) claimant
interviews are conducted on a walk-in basis, (2)
the office tries to conduct claimant interviews
as quickly as possible because of heavy demand
and expectations by the public, and (3) many
claimants are limited by either physical
impairments, education, economics or language,
which could further complicate the interview
process.

Fact ¶ 17 (emphasis added).

Defendant has explained that reliance on technological

alternatives to ASL interpreters is not possible because of

the nature of the claimants:

– 4 –

> [M]any of our claimants have intellectual,
> technological, or physical/mental impairments
> that would prevent them from even learning how to
> use [a speech recognition] program.

Fact ¶ 18.

Similarly there are inherent limitations on the use of

lip-reading to comprehend speech:

> When communicating with most Deaf individuals, the use
> of lip reading alone is not adequate because of the
> large number of words that look alike on the lips.  In
> tests, using simple sentences, Deaf people recognize
> perhaps three or four words in every sample.  The
> majority of information that is conveyed in a
> conversation is not understood . . . . Deaf
> individuals are faced with this frustration daily.
> Lipreading alone is not a feasible communication
> option for the majority of Deaf individuals.

Fact ¶ 19.

Ms. Friends' clients often failed to do the things

which are necessary for effective speech-reading, such as

making eye contact, looking at her when speaking, keeping

hands away from the mouth, and enunciating carefully.  Fact

¶ 20.  Under these circumstances it would be virtually

impossible for Ms. Friends, or almost any other deaf

person, to fully comprehend what the claimants were saying

to her by relying on speech-reading.  Fact ¶ 21.

Presumably in recognition of the fact that Ms. Friends

could not rely on lip-reading to understand spoken words,

defendant did provide an ASL interpreter for communications

between Ms. Friends and her supervisors, mentors, trainers, and colleagues:

> CDS did authorize funding for up to 32 hrs of
> interpreter services per week for mentoring,
> training, unit meetings, progress review and
> other work related activities . . .

Fact ¶ 22.

Ms. Friends could not in fact comprehend what claimants told her sufficiently well to be able to efficiently and correctly handle their claims. Fact ¶ 23. Indeed, it was far more difficult for Ms. Friends to understand claimants' speech than it was to understand the speech of her colleagues, mentors, and supervisors. Fact ¶ 24. Defendant, however, refused Ms. Friends' repeated requests for an ASL interpreter for communicating with claimants. Fact ¶ 40. It is that refusal which is the subject of this motion.

Defendant's explanation was that Ms. Friends' position description contained a restriction on the right of deaf employees to accommodation for communicating with members of the public, (although not on their right to accommodation for communicating within the office):

> Even though Ms. Friends was hearing impaired, the
> duties of this position require the ability to
> communicate (speak and understand spoken words)
> in English.  Communicating with the English
> speaking public does not require the use of an
> ASL interpreter.  If, therefore, she was not

fluent in the English language because she can
not hear, read lips and/or did not have
audible/understandable speech, she is not
qualified to perform the duties of the Bi-lingual
CR position.

Fact ¶ 26.

The alleged bar on deaf people being hired for the

position is not contained in the portion of the position

description that states the qualifications for the job.

The 'qualifications' section of Ms. Friends' position

description was identical to that in the standard claims

representative position:

Ability to communicate with individuals for the
purposes of obtaining information, motivating
individuals to appropriate courses of action, and
conveying an understanding of complex
requirements of particular programs.

Fact ¶ 27.

Another deaf claims representative in the Washington

Field Office, presumably with the same qualifications

requirement in his or her position description, was

provided with an ASL interpreter for over 35 hours per

week.  Fact ¶ 28.

What defendant argues bars deaf employees from the

position it hired Ms. Friends for, in contrast to the

standard claims representative position which deaf people

can (with accommodation) serve in, is a statement at the

head of her position description.  That statement says that

– 7 –

the incumbent must be able to assist the "non-English speaking public":

> This position is different from position # 3C363A in that the incumbent is required to possess and use bilingual skills to assist the non-English speaking public in conducting necessary Social Security business.

Fact ¶ 29.

According to defendant, this sentence means that a deaf person is not qualified for the position unless she can serve the English speaking public without an ASL interpreter.  Fact ¶ 30.

Ms. Friends does not in fact meet the asserted qualification requirement.  She could not, in fact, communicate sufficiently well with speaking claimants to perform the interview function of her position.[2]  Fact ¶ 31.

Defendant also claims to have determined that Ms. Friends had not developed the technical competence to resolve, without benefit of supervisory consultation, all but the most unusual problems:

> Simply put, even if the Agency granted Complainant all of her specific requests for reasonable accommodation, she cannot prove that she could have performed the essential functions of her job as a claims representative, especially at the more complex GS-11 level.[2]  She is,

---

[22]  Ultimately, in September 2004 the agency fired Ms. Friends for allegedly being unable to perform the essential functions of her position at the GS 11 level.  This fact, however, is not material to the issue presented by count I of the complaint.

> therefore, not a qualified individual with a
> disability under the Rehabilitation Act.

---

[2]  The GS-11 level is the keystone position for
bringing direct personal service to the public .
. . .  Unlike at other grade levels, the employee
"is expected to resolve, without benefit of
supervisory consultation, all but the most
unusual problems[.]"

Fact ¶ 32 (emphasis added).

In 2001, the EEOC determined that it would not impose

an undue burden on the Social Security Administration to

provide a nearly full-time ASL interpreter to a deaf

employee for the purpose of conducting claimant interviews:

> The agency stated that the above-cited
> accommodations would impose an undue hardship
> because they were economically unfeasible.
> However, the agency did not provide any detailed
> data to support its contention that such an
> accommodation would be an undue hardship, but
> instead made only general conclusory statements
> about the associated economic hardship.
> Considering the overall size of the agency, which
> during the period at issue was approximately
> 60,000 employees in over 1300 nationwide
> facilities; the fact that a profoundly deaf
> claims representative in the agency's Washington,
> DC field office had an interpreter for 35 1/2
> hours per week; and the intent of Congress that
> the Federal government undertake measures to
> reasonably accommodate that would involve more
> than a de minimis cost; we find that the cost of
> hiring either a full-time or part-time
> interpreter for grievant would not be an undue
> hardship.

Fact ¶ 33.

One of defendant's denials of Ms. Friends' request for

an ASL interpreter is dated June 4, 2004.  Fact ¶ 34.  Ms.

Friends initiated her EEO complaint on June 9, 2003, within 45 days of that denial.  Fact ¶ 35.

ARGUMENT


I    FOR MS. FRIENDS TO BE ENTITLED TO JUDGMENT, THE
     UNDISPUTED FACTS MUST SHOW A DENIAL OF REASONABLE
     ACCOMMODATION TO A QUALIFIED DISABLED EMPLOYEE.

     Summary judgment is proper because the undisputed
facts prove that defendant violated the Rehabilitation Act
by failing to accommodate Ms. Friends' deafness by not
providing an ASL interpreter to translate for her when
conducting claimant interviews.


A.    SUMMARY JUDGMENT IS PROPER WHEN THERE ARE NO MATERIAL
      FACTS IN GENUINE DISPUTE AND THE PLAINTIFF IS ENTITLED
      TO JUDGMENT AS A MATTER OF LAW.

      Under Rule 56(a), the plaintiff may "move with or
without supporting affidavits for a summary judgment in the
party's favor upon all or any part thereof."  After the
adverse party has an opportunity to respond, the "judgment
sought shall be rendered forthwith if the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there
is no genuine issue as to any material fact and that the

-11-

moving party is entitled to judgment as a matter of law."
Fed.R.Civ.Proc. 56(c).

The affidavits referred to in 56(c) "shall be made on
personal knowledge, shall set forth such facts as would be
admissible in evidence, and shall show affirmatively that
the affiant is competent to testify to the matters stated
therein."  Fed.R.Civ.Proc. 56(e).  Stated otherwise,
summary judgment cannot be defeated by affidavits reciting
"hearsay or other information excludable from evidence at
trial."  *Martin v. John W. Stone Oil Distributor, Inc.*, 819
F.2d 547, 549 (5th Cir. 1987)

Nor can summary judgment be defeated by disputes over
facts which are not material, i.e., which could not affect
the outcome of the case under the applicable legal
standard.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
248 (1986).

In deciding on a summary judgment motion, the court
must draw all reasonable inferences in favor of the non-
movant.  *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).
On the other hand, judgment cannot be denied on the basis
of speculation.  *Beale v. Hardy*, 769 F.2d 213, 214 (4th
Cir. 1985).

Plaintiff is both the moving party on this motion and
the party with the burden of proof on the merits of the

-12-

case.  In support of this motion, plaintiff must
demonstrate three things:  (a) that there is a sufficiency
of admissible evidence in support of each element (and
potentially disputable sub-element) of her prima facie
case;  (b)  there is no admissible evidence countering her
own, sufficient to create a triable issue as to any of the
elements of her prima facie case;  and (c)  there is no
admissible evidence in support of defendants' affirmative
defenses.


B.    TO PREVAIL, MS. FRIENDS MUST PROVE THAT SHE WAS A
      QUALIFIED INDIVIDUAL WITH A DISABILITY WHOSE REQUEST
      FOR A REASONABLE ACCOMMODATION WAS DENIED.

      This action is brought under section 501 of the
Rehabilitation Act of 1973, 29 U.S.C. § 791, which provides
as follows:

      (b)  Each . . . agency . . . shall . . . submit
      to the commission and to the Committee an
      affirmative action program plan of the hiring,
      placement, and advancement of individuals with
      disabilities . . .   Such plan shall include a
      description of the extent to which and methods
      whereby the special needs of employees who are
      individuals with disabilities are being met.  . .
      .

                  *          *          *

      (g)  The standards used to determine whether this
      section has been violated in a complaint alleging
      nonaffirmative action employment discrimination

–13–

under this section shall be the standards applied
under title I of the Americans with Disabilities
Act of 1990 and the provisions of section s501
through 504 of the Americans with Disabilities
Act of 1990, as such section relate to
employment.

The Equal Employment Opportunity Commission has issued

implementing regulations:

(a)  Model employer.  The Federal Government
shall be a model employer of individuals with
disabilities.  . . .

(b)  ADA standards.  The standards used to
determine whether section 501 . . . has been
violated . . . shall be the standards . . .
These standards are set forth in the Commission's
ADA regulations at 29 CFR part 1630.

29 C.F.R. § 1614.203.

It should be stressed, however, that there are

statutory differences between § 501 of the Rehabilitation

Act and the ADA.  First, § 501, unlike the ADA, mandates

affirmative action to hire people with disabilities.  No

private employer is required to take affirmative actions.

Title VII, even as it applies to the federal government,

does not mandate affirmative action for women or

minorities.  Second, § 501 specifically mandates

affirmative action not just in hiring but in placement and

advancement.  Third, the implementing regulations mandate

that the federal agencies be model employers.  No private

employer violates the law if it acts as less than a model employer.

The EEOC regulations make it an unlawful act of discrimination to fail to reasonably accommodate disabilities:

> (a)  It is unlawful for a covered entity not to make reasonable accommodation to the known physical . . . limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business.

29 C.F.R. § 1630.9.

The regulations similarly bar employers from evading this responsibility by simply creating a qualification requirement that the employee not need any accommodation to disabilities:

> It is unlawful for a covered entity to use qualifications standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities, on the basis of the disability, unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

29 C.F.R. § 1630.10.

Stated otherwise, "Employers may not simply declare the absence of a disability a job qualification . . . "

*Hawkins v. George F. Cram Co.*, 397 F.Supp.2d 1006, 1021 (S.D.Ind. 2005).

To prevail, Ms. Friends must prove that she is a "disabled" employee, that she is a "qualified" employee, and that she reported her claimed disability to the defendant; that she requested "reasonable" accommodations to her disability; and that those requests were denied. *Rhoads v. FDIC*, 256 F.3d 373 (4th Cir. 2001).

The regulations define 'qualified' in terms of being able to perform the duties of the position if reasonable accommodations are provided:

> Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirement of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position.

29 C.F.R. § 1630.2(m).

The regulations expressly identify the "provision of qualified readers or interpreters" as reasonable accommodations. 29 C.F.R. § 1630.2(o)(2).

Ms. Friends need not prove discriminatory intent in order to prevail, because "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of

-16-

thoughtlessness and indifference—of benign neglect."

*Alexander v. Choate*, 469 U.S. 287, 295 (1985).  Thus, it is

irrelevant whether failure to was caused by malice,

negligence, ignorance, deliberate action, etc.

II   MS. FRIENDS WAS A DISABLED EMPLOYEE WHOSE REQUEST FOR

     ACCOMMODATION TO HER INABILITY TO HEAR CLAIMANTS'

     SPEECH WAS DENIED.

     Several elements of Ms. Friends' case are facially

undisputed:  Ms. Friends in disabled, Fact ¶¶ 2, 3;  she

could not perform the client interview function of her

position without an ASL interpreter, Fact ¶¶ 16, 17, 18,

19, 20;  she repeatedly requested the accommodation of ASL

interpretation for claimant interviews, Fact ¶ 21;  those

requests were denied, Fact ¶ 21.


III  MS. FRIENDS WAS A QUALIFIED DISABLED EMPLOYEE.

     Defendant has made two arguments that Ms. Friends was

not qualified within meaning of the Rehabilitation Act.

First, defendant says that she created a qualification

requirement for the position which, by definition, a deaf

person like Ms. Friends cannot meet.  Second, defendant

notes that she hired Ms. Friends under 5 C.F.R. § 2103(u),

which is a special authority for hiring people with severe

disabilities.  Defendant argues that such people have no

enforceable right to any accommodation to their

disabilities until and unless they successfully complete a

two year probationary period.

A.    DEFENDANT DID NOT SUCCEED IN LIMITING MS.
FRIENDS' POSITION TO PEOPLE WHO CAN UNDERSTAND SPOKEN
ENGLISH WITHOUT AN ASL INTERPRETER.

Defendant claims that Ms. Friends's need for an ASL
interpreter disqualified her for the position defendant
hired her.

The claim must be analyzed in the context of three
factors.  First, the EEOC, in recently holding that the SSA
was obliged to provide deaf employees with ASL interpreters
for the purpose of conducting claimant interviews, had
noted that SSA's Washington Field Office provided a nearly-
full time interpreter for a deaf claims representative.
Fact ¶ 33.  Second, an employer cannot exonerate itself
from liability under the Rehabilitation Act merely by
declaring that a job must be performed without
accommodations to disabilities.  29 C.F.R. § 1630.10.
Third, defendant sees a distinction between needing an ASL
interpreter when communicating with staff who are careful
to talk in ways that facilitate speechreading and when
communicating with claimants who cannot be expected to use
that care.

In the present case, defendant did not succeed in
modifying the claims representative position so that deaf

–19–

people would be excluded from it.  That objective could
have been met only if the qualifications statement in the
position description had been explicitly re-written along
the following lines:

> Ability to communicate, <u>without reliance on any
> accommodation to disabilities, with English-
> speaking</u> individuals for the purposes of
> obtaining information, motivating individuals to
> appropriate courses of action, and conveying an
> understanding of complex requirements of
> particular programs.  <u>However, a person is
> qualified even if her or she requires
> accommodation to disabilities when communicating
> with English-speaking people other than
> claimants.</u>

That was not done.  The language in the position
description that defendant does rely on does not in fact
address, one way or the other, the qualifications needed
for dealing with English-speaking members of the public.
The language fairly requires the ability to communicate
through ASL with deaf members of the communicate, but it
does nothing to the right to accommodation in communicating
with speaking members of the community.

B.    ENFORCEMENT OF THE RIGHT TO ACCOMMODATIONS
NECESSARY TO PERFORMING ESSENTIAL FUNCTIONS OF A JOB
DOES NOT DEPEND ON SUCCESSFUL COMPLETION OF A TWO-YEAR
PROBATIONARY PERIOD.

The agency's chief defense before the EEOC was that
Ms. Friends never had any enforceable right to
accommodation under the Rehabilitation Act because
management determined, two years after hiring her, and
after having promoted her, and without providing an
accommodation concededly necessary for performing the job,
that Ms. Friends lacked the technical competence to
resolve, without benefit of supervisory consultation, all
but the most unusual problems presented by claimants:

> Simply put, even if the Agency granted
> Complainant all of her specific requests for
> reasonable accommodation, she cannot prove that
> she could have performed the essential functions
> of her job as a claims representative, especially
> at the more complex GS-11 level.[2] She is,
> therefore, not a qualified individual with a
> disability under the Rehabilitation Act.
> _____
> [2]  The GS-11 level is the keystone position for
> bringing direct personal service to the public .
> . . .  Unlike at other grade levels, the employee
> "is expected to resolve, without benefit of
> supervisory consultation, all but the most
> unusual problems[.]"

Fact ¶ 32 (emphasis added).

Whether that assessment is accurate, and whether,
assuming that it is, it justified firing Ms. Friends rather

than restoring her to the grade level at which management
certified her performance to be satisfactory, are issues
presented in count II of the complaint.  The relevance to
the present issue is that defendant asked the EEOC to
dismiss Ms. Friends' complaint on the ground that she was
not, for the reasons just quoted, a qualified person, and
that only qualified people have enforceable rights to
accommodation under the Rehabilitation Act.

Defendant is not saying that disabled employees are
not entitled to accommodations until they complete
probation, and Ms. Friends' purported probationary status
was never given as a reason for denying her the requested
accommodation.  What defendant is saying is that a disabled
employee has no way to enforce her right to a reasonable
accommodation if she is released before the end of a
purported two year probationary period, because failing
probation means she was never a qualified employee and only
qualified employees have a right of action under the
Rehabilitation Act.

According to defendant's theory, if a person in a
wheelchair is hired under 5 C.F.R. § 213.3102(u), and two
years later the agency lets him go because he has not
performed satisfactorily, the person has no claim for
damages under the Rehabilitation Act for the agency's

failure to provide wheelchair-accessible restroom
facilities.  In the present case, defendant is saying that
Ms. Friends' difficulties in performing her duties means
she cannot seek remedy for defendant's failure to provide
the accommodation essential to the performance of those
duties.

It is impossible to read the Rehabilitation Act in
such a cynical way.

IV   THE REQUESTED ACCOMMODATION WAS REASONABLE.


Since the alleged distinction between the standard position and Ms. Friends' position with respect to being able to comprehend speech without an ASL interpreter is illusory, the provision of an interpreter is a perfect example of a reasonable accommodation.  All are agreed that a claims representative has to know what claimants say, all are agreed that Ms. Friends could not know what claimants said without an ASL interpreter, and all are agreed that with an ASL interpreter Ms. Friends would be able to know what claimants say.

V    DEFENDANT HAS NO EVIDENCE TO PROVE UNDUE HARDSHIP.


Before the EEOC, defendant raised, as an affirmative defense, a claim that the cost of providing Ms. Friends the requested accommodation would impose an undue hardship on it.

Defendant admitted that providing Ms. Friends an ASL interpreter for 32 hours a week would not impose an undue hardship on it.  Fact ¶ 22.

The EEOC had earlier found that providing a full-time ASL interpreter would not impose an undue hardship on the Social Security Administration:

> The agency stated that the above-cited accommodations would impose an undue hardship because they were economically unfeasible. However, the agency did not provide any detailed data to support its contention that such an accommodation would be an undue hardship, but instead made only general conclusory statements about the associated economic hardship. Considering the overall size of the agency, which during the period at issue was approximately 60,000 employees in over 1300 nationwide facilities; the fact that a profoundly deaf claims representative in the agency's Washington, DC field office had an interpreter for 35 1/2 hours per week; and the intent of Congress that the Federal government undertake measures to reasonably accommodate that would involve more than a de minimis cost; we find that the cost of hiring either a full-time or part-time interpreter for grievant would not be an undue hardship.

Fact ¶ 33.

During the EEOC complaint process in the present case, defendant similarly failed to provide any detailed data to support its contention that such an accommodation would be an undue hardship.

There is, therefore, no basis for defendant's undue hardship defense.

CONCLUSION

The court should award Ms. Friends summary judgment on count I of her complaint.

Respectfully submitted,

/s/

Phillip R. Kete
General Counsel, AFGE Local 1923
G-314 West Highrise
6401 Security Blvd.
Baltimore, MD  21235
(410) 966-6500

DC Bar No. 375724

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
ALICE ANN FRIENDS,                  )
        Plaintiff,                  )
                                    )
        v.                          )
                                    )  06-CV01762-ESH
JOANNE B. BARNHART,                 )
        Defendant.                  )
                                    )
_____)


PLAINTIFF'S STATEMENT OF MATERIAL FACTS

IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT


1.   Alice Ann Friends is a profoundly deaf person with a bachelor's degree and a master's degree.  Exh. 1 ¶ 2, 3.

2.   Her deafness substantially limits her ability to hear, which is a major life activity.  Exh. 1 ¶ 2.

3.   Ms. Friends can read and write English well. Exh. 1 ¶ 4.

4.   Ms. Friends speaks English fluently, albeit without full control over intonations.  Exh. 1 ¶ 5.

5.   Defendant hired Ms. Friends in September 2002 as a GS 9 "Social Insurance Specialist/Claims Representative

(Bilingual)" in the Washington Field Office.  Exh. 1 ¶ 6;
Exh. 6.

6.   She was hired under 5 C.F.R. § 213.3102(u),
designed to bring severely disabled people into the
government.  Exh. 6.

7.   According to defendant, the appointment was
subject to a two year trial period.  Exh. 15 at 2.

8.   Ms. Friends assumed, when she was hired, that
there would be a one year probationary period.  Shortly
after starting work she was provided an employee handbook
that stated that new hires are normally subject to a one
year probationary period.  Exh. 1 ¶ 9.

9.   Defendant knew Ms. Friends was deaf when it hired
her.  Exh. 1 ¶ 10.

10.  Ms. Friends was given six months of classroom
training.  Exh. 1 ¶ 11.

11.  During that training, she explained that she
could not comprehend what was being told her orally and, as
a result, for the last two months of the training the
agency did provide her an ASL interpreter so she could
understand what was said.  Exh. 1 ¶ 12.

12.  After completion of the formal training, Ms.
Friends was given six months of on-the-job training.  Exh.
1 ¶ 13.

13.  Her requests for an ASL interpreter during this period were denied, albeit not in writing.  Exh. 1 ¶ 14, 15.

14.  Upon conclusion of her on-the-job training, management officially certified that she had performed satisfactorily as a GS 9 during the year ending September 2003.  Exh. 5.

15.  In October 2003, management promoted her to GS 11, which is the full-performance level of the position. Exh. 9.

16.  The essential functions of the claims representative job included the following:

> (1)  conducting interviews with claimants to obtain, clarify, and verify information about individual applicants' initial and continuing eligibility for various benefit programs administered by the agency;  (2)  adjudicating claims for benefits and eligibility to all programs administered by the agency;  (3) authorizing payment of claims for benefits;  and (4)  conducting interviews, developing, investigating, and resolving post entitlement actions which may involve suspension, resumption, or termination of eligibility or payments.

Exh. 7, 8.

17.  The Social Security Administration has correctly told the EEOC that the interviewing function cannot be performed by deaf people without the accommodation of an ASL interpreter:

– 3 –

The [Social Security Administration] stated that
grievant was not accommodated and thus was not
placed in the Svce Rep position because she could
not perform an essential function of the
position, i.e., face-to-case interviewing.
Specifically, the agency stated that grievant
would need a full-time sign language interpreter
to successfully perform the above-stated
essential functions because (1) claimant
interviews are conducted on a walk-in basis, (2)
the office tries to conduct claimant interviews
as quickly as possible because of heavy demand
and expectations by the public, and (3) many
claimants are limited by either physical
impairments, education, economics or language,
which could further complicate the interview
process.

Exh. 13 at 2.

18.    Defendant has explained that reliance on

technological alternatives to ASL interpreters is not

possible because of the nature of the claimants:

[M]any of our claimants have intellectual,
technological, or physical/mental impairments
that would prevent them from even learning how to
use [a speech recognition] program.

Exh. 15 at 2 (numbered page 15).

19.    There are inherent limitations on the use of lip-

reading to comprehend speech.  For example:

When communicating with most Deaf individuals, the use
of lip reading alone is not adequate because of the
large number of words that look alike on the lips.  In
tests, using simple sentences, Deaf people recognize
perhaps three or four words in every sample.  The
majority of information that is conveyed in a
conversation is not understood, since only 20% of all
speech is visible on the lips.  . . . Deaf individuals
are faced with this frustration daily.  Lipreading

– 4 –

alone is not a feasible communication option for the
majority of Deaf individuals.

Exh. 2 ¶ 7.

20.  Ms. Friends' clients often failed to do the
things which are necessary for effective speech-reading as
set out in exhibit 2 ¶¶ 4, 5, 6, 7, such as making eye
contact, looking at her when speaking, keeping hands away
from the mouth, and enunciating carefully.  Exh. 1 ¶ 20.

21.  Under these circumstances it would be virtually
impossible for Ms. Friends, or almost any other deaf
person, to fully comprehend what the claimants were saying
to her by relying on speech-reading.  Exh. 2 ¶ 12.

22.  Defendant provided an ASL interpreter for up to
32 hours per week for communications between Ms. Friends
and her supervisor and mentor:

> CDS did authorize funding for up to 32 hrs of
> interpreter services per week for mentoring,
> training, unit meetings, progress review and
> other work related activities . . .

Exh. 10 at 3.

23.  Ms. Friends could not in fact comprehend what
claimants told her sufficiently well to be able to
efficiently handle their claims without mistakes.  Her
constant fear that she was not getting all the information
correctly interfered with her ability to remedy and apply

– 5 –

what she had been taught about handling claims.  Exh. 1 ¶ 21.

24.  It was far more difficult for Ms. Friends to understand claimants' speech than it was to understand the speech of our colleagues, mentors, and supervisors.  Exh. 1 ¶ 22.

25.  An ASL interpreter would have allowed Ms. Friends to know everything that her hearing claimants said to her.

26.  Defendant's explanation for denying Ms. Friends' request was that her position description contained a restriction on the right of deaf employees to accommodation for communicating with members of the public, (although not on their right to accommodation for communicating within the office):

> Even though Ms. Friends was hearing impaired, the duties of this position require the ability to communicate (speak and understand spoken words) in English.  Communicating with the English speaking public does not require the use of an ASL interpreter.  If, therefore, she was not fluent in the English language because she can not hear, read lips and/or did not have audible/understandable speech, she is not qualified to perform the duties of the Bi-lingual CR position.

Exh. 10 at 2.

27.  The 'qualifications' section of Ms. Friends' position description was identical to that in the standard claims representative position:

> Ability to communicate with individuals for the
> purposes of obtaining information, motivating
> individuals to appropriate courses of action, and
> conveying an understanding of complex
> requirements of particular programs.

Exh. 7 at 4; Exh. 8 at 4.

28.  Another deaf claims representative in the
Washington Field Office was provided with an ASL
interpreter for over 35 hours per week.  Exh. 13 at 3.

29.  The only stated difference between Ms. Friends'
position and the standard claims representative position

> This position is different from position # 3C363A in
> that the incumbent is required to possess and use
> bilingual skills to assist the non-English speaking
> public in conducting necessary Social Security
> business.

Exh. 7 at 2;  Exh. 8 at 2.

30.  According to defendant, this sentence means that
a deaf person is not qualified for the position unless she
can comprehend spoken English without an ASL interpreter.
Exh. 10 at 2.

31.  Ms. Friends could not communicate sufficiently
well with speaking claimants to perform the interview
function of her position.  Exh. 1 ¶ 21.

32.  Defendant claims to have determined that Ms.
Friends had not developed the technical competence to
resolve, without benefit of supervisory consultation, all
but the most unusual problems:

Simply put, even if the Agency granted
Complainant all of her specific requests for
reasonable accommodation, she cannot prove that
she could have performed the essential functions
of her job as a claims representative, especially
at the more complex GS-11 level.[2] *She is,
therefore, not a qualified individual with a
disability under the Rehabilitation Act*.

_____

[2]  The GS-11 level is the keystone position for
bringing direct personal service to the public .
. . .  Unlike at other grade levels, the employee
"is expected to resolve, without benefit of
supervisory consultation, all but the most
unusual problems[.]"

Exh. 14 at 2.

33.  In 2001, the EEOC determined that it would not

impose an undue burden on the Social Security

Administration to provide a nearly full-time ASL

interpreter to a deaf employee for the purpose of

conducting claimant interviews:

The agency stated that the above-cited
accommodations would impose an undue hardship
because they were economically unfeasible.
However, the agency did not provide any detailed
data to support its contention that such an
accommodation would be an undue hardship, but
instead made only general conclusory statements
about the associated economic hardship.
Considering the overall size of the agency, which
during the period at issue was approximately
60,000 employees in over 1300 nationwide
facilities; the fact that a profoundly deaf
claims representative in the agency's Washington,
DC field office had an interpreter for 35 1/2
hours per week; and the intent of Congress that
the Federal government undertake measures to
reasonably accommodate that would involve more
than a de minimis cost; we find that the cost of
hiring either a full-time or part-time

interpreter for grievant would not be an undue
hardship.

Exh. 13 at 3.

34.  One of defendant's denials of Ms. Friends'
request for an ASL interpreter is dated June 4, 2004.  Exh.
11.

35.  Ms. Friends initiated her EEO complaint on June
9, 2003, within 45 days of that denial.  Exh. 1 ¶ 26.

36.  The agency's regulations require that denials of
accommodation requests be in writing and that they state
the specific reason for the denial.  Exh. 12 at 15.

37.  The only reason given in agency's written denial
of Ms. Friends' request was that provision of an ASL
interpreter was not appropriate because of the nature of
the position.  Exh. 11.

38.  When offering the job to Ms. Friends, the manager
referred specifically to the fact that, "Our office is
located in the Gallaudet University servicing area which,
as you can imagine, gives us the opportunity to provide
service to many deaf people."  Exh. 3.

39.  The formal job offer stated explicitly that "This
is a permanent Career-Conditional Appointment."  Exh. 4.

40.  From September 2002 until at least August 2004,
Ms. Friends repeatedly requested, orally and in writing, an

ASL interpreter for claimant interviews.  All the requests
were denied.  Exh. 1 ¶ 29.

Respectfully submitted,


/s/

Phillip R. Kete
General Counsel, AFGE Local 1923
G-314 West Highrise
6401 Security Blvd.
Baltimore, MD  21235

(410) 966-6500

EXHIBIT LIST

1.   Declaration of Alice Ann Friends.

2.   Declaration of Kimber Gallagher.

3.   Sept. 10, 2002, email job offer.

4.   Sept. 16, 2002, email job offer.

5.   October 22, 2003, performance assessment.

6.   September 24, 2002, appointment SF 50.

7.   GS 9 position description.

8.   GS 11 position description.

9.   Oct. 21, 2003 promotion SF 50.

10.  Affidavit of Doug France.

11.  June 4, 2004, email from Doug France.

12.  "Procedures for Providing Reasonable Accommodation for
     Persons with Disabilities"

13.  *Vitale v. Massanari*, EEOC 02980014 (June 13, 2001).

14.  Agency Reply to Complainant's Opposition

15.  Memorandum in Support of Agency's Motion for Summary
     Judgment

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALICE ANN FRIENDS,    )
          Plaintiff,    )
              )
              )
    v.      )
              )    06-CV01762-ESH
              )
JOANNE B. BARNHART,    )
          Defendant.    )
              )
              )

PLAINTIFF'S DECLARATION IN SUPPORT OF MOTION FOR

PARTIAL SUMMARY JUDGMENT


   1.   My name is Alice Ann Friends.  I am the plaintiff
in this case.

   2.   I have permanent bilateral deafness.  My average
right ear Db  is 95 Db and my left ear is 105 Db.  I cannot
hear anything without hearing aids.  With hearing aids I
can hear sounds but not distinguish words.  Hearing sounds
through the hearing aids makes it easier to more accurately
speech-read.

   3.   I have a bachelor's degree and a master's degree.

   4.   I can read and write English.  I can communicate
fluently in ASL.  However, ASL cannot be written or read.



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALICE ANN FRIENDS,        )
          Plaintiff,      )
                          )
      v.                  )
                          )    06-CV01762-ESH
JOANNE B. BARNHART,       )
          Defendant.      )
                          )

PLAINTIFF'S DECLARATION IN SUPPORT OF MOTION FOR

PARTIAL SUMMARY JUDGMENT

1.    My name is Alice Ann Friends.  I am the plaintiff
in this case.

2.    I have permanent bilateral deafness.  My average
right ear Db  is 95 Db and my left ear is 105 Db.  I cannot
hear anything without hearing aids.  With hearing aids I
can hear sounds but not distinguish words.  Hearing sounds
through the hearing aids makes it easier to more accurately
speech-read.

3.    I have a bachelor's degree and a master's degree.

4.    I can read and write English.  I can communicate
fluently in ASL.  However, ASL cannot be written or read.



5.    I speak English, although I have been told sometimes that my tone of voice is not always correct. That is because I cannot tell whether my voice rises and falls in tone as I speak.

6.    I was hired as a GS 9 "Social Insurance Specialist/Claims Representative (Bilingual)" in September 2002, in the SSA Washington Field Office.   Exhibit 6 is the notification of personnel action.

7.    Exhibit 3 is a copy of the September 10, 2002, email message I received from the office manager offering me the job of "Claims Representative."   It states, in part:

> Our office is located in the Gallaudet University servicing area which, as you can imagine, gives us the opportunity to provide service to many deaf people.

8.    Exhibit 4 is a copy of the formal job offer that was made to me by Mary Pastorius, of the Center for Human Resources, on September 16, 2002.   The offer states explicitly that "This is a permanent Career-Conditional Appointment."

9.    I assumed when I was hired that I would have to serve a one year probationary period.   Shortly after I started work I was provided an employee handbook that said new hires were normally subject to a one year probationary period.

- 2 -

10.   The agency knew I was deaf when it hired me.

11.   I was in classroom training until the end of February 2003.

12.   The classroom training was via Interactive Video Training, which was live classroom training on tv.  The captioning on the IVT was so poor that I repeatedly informed management that I needed an ASL interpreter in order to know what the teacher was saying.  As a result, I was provided an ASL interpreter for the last few months of my training.

13.   Beginning in March 2003 I was gradually given a full-time work load, including regular client interviews, as part of my training.

14.   Between March and September 2003, I reported to my supervisor that I needed an ASL interpreter in order to sure I knew what claimants were saying.

15.   These requests were denied, although not in writing.

16.   In September 2003, management rated my performance during the preceding year as satisfactory. Exhibit 5 is a copy of that performance assessment.

17.   I was promoted to GS 11 in September 2003. Exhibit 6 is a copy of the SF 50 notifying me of the promotion.

- 3 -

18.   Exhibits 7 and 8 to this declaration are copies of my GS 9 and GS 11 position descriptions, as provided to by the agency in response to my document request.

19.   The words 'lip-read' and 'speech-read' mean the same thing, although 'speech-read' more accurately describes the process.

20.   The claimants I met with often failed to do the things which are necessary for effective speech-reading as set out in exhibit 4, such as making eye contact, looking at me when speaking, keeping hands away from the mouth, and enunciating carefully.

21.   I could not know what claimants told me sufficiently well as to be able to always efficiently handle their claims without mistakes.  My constant fear that I was not getting all the information correctly interfered with my ability to remedy and apply what I had been taught about handling claims.

22.   I was usually able to successfully speech-read what my supervisors to me because they were careful to do the things identified in exhibit 4 to facilitate speech-reading.  It was far more difficult for me to understand claimants' speech than it was to understand the speech of my colleagues, mentors, and supervisors.

- 4 -

I certify that the above statements are true and are based
on my own knowledge.


_Alice Ann Friends_                    _December 20, 2006_

ALICE ANN FRIENDS                     December 20, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALICE ANN FRIENDS,<br>      Plaintiff,<br><br>      v.<br><br>JOANNE B. BARNHART,<br>      Defendant. | 06-CV01762-ESH |

DECLARATION OF KIMBER GALLAGHER

1.   My name is Kimber Gallagher, Au.D.  My address is 2332 Forty Niner Ct., Antioch, CA  94531.

2.   I am providing this declaration at the request of the plaintiff in this action, Ms. Alice Ann Friends.

3.   I was awarded the degree of Doctor of Audiology from Baylor College of Medicine in 1996.  In addition, I taught Aural Rehabilitation courses to Master's degree students at San Jose State University, and I have taught speechreading to adults.  This work includes instruction on the uses and limitations of speechreading.

4.   Attachment A to this declaration is a statement provided by the National Technical Institute for the Deaf:

> Lipreaders or speechreaders must watch not only the lips, but also the cheeks, teeth, tongue, neck and facial expressions of the speaker.  Still, only 40% of

speech is visible, and many sounds look familiar on
the lips. Most people would find it impossible to
tell the difference between words like "bat," "mat,"
"pat," "bad," "mad," "ban," "man," and "pan" from
lipreading. Or combinations of words may look
confusing to the lipreader: "I love fried eggs" and
"I love Fridays," or "I'd like 15 stamps" and "I'd
like 50 stamps." Very few deaf people can depend
entirely on lipreading; some use a system of hand-
signals (cued speech) to guide lipreading.

5.  Attachment B to this declaration is a statement by
the National Center on Deafness, saying what a person must
do in order to have his or her speech to be understood
through speech-reading:

Speak a little slower but keep your natural pace and
    rhythm—don't distort
Keep the message straightforward and clear
Have pen and paper ready if needed
Eye contact is essential
Try to avoid moving around as you speak
Don't cover your mouth or talk with your head down as
    you write
Hold things up for viewing or point to them when
    necessary
Give people time to look at what you are pointing at,
    then back at you
Background noise and group discussions can make lip-
    reading very difficult
Good lighting is important.
The light should be on the speaker's face
Avoid having he light behind you or putting your face
    in a shadow
Facial expressions, gestures, and so on make up a
    massive percentage of what we communicate
Lip-reading involves the whole face, and your
    expressions will convey a lot of information too
Some words are easier to lip-read than others
If there are difficulties, try saying it another way

- 2 -

6.   Attachment C to this declaration is an excerpt
from a manual prepared by the California State University
at Northridge:

> Even good lip-readers may miss many words.  Keep in
> mind that only 25-30% of spoken English can be lip
> read.  . . .  When a person is reading your lips,
> enunciate clearly, but do not yell or over enunciate
> your words, as you will distort your lip movements and
> also look very foolish.  Remove from your mouth
> objects such as cigarettes, pipes, gum, chewing
> tobacco, or food.  Keep your hands or any other
> objects from covering your mouth.  A beard or mustache
> may interfere with a lip reader's ability to read your
> lips.

7.   Attachment D to this declaration is an excerpt
from an article by Dr. Guthman and Ms. Sandberg, published
by the Minnesota Chemical Dependency Program for Deaf and
Hard of Hearing Individuals:

> When communicating with most Deaf individuals, the use
> of lip reading alone is not adequate because of the
> large number of words that look alike on the lips.  In
> tests, using simple sentences, Deaf people recognize
> perhaps three or four words in every sample.  The
> majority of information that is conveyed in a
> conversation is not understood . . . .  Deaf
> individuals are faced with this frustration daily.
> Lipreading alone is not a feasible communication
> option for the majority of Deaf individuals.

8.   It is my opinion, based on my education and
experience, that all four quoted statements are accurate.

9.   I have been informed by Ms. Friends' counsel that
the following is an accurate quotation from a decision by
the Equal Employment Opportunity Commission:

The [Social Security Administration] stated that
grievant was not accommodated and thus was not
placed in the Svce Rep position because she could
not perform an essential function of the
position, i.e., face-to-case interviewing.
Specifically, the agency stated that grievant
would need a full-time sign language interpreter
to successfully perform the above-stated
essential functions because (1) claimant
interviews are conducted on a walk-in basis, (2)
the office tries to conduct claimant interviews
as quickly as possible because of heavy demand
and expectations by the public, and (3) many
claimants are limited by either physical
impairments, education, economics or language,
which could further complicate the interview
process.

10.   I have been informed by Ms. Friends' counsel that
the following statement has been made by the Social
Security Administration by way of explaining why a deaf
employee cannot use a speech recognition program when
interviewing Social Security claimants:

[M]any of our claimants have intellectual,
technological, or physical/mental impairments
that would prevent them from even learning how to
use [a speech recognition] program.

11.   I have been informed by Ms. Friends' counsel that
Ms. Friends has sworn that the following statement is true:

My clients often failed to do the things which
are necessary for effective speech-reading, such
as making eye contact, looking at me when
speaking, keeping hands away from the mouth, and
enunciating carefully.

12.   If the above three statements are accurate, it is
my opinion that it would be virtually impossible for Ms.

- 4 -

Friends, or almost any other deaf person, to fully

comprehend what the claimants were saying to her by relying

on speech-reading.

13. I have also been informed that Ms. Friends cannot

see well out of one eye. If so, it would be even more

difficult for Ms. Friends to accurately speechread under

sub-optimum conditions, or for lengthy periods, than it

would be for most deaf people.


I declare under penalty of perjury that the above

statements are true.


KIMBER GALLAGHER


December 20, 2006

- 5 -

A Primer

# Communicating with Deaf People: A Primer

*This is designed as a basic guide for hearing people who want to communicate with deaf and hard-of-hearing individuals. It is condensed from the National Technical Institute for the Deaf's publication Celebrate Diversity.*

## Deaf Culture

Deaf culture is based on the heritage and traditions of the Deaf community. Features of Deaf culture include a shared language (American Sign Language) and customs; literature and art; intermarriage; and social, political, business and sport organizations. Not all people who are deaf participate in Deaf culture, just as not all people born Jewish participate in Jewish culture.

## An Invisible Population

The man you nod to as you pass him working in his garden or the jogger whose path you cross every morning--any one of them may be deaf. Deafness is invisible. Be careful not to stereotype people. Deaf people differ from each other as much as hearing people do.

## Communication

People communicate in many ways--through speech, writing, pictures and gestures. Hearing people supplement their spoken words with voice tone and inflection, facial expression and hand gestures. Most deaf people use sign language and fingerspelling. Some prefer to lipread and use their voices. Many use a combination of these methods.

Sign language is a visual language using a combination of hand movements and hand shapes to represent concepts, letters and words. American Sign Language (ASL) is a true language and has its own grammatical structure. It is cherished by the Deaf community for its beauty and ease of expressing and receiving both complex and abstract concepts. In fingerspelling, 26 hand shapes represent the letters of the alphabet and messages or individual words are spelled out. Slight pauses indicate the end of a word. Fingerspelling may be used in signed conversations to express a proper name or a particular term.

## Residual Hearing and Hearing Aids

Hearing losses vary. Most deaf people have some residual hearing. The sounds they hear may seem faint, distorted or incomplete. Some deaf individuals have no residual hearing.

Hearing aids do not restore perfect hearing; they make sounds louder, but not clearer. Depending on the degree of hearing loss, deaf individuals may be able to use hearing aids to help understand speech sounds, monitor the

PENGAD 800-631-6989

Attachment

A

A Primer

loudness of their own voices and/or recognize environmental sounds. Not every deaf person wears a hearing aid; some do not find them beneficial, some do not feel comfortable using them, and others choose not to use them for personal or cultural reasons.

## Lipreading

Lipreaders or speechreaders must watch not only the lips, but also the cheeks, teeth, tongue, neck and facial expression of the speaker. Still, only 40% of speech is visible, and many sounds look similar on the lips. Most people would find it impossible to tell the difference between words like "bat," "mat," "pat," "bad," "mad," "pad," "ban," "man," and "pan" from lipreading. Or combinations of words may look confusing to the lipreader: "I love fried eggs" and "I love Fridays," or "I'd like 15 stamps" and "I'd like 50 stamps." Very few deaf people can depend entirely on lipreading; some use a system of hand signals (cued speech) to guide lipreading.

## Learning a Language

Some deaf people are born deaf or lose their hearing before they learn a spoken language. Others become deaf later in life because of illness, injury or congenital conditions. Ninety percent of deaf babies are born to hearing families; the 10 percent born to deaf families grow up learning sign language very much as hearing babies learn spoken language--by observing (instead of listening) and imitating. Learning English can be a slow process for children deafened before they learned a spoken language and who were raised without a visual language.

## Using Voice

Some deaf people use their voices and some do not. Most have had years of speech therapy and training, and some have developed clear speech. Many have developed speech that is understandable upon repetition but which is marked with unclear pronunciation or intonation. Some deaf people mouth words without voicing them. Whatever the choice of the individual, use of voice is not an indicator of intelligence or academic standing.

## Customs and Courtesies of Conversation

Deaf people appreciate the efforts of hearing people to learn and use sign. The slow communication speed is a common experience of anyone learning a new language. A deaf person will understand a hearing person's message even with mistakes, just as a hearing person will usually understand the spoken message of a person just learning English who makes some mispronunciations and grammatical errors.

Good lighting, unobstructed vision and a non-distracting, non-glare background are essential environmental conditions for successful and comfortable visual-based communication. A table in the middle of the room

forces people to stand in a circle and provides them with a full view of each other. Loud noise interferes with successful and comfortable auditory-based interaction.

Facial expressions are a critical part of communication because they convey the emotions and tone of the conversation. Signing without facial expression is similar to monotone speech. Also, using voice and mouth movement helps a deaf person who has some lipreading skills and/or residual hearing. However, a loud voice and exaggerated mouth movement interferes with understanding the voiced message.

### Getting Attention

Some of the ways to get the attention of a deaf person are to tap the person on the shoulder, wave hands, flash lights or stomp feet on the floor. Deaf people may use these methods to get the attention of others. If one person can't get the attention of the intended person but does get the attention of someone near that person, the signaler may point to the person wanted and the nearby person may tap that person on the shoulder. Your shoulder may be tapped in the process of getting someone else's attention.

### Interrupting a Signed Conversation

Deaf people usually do not have private conversations where they can be "overseen," so a deaf person knows it is OK to watch for a pause in a signed conversation, interrupt with a gesture, deliver the message and leave. Hearing people, however, will not watch what they believe to be a private conversation, and will stand by, waiting to be acknowledged. If you do this with deaf people, they will not understand your intention and will continue their conversation. To interrupt a signed conversation, make your desire known by eye contact and gesture without waiting for a pause, then stand by without observing until the person you want to talk to turns to you.

### Tips for Group Discussions

When conversing with groups including deaf people, be sure to restate the topic as a courtesy every time someone joins your conversation or group. At meetings, it is often helpful to write an agenda on a board or an overhead transparency, and indicate the current item under discussion with arrows.

Focus attention on one speaker at a time so everyone is looking in the right direction before the message begins. Have the last speaker always acknowledge the next speaker by pointing. When using an interpreter, make sure the message has been translated and understood before moving on to the next speaker. Be sensitive to everyone's desire to participate, especially before changing the topic. Remember that a deaf person has no way of hearing the dropoff in voice intonation that many hearing people use to indicate they have finished speaking, and may thus jump in at any pause. The person is not being rude; too much caution before "jumping in" may mean

A Primer

the deaf person never gets to participate at all, or may make a comment too late for it to be on topic.

## Walking Through/Around a Conversation

A deaf person would consider it impolite for someone to interrupt a conversation in order to ask to pass by, yet a hearing person would consider it impolite for someone to just walk between two people having a conversation. If you encounter two deaf people having a conversation, see if there is a path around them; if not, walk quickly and unobtrusively between them, signing "excuse me" whether or not the people see it. Conversely, if you are in conversation with another hearing person and blocking the path of a deaf person, that person may touch your back so you will step forward and allow you to walk behind him.

## Noise

Deaf people are not always aware that they are making noise that is disturbing to hearing people. They appreciate knowing this and being told so in a friendly way.

## Saying Goodbye

Some people say that long and reluctant goodbyes are a part of Deaf culture. Before technology allowed deaf people to communicate with each other and hearing people more easily, all communication had to take place face-to-face, and such meetings were often difficult to arrange. The old tradition of saying goodbye only after much repetition and reluctance seems to have held. Even when communicating on a TTY, for example, the signoff signal (SK) is usually repeated, and a person never elects to end the conversation without making sure the other person or people are really ready to end it ("GA or SK"--"go ahead or sign off").

## TTYs and Relay Services

A TTY (also sometimes called a TDD) is a machine that allows deaf or hearing people to communicate over phone lines with others who have similar equipment by typing their messages back and forth. To learn more about TTY etiquette, read guides especially written for using this device.

A telephone relay service enables deaf and hearing people to communicate via a dual-party phone system. This way, the hearing person need not have a TTY to communicate on the phone with a deaf person. Either individual dials a relay service number, and an operator places the call to the other person. The operator announces the caller to the person being called (by voice or by typing on a TTY), types voiced messages from the hearing caller to the deaf caller, and voices the deaf caller's TTY messages to the hearing caller. All relay calls are confidential.

A Primer

To learn more about hearing/deaf communication as it relates to assisting deaf people with alcohol or drug addictions, contact SAISD below.

~~~~~~~~~~~~~~

**SAISD**

Substance and Alcohol Intervention Services for the Deaf
Rochester Institute of Technology
August Center
115 Lomb Memorial Drive
Rochester, NY 14623-5608

(716) 475-4978 Voice and TTY
with Adaptable 24-Hour Answering Machine
(716) 475-7375 Fax
wmdgrl@rit.edu
8:30 A.M. to 4:30 P.M.

Services | Staff | Interpreted Meetings | Nat'l Directory | External Links | Back to Tips



Deaf and Hard of Hearing

# III. Deaf and Hard of Hearing

## A. Basic Information

Rarely is a person completely deaf, and a hearing loss could fall anywhere along the continuum from totally deaf to hearing. The amount of usable (or residual) hearing varies greatly from person to person. Depending upon the type of loss, the person may or may not benefit from the amplification that a hearing aid provides. Hearing aids only amplify sound, they do not make sound clearer. The severity of a person's hearing loss could be different at various frequencies. Therefore, ability to hear different voices will vary depending on a number of factors, including the pitch of the voice. Also, it is important to note that a person's ability to hear a voice is different than the ability to discriminate between sounds and to understand speech.

The life activity most affected by hearing loss is communication. Colleagues and friends must be versatile in finding an effective communication method. Pen and paper are handy communication devices in some situations. Although you want to avoid gross or exaggerated arm waving, pantomime is helpful. Be aware that if you point to an object or area during a conversation with a person who is deaf or hard of hearing, that person will most likely turn to look at where you are pointing. Allow their gaze to return to you before continuing with what you are saying. Though not effective for all people who are hearing impaired, knowing some sign language and fingerspelling is helpful. Learn some elementary or survival signs from colleagues, coworkers, or managers who are deaf or hard of hearing.

People who are deaf or hard of hearing, like people who are hearing, have different education levels. Knowledge of English grammar, syntax, and spelling varies from individual to individual. A person who uses American Sign Language (ASL) as their primary language of communication may or may not be proficient in using standard English. For the most part, English is an oral/aural language designed to be spoken and heard. Therefore, it is quite challenging to learn and understand English when you can not hear, especially when it varies so greatly from the structure and syntax of ASL. The person who is not proficient in English is not stupid or illiterate; he or she just uses a different language to communicate.

## B. Interactions: Communication Considerations

### 1. Attention Getters

Getting the attention of someone who is deaf or hard of hearing can vary depending on the person and the situation. If the person has enough residual hearing to pick up a verbal cue, calling their name is quite appropriate. When this does not work and the person is within reach, a light tape on the shoulder or lightly placing your hand on their shoulder works well. A heavy touch and rapid taping is used to indicate urgency, such as during an emergency. For people out of arms reach, you can ask some one closer to the person to tape them on the shoulder, or you can wave your hand and arm in the air. Sometimes hitting your foot on the floor repetitively or light pounding on a table are used. The latter works especially well when the person who is hearing impaired is leaning on the table. For getting the attention of large groups, simply flash the lights in the room on and off several times at a slow and steady pace. This works well in mixed groups of deaf and hearing people. Again, rapidly flashing the lights indicates an emergency.

Attachment B

## 2. Lip Reading

Not all hearing impaired people are good lip readers and lip reading skill has no correlation to a person's intelligence. Even good lip readers may miss many words. Keep in mind that only 25-30% of spoken English can be lip read. Not all deaf people know how to speak sign language, or choose to use sign language interpreters. Some prefer to communicate through lip reading and some prefer sign language. When a person is reading your lips, enunciate clearly, but do not yell or over enunciate your words, as you will distort your lip movements and also look very foolish. Remove from your mouth objects such as cigarettes, pipes, gum, chewing tobacco, or food. Keep your hands or any other objects from covering your mouth. A beard or mustache may interfere with a lip reader's ability to read your lips. Try to sit with a light source in front of you, not behind you (such as a window).

## 3. Speech

Many deaf and hard of hearing people have voices that are easily understood. Others cannot monitor the volume and tone of their speech and may be initially hard to understand. If a person is speaking for themselves and you do not understand their speech, it is appropriate for you to ask them to repeat, or even to write down what is being said. Ask in a respectful, not condescending manner. Deaf people, like hearing people, vary to some degree in their communication skills.

## 4. Sign Language

For many people who speak sign language, American Sign Language (ASL) is the first language that they acquire and use. ASL is a recognized language with a unique syntax, grammar, and structure. It is not at form of English. Other people who use sign language that is not ASL use one of the manual codes for English that combines some of the vocabulary of ASL signs with some of the grammar and syntax of English.

## 5. Sign Language Interpreters

The need for an interpreter depends on the situation and the people involved. Interpreters can be described as a communication link. A telephone, for example, is a communication link; it does not add information or alter the content of the message.

Do not refer to a deaf person as deaf and dumb. Many deaf people have the ability to speak orally. Deafness does not, in itself, affect intelligence. Some people prefer to voice for themselves, even with a sign language interpreter present interpreter. In addition, in conversation it is not necessary to avoid using the words or phrases like hear or sounds good with a deaf person.

## 6. The Function of the Interpreter is to:

- Allow more direct communication.
- Improve communication accuracy and avoid misunderstandings.
- Decrease frustrations.
- Raise the "comfort level" of those interacting.
- Facilitate more complete communication, so that both individuals feel free to ask questions and offer more in-depth explanations.
- Save time
- Make clear any non-verbal communication

# C. How to Work with a Sign Language Interpreter

The interpreter makes communication possible between persons separated by different language modes. Listed below are some tips on how to work with an interpreter.

- First remember the interpreter's role is to facilitate communication. It is inappropriate for you to address him/her directly.
- Maintain eye contact with the deaf person, not with the interpreter.
- Allow the interpreter to position themselves near you, this will allow the deaf person to watch the interpreter and your expressions as needed.
- Address the deaf person directly, avoid phrases such as, "ask her this...", or "tell him to . . ." Talk through, not to, the interpreter.
- The interpreter is bound by a Code of Ethics which requires him/her to interpret everything communicated, whether it be signed or spoken. This includes any phone calls or comments you make in the deaf person's presence. It is inappropriate for you to request the interpreter to keep anything from the deaf person
- In situations of a serious nature, the use of a deaf person's close friend or family member as an interpreter is inappropriate.

# D. To Request a Sign Language Interpreter

To find an agency in your area that provides sign language interpreters, contact your local state unemployment office, your local office of the state department of rehabilitation, community based organizations that serve people with disabilities or the national Registry of Interpreters for the Deaf, Inc. at 301-608-0050 Voice/TDD.

To request an interpreter, most agencies require at least three to five days notice in advance. Have the following information ready:
1. Date and time of interview or meeting
2. Name of interviewer (or contact person) and company
3. Address of company, including room number, zip code and nearest cross streets
4. Telephone number, including extension and area code
5. State what the event is (meeting, job interview, etc.) and request any special circumstances, ASL interpreter, signed English, oral, etc.

# E. Phone Calls

Relay services establish communication between hearing people who use voice phones and hearing or speech impaired people who use Telecommunication Devices for Deaf (TDD). The Americans with Disabilities Act mandates that every state establish such a service for both in state and out of state calls.

If you wish to contact a deaf person using your local relay service, call the voice number and give the operator the deaf person's TDD number. If you are deaf and trying to contact a voice number with your TDD, call the TDD number and give the operator the voice number.

The relay operator will be using both the telephone and the TDD while relaying communications between the deaf person and the hearing person. The hearing person needs to speak at a slower than normal pace in order for the operator to be able to keep up while typing. The hearing person also will need to say "GA" or (Go Ahead) to inform the operator to let the deaf person know it is their turn to

speak. There may be periods of silence while the operator waits for the TDD user to finish a complete thought before the operator speaks it into the phone. It is important to be patient and to recognize that typing takes longer than talking. If you are unaccustomed to using a telephone relay service, the relay operator will be most happy to assist you in using this service.

**Back to Contents**

CSUN – Situational Tips for Communications/Situational Tips for Communication



## HANDBOOK

- Home
- **About ICC**
- **Student Services**
- **For Employers**
  - **Career Information Exchange**
- **Handbook**
- **Links**
- **Deaf Mentor Videos**
- **Career Consultants Program**
- **Student Resource Links**
- **NCOD Home**
- **Special Projects**
- **Website Compliancy**

### Situational Tips for Communication

*Choosing appropriate communication accommodations for employees who are deaf and hard of hearing is an important step towards full inclusion in the workplace. It is important to recognize that individuals who are deaf or hard of hearing have diverse levels of hearing loss, and their communication preferences and capabilities vary. Communication accommodations must be evaluated in light of an individual's job responsibilities and, very importantly, the communication environment.*

For employees who are deaf or hard of hearing and their supervisors, selecting communication accommodations can be challenging but rewarding.

Including the deaf or hard-of-hearing employee in the decision-making process about what communication accommodations to use helps to ensure an appropriate fit. The staff member knows best what will work for him or her in specific situations. We have listed several common work- related situations where communication may be an issue and potential solutions to explore.

For explanations of specific accommodations see the "Job Accommodations" section.

### The Interview

The interview is generally the first face-to-face encounter with the person who is deaf or hard-of-hearing. This may be the first time the employer thinks about communication issues, and possibly their first time seeing sign language and an interpreter. Many questions may come up. Some are appropriate to ask and some are not.

### Before the Interview

It is incumbent on the applicant to request an accommodation for an interview or for use on the job. However, if the candidate has identified a hearing loss, you may inquire about

Attachment C

REDACTED 800-631-6989

Communication Tips for Communication

which method of communication he or she would prefer – lipreading, sign language interpreter or another mode. Select a location for the interview that is well lit, without a window or backlight behind the interviewer that would cause his or her face to be shadowed. If an interpreter will be present, make sure there is ample room to position the interpreter next to the interviewer so the individual can easily see both. On the day of the interview, inform your receptionist beforehand that you are expecting an applicant who is deaf or hard-of-hearing. If an interpreter is present, provide him or her with any written materials that will be used during the interview. 13

## During the Interview



For tips on using an interpreter during the interview, please refer to the section on "Working with Interpreters." If you meet with a candidate who does not need or prefers not to use an interpreter refer to "One-on-One Meetings (Without an Interpreter)" in the next section.

There are *appropriate and inappropriate* questions during the interview process regarding the person's hearing loss.

*You may not ask* about the cause, nature, or severity of the hearing loss. Also, these questions may not be asked on the application form.

*You may ask about:*

- Skills and qualifications as they relate to the position you are offering
- Responsibilities and other tasks performed at a previous job
- Any question that will help you determine if the candidate is qualified - based on educational background, work experience, skills and ability to perform the job
- Preferred mode of communication and accommodations that could be made during various settings (i.e. one-on-one communications, group discussions, etc.)

Back to Table of Contents

## One-on-One Meetings (Without an Interpreter)

*Note: For one-on-one meetings with an interpreter, see the section on "Working with Interpreters." It is best to consult with the person who uses the accommodations to find out what their preference is in this type of situation.*

ACCOMMODATION – Disability Tips for Communication/Situational Tips for Communication

✓ *Possible accommodations may include:*

- Communicating using paper and pen
- Type back and forth on a computer monitor
- Assistive Listening Devices (ALDS)
- Personal amplification systems
- FM systems
- Sign language interpreter
- Lipreading

## Tips For Communicating with Someone Who Lipreads

- Cut out or reduce background noise by turning off the TV or radio, and shutting windows and doors if needed
- Make eye contact before speaking
- Be sure to look directly at him or her when speaking
- If a candidate does not seem to understand you, repeat your statemen and then rephrase it. Do not repeat it louder or slower as this often does not help
- Speak slowly and clearly – don't overemphasize or exaggerate mouth movements
- Keep hands or any other objects away from your mouth when speaking
- Try to position yourself so that your face is well lit. Avoid backlighting by bright lights or windows. This will darken your face and make it harder to read your lips
- Write important information to be sure it is understood
- Have the person repeat vital facts to be sure they are correct
- If you feel that spoken conversation is not accomplishing its purpose, ask the person if they would prefer another form of communication

### Back to Table of Contents

### Meetings with 3 or More People

The duration and nature of the meeting, plus the individual (s), will determine the accommodations. Speak with the person who requires accommodations to find out what they prefer.

*Beforehand,* provide the participant who is deaf or hard of

http://icc.csun.edu/tablesTC.html

hearing with any printed materials that will be discussed during the meeting.

When passing out papers during a meeting be sure to give the participant who is deaf or hard of hearing ample time to look at the materials before continuing to speak. Anything that is said while the deaf or hard of hearing person is looking away from the interpreter/speaker will be missed.



*Possible accommodations may include:*

- Notetakers
- Interpreters
- Realtime captioning services
- Assistive listening devices (ALDS)
- FM systems
- Infrared systems
- Open or closed captioning of video materials

## Conferences/Lectures/Workshops

The duration, nature and size of the conference will determine the accommodations. Speak with the employee who requires accommodations to find out what they prefer.



*Possible accommodations may include:*

- Interpreters (the duration of sessions will dictate how many are necessary)
- Captioning services
- Assistive Listening Devices (ALDS)
- FM systems
- Infrared systems
- Induction Loops Systems

Traditional - Situational Tips for Communication/Situational Tips for Communication

## Casual/Social Interactions

Social and informal interactions are an important part of an employment environment. Work culture and camaraderie are cultivated through casual interactions. It is vital that all employees, including those who are deaf and hard-of-hearing, have the opportunity to interact with their supervisors and co-workers in social and informal situations.

*Useful accommodations may include:*

- **Gestures**– Do not be afraid to use gestures when communicating with a person who is deaf or hard-of-hearing
- **Lipreading**– See "Tips for Communicating with Someone who lipreads"
- **Pen and paper**
- **Typing back and forth on a computer terminal**

## Phone Calls

It is important to evaluate the essential job functions of the person who is deaf or hard of hearing. Is taking calls and/or making calls absolutely necessary for them to perform their job successfully?



*If not, there are several options:*

- Job restructuring
- Email / text pagers
- Fax
- Instant messages

If handling phone calls is necessary for your staff member to successfully perform their job, there are many accommodations that can help accomplish this:

- Telephone amplifiers
- Flashing lights
- Text Telephones (TTY/TDD)
- Interpreters (on an intermittent basis or permanent)
- Telecommunications Relay Service

## How to Use the Telecommunications Relay Service

Telecommunications Relay Service is a toll-free service that enables people who use text telephones to make calls to people without them and vice-versa.

Handbook - Situational Tips for Communication:Situational Tips for Communication

The most common way of conducting a Telecommunications Relay Service (TRS) call between you, and a text telephone (TTY) user is for a TRS Communication Assistant (CA) to verbalize to you what the TTY user is typing and type what you say to the TTY user. The TRS works the same way for both voice-to-TTY calls and TTY-to-voice calls. Local calls are free, and long distance calls incur your standard long distance charges.

1. Dial the TRS access number for your state and give the CA the telephone number you want to call.
2. Once the call is connected and is being relayed, talk as though you are speaking directly to the person you are calling, but speak a little more slowly since the CA is typing what you say.
3. Say "Go Ahead" or "GA" when you finish your part of the conversation and are ready for a reply.
4. There may be periods of silence while the operator waits for the TTY user to finish a complete thought before the operator speaks it into the phone. It is *important* to be patient and to recognize that typing takes longer than talking.
5. All calls made through the TRS are strictly confidential and no records are maintained.

If you are unaccustomed to using a telephone relay service, the relay operator will be more than happy to assist you.

Back to Table of Contents

**Attention-Getting Techniques**




- Flash overhead lights - very effective with a large group of participants who are deaf and hard of hearing, or when entering an office.
- Tap on the shoulder or arm of the person you would like to speak with - a rapid tapping generally means a sense of urgency.
- Tap or pound on a desk or table – this is only effective if the person you want to speak to is touching the desk or table.
- Stomping on the floor often works and is an informal, yet often acceptable, way to get a person's attention.
- Waving your hand in the line of vision of the person who is deaf will often attract their eyes in your direction.
- Calling their name at an elevated volume is appropriate if the

Communication Tips for Communication Tips for Communication

person has enough residual hearing to pick up a verbal cue.

Back to Table of Contents

© August, 2002 Increasing Career Choices. All rights reserved. Send Comments or Questions to Webmaster

2/22/2006

## Access to Treatment Services for Deaf and Hard of Hearing Individuals

Debra S. Guthmann, Ed.D is the Secretary for the National Association on Alcohol, Drugs and Disability. Dr. Guthmann is director of the Division of Pupil Personnel Services at the California School for the Deaf in Fremont, CA, and the former director and current project director for a long-term training grant at the Minnesota Chemical Dependency Program for Deaf and Hard of Hearing Individuals located in Minneapolis, Minnesota. Dr. Guthmann has developed materials and provided outreach and training activities nationally and internationally regarding various aspects of substance abuse with Deaf and hard of hearing individuals. Dr. Guthmann served as a consulting writer for the Substance Use Disorder Treatment For people with Physical and Cognitive Disabilities Treatment Improvement Protocol (TIP) recently completed by the Center for Substance Abuse Treatment. Dr. Guthmann is also the Vice President of the American Deafness and Rehabilitation Association.

Katherine A. Sandberg, B.S., LADC is a member of the National Association on Alcohol, Drugs and Disability. Ms. Sandberg is program manager of the Minnesota Chemical Dependency Program for Deaf and Hard of Hearing Individuals. Ms. Sandberg was also involved in the development of a specialized version of the Drug Abuse Resistance Education (D.A.R.E.) Curriculum and has provided material development, outreach and training activities in the area of substance abuse with Deaf and hard of hearing individuals nationally. Ms. Sandberg served on the Consensus panel for the Substance Use Disorder Treatment For people with Physical and Cognitive Disabilities Treatment Improvement Protocol(TIP) recently completed by the Center for Substance Abuse Treatment.

### Introduction

As an alcohol and drug counselor, how many times have you provided services to persons who are Deaf or hard of hearing? For most counselors, the answer would be "None". A small percentage of counselors may have seen one or two Deaf clients. Many of those counselors report feeling awkward and inadequate when providing services to a Deaf person. Whether you work in a large public treatment center, a small private agency or in private practice, most of us are ill-prepared to work with Deaf clients. Information about Deaf people, their culture and their language are rarely a part of counselor training programs. Although the Americans with Disabilities Act (A.D.A.) is a federal civil rights act, which guarantees access to treatment by Deaf people, few agencies actually comply with this legal mandate. Even programs that want to serve Deaf individuals and are attempting to make programming accessible may not know how to accomplish this feat.

### Views of Deafness

Deafness is commonly considered from two different perspectives. One perspective identifies Deafness as a disability, this is commonly referred to as the medical model. The second perspective recognizes Deaf people as a cultural group with common language, experiences and values. Both perspectives offer a unique look at the Deaf population. Each viewpoint is important when considering the provision of substance abuse services for people who are Deaf.

Deafness is considered a disability with protections under the ADA of 1990. Within the bounds of what is considered reasonable accommodations, this act guarantees people with disabilities(which includes Deaf individuals), a number of rights that are often assumed to be universal. It provides some of the same basic rights to persons with disabilities as non-disabled individuals receive, such as access to

Access to Treatment Services for Deaf and Hard of Hearing Individuals

buildings, employment, housing, etc. The ADA is a federal rights act which provides the same basic civil rights to persons with disabilities as all other non-disabled individuals. Title II of the ADA requires that public programs be made accessible to persons with disabilities. Title III of the ADA requires that public accommodations be accessible to people with disabilities. The interpretation of these two sections of the ADA means that alcohol and drug treatment programs are required to provide reasonable accommodations in order to make their services accessible to persons who are Deaf. This could include a variety of accommodations such as special telephone access, signal lights that are used to visually display fire alarms, door bells and close captioning services. Under the ADA, persons who are Deaf have the right to communication access including interpreters and modification of written materials while in treatment in the same way that a person in a wheelchair has the right to an accessible entrance.

From the cultural perspective, Deaf people who enter treatment can benefit from the same cross cultural counseling principles that are being used with African American, Latino and Native American clients. The majority of Deaf people use American Sign Language (A.S.L.) as their primary means of communication. The Deaf community has a rich history of social, cultural and linguistic features similar to other minority populations. Social norms and values shape life in the Deaf Community and therefore impact how treatment services should be delivered.

People who are Deaf or hard of hearing are referred to as having a hidden disability. The disability does not become evident until the person begins to communicate. It is assumed by the hearing community, that if a person wears a hearing aid, then all listening and hearing problems are solved. Unfortunately, this is not true. Many Deaf and hard of hearing individuals are excluded from normal conversations because others do not realize that they cannot hear even with a hearing aid. Often hearing aids amplify and at the same time can distort sound.

Some Facts About Deaf People

A collection of facts can help the person who is unfamiliar with Deaf people begin to understand the experience of being Deaf. The following are some key factors in the life of most Deaf people in the United States today.

- At least 90% of Deaf children are born to hearing parents;
- Deaf people have a wide range of hearing loss that may have very different effects on a person's ability to process sound and, thus, to understand speech.
- Hearing aids may be beneficial for some people but do not cure the hearing loss;
- Deaf people have varying abilities to produce intelligible speech. This is related to the degree and frequency range of the hearing loss as well as the age of onset.
- Lipreading/ speechreading ability varies from person to person (hearing and Deaf alike) and is generally ineffective for communicating since many spoken words look alike on the lips.
- Many Deaf people, although intelligent, do not have a good command of written English.
- Deaf people go to school, have jobs, drive cars, fall in love, get married, pay taxes and eat at McDonalds....just like hearing people.

Cultural aspects of the Deaf community

A Deaf person can do anything that a hearing person can do except hear! However, there are some aspects of a Deaf person's life that may be different. Deaf people have access to TV programs only if they are captioned. Otherwise, they get what you do when you turn off the sound......not much! Deaf people have telephones but use them in a different way. The phones are called TTY's or TDD's (telecommunication devices for the Deaf) and are devices which allow a person to type their message

Access to Treatment Services for Deaf and Hard of Hearing Individuals

instead of speaking. The emergence of relay services in most states, allows a Deaf person with a TTY to contact hearing people through their regular phone by using an operator to "relay" the messages back and forth. When Deaf people go to public events, like a lecture, conference or a Twelve Step meeting, they need to request a sign language interpreter. Even a visit to the doctor requires advance planning to arrange for a sign language interpreter to ensure clear and accurate communication. Many of the daily events and encounters we take for granted as hearing people, pose communication barriers for Deaf people.

The Deaf Community is a place rich with history and culture. "The Deaf community is comprised of Deaf and hard of hearing individuals who share a common language, common experiences and common values"(Padden and Humphries, 1988). Deaf people are part of a linguistic minority whose primary language is ASL, a visual language of hand shapes, hand and body motions and facial expression.

Among Deaf people, voices are rarely used, even by people who have intelligible speech. Deaf people have methods to get one another's attention by waving, tapping on the floor or table (which produces vibrations that can be felt) or even throwing things. These behaviors substitute for our "shout across the room". Establishing, fostering and maintaining social ties with other Deaf people is of utmost value. It is common to have friendships with Deaf people in other towns, states and throughout the country. Deaf social events tend to attract Deaf people from hundreds or even thousands of miles away. Residential schools for the Deaf found in most states, have historically been the core of Deaf education and the center of the Deaf community. These and many other factors must be considered when providing substance abuse services to Deaf clients.

The Deaf community is a small close-knit group of people who have a strong grapevine through which information about each other is shared on a national basis. This grapevine can cause unique problems when a Deaf person enters a treatment program because of the issues that may arise. The idea of confidentiality is viewed differently among Deaf and hard of hearing individuals than it is among hearing people. Deaf people may have concerns about confidentiality or may know other patients or staff at the program. Hearing people do not typically encounter this type of situation since there are so many more treatment options.

Communicating with Deaf People

Many times Deaf people are put in situations where they are forced to communicate by writing back and forth. Some Deaf people may inappropriately undergo a chemical dependency assessment through this method. For most Deaf people, when communicating with a hearing person who is not fluent in ASL, the use of a sign language interpreter is the only method of accurate and reliable communication.

When communicating with most Deaf individuals, the use of lip reading alone is not adequate because of the large number of words that look alike on the lips. In tests, using simple sentences, Deaf people recognize perhaps three or four words in every sample. The majority of information that is conveyed in a conversation, is not understood, since only 20% of all speech is visible on the lips (Jeffers and Barley, 1971). Deaf individuals are faced with this frustration daily. Lipreading alone is not a feasible communication option for the majority of Deaf individuals!

It is important to remember that not all Deaf persons use the same mode of communication. You should always ask the Deaf person how he/she prefers to communicate. Sign language or oral interpreters are trained professionals who provide the necessary communication link between hearing people and Deaf or hard of hearing individuals. Interpreters facilitate communication for both parties involved with the conversation.

Access to Treatment Services for Deaf and Hard of Hearing Individuals

Interpreters are not simply individuals who know sign language. They are professionals who generally receive training from an interpreter training program and are certified by the National Registry of Interpreters for the Deaf or other accrediting agencies. A "signer" is generally someone who has taken sign language classes. A "signer" may only have skills to communicate at a basic level and should not be thought of as an "interpreter". A family member who has attended sign language classes, but is not a certified interpreter is considered a "signer" and should not be used to interpret for a Deaf family member. Sign language interpreters change the signed message into spoken English for the hearing consumer. They also use sign language to relay the spoken message for the consumer who is Deaf or hard of hearing. Oral interpreters work with consumers who are Deaf or hard of hearing and rely solely on speechreading for communication. Oral interpreter enunciates, repeats and/or rephrases a speaker's remarks using natural lip movements and gestures. They carefully choose words that are more visible on the lips. Tactile interpreters use touch to communicate with Deaf or hard of hearing individuals who have a significant visual impairment.

When working with an interpreter, always ensure that the environment is conducive to visual communication, by making sure that the lighting is optimal and visual distractions are minimized. A neutral or dark background behind the interpreter is often a preferable setting. If you are meeting with a Deaf person in a room where there is poor lighting, it will be more difficult for you to ensure accessible and accurate communication. It is important to have the Deaf person's attention before speaking. To get a Deaf or hard or hearing person's attention, it is appropriate to tap on the shoulder or wave gently. Make sure to look directly at the Deaf person while speaking even though the natural tendency may be to look at the interpreter. Eye contact is important when communicating with Deaf people. Be aware that if you look away , it may be distracting for the Deaf person.

During conversation, treat the Deaf person with the same courtesy that you would to a hearing person. Do not place anything in your mouth while speaking to a Deaf person, and avoid covering your mouth with your hand or with papers. Enunciate each word clearly, but do not exaggerate or over-

**From:** |DC FO Washington Postal Plaza <DC.FO.Washington.Postal.Plaza@ssa.gov>
**Date:** Tue Sep 10, 2002  10:31:09  AM US/Eastern
**To:** "'friendspaws@frontiernet.net'" <friendspaws@frontiernet.net>
**Subject:** Possible Claims Representative position

Dear Alice,

I received a copy of your resume from Steve Bock, manager at the Martinsburg
WV Social Security Office.

I currently have a position open for a Claims Representative which I would
like to discuss with you.

Our office is located in the Gallaudet University servicing area which, as
you can imagine, gives us the opportunity to provide service to many deaf
people.

I am currently checking with our Regional Office to determine if you can be
considered as a candidate for the position without applying through USA
Jobs.

Please call or write to me as soon as possible.

Thanks,

Judy Nease, Manager
Social Security Office
1905B 9th Street NE
Washington DC 20018

(202) 233-2011

3

**From:** "Pastorius, Mary" <Mary.Pastorius@ssa.gov>
**Date:** Mon Sep 16, 2002  2:12:41 PM US/Eastern
**To:** "'friendspaws@frontiernet.net'" <friendspaws@frontiernet.net>
**Subject:** selection

Good Afternoon, Alice, my name is Mary Pastorius from Social Security
Administration, Center for Human Resources, Philadelphia, PA.  I spoke with
Nancy Nease this afternoon and she would like to hire you for a Social
Insurance Specialist (Claims Representative) in the Washington (Postal
Plaza), DC office located at 1905B  9th St NE, Washington, DC.  This is a
permanent Career-Conditional Appointment.  The effective date would be
September 22, 2002 with a reporting date of Monday, September 23, 2002.  The
starting time is 8:00 AM.  If you accept, I will FED EX you a letter along
with a package of forms that you may begin to complete before you report to
the office and finish in the office.  The most important form for you to
have ready when you report is the Direct Deposit.

I am leaving the office today at 3:00PM but I will be in on Tuesday,
September 17, 2002 from 6:00 AM till 4:00 PM.

My phone number is 215-597-9269.

Congratulations!

Mary Pastorius

4

# Performance Assessment for Nonsuperv⌐ory Employees

## Part A: Identifying Information

Employee: _FRIENDS_ ___ _ALICE ANN_ ___        SSN: _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_

Last ___ First ___ MI

_SOC. INS CLAIMS REP_ ___        _3C361A_ ___        _GS-9-1_

Position Title ___ Position # ___ Series/Grade

## Part B: Description of Standard

Select Either:

(✓) 1. Generic Performance Standard:

The successful employee will normally perform the critical element of the position description. Successful performance means managing assigned workloads in a realistic manner which results in completion of work within reasonable timeframes; contributing in a positive way to the accomplishment of organizational objectives; and duly considering priorities in planning and performing assigned duties. The skills and knowledge of the employee will usually be effectively applied to provide service to the beneficiaries and to maintain the accuracy of the Agency's records.

( ) 2. Job Specific Performance Standard:

## Part C: Orientation Briefing(s)

Date Performance Plan Issued and Orientation Briefing Conducted

_9/22/02_

Supervisor's Signature

_Judith a Nease_

Employee's Initials

_aaf_

Subsequent Orientation Briefing(s):

## Part D: Informal Performance Discussions

| Date | Ee's Intls. | Spvr's Intls. |
|------|-------------|---------------|
| _9/2/03_ | _aaf_ | _JaN_ |
| | | |
| | | |

## Part E: Certification of Performance

1. Period Covered by Assessment (if less than full assessment year): From _____ to _____

(✓) 2. This certifies that the employee's performance is at the Successful Level (Level 3)

( ) 3. This certifies that the employee's performance is at the Unacceptable Level (Level 1)

( ) 4. This is the employee's Rating of Record for assessment year _____ (complete if applicable)

_Robin O'Wells_ ___        _10/22/03_ ___        _alice ann friends_ ___        _10/22/03_

Assessing Official's Signature ___ Date ___ Employee's Signature ___ Date

FORM **SSA-331** (7-95)

PBN040 00C-031-6989

5

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| FRIENDS, ALICE ANN | 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 | 11/04/70 | 09/22/02 |

**FIRST ACTION**

**SECOND ACTION**

| 5-A. Code | 5-B. Nature Of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 170 | EXC APPT | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| WUM | SCH A, 213.3102(U) | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

**7. FROM: Position Title and Number**

**15. TO: Position Title and Number**

SOCIAL INSURANCE SPEC (BLNGL)
CLMS REP (BLNGL)
S2D3MZ012    03C363A

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GS | 0105 | 09 | 01 | $ 38406 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | $ 34451 | $ 3955 | $ 38406 | $ 0 |

**14. Name and Location of Position's Organization**

**22. Name and Location of Position's Organization**

ORC
OFC REGNL COMM PHILADELPHIA
AREA DIR #3
FO, WASHINGTON, DC
FO, WASHING (POSTAL PLAZA), DC

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 — 1 - None / 2 - 5-Point / 3 - 10-Point/Disability / 4 - 10-Point Compensable / 5 - 10-Point Other / 6 - 10-Point/Compensable/30% | 2 — 0 - None / 1 - Permanent / 2 - Conditional / 3 - Indefinite | F   SEX | YES ☐   NO ☒ |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0   BASIC ONLY | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K   FERS & FICA | 09/22/02 | F   FULL-TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2 — 1 - Competitive Service / 2 - Excepted Service / 3 - SES General / 4 - SES Career Reserved | N — E - Exempt / N - Nonexempt | 4007563 | 1535 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 40. Agency Data CLS 00 | 41. VET-STAT X | 42. EDUC LVL 17 | 43. SUPV LVL 8 | 44. POSITION SENSITIVITY NONSENSITIVE/LOW RI |
|---|---|---|---|---|

**45. Remarks**

APPOINTMENT AFFIDAVIT EXECUTED 00-00-00.
CREDITABLE MILITARY SERVICE: 00-00-00
PREVIOUS RETIREMENT COVERAGE: 00-00-00
UPON COMPLETION OF 2 YEARS CONTINUOUS SATISFACTORY SERVICE AT
ACCEPTABLE LEVEL OF PERFORMANCE EMPLOYEE MAY BE NONCOMPETITIVELY
CONVERTED TO CAREER OR CAREER CONDITIONAL APPOINTMENT
SCHEDULE A APPOINTMENT ELIG FOR LIFE AND HEALTH BENEFITS
EMPLOYEE IS AUTOMATICALLY COVERED UNDER FERS.

6

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| SZ - SOCIAL SECURITY ADMIN | NANCY BEADLE |
| 47. Agency Code SZ00 | 48. Personnel Office ID 1166 | 49. Approval Date 09/24/02 | DIRECTOR, CENTER FOR HUMAN RESOURCES 021118529 |

/*+-**POSITION DESCRIPTION**          (Please Read Instructions on the Back)

| | | | | | 1. Agency Position No. |
|---|---|---|---|---|---|---|
| | | | | | | 3C363A |

| 2. Reason for Submission | | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|---|
| [ ] Redescription [X] New | | [ ] Hdqtrs. [X] Field | Regional Offices | Field Offices | |
| [ ] Reestablishment [ ] Other | | | 7. Fair Labor Standards Act | 8. Financial Statements Required | |

Explanation *(Show any positions replaced)*

7. Fair Labor Standards Act: [ ] Exempt  [X] Nonexempt

8. Financial Statements Required: [ ] Executive Personnel Financial Disclosure   [ ] Employment and Financial Interests

| 10. Position Status | 11. Position is: | 12. Sensitivity | 13. Competitive Level |
|---|---|---|---|
| [X] Competitive | [ ] Supervisory [X] | [X] 1-Non-Sensitive | 00 |
| [ ] Excepted (Specify in Remarks) | [X] Non-Supvry. | [ ] 2-Noncritical Sensitive [ ] 4-Special Sensitive | 14. Agency Use |
| [ ] SES (Gen.) [ ] SES (CR) | | [ ] 3-Critical Sensitive [ ] 5-Moderate Risk [ ] 6-High Risk | |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | Social Insurance Specialist (BLNGL) | GS | 105 | 9 | RS | 8/17/90 |
| c. Recommended by Supervisor or Initiating Office | | | | | | |

16. Organizational Title of Position (if different from official title)
Claims Representative (Bilingual)

17. Number of allocations
V- * (See Remarks #23)

18. Department, Agency or Establishment
Social Security Administration

c. Third Subdivision
Office of the Area Director

a. First Subdivision
Office of the Deputy Commissioner, Operations

d. Fourth Subdivision
Field Offices

b. Second Subdivision
Office of the Regional Commissioner

e. Fifth Subdivision

**20A. Supervisor Certification.** I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that the false or misleading statements may constitute violations of such statutes or their implementing regulations.

**20B. Allocation Certification** I certify that each incumbent will perform the grade controlling duties and responsibilities of this position a substantial amount of time (i.e., 25% or more).

| 20a1. Typed Name and Title of Immediate Supervisor | | 20b. Typed Name and Title of Delegated Authorizing Official for Non-Supervisory GS-14 and Below (Required) |
|---|---|---|
| Signature: | Date | Herbert R. Doggette, Jr. Deputy Commissioner, Operations |
| 20a2. Typed name of higher level management concurrence (Optional if 20a1 is signed) | | Signature /s/  Date 3/5/90 |
| Signature: | Date | |

**21. Classification/Job Grading Certification.** I certify that this position has been classified/graded as required by Title 5, U. S. Code, in conformance with standards published by the Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.

| 21a. Typed Name and Title of Official Taking Action | | 21b. Typed Name and Title of Delegated Authorizing Official for GS-15/SES |
|---|---|---|
| Robert Sunderland Personnel Management Specialist | | |
| Signature /s/ | Date 8/17/90 | Signature  Date |

22. The standards, and information on their application, are available in the personnel office. Position Classification Standards Used in Classifying/Grading Position:
GS-105-0

23. Remarks
*Allocations included in GS-105-11-#3C363.

24. Description of Major Duties and Responsibilities  (See Attached)

Form SSA-801 (October 2001)  (former OF-8)



Social Insurance Specialist
(Claims Representative-Bilingual)
GS-105-09-#3C363A

This position is different from position # 3C361A in that the
incumbent is required to possess and use bilingual skills to assist
the non-English speaking public in conducting necessary Social
Security business.

---

Social Insurance Specialist
(Claims Representative)
GS-105-09-#3C361A

Amended: 2/27/78, 8/7/80, 6/24/91

Duties

This is the senior level training position leading to the journeyman
claims representative position. The incumbent will be responsible for
performing the following duties:

- Conducts interviews to obtain, clarify, and verify information about
  individual applicants' initial and continuing eligibility for
  retirement, survivors, disability, black lung, health insurance
  benefits, and eligibility to supplemental security income payments
  including State supplements. (CRITICAL ELEMENT)

- Finally adjudicates claims for benefits and eligibility to all
  programs administered by SSA. (CRITICAL ELEMENT)

- When so designated, authorizes for payment, with limited review,
  claims for benefits and eligibility to all SSA programs. (CRITICAL
  ELEMENT)

- Conducts interviews, develops, investigates, and resolves post
  entitlement actions which may involve suspension, resumption, or
  termination of eligibility or payments. (CRITICAL ELEMENT)

- Provides some technical guidance to lower grade employees involved
  in the claims process.

- As designated, conducts case reviews and informal and formal
  conferences to reconsider initial decisions and post eligibility
  decisions affecting an individual's eligibility, continuing
  eligibility, or amount of payment under the SSI program.

- As designated, makes final non medical decisions on SSI
  reconsideration's.

- Determines finally, if applicants for, or recipients of, disability insurance benefits and disability payments under the SSI program are engaging in substantial gainful activity.

- Provides referral services to individuals needing the services of other programs or organizations.

- Participates in training sessions as a student and, as designated, as an instructor.

- Develops, investigates, and resolves discrepancies in earnings and determines amounts to be posted or deleted from individual records.

- Identifies the need for and approves the selection of representative payees for individuals unable to handle their own benefits.

- Determines whether income is wages or self employment income and whether it is covered income under the Social Security Act.

- Authorizes advance SSI payments in specified case situations and requests onetime payments as necessary.

- Protects the rights of individuals by assuring that claimants and/or their personnel representatives understand the claimants' legal rights and obligations under the Act and its relationship to other social welfare and benefit programs.

I. Job Requirements

- Understanding of the philosophies, principles, and objectives of social insurance and welfare programs.

- Knowledge of the policies and specific provisions of the retirement, survivors, disability, and health insurance programs, and the black lung and SSI programs.

- Knowledge of State laws involving descent, welfare payments and social service programs, Medicaid, workmen's compensation, etc. and various Federal laws, such as parts of the Internal Revenue Code, Railroad Retirement Act, Veterans Administration laws, Immigration and Nationality Act, and others having a relationship to SSA programs.

- General understanding of the relationships of SSA programs to other programs addressed to the same or similar issues and problems.

- General ability to communicate with individuals for the purpose of obtaining information, motivating individuals to appropriate courses of action, and conveying and understanding of complex requirements of particular programs.

- General ability to evaluate evidence and the facts of situations, to draw sound conclusions, and to explain the basis for the conclusions.

- Knowledge of the SSA-integrated data processing system and the ability to use the systems input and output methodology, forms, and data, as well as the ability to recognize and resolve systems input alerts, edits, and rejects.

## II. Difficulty of Work

This training position covers the full range of the job. This includes the communicative, adjudicative, authorization, and SSI reconsideration functions involved with claims and post entitlement activities.

Subjects and issues covered in interviewing work include the complete range of substantive issues and procedural matters of the several social insurance programs and the black lung and SSI programs. The development and adjudicative functions involve quasi-legal matters which must be related to the individual circumstances of the general public in the district, and this involves intricate situations needing careful distinctions.

Claims that are authorized for payment must be carefully reviewed and evaluated. Claims that are authorized may be reviewed by a supervisor or journeyman employee. Case reviews, informal and formal conference interviews in SSI reconsideration cases may be extremely sensitive due to the legal tenor or the conference interview. The incumbent must be able to deal with the majority of issues with a high level of expertise.

The guidelines consist principally of the legal regulations and procedural requirements associated with the respective social insurance programs and the black lung and supplemental security income programs. These guides are numerous, extensive, and complex; however, their communication and application to individual cases and circumstances impose demands for judgment in selecting applicable provisions, interpreting their intent and adaptation, their use, together with ingenuity in explaining how these requirements serve the needs of the persons concerned.

## III. Responsibility

The communicative functions are normally not subject to review. The technical adequacy of information provided is assured through complaints made by claimants as to the service provided, or through a review of applications, records, letters, or other documents originated by the representative on an intermittent basis. Neither the interviews conducted nor the claims adjudicated are segregated as to type or level of difficulty.

The representative is expected to resolve, with a minimum of supervisory consultation, all but the most unusual problems; e.g., those which may be of a precedent setting or a delicate public relations nature, or of unresolved policy issues. Technical assistance is available from the supervisor; however, it is normally expected to be requested only where precedent decisions or policy are not available. Authorized claims are subject to a limited review. Supervisors may designate a sample case for review to determine training needs and the individual's progress towards the journeyman level. SSI reconsideration's through case review or informal or formal conference interviews will require high caliber expertise. This is true both from the standpoint of the persons being interviewed as well as from the subject matter involved in the issues to be resolved. SSI reconsideration decisions are subject to review only through the SSA appeals process.

The work performed is a vital part of the functions through which the organization directly informs members of the general public about the concerned programs and extends benefits of these programs to them.

Work is performed under the general supervision of the district manager, assistant district manager, branch manager, or operations supervisor.

IV.  Personal Relationship

These relationships are important in that much of the work consists of conducting interviews. Many members of the general public in the area are likely to be subjects of interviews over a period of time in their capacity as applicants, beneficiaries, claimants, legal representatives, employers, and sources of information. In the interviews the purposes include eliciting specific items of information, explaining substantive and procedural requirements, and interpreting program concepts. Because the coverage of the program is so broad, individuals from all strata of society will come in contact with the representatives.

Due to the highly sensitive nature of the SSI reconsideration conferences the incumbent must exercise a high degree of skill in the interpersonal exchange which surrounds these conferences.

V.  Other

The incumbent's official duty station may be district office branch office, or other established field facility. Duties assigned may be performed in contact stations, other temporary locations, or in an institution, hospital, or other service location.

AMENDMENT TO POSITION DESCRIPTION (OF-8)
(Use only for revisions not requiring major rewriting)

VIL SERVICE TITLE

Social Insurance Representative

ORGANIZATIONAL TITLE

Claims Representative

| NAME OF INCUMBENT (if any) | SCHEDULE, SERIES, GRADE, AND POSITION NUMBER |
|---|---|
| | GS-105-~~10-#1901~~ |
| | 11-30361 |

ORGANIZATIONAL LOCATION

| DIVISION | BRANCH |
|---|---|
| Office of Program Operations | Office of the Assistant Regional Comm., FO |
| SECTION | UNIT |
| Office of the Regional Commissioner | District/Branch Offices |

REASON FOR AMENDMENT

To show the supervisory resident representative as an alternative supervisor
for this position.

AMENDMENT(S): (Use reverse side if needed)

III. **Difficulty of Work**

Change the last sentence to read:

Work is performed under the general supervision of a district manager,
assistant district manager, branch manager, operations supervisor, or
supervisory resident representative.

Milton R. Johnson Dir, OHAP (FK) 2/23/78

| | DATE |
|---|---|
| APPROVED: | 2/10/78 |
| _Robert R Bynum_ | |
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST | DATE |
| _John C Williams Jr_ | 2/27/78 |
| ...GNATURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL | DATE |
| _C P Bennett_ | 2/27/78 |

FORM OAAD-410
(1-61)

## AMENDMENT TO POSITION DESCRIPTION (OF–8)
### (Use only for revisions not requiring major rewriting)

CIVIL SERVICE TITLE

Social Insurance Representative

ORGANIZATIONAL TITLE

Claims Representative

| NAME OF INCUMBENT (if any) | SCHEDULE, SERIES, GRADE, AND POSITION NUMBER |
|---|---|
|  | GS-105-~~10-#1901~~ |
|  | *11-3C361* |

ORGANIZATIONAL LOCATION

| DIVISION | BRANCH |
|---|---|
| ORC, ARC/FO, Office of Area Director | District/Branch Offices |
| SECTION | UNIT |
|  |  |

REASON FOR AMENDMENT

To include the food stamp function in the PD.

AMENDMENT(S): (Use reverse side if needed)

Duties

Add as a duty, on page 2, immediately before "Performs other duties as assigned . . ." :  "Receives and directs the processing of food stamp applications per current procedures and policies."

| APPROVED: Herbert R. Doggette, Jr. Deputy Commissioner, Operations | *Herbert R. Doggette, Jr. by Art Solomon* | DATE *8/7/80* |
|---|---|---|
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST |  | DATE |
| SIGNATURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL Thomas J. Longley Chief, Classification Management Branch |  | DATE *8/7/80* |

FORM SSA-3640 (1-61) (FORMERLY OAAD-410)
PRIOR EDITIONS MAY BE USED UNTIL SUPPLY IS EXHAUSTED

## AMENDMENT TO POSITION DESCRIPTION (OF-8)
### (Use only for revisions not requiring major rewriting)

SERVICE TITLE

Social Insurance Representative

ORGANIZATIONAL TITLE

Claims Representative

| NAME OF INCUMBENT (If any) | SCHEDULE, SERIES, GRADE, AND POSITION NUMBER |
|---|---|
| | GS-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, A, B, C |

ORGANIZATIONAL LOCATION

| DIVISION | BRANCH |
|---|---|
| Deputy Commissioner for Operations | Assistant Regional Commissioner for Field Operations |
| SECTION | UNIT |
| Office of the Regional Commissioner | Field Offices |

REASON FOR AMENDMENT

Add duty.

AMENDMENT(S):(Use reverse side if needed)

"May perform cashier duties through the use of the Third Party Draft System for the payment of certain administrative expenses (such as claims evidence, local travel, small purchases, etc.). Maintains accurate receipts and controls to account for all draft activity and is responsible for safeguarding drafts. Ensures drafts are issued only for authorized purposes. Inputs payment information into the Agency's central accounting system via PC Email."

| APPROVED: _Janice L. Warden_ | DATE 6/17/91 |
|---|---|
| Janice L. Warden, Acting Deputy Commissioner for Operations | |
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST _Fred Frank_ | DATE 6/24/91 |
| S.    TURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL | DATE |

FORM SSA-3640 (1-61)

| POSITION DESCRIPTION | (Please Read Instructions on the Back) | | 1. Agency Position No.<br>3C363 |
|---|---|---|---|

| 2. Reason for Submission | 3. Service | 4. Employing Office Location<br>Regional Offices | 5. Duty Station<br>Field Offices | 6. OPM Certification No. |
|---|---|---|---|---|

**2. Reason for Submission**
☐ Redescription  ☐ Reestablishment  [X] New  ☐ Other

**3. Service** ☐ Hdqtrs.  [X] Field

Explanation (*Show any positions replaced*)

**7. Fair Labor Standards Act**
☐ Exempt  [X] Nonexempt

**8. Financial Statements Required**
☐ Executive Personnel Financial Disclosure  ☐ Employment and Financial Interests

**10. Position Status**
[X] Competitive  ☐ Excepted (Specify in Remarks)  ☐ SES (Gen.)  ☐ SES (CR)

**11. Position is:**
☐ Supervisory  [X] Non-Supvry.

**12. Sensitivity**
[X] 1-Non-Sensitive  ☐ 2-Noncritical Sensitive  ☐ 3-Critical Sensitive  ☐ 4-Special Sensitive  ☐ 5-Moderate Risk  ☐ 6-High Risk

**13. Competitive Level** 00

**14. Agency Use**

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | Social Insurance Specialist (BLNGL) | GS | 105 | 11 | RS | 8/17/90 |
| c. Recommended by Supervisor or Initiating Office | | | | | | |

**16. Organizational Title of Position (if different from official title)**
Claims Representative (Bilingual)

**17. Number of allocations**
V- 438 * (See Remarks #23)

**18. Department, Agency or Establishment**
Social Security Administration

**a. First Subdivision**
Office of the Deputy Commissioner, Operations

**b. Second Subdivision**
Office of the Regional Commissioner

**c. Third Subdivision**
Office of the Area Director

**d. Fourth Subdivision**
Field Offices

**e. Fifth Subdivision**

**20A. Supervisor Certification.** I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that the false or misleading statements may constitute violations of such statutes or their implementing regulations.

**20B. Allocation Certification.** I certify that each incumbent will perform the grade controlling duties and responsibilities of this position for a substantial amount of time (i.e., 25% or more).

**20a1. Typed Name and Title of Immediate Supervisor**

Signature: _____ Date: _____

**20b. Typed Name and Title of Delegated Authorizing Official for Non-Supervisory GS-14 and Below (Required)**
Herbert R. Doggette, Jr.
Deputy Commissioner, Operations

**20a2 Typed name of higher level management concurrence (Optional if 20a1 is signed)**

Signature: _____ Date: _____

Signature: /s/    Date: 3/5/90

**21. Classification/Job Grading Certification.** I certify that this position has been classified/graded as required by Title 5, U. S. Code, in conformance with standards published by the Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.

**21a. Typed Name and Title of Official Taking Action**
Robert Sunderland
Personnel Management Specialist

Signature: /s/    Date: 8/17/90

**21b. Typed Name and Title of Delegated Authorizing Official for GS-15/SES**

Signature: _____ Date: _____

**22.** The standards, and information on their application, are available in the personnel office. Position Classification Standards Used in Classifying/Grading Position:
GS-105-0

**23. Remarks**

| BOS | NY | PHI | ATL | CHI | DAL | KC | DEN | SF | SEA |
|---|---|---|---|---|---|---|---|---|---|
| 200 | 700 | 115 | 181 | 109 | 75 | 20 | 35 | 800 | 115 |

*Allocations includes use of GS-105-9/7/5-#3C363A/B/C.

(462) IA, memo, 7/10/00 - Total: ~~900~~
(1450) IA, survey, 5/8/03 - Total: 2350

**24. Description of Major Duties and Responsibilities (See Attached)**

Form SSA-801 (October 2001)  (former OF-8)

8

Social Insurance Specialist
(Claims Representative-Bilingual)
GS-105-11-#3C363

This position is different from position #3C361 in that the incumbent is
required to possess and use bilingual skills to assist the non-English
speaking public in conducting necessary Social Security business.

---

Social Insurance Specialist
(Claims Representative)
GS-105-11-#3C361

Amended 2/27/78, 8/7/80, 6/24/91

DUTIES

This is the keystone position in the Social Security Administration
through which the major operating objective of bringing direct
personal service to the public is achieved. The incumbent:

--Conducts interviews to obtain, clarify, and verify information about
individual applicants' initial and continuing eligibility for
retirement, survivors, disability, black lung, health insurance
benefits, and eligibility for supplemental security income payments,
including State supplements where required;(CRITICAL ELEMENT)

--Examines evidence to evaluate its validity and acceptability in
establishing entitlement to benefits, and, when necessary, takes the
required developmental action to insure that all available relevant
evidence has been obtained. Assists the applicant in securing
evidence, and prepares special determinations of fact to resolve
evidentiary discrepancies;

--Finally adjudicates and finally authorizes for payment, without
subsequent review, claims for benefits and eligibility to all
programs administered by SSA and finally disallows, without
subsequent review, a full range of all types of SSI claims, RSDHI
claims lacking in insured status, RSDHI claims previously denied,
disabled widow's benefits claims not meeting the prescribed
period;(CRITICAL ELEMENT)

--Makes final reconsideration decisions on disability insurance and
disabled widows cases involving reaffirmations of initial or
subsequent denials of benefits not involving medical issues;

--Conducts interviews, develops, investigates, and resolves
postentitlement actions,(CRITICAL ELEMENT) including SSI
redeterminations, which may involve suspension, resumption, or
termination of eligibility or payments;

--Provides technical guidance to other employees involved in the claims process;

--Assists individuals in filing for administrative appeals in matters concerning entitlement to benefits or coverage under the various programs;

--Conducts case reviews, informal and formal conferences to reconsider initial decisions and posteligibility decisions affecting an individual's eligibility, continuing eligibility, or amount of payment under the supplemental security income program and makes final decisions on nonmedical issues in SSI reconsiderations;

--Determines finally if applicants for or recipients of disability insurance benefits and disability payments under the SSI program are engaging in substantial gainful activity;

--Recognizes the need for and approves the selection of representative payees for individuals unable to handle their own benefits;(CRITICAL ELEMENT)

--Protects the integrity of SSA programs through identification, investigation, and resolution of potential program abuse situations;

--Provides referral services to individuals needing the services of other programs or organizations;

--Participates in training sessions both as student and instructor;

--Authorizes advance SSI payments and requests one-time payments as necessary;

--As assigned and as necessary contributes to the office information-public relations programs by making public speeches and assists in public information projects; informs superiors of trends in public reaction to social security programs;

--Protects the rights of individuals by assuring that claimants and/or their personal representative understand the claimants' legal rights and obligations under the Act and its relationship to other social welfare and benefit programs;

--Develops, investigates, and resolves discrepancies in earnings and determines amounts to be posted or deleted from individual records;

--Determines whether income is wages or self-employment income and whether it is covered income under the Social Security Act; and

--Performs other duties as assigned and assumes new responsibilities dictated by legislative or policy changes.

JOB REQUIREMENTS

--Understanding of the philosophy, principles, objectives, and
  specific provisions of all programs administered by SSA and the
  relationship of these programs to others which are related.

--Knowledge of State laws involving descent, welfare payments and
  social service programs, Medicaid, workman's compensation, etc., and
  various Federal laws, such as parts of the Internal Revenue Code,
  Railroad Retirement Act, laws concerning veterans' benefits,
  Immigration and Nationality Act, and others having a relationship to
  SSA programs.

--Knowledge of the SSA-integrated data processing system and the
  ability to use the systems input and output methodology, forms, and
  data, as well as the ability to recognize and resolve systems input
  alerts, edits, and rejects.

--Ability to communicate with individuals for the purposes of
  obtaining information, motivating individuals to appropriate courses
  of action, and conveying an understanding of complex requirements of
  particular programs. --Ability to evaluate evidence and the facts of
  situations, draw sound conclusions, and explain the basis for the
  conclusions.

DIFFICULTY OF WORK

Assignments cover the communicative, adjudicative, final
authorization, and SSI reconsideration functions through the full
range of claims and postentitlement activities.

Subjects and issues covered in interviewing work cover the complete
range of substantive issues and procedural matters of the various
social insurance programs and the black lung and supplemental security
income programs. The development and adjudicative functions involve
quasi-legal matters which must be related to the individual
circumstances of each applicant.

The incumbent must carefully evaluate all facets of the claims being
finally authorized.

Informal and formal conference interviews in SSI reconsideration cases
may be extremely sensitive. Due to the legal tenor of the conference
interview, the incumbent must be able to deal with all issues with a
high level of expertise.

The guidelines consist, principally, of the legal regulations and
procedural requirements of the various social insurance, black lung,
and supplemental security income programs. These guides are numerous,
extensive, and complex. Their application to distinctive cases and
circumstances requires judgment and insight in applying the
requirements to the needs of the individuals concerned. Work is

performed under the general supervision of a district manager, assistant district manager, branch manager, or operations supervisor.

## RESPONSIBILITY

The work performed is a vital part of the functions through which the organization directly informs members of the general public about the concerned programs and extends benefits of these programs to them.

The communicative functions are normally not subject to review. The technical adequacy of information provided is assured through occasional spot checks or observations made by the supervisor, through complaints made by claimants as to the service provided, or through a review of applications, records, letters, or other documents originated by the representative on an intermittent basis. Neither the interviews conducted nor the claims adjudicated and authorized are segregated as to type or level of difficulty.

The representative is expected to resolve, without benefit of supervisory consultation, all but the most unusual problems; such as, those which may be precedent setting, of a delicate public relations nature, or unresolved policy issues. Technical assistance is available from the supervisor, however, it is normally expected to be requested only where precedent decisions or policy are not available.

Claims that are finally authorized are not subject to a subsequent review. A sample of cases may be evaluated through the SSA quality appraisal system either during processing or at the end of line after payment is effectuated. SSI reconsideration decisions are subject to review only through the SSA appeals process.

## PERSONAL RELATIONSHIPS

These relationships are important in that much of the work consists of conducting interviews. Coverage of the programs is so general that all segments of the general public will be encountered as potential applicants, beneficiaries, claimants, legal representatives, employers, and sources of information. In the interviews, the purposes include eliciting specific items of information, explaining substantive and procedural requirements, and interpreting program concepts. Interviews must be conducted in a tactful and courteous manner.

## OTHER

The incumbents' official duty station may be a district office, branch office, or other established field facility. Duties assigned may also be performed in contact stations, other temporary locations, or in institutions, hospitals, or other locations as designated by supervisors.

AMENDMENT TO POSITION DESCRIPTION (OF–8)
(Use only for revisions not requiring major rewriting)

VIL SERVICE TITLE

Social Insurance Representative

ORGANIZATIONAL TITLE

Claims Representative

NAME OF INCUMBENT *(If any)*

SCHEDULE, SERIES, GRADE, AND POSITION NUMBER

GS–105-~~10 #1901~~
11-30361

ORGANIZATIONAL LOCATION

| DIVISION | BRANCH |
|---|---|
| Office of Program Operations | Office of the Assistant Regional Comm., FO |
| SECTION | UNIT |
| Office of the Regional Commissioner | District/Branch Offices |

REASON FOR AMENDMENT

To show the supervisory resident representative as an alternative supervisor for this position.

AMENDMENT(S): *(Use reverse side if needed)*

III.   Difficulty of Work

    Change the last sentence to read:

    Work is performed under the general supervision of a district manager, assistant district manager, branch manager, operations supervisor, or supervisory resident representative.

Milton L. Johnson   Dir., OHAP
                    (PK)          2/23/78

APPROVED:

| | DATE |
|---|---|
| *Robert L Bynum* | 2/10/78 |
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST | DATE |
| *Mike C Williams Jr* | 2/27/78 |
| SIGNATURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL | DATE |
| *L. P. Bennett* | 2/27/78 |

FORM OAAD-410
(1-61)

# AMENDMENT TO POSITION DESCRIPTION (OF–8)
### (Use only for revisions not requiring major rewriting)

CIVIL SERVICE TITLE

Social Insurance Representative

ORGANIZATIONAL TITLE

Claims Representative

| NAME OF INCUMBENT (if any) | SCHEDULE, SERIES, GRADE, AND POSITION NUMBER |
|---|---|
|  | GS-105-10-#1001 |
|  | #-3C361 |

ORGANIZATIONAL LOCATION

DIVISION

ORC, ARC/FO, Office of Area Director

BRANCH

District/Branch Offices

SECTION

UNIT

REASON FOR AMENDMENT

To include the food stamp function in the PD.

AMENDMENT(S): (Use reverse side if needed)

Duties

Add as a duty, on page 2, immediately before "Performs other duties as assigned . . ." :  "Receives and directs the processing of food stamp applications per current procedures and policies."

| APPROVED: | | DATE |
|---|---|---|
| Herbert R. Doggette, Jr.  *Herbert R. Doggette, Jr. by Art Solomon* | | 8/7/80 |
| Deputy Commissioner, Operations | | |
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST | | DATE |
| | | |
| SIGNATURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL | | DATE |
| Thomas L. Longley  *Thomas L. Longley* | | 8/7/80 |
| Chief, Classification Management Branch | | |

FORM SSA-3640 (1-61) (FORMERLY OAAD-410)
PRIOR EDITIONS MAY BE USED UNTIL SUPPLY IS EXHAUSTED

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| FRIENDS, ALICE ANN | 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 | 11/04/70 | 09/21/03 |

### FIRST ACTION / SECOND ACTION

| 5-A. Code | 5-B. Nature Of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 702 | PROMOTION | | |
| 5-C. Code | 5-D. Legal Authority | 6-C Code | 6-D. Legal Authority |
| WUM | SCH A, 213.3102(U) | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| SOCIAL INSURANCE SPEC (BLNGL) | SOCIAL INSURANCE SPEC (BLNGL) |
| CLMS REP (BLNGL) | CLMS REP (BLNGL) |
| S2D3MZ012    03C363A | S2D3MZ012    03C363O |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0105 | 09 | 02 | $ 41379 | PA | GS | 0105 | 11 | 01 | $ 48451 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $ 36703 | $ 4676 | $ 41379 | $ 0 | $ 42976 | $ 5475 | $ 48451 | $ 0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| ORC | ORC |
| OFC REGNL COMM PHILADELPHIA | OFC REGNL COMM PHILADELPHIA |
| AREA DIR #3 | AREA DIR #3 |
| FO, WASHINGTON, DC | FO, WASHINGTON, DC |
| FO, WASHING (POSTAL PLAZA), DC | FO, WASHING (POSTAL PLAZA), DC |

### EMPLOYEE DATA

| 23. Veterans Preference | | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1 - None   3 - 10-Point/Disability   5 - 10-Point Other<br>2 - 5-Point   4 - 10-Point Compensable   6 - 10-Point/Compensable/30% | | 2   0 - None   2 - Conditional<br>1 - Permanent   3 - Indefinite | F   SEX | YES   X NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| W0   BASIC + OPTIONAL(5X) | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K   FERS & FICA | 09/22/02 | F   FULL-TIME | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2   1 - Competitive Service   3 - SES General<br>2 - Excepted Service   4 - SES Career Reserved | N   E - Exempt<br>N - Nonexempt | 4007563 | 1535 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 40. Agency Data NC | 41. VET-STAT | 42. EDUC LVL | 43. SUPV LVL | 44. POSITION SENSITIVITY |
|---|---|---|---|---|
| CLS   00 | X | 17 | 8 | NONSENSITIVE/LOW RI |

| 45. Remarks |
|---|
| CURRENT DATE OF LAST EQUIVALENT INCREASE 09-21-03. |

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| SZ - SOCIAL SECURITY ADMIN | LARRY G. MASSANARI |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | REGIONAL COMMISSIONER |
| SZ00 | 1166 | 10/21/03 | 031513750 |

1 - Employee Copy - Keep for Future Reference

## AFFIDAVIT

| | |
|---|---|
| Alice Ann Friends, Complainant | ) |
| | ) |
| v. | )    Case No. 04-0452-SSA |
| | ) |
| Social Security Administration | ) |

I, Doug France, make the following statement freely and voluntarily to Donald W. Mirsch, who has identified himself to me as an Independent Contractor/EEO Investigator. I hereby solemnly swear/affirm that my answers to the following questions are true and complete to the best of my knowledge and belief.

Q1    What is your name, position title, organization and duty station. How long have you been in this position?

A1-1:  Doug France, Equal Employment Specialist, SSA, Office of Civil Rights and
        Equal Opportunity (OCREO), Center for Disability Services (CDS)
A1-2:  2 years, 7 mos.

Q2    Do you have any physical disabilities? Are you represented in this matter?

A2-1:  No.
A2-2:  No.

Q3    Do you know the Complainant, Alice Ann Friends, and/or are you aware of her physical disability(ies)? What is your understanding of her physical disability(ies) and how do you come to have that awareness?

A3-1:  I do not personally know Ms. Friends, nor have I ever met here in person, but am
        aware that she is disabled.
A3-2:  As I understand it, Ms. Friends has a hearing impairment which I became aware
        of as a result of her request for reasonable accommodation.

Q4    Based on your official duties, is Ms. Friends a "qualified handicapped individual" who is entitled to reasonable accommodation under the law?

A4:    Whether a person is a "qualified individual with a disability" depends on the
        position which the person holds. To be a "qualified individual with a disability,"
        a person must be able to perform the essential duties of the position, with or
        without reasonable accommodation.

Initials _____



Page 1 of 4

EXHIBIT 7
Page 1 of 4 pages.

Based on the accommodation requests we received from Ms. Friends, I doubt that she is able to perform the essential duties of the Bi-lingual Claims Representative (CR) position even with accommodation. This position requires the incumbent to understand multiple languages, in this case English and American Sign Language (ASL). Even though Ms. Friends was hearing impaired, the duties of this position require the ability to communicate (speak and understand spoken words) in English. Communicating with the English speaking public does not require the use of an ASL interpreter. If, therefore, she was not fluent in the English language because she can not hear, read lips and/or did not have audible/understandable speech, she is not qualified to perform the duties of the Bi-lingual CR position.

My doubt as to her qualification is further supported by Ms. Friends' reasonable accommodation request for hearing aids. She asserted that her hearing aids were malfunctioning and had "reached the life expectancy". She requested the Agency to provide her with new ones because hearing aids were required to do her job as a CR. The EEOC's Enforcement Guidance on Reasonable Accommodation says that employers are not required to provide employees with devices that are also personal in nature, and specifically mentions hearing aids as being an assistive device that is personal in nature. The EEOC's Guidance says that "if an employee with a disability, with or without reasonable accommodation, cannot perform the essential functions of the position . . . in the absence of . . . an assistive device; then s/he is unqualified."

Also noteworthy is the fact that the EEOC's Guidance states that if a "probationary employee has never adequately performed the essential functions, with or without reasonable accommodation, then s/he is not entitled to reassignment because s/he was never 'qualified' for the original position."

Finally, I would like to add that even though the Agency did not provide Ms. Friends with the requested hearing aids, it did provide her with the services of an interpreter for up to 32 hours a week. This accommodation was provided because she claimed that her hearing impairment and inadequate hearing aids made it difficult to hear what was being said during training or mentoring sessions. And, the interpreter service would "facilitate effective communication". We did, however, prohibit Ms. Friends from using ASL interpreter services when interviewing members of the hearing public since such services are unnecessary to communicate with the hear public in English.

Q5    According to established Agency procedures, what kinds of requests for reasonable accommodation must be submitted to your office for consideration, approval or disapproval?

Initials _dA_                                           Page _2_ of _4_

EXHIBIT __7__
Page _2_ of _4_ pages.

A5:   Evaluation of reasonable accommodation requests for the following is the jurisdiction of CDS:

   1. Assistive technology (adaptive hardware devices and assistive software applications);
   2. Assistive software refresher training;
   3. Full-time equivalent (FTE) Pool Readers, Personal Assistants and/or Interpreters; and
   4. As needed request for Interpreter Services

Q6    According to official files maintained at your office, were any of Ms. Friends' requests for reasonable accommodation forwarded to your office for consideration and final disposition? If yes, please discuss (with specific reference to hearing aid and full-time interpreter).

A6-1:  Yes.

A6-2:  CDS received and evaluated the following reasonable accommodation requests from Ms. Friends:

   1. WINTALK (integrated TTY) computer software configuration;
   2. Full-time interpreter; refresher training; effective mentoring; other adjustments to work environment (including relocation);
   3. Hearing aids;
   4. iCommunicator (text-to-speech) device; and
   5. Sorenson Video Relay Service (VRS)

Q7    Were any of these request for reasonable accommodation denied by your office? If yes, was "undue hardship" the reason for denial? If yes, please discuss fully.

A7-1:  Yes. Ms. Friends request for a full-time interpreter (A6-2.2 above) was "partially" denied. Her request for hearing aids (A6-2.3 above) was denied because hearing aids are personal assistive devices also needed/used off the job. Her request for the iCommunicator device and Sorenson VRS (A6-2.4 and 5 above) were denied because use of the iCommunicator device was not practical (required voice training by each user; i.e., claimants) and VRS would require changes to SSA systems that could not be implemented at the present time.

A7-2:  Although CDS did authorize funding for up to 32 hrs of interpreter services per week for mentoring, training, unit meetings, progress review and other work related activities, this authorization did not allow the use of interpreter services to conduct interviews with the hearing public.

   The Agency believes it is an undue hardship to provide interpreter services for a deaf or hard-of-hearing employee (who cannot speak English and read lips) because use of an interpreter would require a fundamental alteration in the duties of Ms. Friends' position.

Initials _____

Page _3_ of _4_

EXHIBIT    7
Page _3_ of _Y_ pages.

The ability to communicate with the English speaking-hearing public is an essential function of her position; i.e., Bi-lingual CR.

I would also note that it would generally be unduly burdensome for the Agency to provide full-time interpreters for employees in the CR position. The services of an interpreter would be needed to assist Ms. Friends with virtually all aspects of her claim taking function. Multiple ASL interpreters (each with an hour pay rate equivalent to or greater then the Agency employee they are assigned to assist) would be needed to conduct most face-to-face claim interviews. Such an arrangement would result in three (3) individuals performing a job function (face-to-face interviewing) normally requiring only one (1) CR. Furthermore, the use of an ASL interpreter would lengthen the time required to conduct these interviews. Additionally, contract interpreters would need to be trained in the meaning and use of SSA terminology and the application of programmatic policy and procedure. When the ASL interpreter did not report to work the office's interviewing schedule would be severely impacted and public service disrupted.

I have read the above statement consisting of __4__ pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties to the complaint.

_____
Doug France

Subscribed and sworn/affirmed before me in  ELLICOTT CITY, MD
this __18__ day of __MARCH__ , 2005.

_____
Donald W. Mirsch

Initials _____                                   Page __4__ of __4__

EXHIBIT __7__
Page __4__ of __4__ pages.

**France, Doug**

| | |
|---|---|
| **From:** | France, Doug |
| **Sent:** | Friday, June 04, 2004 1:54 PM |
| **To:** | Friends, Alli |
| **Cc:** | Wells, Robin; Lieberman, AnnJoy; Kahan, Barbara |
| **Subject:** | Your Request for Reassessment--INFO |

Ms. Friends,

We have evaluated the information you provided in conjunction with your request (Mr. Bruce Williams' letter dated May 11, 2004) for a reassessment of our decision to deny your reasonable accommodation (RA) request for a full time interpreter. I apologize for the delay in responding to this request.

As you know interpreter service is routinely provided, as a reasonable accommodation for deaf employees with disabilities, on an as needed basis. And to our knowledge, the Agency has been providing interpreter service whenever you requested it. Although we cannot authorize full time interpreter services, the Center for Disability Services does authorize up to 32 hrs of interpreter service, per week, while you continue to be mentored. These services can, of course, also be used for any type of training, staff meetings, progress/performance discussions with your supervisor, and any other business related need.

At no time, however, can sign language interpreter service be used to conduct interviews and/or other business with the public.

Please contact me if you have any other questions regarding this matter.

Sincerely,

Doug France
Center for Disability Services
Voice: 410-965-7778
Fax: 410-966-8120



EXHIBIT
Page _14_ of _17_

# Procedures for Providing Reasonable Accommodation for Persons with Disabilities



PENGUD 800-831-6989

12

ExH. 10c
PAGE 1 OF 23 PAGES

# TABLE of CONTENTS

Summary of SSA Reasonable Accommodation Procedures          1

Agency Policy                                               2

Definition of Terms                                         2

Requesting Reasonable Accommodation                         4

Written Requests for Record Keeping Purposes                5

Determining Which SSA Official Will Process the Request      5

The Interactive Process                                     11

Three-Part Analysis for Approving or Denying Requests       11

Obtaining Medical Information                               13

Confidentiality Requirements Regarding Medical Information   13

Approving a Request for Reasonable Accommodation            14

Denying a Request for Reasonable Accommodation              15

Information Tracking and Reporting                          16

Supporting Reasonable Accommodation--A Total Approach       17

Distribution                                                21

Inquiries                                                   21

Appendix A--Form SSA-501-F3

Appendix B--Directory of SSA Personnel

# REASONABLE ACCOMMODATION PROCEDURES

## Summary of SSA Reasonable Accommodation Procedures

1. An individual makes a **request** for reasonable accommodation.
   (See page 4)

   - An **employee** can request reasonable accommodation from his or her supervisor, a supervisor or a manager in his or her immediate chain of command, the Disability Services Team or the component EEO officer.

   - An **applicant** for employment can request reasonable accommodation for the interview/application process from any employee with whom he or she has contact in connection with the interview/application process.

   - **Employees** (not **applicants**) must follow up an oral request in writing. However, officials should not wait for a written request to act on an oral request for accommodation.

2. A reasonable accommodation request for an **applicant** to engage in the interview/application process should be approved and provided as soon as possible. If the request is not feasible (because it would be an undue burden on the agency to provide it within the necessary time frame) the applicant should be advised of this, and of alternative accommodations, which will be provided. An alternative accommodation should be provided so that the applicant can engage in the interview/application process.

3. If the reasonable accommodation request for an **employee** is approved, the requested item or service will be provided to the employee as soon as possible, which would generally be within 30 calendar days following receipt of the request. If it is not possible to make the accommodation within 30 calendar days; i.e., if an item cannot be provided timely or medical documentation not provided timely, the employee must be informed of the status of the request within 30 calendar days following receipt of the request.

4. If the accommodation which the employee requests is not feasible, but another accommodation might be feasible, the supervisor should engage in an interactive process with the employee to identify other accommodations that

would also be effective. The agency is not obligated to provide an employee with the accommodation of his/her choice but with one which is reasonable and which would be effective.

5. If an employee's reasonable accommodation request is denied, a letter, signed by the decision maker, must be provided to the employee within 30 days of the date the decision maker receives the request. Denial letters must inform employees of their rights. (See page 15).

## Agency Policy

It is SSA's policy to fully comply with the reasonable accommodation requirements of the Rehabilitation Act of 1973. Under the law, Federal agencies must provide reasonable accommodation to qualified employees or employment applicants with disabilities, unless to do so would cause undue hardship. The Agency provides reasonable accommodation when:

1. An employment applicant with a disability needs an accommodation to be considered for a job;

2. An employee with a disability needs an accommodation to enable him or her to perform the essential functions of the job or to gain access to the workplace; and

3. An employee with a disability needs an accommodation to enjoy equal benefits and privileges of employment.

SSA will process requests for reasonable accommodation and, where appropriate, provide reasonable accommodations in a prompt, fair and efficient manner. The Agency is also dedicated to improving the recruitment, promotion and retention of qualified persons with disabilities by providing the information and resources necessary to support them and to accomplish the Agency's mission.

## Definition of Terms

- **Reasonable Accommodation:** Any modification or adjustment to a job or change in the work environment that enables a qualified applicant with a disability to compete equally or a qualified employee with a disability to perform the essential functions of the position. The accommodation must be job related and not for personal use; e.g., hearing aids, prosthetic devices, wheelchairs, and transportation to work. The need for reasonable

2

accommodation is determined on a case-by-case basis, taking the following into consideration: the individual's specific disability and existing limitations to the performance of a job function, the essential duties of the job, the work environment and the feasibility of the proposed accommodation.

- **Disability:** A physical or mental impairment that substantially limits one or more of a person's major life activities. The term, *substantially limits,* implies a degree of severity and duration: A person's major life activities are substantially limited if he/she is unable to perform, or is significantly limited in the ability to perform, an activity compared to an average person without a disability. A determination of "substantially limited" must always be based on the effect of an impairment on that individual's major life activities. *Major life activitie*s are activities that an average person without a disability can perform with little or no difficulty; they include, but are not limited to: speaking, hearing, seeing and walking.

- **Qualified Individual with a Disability:** An individual with a disability is *qualified* if he or she: 1) satisfies the requisite skill, experience, education and other job-related requirements of the position; and 2) can perform the essential functions of the position, with or without reasonable accommodation, and without posing a threat of substantial harm to others or to him or herself.

- **Essential Functions:** Those job duties that are so fundamental to the position that one cannot do the job without performing the duties. A function can be essential if, among other things: the position exists specifically for the performance of that function; there are a limited number of other individuals who could perform the function; or the function is specialized and the individual is hired based on his or her ability to perform the function. The determination of the essential functions of a position must be done on a case-by-case basis so that the determination reflects not simply the components of a generic position description, but the job as it is actually performed.

- **Undue Hardship:** *Undue hardship* means that a specific accommodation would require significant difficulty or expense. Undue hardship is always determined on a case-by-case basis, considering factors that include the nature and cost of the accommodation requested and the impact of the accommodation on the operations of the Agency. SSA does not have to

3

provide accommodations that would impose an undue hardship on the operation of the Agency.

- **Reassignment:** Reassignment is a "last resort" form of reasonable accommodation that, absent undue hardship, is provided to employees (not applicants) who, because of a disability, can no longer perform the essential functions of their jobs, with or without reasonable accommodation. Reassignment also covers employees who are new to the job, employees who no longer perform essential functions of the position, and employees who acquire essential functions that they are unable to perform. Reassignments are made only to funded vacant positions and only to employees who are qualified for the new position. If the employee is qualified for the position, he or she will be reassigned to the job without having to compete for it.

## Requesting Reasonable Accommodation

A request for reasonable accommodation is a statement that an individual needs an adjustment or change at work, or in the job application process, or as a benefit or privilege of employment for a reason related to a disabling condition. **The reasonable accommodation process begins as soon as the request for accommodation is made.**

The requestor does not have to use any special words, such as "reasonable accommodation," "disability," or "Rehabilitation Act." An individual may request, from his or her supervisor, a supervisor or a manager in his or her immediate chain of command, the Disability Services Team or the component EEO officer, a reasonable accommodation whenever he or she determines one is needed, even if he or she has not previously disclosed the existence of a disability.

An **applicant for employment** may request a reasonable accommodation orally or in writing from any SSA employee with whom the applicant has contact in connection with the application/selection process. An **employee** should request reasonable accommodation from his or her supervisor, a supervisor or a manager in his or her immediate chain of command, the Disability Services Team or the component EEO officer. A family member, health professional, or other representative may request an accommodation on behalf of an SSA employee or applicant. When a third party requests the accommodation, the decision maker should, if possible, confirm with the applicant or employee with a disability that he or she, in fact, needs an accommodation before proceeding. The request should be

4

- Requests for a change in a condition of employment such as modified duties, or a change in schedule, or the location and size of an employee's workspace.

- Requests for reassignment.

Reassignment is a "last resort " form of reasonable accommodation that will be provided, absent undue hardship, to an employee who, because of a disability, can no longer perform the essential functions of the position he or she holds, with or without reasonable accommodation. Reassignment, including reassignment to a lower-graded position, must be considered if there are no other effective accommodations that would enable the employee to perform the essential functions of his or her current job, or if all other possible accommodations would impose undue hardship.

Reassignment is available only to employees, not to applicants, and may be made only to a funded vacant position. A funded position is a position for which the agency has a need and would fill even in the absence of the employee's need for a position. The law does not require that agencies create new positions, fill positions for which position descriptions are "on the books" but for which the agency has no need, or move other employees out of their jobs in order to create a vacancy into which an employee with a disability may be placed.

After it is determined and documented that the employee cannot perform the essential functions of his or her current position, because of his or her disability, and the Agency cannot accommodate the employee in his or her current position, management will ask the employee if he or she is willing to accept a reassignment.

Management will obtain the employee's resume, SSA-45 or OF-612 to determine positions for which the employee qualifies. To qualify for a vacant position, an employee must have the requisite skill, experience, education and other job-related requirements necessary to fill the vacant position. The employee must also have the ability to perform the essential functions of the new position with or without reasonable accommodation.

Management will initially attempt to locate an equivalent, funded position in the same commuting area which is presently vacant or which is anticipated to become vacant within 60 days. If such a position is located and the

10 c

employee is qualified for the position, he or she should be non-competitively reassigned. If an equivalent, funded vacant position does not exist within the commuting area, management should determine whether the employee would be willing to relocate in order to secure an equivalent, funded vacant position and identify the area(s) to which the employee would be willing to relocate. Management should then determine whether an equivalent, funded vacant position is available in an area to which the employee would be willing to relocate. If no equivalent, funded vacant position is found, management must look for a lower graded position that is as close as possible to the employee's current grade and commuting area or in an area to which the employee would be willing to relocate and under the same appointing authority. The employee should be advised that, as with other transfers not required by management, the agency is **not** obliged to pay the employee's relocation expenses.

Managers should consult with appropriate Servicing Personnel Offices and/or Reasonable Accommodation Contact Persons to locate positions for which the employee may qualify. Management and the employee will discuss whether accommodations will be necessary in the new position and the feasibility of providing those accommodations.

## Disability Services Team (DST)

DST in the Office of Civil Rights and Equal Opportunity at Social Security Headquarters is the "decision maker" for reasonable accommodation requests funded by the following centralized accounts:

1. Centralized Accounts for Assistive Technologies and other Adaptive Devices

- SSA maintains a centralized information technology account from which assistive technologies are purchased. Assistive technologies include computer hardware and software as well as other information technology aids that accommodate and enable persons with disabilities to perform the essential functions of their jobs. A second centralized account is maintained for the purchase of other adaptive devices that are not considered to be "technologies." Devices that are commonly provided are kept in stock. When DST approves a request for assistive technologies, the devices are obtained from existing stock or purchased using funds from the centralized

accounts. DST works with the Contracting Officer in SSA's Office of Acquisition and Grants (OAG) to make procurement decisions based on the supporting documentation that is provided with the reasonable accommodation request.

2. Assistive Technologies Training

- Specialized assistive technologies training is provided under the National IWS/LAN Follow-on Contract for employees who receive a special computer workstation configuration that includes assistive software.

- Specialized assistive devices training is also available for employees with disabilities under a separate contract that is administered by DST. This contract supplies training for employees who need refresher training on the use of assistive technologies.

- The following specific types of assistive devices training are available through the above-mentioned contracts:

  – Employees who are blind and need training on synthetic speech output devices or on computer workstation configurations containing both speech and refreshable Braille output.

  – Employees who have low vision and who need training on magnification devices or on workstation configurations containing both magnification and speech output.

  – Employees with mobility impairments who need to be trained on the use of voice recognition systems because they are unable to use keyboards or other input devices.

  – Employees who are deaf and need training on integrated telecommunication devices for the deaf (TDD) systems.

3. Contract Services for Sign Language Interpreters

- The contract for sign language interpreter services provides interpreters for job applicants and employees who are deaf or hard of hearing. DST is the Contracting Officer's Technical Representative for the Agency-wide contract that provides daily onsite interpreters at SSA headquarters and

hourly interpreters, by request, to all SSA offices. Additional information can be found at: http://ro.ba.ssa.gov/ewd/ra/ianda.asp

- DST reviews, approves and funds requests for sign language interpreter services for SSA employees and job applicants. However, OAG processes the purchase requests against the Agency-wide contract. DST is responsible for monitoring the contractor's performance and reporting performance findings to the Contracting Officer in OAG. DST and OAG share the responsibility for monitoring and upholding the integrity of the sign language interpreter contract.

- DST's procedures for requesting sign language interpreter services under the current contract are:

  - All requests for hourly sign language interpreter services for job applicants and employees, who are deaf or hard of hearing, must be sent to DST for approval.

  - The Agency-wide contract must be used for extended services; i.e., 1-week or more training classes, when the cost is equal to or more than $2,500. On those infrequent occasions, to help guarantee delivery of sign language interpreters, SSA Form-393 should be prepared and mailed to DST as early as possible.

  - All requests for hourly sign language interpreters, (when the cost is equal to or less than $2,500), must be prepared on SSA Form-393 and sent to DST for approval. After receiving budget approval from DST, sign language interpreter services may be purchased at the local level using a vendor of choice.

  - When an office will be requesting sign-language interpreter services during a fiscal year, but the services provided would not cost more than $2,500, a blanket request for $2,500 (or less) must be sent to DST at the beginning of that fiscal year. After receiving budget approval from DST, sign language interpreter services may be purchased at the local level using a vendor of choice.

4. DST is also the decision maker for requests related to SSA's Full-Time Equivalency (FTE) Pool for Reasonable Accommodations. The FTE positions are used to allow offices to hire individuals on a full-time, part-time or

9

intermittent basis to serve as: <u>readers</u> for qualified employees who are blind and for employees who have low vision; <u>personal assistants</u> for employees with severe physical/mobility impairments; and <u>sign language interpreters</u> for employees who are deaf or hard of hearing, at sites with several deaf employees.

- Requesting Use of FTE Pool as a Reasonable Accommodation

  - Requests are sent to DST on form SSA-501-F3.

  - A request to use the FTE pool to hire an individual to perform services, which will allow an employee with a disability to perform the essential functions of the position, may be initiated by the employee or by management during the employee's employment or after the hiring process.

  - Any SSA component may request use of the FTE pool.

  - Approval to hire from the FTE pool is granted only after all other options for providing reasonable accommodation have been explored.

  - DST has the delegated authority to approve or deny requests for FTE assistance.

- Employing an Assistant for an Employee with a Disability

  - Both management and the employee must be involved in the selection, interview and hiring process of a prospective assistant.

  - Local offices are to maintain all records, and are responsible for the personnel actions and general management of the FTE pool assistants.

  - When the centralized FTE pool is used, that fund pays salaries and benefits for the assistants. All other expenses for the assistants; e.g., travel, training, overtime/over-tour payment, are funded by the component/office employing the assistant.

— When an assistant for an employee with a disability is hired, the assistant is offered an appointment in the excepted service and the appointment may not exceed 2 years.

— If the assistant's performance is acceptable to the employee with a disability and to management, the appointment may be renewed for an additional 2 years.

— Readers, personal assistants and/or sign language interpreters are hired under Schedule A authority, 5 CFR 213.3102(ll) ["ll" is double "L"]. Individuals with disabilities who are hired as assistants may be hired under the 213.3102(u) authority.

## The Interactive Process

Communication is a priority and is encouraged throughout the entire reasonable accommodation process. The first step should always be a thorough, frank discussion between the employee and his or her immediate supervisor. On-going communication is particularly important where the specific limitation, problem or barrier is unclear; where an effective accommodation is not obvious; or where the parties are choosing between different possible reasonable accommodations. DST is always available to provide advice.

The decision maker or any other SSA official who receives information in connection with a request for reasonable accommodation may share information connected with that request with other Agency officials only when those officials need to know the information in order to make determinations about that request. See sections entitled "Obtaining Medical Information" and "Confidentiality Requirements Regarding Medical Information" for specific rules governing the confidentiality of medical information.

## Three-Part Analysis for Approving or Denying Requests

Before approving or denying a request for reasonable accommodation, the SSA decision maker should:

1. **Determine if the requestor is a qualified person with a disability.** A determination of disability is not necessarily based on the diagnosis of the impairment, but rather on the effect the impairment has on the life activities of the individual. A mild or borderline case may affect major life activities, but

not substantially restrict those activities. Transitory conditions that last only a few weeks or months are not considered disabilities. Medical documentation may be required to determine if the requestor is a qualified person with a disability. (See section entitled, "Obtaining Medical Information."

2. **Determine if the accommodation is needed to: 1) enable a qualified applicant with a disability to be considered for the position he or she desires; 2) enable a qualified employee with a disability to perform the essential functions of his or her position; and 3) enable an employee with a disability to enjoy equal benefits and privileges of employment as similarly situated employees without disabilities.** As previously noted, modifications or adjustments must be made to the job application and interviewing process to accommodate qualified applicants with disabilities. As previously defined, essential functions are the most important or main duties of the position. They are the functions that define the position. These are determined not just by the position description, but by what employees in the position do and how the job is actually performed. A decision maker may restructure a job held by an employee with a disability to eliminate marginal duties, but the essential functions of the job may not be eliminated nor may performance standards for those functions be lowered. Appropriate adjustments or modifications must be made so that employees with a disability can enjoy the same benefits and privileges of employment as other employees. Although an employee's accommodation of preference is always seriously considered, SSA is not obligated to provide the accommodation of choice, but must provide an equally effective accommodation.

3. **Determine what effect the accommodation will have on the employee's performance and on the Agency's operations.** Is the requested accommodation reasonable? An accommodation is reasonable if it is effective. Consider the applicant's or employee's specific disability, his or her existing limitations and abilities to perform the particular job, the size and type of the Agency operation, and the nature and cost of the accommodation.
If the accommodation will in some way negatively impact the Agency's operations, it may constitute an undue burden and another accommodation may need to be considered. If an SSA decision-maker believes that an accommodation would represent an undue burden, he or she should contact the Disability Services Team.

10c
PAGE 14 OF 23 PAGES

## Obtaining Medical Information

SSA is entitled to know that an applicant or employee has a disability that requires a reasonable accommodation. In some cases the disability or need for accommodation will be obvious or otherwise already known to the decision maker, for example where the employee is blind. In these cases, SSA will not seek any further medical information. However, when a disability or the need for an accommodation is not obvious or otherwise already known to the decision maker, SSA may require that the individual provide documentation about the disability and his or her functional limitations. At a minimum, acceptable medical documentation must establish the nature of the medical condition, the limitations the medical condition imposes and the causal connection between the medical condition and the inability to meet workplace expectations. If a decision maker decides to seek medical information, he or she will request only information sufficient to substantiate that the individual has a disability and needs the reasonable accommodation requested, and the decision maker will not ask for unrelated documentation. The decision maker has the right to consult with the SSA Medical Director to determine what information is needed as well as to review medical documentation. This review will be at Agency expense.

Once the medical documentation is received, the decision maker will evaluate it, in consultation with the SSA Medical Director, if necessary. If the information provided by the person requesting the accommodation or the information provided by the health professional is insufficient to enable the decision maker to determine whether an accommodation is appropriate, the decision maker may ask for further information. If an employee fails or refuses to provide appropriate documentation or to cooperate with SSA's efforts to obtain documentation, the request for reasonable accommodation can be denied.

## Confidentiality Requirements Regarding Medical Information

Under the Rehabilitation Act, medical information obtained in connection with the reasonable accommodation process must be kept confidential. This means that all medical information that SSA obtains in connection with such requests, including information about an employee or applicant's functional limitations and reasonable accommodation needs, must be kept in a secure location in locked files separate from the employee's SF-7B file or official personnel file. Any SSA employee who obtains or receives such information is strictly bound by confidentiality requirements and may disclose this information only as follows:

10 c

PAGE 15 OF 23 PAGES

- Management officials who need to know (including the decision maker who requested that the medical information be obtained) may be told about necessary restrictions on the work or duties of the employee and about the accommodation(s) necessary for the employee to perform his or her duties. However, information about the employee's general medical history should only be disclosed if strictly necessary;

- First aid and safety personnel may be informed, when appropriate, *if* the employee might require emergency treatment because of the disability;

- Information may be given to Government officials or contractors assigned to investigate Agency compliance with the Rehabilitation Act.

- Information may be given to the agency EEO officials to maintain records and evaluate and report on the agency's performance in processing reasonable accommodation requests.

Whenever medical information is disclosed, the individual disclosing the information must inform the recipients of the information about the confidentiality requirements attached to it. These recipients are also bound by the confidentiality requirements.

## Approving a Request for Reasonable Accommodation

As soon as the decision maker determines that a reasonable accommodation will be provided, SSA will process the request and provide the accommodation in as short a timeframe as possible. SSA recognizes, however, that the time necessary to process a request will depend on the nature of the accommodation requested and whether it is necessary to obtain supporting information. If an approved accommodation cannot be provided within 30 calendar days of the date the decision maker receives the request due to extenuating circumstances; i.e., due to procurement delays, the decision maker will inform the employee of the status of the request before the end of the 30 calendar days. Also, if a decision cannot be reached within 30 calendar days; i.e., difficulty securing medical documentation, the decision maker will also inform the employee of the status of the request before the end of the 30 calendar days. Where feasible, if there is a delay in providing the request, temporary measures will be taken to provide assistance.

14

PAGE 16 OF 23 PAGES

## Denying a Request for Reasonable Accommodation

As soon as the decision maker determines that a request for reasonable accommodation will be denied, he or she will inform the requestor in writing.  The explanation for the denial should be written in plain language, clearly stating the specific reasons for denial.  Where the decision maker has denied a specific requested accommodation, but has offered to make a different accommodation in its place, the decision letter should explain both the reasons for denying the accommodation requested and the reasons that the decision maker believes that the accommodation being offered will be effective.  The written notice of denial should explain the procedures available for reassessment and independent review of the decision (see next paragraph) and should also inform the individual that he or she has the right to file an equal employment opportunity (EEO) complaint.

Employees can request prompt reassessment of a denial of reasonable accommodation.  If an employee has additional information to provide in support of his/her request, the additional information should be forwarded to the decision maker, along with a request that the earlier decision be reassessed.  The decision maker will respond to the request for reassessment within 5 business days of receipt of the new information.  If the decision maker does not reverse the decision, the employee can ask for an independent review of the request:

- **If the decision maker was a management official in the region/component,** the request for an independent review should be sent to the decision maker's manager.  This official will make the decision within 10 business days.

- **If the decision maker was the DST Leader,** the request for an independent review should be sent to the Human Resources Manager, who will make the decision within 10 business days, at the following address:

> Social Security Administration
> Human Resources Manager
> Office of Civil Rights and Equal Opportunity
> P.O. Box 47698
> Baltimore MD 21244-7698

An individual's participation in the independent review process does not satisfy the requirements for bringing a claim under the discrimination complaint process, the agency grievance procedure or the negotiated grievance procedures.  Also,

15

pursuing this option does not extend the time limits for initiating statutory claims or claims based on a collective bargaining agreement.

## Information Tracking and Reporting

DST maintains a database of information for internal use only. Data is collected for all reasonable accommodation requests for which DST has the delegated decision making authority. This information helps DST provide equipment and software upgrades, provide maintenance to equipment and provide specialized training to employees. The data is confidential and the names of the employees who requested accommodation are not disclosed. This data should be maintained for 3 years. The DST database can provide the following information about requests for which DST has the delegated decision making authority:

1. The number and types of reasonable accommodations that have been requested in the application process and whether those requests have been granted or denied;

2. The jobs (occupational series, grade level and Agency component) for which reasonable accommodations have been requested;

3. The types of reasonable accommodations that have been requested for each of those jobs;

4. The number and types of reasonable accommodations for each job, by Agency component, that have been approved, and the number and types denied;

5. The number and types of requests for reasonable accommodations that relate to the benefits or privileges of employment, and whether those requests have been granted or denied;

6. The reasons for denial of requests for reasonable accommodation;

7. The amount of time taken to process each request for reasonable accommodation; and

8. The sources of technical assistance that have been consulted in trying to identify possible reasonable accommodations.

**Each region/component is also responsible for tracking all of the information (1-8) shown above for requests for which they have the delegated decision**

PAGE _18_ OF _23_ PAGES  _10c_

**making authority** (see pages 5-6). The Associate Commissioner for the Office of Civil Rights and Equal Opportunity will request this information from components and regions on an annual basis and will provide the format in which the data is to be submitted.

## Supporting Reasonable Accommodation - A Total Approach

### Selective Placement

The SSA Selective Placement Program is a special employment program designed to assist qualified individuals with disabilities to obtain employment consistent with their level of skills and abilities. The Selective Placement Program promotes hiring, retention and advancement of persons with disabilities and considers the individual's capacity for safe and efficient job performance. The DST Selective Placement Coordinator is responsible for nationwide program leadership, and provides direction and guidance to his or her counterparts nationwide. These individuals work closely with agencies concerned with the rehabilitation and employment of persons with disabilities.

Individuals with disabilities may be hired under both competitive and noncompetitive appointing authorities. To qualify for a noncompetitive appointment under Schedule A Appointing Authority, 5 CFR 213.3102(u) (t), an individual:

- Must have a severe physical or mental disability; and

- Must be certified by a state rehabilitation agency or the Department of Veterans Affairs.

If an individual with a disability is hired noncompetitively through the Selective Placement Program, the Selective Placement Coordinator will discuss any necessary accommodations with the employee's management. Additional information about the Selective Placement Program can be found on the following two SSA intranet web sites: http://cofp.ba.ssa.gov/ocreo/disabilities.htm and: http://ro.ba.ssa.gov/ewd/ra/selective_placement.asp

### Employees with Disabilities (EWD) Intercomponent Workgroup

Key personnel from all SSA components serve on the SSA EWD Workgroup. This workgroup meets bi-weekly (or more often as needed) to address issues that affect employees with disabilities. The workgroup has the responsibility for:

- Formulating strategies for providing assistive technologies and improving customer service

- Developing or recommending standards for assistive devices and software upgrades

- Acting as advocates for employees with disabilities by ensuring that they are included, or considered, in Agency-wide contracts, identifying necessary resources, promoting awareness of accessibility needs, and maintaining the EWD Intranet Web Site at http://ro.ba.ssa.gov/ewd/new.asp

**Employees with Disabilities Intranet Web Site**

The EWD Intranet Web Site at http://ro.ba.ssa.gov/ewd/new.asp contains a wealth of information about training, assistive devices, accessibility standards and also contains a library of other technical documents.

**Employees with Disabilities Help Desk**

The Office of Telecommunications and Systems Operations maintains an EWD Help Desk. This help desk performs the following services: answers telephone calls; keeps a record of problems and responds to questions from employees Agency-wide; forwards requests for hardware maintenance, and answers software questions. See SSA Intranet Web Site at http://co.ba.ssa.gov/otso/DNNSO/ncb/ewdst/index.htm

**Research and Development**

The Assistive Technology Center in the Office of Telecommunications and Systems Operations performs the following functions to ensure that employees with disabilities can operate in the SSA environment with state-of-the-art assistive technologies:

- Certifies and tracks the accessibility of software and web applications through the Office of System's "Change Control Board;"

- Develops and maintains Windows NT system policies for EWD;

- Develops installation instructions for changes/updates to assistive software;

- Performs downloads/retrofits to adaptive workstations;

- Tests new SSA applications and updates; and

- Develops system management server scripts to remotely update software.

## Usability Testing

The Office of Automation Support in the Office of the Deputy Commissioner for Operations (DCO) has an assistive devices lab that tests software for accessibility, furnishes consultation services for software developers and evaluates software application training curriculum plans and develops customized training.

## Section 508 Advisory Council

The Social Security Administration Section 508 Advisory Council was established for the purpose of complying with the extensive reporting requirements of Section 508. The council is working to establish Agency-wide plans and processes that will ensure that electronic and information technology that the agency procures, develops, maintains or uses will be accessible to persons and employees with disabilities. Information about the Council can be found at SSA intranet site, http://ro.ba.ssa.gov/508/508.asp

## SSA's National Advisory Council for Employees with Disabilities

The SSA National Advisory Council for Employees with Disabilities (NACED) serves in an advisory capacity to the Commissioner of Social Security and SSA executives about issues of concern to SSA employees with disabilities and customers with disabilities.

## Accessible Building/Workplace Modifications

At headquarters, the Office of Facilities Management is responsible for making necessary workplace modifications (site preparation) to ensure accessibility for persons with disabilities. The Office of Publications and Logistics Management, Office of Property Management UNICOR Team provides for customization of furniture (workstations) in support of necessary reasonable accommodations. The Office of Facilities Management and Office of Publications and Logistics Management work together to reconfigure worksites and workstations. Decision

19

makers should direct headquarters reasonable accommodation requests for accessible worksites and building modifications or workstation customization to either the Office of Facilities Management, Office of Publications and Logistics Management or the Office of Property Management. Reasonable accommodation requests for accessible worksites, building modifications or workstation customization outside headquarters should be directed to appropriate regional staff identified in Appendix B.

## Ergonomic Chairs

The Office of Property Management provides ergonomic chairs for employees who have medical conditions requiring specific features in a chair. An ergonomic chair can be provided based on a written statement provided by a physician who identifies the specific requirements needed by the employee; e.g., adjustable lumbar support, upper back support, etc. The requests are evaluated on a case-by-case basis with input from the SSA Medical Director, as needed. The Office of Property Management's ability to fill these requests is limited to the available inventory of chairs. If no suitable chairs are available, funding becomes the responsibility of the employee's component. Additional information can be found on the SSA intranet web Site at: http://co.ba.ssa.gov/oplm/ergonomicProperty.htm

## Braille Materials/Alternate Formats

The Braille Services Team (BST) in the Office of Publications Management produces and distributes materials, in alternative media formats, that are accessible to employees who are blind or who have low vision. Documents for individuals who are visually impaired are produced in hardcopy Braille, large print, on audiocassettes and computer disks. If BST cannot produce Braille copies of a document, a contractor will be used to print the documents and the requesting component is responsible for paying the cost of the contract services. BST can duplicate audiocassette copies of documents but cannot narrate material onto audiocassettes. Public information pamphlets are also available in alternative media formats. BST maintains a list of publications that are available in alternative media format. See Internet site http://www.ssa.gov/pubs/alt-pubs.htm

20

## Distribution

These procedures will be available to all SSA employees.  Print copies will be available from SSA, Office of Civil Rights and Equal Opportunity (OCREO), Disability Services Team.  These procedures will also be available from OCREO in alternative formats.  They are posted on the SSA intranet at http://cofp.ba.ssa.gov/ocreo/disabilities.htm

## Inquiries

For further information about these procedures, please contact the Disability Services Team Leader at (410) 966-3819.

You may also access the following two websites for additional information:

www.eeoc.gov
http://cofp.ba.ssa.gov/ocreo/disabilities.htm

10c
PAGE 23 OF 23 PAGES

101 FEOR 1268

## Maria Vitale v. Massanari, Commissioner, Social Security Administration

### Equal Employment Opportunity Commission-OFO

EEOC 02980014

### June 13, 2001

### Related Index Numbers

**23.027 Handicap Discrimination, Hearing Disability**

**23.0455 Handicap Discrimination, Reasonable Accommodation, Types of, Good Faith Efforts**

**23.048 Handicap Discrimination, Undue Hardship**

**60.015 Authority of Equal Employment Opportunity Commission, Review of Arbitration Decisions**

### Case Summary

THE COMMISSION FOUND THE AGENCY DISCRIMINATED AGAINST GRIEVANT BY NOT PROVIDING SUITABLE ACCOMMODATION FOR HER DEAFNESS AND, THEREBY, REVERSED THE ARBITRATOR'S FINDING OF NO DISCRIMINATION BASED ON DISABILITY.

The commission found the agency discriminated against grievant by not providing suitable accommodation for her deafness and, thereby, reversed the arbitrator's finding of no discrimination based on disability. Grievant was born and remained profoundly deaf. She was employed as a GS-8 Tele-service Representative in a unit consisting of deaf employees. In 1993, due to personal problems, she requested a hardship transfer to a region that included her hometown. The agency did not respond to either her initial or second request for the transfer. In 1996, grievant discovered several vacant GS-8 representative position in her desired facility and in anticipation of receiving one of the vacant positions, grievant relocated to the region. She was on leave without pay for several months and then accepted a hardship transfer to a clerical GS-5 position within

her sought facility. Grievant filed a grievance alleging discrimination based on her disability when the agency failed to accommodate her disability for a hardship transfer to a service representative position. The agency stated that grievant was not accommodated and thus was not placed into the sought position because she could not perform an essential function of the position, i.e. face-to-face interviewing. Specifically, the agency stated that grievant would need a full-time sign language interpreter to successfully perform the above-stated essential function because (1) claimant interviews are conducted on a walk-in basis; (2) interviews are conducted as quickly as possible due to heavy demand and the expectations of the public; and (3) many claimants are limited by either physical impairment, education, economics or language which could further complicate the process. The agency indicated that it does not hire one-on-one full-time interpreters because it is very costly and can be disruptive to the office. In addition, the agency stated that it had researched the possibility of connecting a TDD to grievant's new office but was informed that the plan was not feasible in terms of good customer service. A hearing was held and the Arbitrator concluded that grievant could not perform the essential functions of the position and that the provisions of a full-time interpreter by the agency was not a reasonable accommodation. The commission began its review of the appeal by noting that the agency was obligated to provide grievant a full-time or part-time interpreter or to provide some other effective reasonable accommodation, unless to do so would impose an undue hardship. The commission found the agency failed to provide any detailed data to support its contention that such an accommodation would be an undue hardship, but instead made only general conclusory statements about the associated economic hardship. In support of its decision, the commission highlighted the size of the agency, approximately 60,000 employees in over 1300 nationwide facilities, and the fact that a profoundly deaf claims representative in the agency's

Copyright © 2006 LRP Publications

Washington, D.C. field office had an interpreter for 35.5 hours. The commission thereby found that the cost of hiring either a full-time or part-time interpreter for grievant would not be an undue hardship. Accordingly, the commission reversed the arbitrator's finding of no discrimination and ordered the agency to offer grievant a full-time, GS-8, Service representative position in her desired facility, together with back pay and training for all responsible management officials. The issue of compensatory damages was remanded to the agency for further investigation.

## Full Text

### Decision

#### Introduction

Grievant timely initiated an appeal of a final decision by an arbitrator (final decision) concerning her grievance of unlawful employment discrimination on the basis of disability (profound deafness) in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 *et seq.* For the reasons stated herein, the arbitrator's final decision is reversed.

#### Issue Presented

The issue on appeal is whether grievant has established that the agency discriminated against her on the above-referenced basis when it failed to provide her an accommodation for her disability, which would have allowed her to be selected for a Service Representative (Svce Rep), GS-8 position.

#### Background

Grievant is profoundly deaf and has been so since birth. She was employed as a Tele-service Representative (TS Rep), GS-8, at a state of Washington facility of the agency.1 Grievant began her TS Rep position in 1993 and as such, she provided a full range of customer service assistance to hearing impaired individuals who called the agency on a toll free telephone number and communicated through a Telecommunication Device for the Deaf JDD). In 1993, due to personal problems, grievant

requested a "hardship transfer,"2 from her TS Rep position in Washington state to the Chicago region, which included the Cincinnati, Ohio area (grievant's "home town"). The agency did not respond to grievant's initial request so she resubmitted it, again without response. In 1996, grievant discovered that the Chicago region had several vacant Svce Rep, GS-8 positions so she once again requested a "hardship transfer." Due to grievant's personal circumstances and in anticipation of receiving one of the vacant positions, grievant relocated to Ohio. She was on leave without pay for several months and then accepted a "hardship transfer" to a clerical, GS-5 position in a Cincinnati, Ohio facility of the agency. Grievant, believing she was a victim of discrimination, filed a grievance under the negotiated grievance procedure established by her agency and her representative union. Grievant, in her grievance, alleged that the agency discriminated against her based on disability when it failed to accommodate her disability for a "hardship transfer" to a Svce Rep position.

The agency stated that grievant was not accommodated and thus she was not placed in the Svce Rep position because she could not perform an essential function of the position, i.e., face-to-face interviewing. Specifically, the agency stated that grievant would need a full-time sign language interpreter (interpreter) to successfully perform the above-stated essential function because (1) claimant interviews are conducted on a walk-in basis, (2) the office tries to conduct claimant interviews as quickly as possible because of heavy demand and expectations by the public, and (3) many claimants are limited by either physical impairment, education, economics or language, which could further complicate the interview process. The agency indicated that it does not hire one-on-one3 full-time interpreters because it is very costly4 and can be disruptive to the office, e.g., if the interpreter takes unscheduled leave the office would have to make significant adjustments to allow a deaf employee to perform his/her work on that particular day or days.

Copyright © 2006 LRP Publications

The agency stated further that it researched the possibility of connecting a TDD to the Cincinnati office, which would allow grievant to assist with nationwide calls from hearing impaired claimants, but was told the plan was not feasible in terms of good customer service.

The grievance was not resolved under the negotiated grievance procedure and thus, was assigned to a neutral Arbitrator. A hearing was held and the Arbitrator concluded that grievant could not perform the essential functions of the position and that the provision of a full-time interpreter by the agency was not a reasonable accommodation. This appeal by grievant followed.

## Analysis and Findings

Pursuant to 29 C.F.R. § 1614.401(d), "[a] grievant may appeal the final decision of the agency, the arbitrator or the Federal Labor Relations Authority (FLRA) on the grievance when an issue of employment discrimination was raised in a negotiated grievance procedure that permits such issues to be raised."

Grievant is profoundly deaf and the agency does not dispute that she is a person with a disability. 29 C.F.R. § 1630.2(g). The Commission finds that because grievant would have been able to perform the essential functions of the position at issue herein with accommodation, she is a qualified individual with a disability. 29 C.F.R. § 1630.2(m).

The only question remaining is whether the agency met its legal obligation under the Rehabilitation Act to reasonably accommodate grievant.5 Grievant requested either a full-time or a part-time6 interpreter or job restructuring to facilitate her "hardship transfer" to a Svce Rep, GS-8 position. Rather than provide the grievant with her requested accommodations, the agency offered and grievant accepted, out of necessity, a clerical, GS-5 position. Unless to do so would impose an undue hardship, the agency was obligated to provide grievant a full-time or part-time interpreter or to provide some other effective reasonable accommodation. *See*

*Enforcement Guidance.* The agency, however, was not required by regulation to restructure the Svce Rep job by reallocating an essential function, such as face-to-face interviewing. *See* 29 C.F.R. app. § 1630.2(o). The agency stated that the above-cited accommodations would impose an undue hardship because they were economically unfeasible. However, the agency did not provide any detailed data to support its contention that such an accommodation would be an undue hardship, but instead made only general conclusory statements about the associated economic hardship. Considering the overall size of the agency, which during the period at issue was approximately 60,000 employees in over 1300 nationwide facilities; the fact that a profoundly deaf claims representative in the agency's Washington, DC field office had an interpreter for 35 1/2 hours per week; and the intent of Congress that the Federal government undertake measures to reasonably accommodate that would involve more than a *de minimis* cost;7 we find that the cost of hiring either a full-time or part-time interpreter for grievant would not be an undue hardship. Accordingly, the agency has failed to meet its obligation to reasonably accommodate grievant's disability.

## Conclusion

After a careful review of the record, including grievant's contentions on appeal, the agency's response, and arguments and evidence not specifically addressed in this decision, we REVERSE the arbitrator's finding of no discrimination based on disability. The agency is instructed to comply with the Order as set forth below.

## Order

The agency is ORDERED to take the following remedial action:

(1) Within thirty (30) calendar days of the date this decision becomes final, the agency shall offer grievant a full-time, Service Representative, GS-8 position or a substantially equivalent position at its Cincinnati, Ohio facility. Grievant shall have thirty (30) calendar days, from receipt of the agency's offer,

Copyright © 2006 LRP Publications

to accept or reject.

(2) Regardless of whether grievant accepts or rejects the offered position, the agency shall determine the appropriate amount of back pay with interest and other benefits, *e.g.*, health insurance, retirement, and leave, due grievant, pursuant to 29 C.F.R. § 1614.501, less any appropriate offsets, no later than sixty (60) calendar days after the date this decision becomes final. The time period for purposes of back pay shall be from the effective date of the denial of grievant's 1996 repest for a "hardship transfer" until the last day of the 30-day period during which she can accept or reject the agency's offer or the effective date of grievant's reinstatement to the offered position, whichever comes first. The grievant shall cooperate in the agency's efforts to compute the amount of back pay and benefits due, and shall provide all relevant information requested by the agency. If there is a dispute regarding the exact amount of back pay and/or benefits, the agency shall issue a check to the grievant for the undisputed amount within sixty (60) calendar days of the date the agency determines the amount it believes to be due. The grievant may petition for enforcement or clarification of the amount in dispute. The petition for enforcement or clarification must be filed with the Compliance Officer, at the address referenced in the statement entitled "Implementation of the Commmission's Decision."

(3) The issue of compensatory damages is REMANDED to the agency to, within sixty (60) calendar days of the date the Commission's decision becomes final, gather all evidence relevant to grievant's entitlement to compensatory damages. The grievant shall cooperate in the agency's efforts to compute the amount of compensatory damages due, and shall provide all relevant information requested by the agency. The agency, thereafter, shall issue a final action on the issue of compensatory damages in accordance with 29 C.F.R. § 1614.11(b).

(4) The agency shall post a notice of the finding of discrimination in accordance with the paragraph below entitled, "Posting Order."

(5) The agency shall conduct EEO training for the responsible management officials cited in the grievance at issue herein. Such training shall include, but not be limited to, training on the agency's obligations toward its disabled employees and applicants for employment.

(6) The agency is further directed to submit a report of compliance, as provided in the paragraph entitled "Implementation of the Commission's Decision." The report shall include a copy of the letter offering grievant a position as described in "Order" paragraph (1) as well as supporting documentation of the agency's calculation of back pay and other benefits due grievant.

### Review Rights

[See G1092, FEOR p. I-402.]

[See H1199, FEOR p. I-402.]

[See K1199, FEOR p. I-402.]

[See M0300, FEOR p. I-402.]

[See R1199, FEOR p. I-403.]

[See Z1199, FEOR p. I-404.]

1 Grievant worked in a unit consisting of deaf employees.

2 Based on the record, a "hardship transfer" is movement to another position due to difficulties experienced by the employee, typically in his/her personal life.

3 The agency stated that it hires full-time interpreters only to assist a group of hearing impaired or deaf employees.

4 Based on the record, interpreters are generally hired for a full-time or part-time position at the GS-9 level or contracted with for approximately fifty dollars per hour. A representative for the agency's Office of Civil Rights and Equal Opportunity, which was consulted by the agency about grievant's request for accommodation, stated that it is difficult to find interpreters who are willing to accept full-time employment because of the associated pay.

5 "Reasonable accommodation" describes

modifications to the manner under which a position held is customarily performed that enables a qualified individual with a disability to perform the essential functions of his/her position. *Enforcement Guidance: Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act* (1999) (*Enforcement Guidance*).

6 Grievant stated that after considering her morning, lunch, and afternoon breaks and time set aside for administrative work, she would only require an interpreter for approximately 24 hours per week.

7 *Feris v. Environmental Protection Agency,* EEOC Request No. 05950936 [97 FEOR 3020] (July 19, 1996), *affirming* EEOC Appeal No. 01934828 [97 FEOR 3021].

BEFORE THE
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

| | | |
|---|---|---|
| Alice Friends, | : | |
| Complainant, | : | EEOC Hearing No. 100-2005-00775X |
| | : | |
| v. | : | |
| | : | |
| Jo Anne B. Barnhart, Commissioner | : | |
| of Social Security, | : | Agency Case No. SSA 04-0452 |
| Agency. | : | |

## AGENCY'S REPLY TO COMPLAINANT'S OPPOSITION TO AGENCY'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Complainant, Alice Friends, alleges that the Agency intentionally discriminated against her when it denied some of her specific requests for reasonable accommodation. The Agency timely filed its motion for summary judgment on February 22, 2006. Complainant filed a forty-five page response in opposition to the Agency's motion for summary judgment on March 13, 2006. This forty-five page response, which substantially exceeds the fifteen-page limit enforced by the EEOC's Washington Field Office, fails to create a genuine issue of material fact and completely disregards the pertinent issues in this case. [1]

Notwithstanding Complainant's long-winded response, the fact remains that, throughout her entire two-year probationary or trial period, she could not perform the essential functions of her job as a claims representative even with the assistance of a full-time interpreter, which,

---

[1] The Washington Field Office Hearing Procedures clearly state that all "motions and correspondence shall not exceed 15 pages in length (emphasis not added)...[.]" Complainant's forty-five page response considerably exceeds this fifteen-page limit under the Washington Field Office's hearing procedures. Accordingly, Complainant's forty-five page response to the Agency's motion for summary judgment should be stricken from the record.

14

according to Complainant's motion for partial summary judgment, is the gravamen of this case.
Moreover, since Complainant's request for a full-time interpreter would defeat the reason that
her position exists, namely that the bilingual claims representative can conduct interviews in two
languages, she essentially acknowledges that she could not perform the essential functions of the
position with or without reasonable accommodation.

The Agency provided several forms of reasonable accommodation to Complainant to
assist her in successfully completing her two-year trial or probationary period as a claims
representative including formal classroom training and personal mentoring. Nevertheless, she
could not satisfactorily perform her critical job duties throughout her entire two-year trial or
probationary period, which is precisely why the Agency proposed her termination. Simply put,
even if the Agency granted Complainant all of her specific requests for reasonable
accommodation, she cannot prove that she could have performed the essential functions of her
job as a claims representative, especially at the more complex GS-11 level. [2] She is, therefore
not a qualified individual with a disability under the Rehabilitation Act. Because Complainant
cannot establish a case of disability discrimination under a failure to accommodate theory, her
related harassment and hostile work environment claims are also without merit. Accordingly, the
Agency's motion for summary judgment should be granted.

---

[2]    The GS-11 level is the keystone position for bringing direct personal service to the
public (Agency's Mot. Summ. J., Ex. B. At 2). Unlike at other grade levels, the employee "is
expected to resolve, without benefit of supervisory consultation, all but the most unusual
problems[.]" Id., at 5.

2

## **ARGUMENT**

<u>Complainant Has Failed to Show that She Could Have Performed the Essential Functions of Her Job Throughout Her Entire Two-Year Probationary Period, Especially at the More Complex GS-11 Level</u>.

While Complainant submitted a forty-five page response to the Agency's motion for summary judgment, she nevertheless failed to establish that she would be able to perform the essential functions of her job as a claims representative with or without reasonable accommodation throughout her entire two-year trial or probationary period, especially at the more complex GS-11 level. <u>See</u> 29 C.F.R. § 1630.2(m); <u>Polk v. United States Postal Service</u>, EEOC Petition 01A24767, 2005 WL 22118533, *2-3 (E.E.O.C. Sept. 4, 2003). The Agency provided Complainant with several forms of reasonable accommodation, such as a formal six-month IVT training course regarding substantive Title 16 disability policy, mentors who were well-versed in Title 16 disability policy, WINTALK (an integrated telecommunications device for the deaf), and up to 32 hours of interpreter services every week for any work-related functions other than conducting interviews or other business with the public (ROI, Ex. 7 at 2-3; Ex. 7b at 3; Ex. 7d at 2-5, 14, 17; Ex. 8 at 1-2; Ex. 9 at 1; Ex. 12b at 1-2). All of Complainant's mentors, however, including non-management employees, agreed that Complainant constantly made the same errors, many of which were on "basic, fundamental issues" (ROI, Ex. 8 at 1-2; Ex. 9 at 1; Ex. 12b at 2-3). Her inability to perform the essential functions of her job as a claims representative was highlighted by situations where there could be no communication difficulties, such as when (1) she was provided with written instructions and (2) she processed applications filed by deaf claimants (ROI, Ex. 8 at 2; Ex. 9 at 1). Indeed, despite her extensive training and

3

mentoring, she had "difficulties with the technical aspects of the job" (ROI, Ex. 8 at 2), especially at the more complex GS-11 level.

Even if the Agency had granted all of Complainant's specific requests for reasonable accommodation (i.e. full-time interpreter, iCommunicator software, VRS, and hearing aids), she cannot establish that she could have performed the essential functions of her job as a claims representative for the entire duration of her two-year trial or probationary period. There is no dispute that Complainant had significant work-related problems. She simply did not understand Title 16 disability policy and, therefore, she was incapable of asking the correct questions during interviews. She was also unable to apply the information gathered from an interview to adjudicate a claim. None of Complainant's specific requests for reasonable accommodation, which includes her request for a full-time interpreter, would have improved her ability to learn and apply Title 16 disability policy. Because her requests for reasonable accommodation would not have improved her knowledge and application of disability policy, she has failed to prove that she could have performed the essential functions of a claims representative throughout her two-year trial or probationary period, especially at the more complex GS-11 level. See Polk, 2005 WL 22118533 at *2-3.

Complainant offers several excuses for her performance problems, such as poor training and poor mentors (Compl.'s Opp. to Agency's Mot. Summ. J. at 29-44). These excuses are not persuasive. Just like all claims representatives in the Postal Plaza Field Office, Complainant participated in formal IVT training sessions, which were "closed captioned" at the bottom of the televison screen, with the assistance of an ASL interpreter (ROI, Ex. 12b at 1-2). She received mentoring from Michelle Ward, who is also deaf and considered to be a successful and

4

experienced Title 16 Claims Representative (ROI, Ex. 8, Ex. 9 at 1, Ex. 12b at 1-2). Another of

Complainant's mentors, Monte Walker, was very experienced in Title 16 disability claims (ROI,

Ex. 8 at 1-2, Ex. 9 at 1, Ex. 12b at 2). She even received mentoring from Robin Wells, District

Manager of the Postal Plaza Field Office who has considerable SSI knowledge and experience

(ROI, Ex. 6 at 2, ROI, Ex. 8 at 2). Although the Agency provided Complainant with the

necessary training and mentoring that all claims representatives receive, she continued to make

mistakes on "basic, fundamental issues" (ROI, Ex. 12b at 3).

Regardless of the alleged insufficient training or mentoring, or any other factor, the fact

remains that an individual who performs a position, such as claims representative, for a period of

two years should become familiar with basic concepts simply through the repetition in

performing the functions of the position. Even after two years of performing the job of claims

representative, all of Complainant's mentors agreed that she did not even understand basic

concepts in Title 16 policy (ROI, Ex. 8 at 1-2; Ex. 9 at 1; Ex. 12b at 2-3). In fact, these errors

occurred when Complainant was given written instructions on how to complete a case, and even

when she interviewed and processed applications by deaf claimants (ROI, Ex. 8 at 2; Ex. 9 at 1).

Her constant mistakes after two years of experience as a claims representative demonstrates that

she just could not understand and apply Title 16 disability policy, especially at the more complex

GS-11 level.

There is also no merit to Complainant's belief that the Agency created a "super" essential

function of her job (Compl.'s Opp. to Agency's Mot. Summ. J. at 15-18). The regulations

specifically provide that an individual is unable to perform the essential functions of a job when

"the reason that the position exists is to perform that function[.]" 29 C.F.R. 1630.2(n)(2)(i). In

5

this case, the essential reason for a bilingual claims representative is that an individual is able to

conduct interviews with the general public in two languages including ASL. Since

Complainant's request for a full-time interpreter would defeat the "reason that the position

exists," to wit, that the employee can conduct interviews in two languages, she essentially

acknowledges that she cannot perform the essential functions of the position with or without

reasonable accommodation.

Moreover, contrary to Complainant's belief, the Agency was not required to reassign

Complainant as a form of reasonable accommodation. As the Agency argued in its motion for

summary judgment, the EEOC Enforcement Guidance explicitly states an employee is not

entitled to reassignment as a form of reasonable accommodation if the employee could not

perform the essential functions of her job as a claims representative with or without reasonable

accommodation. See EEOC Enforcement Guidance: Reasonable Accommodation and Undue

Hardship Under the Americans with Disabilities Act, Question 25 (Oct. 17, 2002). As

demonstrated above, Complainant was not entitled to reassignment as a form of reasonable

accommodation because she was never able to successfully perform the essential functions of her

position as a claims representative throughout her entire two-year trial or probationary period,

especially at the more complex GS-11 level. Indeed, in her motion for partial summary

judgment, Complainant did not raise the issue of reassignment.

For the reasons expressed in the Agency's motion for summary judgment, the Agency's

response to Complainant's motion for partial summary judgment, and the Agency's reply to

Complainant's forty-five page response to the Agency's motion for summary judgment, the

Agency did not discriminate against Complainant on the basis of disability under a failure to

6

accommodate theory. Nor did the Agency subject Complainant to harassment or a hostile work environment, as she alleges. Accordingly, the Agency's motion for summary judgment should be granted.

Respectfully submitted,

Donna L. Calvert
Regional Chief Counsel

By:_____

Nicholas R. Cerulli, Assistant Regional Counsel
Craig Ormson, Assistant Regional Counsel
Social Security Administration
Office of the General Counsel - Region III
P.O. Box 41777
Philadelphia, PA  19101
(215) 597-1862

7

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Agency's Reply to

Complainant's Opposition to Agency's Motion for Summary Judgment was sent via First-Class

mail on March 21, 2006 to the following:

Phillip R. Kete
Attorney for Complainant
General Counsel
Local 1923, AFGE
6401 Security Blvd.
G-314 West High Rise
Baltimore, MD  21235


Nicholas R. Cerulli
Assistant Regional Counsel

8

BEFORE THE
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

| | | |
|---|---|---|
| Alice Friends, | : | EEOC Hearing No. |
| Complainant | : | 100-2005-00775X |
| | : | |
| vs. | : | |
| | : | |
| Jo Anne B. Barnhart, Commissioner | : | |
| of Social Security, | : | Agency Case No. |
| Agency | : | SSA 04-0452 |

**MEMORANDUM IN SUPPORT OF THE AGENCY'S MOTION
FOR SUMMARY JUDGMENT**

Complainant, Alice Friends, alleges that the Agency intentionally discriminated against her when it denied some of her requests for reasonable accommodation. [1] Although the Agency provided several forms of reasonable accommodation, Complainant cannot establish that she is a "qualified" individual with a disability because she could not satisfactorily perform the essential functions of her job with or without reasonable accommodation during her trial or probationary period. She also would not have been above to perform the essential functions of her job even if the Agency approved all of her specific requests for reasonable accommodation. Moreover, some of her specific requests for reasonable accommodation were, in fact, unreasonable and would impose an undue hardship.

---

[1] Complainant further alleges that she was subjected to harassment and a hostile work environment. In response to the Agency's discovery requests, she explained that "[t]he discrimination and harassment this complaint concerns are in the form of the agency's failure to reasonable accommodate by (sic) disability." Her harassment and hostile work environment claims, therefore, are part and parcel of her primary theory of the Agency's alleged failure to reasonably accommodate her disability.

15

Since the Agency properly denied some of her specific requests for reasonable accommodation, it did not intentionally discriminate against Complainant under a failure to accommodate theory, nor did it subject her to harassment or a hostile work environment as she alleges. Because the material facts in this case are not in genuine dispute, and there is no genuine issue as to credibility, the Agency respectfully requests that the Administrative Judge enter judgment in favor of the Agency without a hearing pursuant to 29 C.F.R. § 1614.109(g)(1).

## STATEMENT OF UNDISPUTED FACTS

Complainant's Work History

1. Complainant was hired as a Social Insurance Specialist/Claims Representative (Bilingual), Grade Series (GS) - 9, at the Postal Plaza Field Office in Washington, D.C., with an effective date of September 22, 2002 (Report of Investigation (ROI), Ex. 13a at 11-13).

2. Complainant is deaf in both of her ears "with understandable speech" (ROI, Ex. 5 at 2). During her interview for the claims representative position, she stated that she was fluent in American Sign Language (ASL) and "professed to read lips very well" (ROI, Ex. 9 at 1).

3. Complainant was hired under the Schedule A appointing authority for persons with disabilities (ROI, Ex. 6 at 1; Ex. 13a at 13). Employees hired under Schedule A must satisfactorily perform her duties during a two-year trial or probationary period before becoming a permanent employee (ROI, Ex. 6 at 1; Ex. 10e at 3 (5 C.F.R. § 213.3102(u)); Ex. 13a at 13).

4. As a claims representative, the essential functions of Complainant's job included the following: (1) conducting interviews with claimants to obtain, clarify, and verify information about individual applicant's initial and continuing eligibility for various benefit programs administered by the Agency; (2) adjudicating claims for benefits and eligibility to all programs

2

Similarly, as Mr. France explained, the iCommunicator and VRS programs were impractical (ROI, Ex. 7 at 3, Ex. 7e3 at 1). Because the iCommunicator program is only effective after it recognizes an individual's speech patterns, which can take up to ninety minutes, the program was impractical because the Agency would be unable to train claimants to use the program prior to an interview, especially given that many of our claimants have intellectual, technological, or physical/mental impairments that would prevent them from even learning how to use the program (ROI, Ex. 7 at 3, Ex. 7e3 at 1). Mr. France also explained that VRS was impractical because the Agency had not yet identified the systems changes that would be necessary to integrate the program into the systems network (ROI, Ex. 7 at 3, Ex. 7e3 at 1).

Finally, as Mr. France explained, the Agency did not have to purchase Complainant a new hearing aid because the Agency is not required to purchase personal use items, such as hearing aids, that are needed to accomplish daily activities both on and off the job (ROI, Ex. 7 at 3; Ex. 7c at 2, 7-10). EEOC's Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans Disabilities Act, General Principles (Oct. 17, 2002).

Because the Agency properly denied some of her specific requests for reasonable accommodation, complainant cannot prevail under a failure to accommodate theory nor can nor can she establish harassing conduct so severe or pervasive as to alter the conditions of her employment.

15