**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALICE ANN FRIENDS**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil Action No.: 06-1762 (ESH)** |
| ) | |
| **JOANNE B. BARNHART**, ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant, Joanne B. Barnhart, Commissioner of the Social Security Administration, respectfully submits her opposition to Plaintiff's motion for partial summary judgment and seeks, pursuant to Federal Rule of Civil Procedure 56, an order granting Defendant summary judgment as to Counts I and II of the Complaint on the grounds that no genuine issue of material fact exists and Defendant is entitled to judgment as a matter of law.

In support of this Motion, Defendant respectfully submits the attached statement of material facts as to which there is no genuine dispute, Defendant's response to Plaintiff's statement of material facts not in dispute, a memorandum of points and authorities with exhibits, and a proposed order.

Respectfully submitted,

/s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____/s/ Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

_____/s/ Michelle N. Johnson_____
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANT

Of Counsel:

Nicholas R. Cerulli
Craig Ormson
Assistant Regional Counsel
Social Security Administration
Office of the General Counsel – Region III
P.O. Box 41777
Philadelphia, PA 19101

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **ALICE ANN FRIENDS**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No.: 06-1762 (ESH)** |
| | ) | |
| **JOANNE B. BARNHART**, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
|  | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to LCvR 56.1 and 7(h), Defendant, Joanne B. Barnhart, respectfully submits this statement of material facts as to which there is no genuine issue in support of her Motion for Summary Judgment.

1.      Alice A. Friends, Plaintiff, was hired as a Social Insurance Specialist/Claims Representative (Bilingual), Grade Series (GS) - 9, at the Postal Plaza Field Office in Washington, D.C., with an effective date of September 22, 2002  (Exhibit ("Ex.") 1, Letter to Ms. Friends from Nancy Beadle dated September 17, 2002 ).  She was hired under the Schedule A appointing authority for persons with disabilities (Ex. 2, Affidavit of Lorna Walters dated March 10, 2005 ("Walters Aff.") ¶ 3).

2.      Plaintiff is deaf in both of her ears "with understandable speech" and is legally blind in her left eye.  (Ex. 3, Affidavit of Alice Ann Friends dated March 2, 2005 ("Friends Aff.") at 2).  During her interview for the claims representative position, she stated that

1

she was fluent in American Sign Language (ASL) and "professed to read lips very well" (Ex. 4, Affidavit of Monte Walker ("Walker Aff.") ¶ 2).

3.     An employee hired under the Schedule A appointing authority must satisfactorily perform his or her duties during a two-year trial or probationary period before becoming a permanent employee (Ex. 2, Walters' Aff. ¶ 3; Ex. 5, Notification of Personnel Action).

4.     As a claims representative, the essential functions of Plaintiff's job included the following: (1) conducting interviews with claimants to obtain, clarify, and verify information about individual applicants' initial and continuing eligibility for various benefit programs administered by the Agency; (2) adjudicating claims for benefits and eligibility to all programs administered by the Agency; (3) authorizing payment of claims for benefits; and (4) conducting interviews, developing, investigating, and resolving post entitlement actions which may involve suspension, resumption, or termination of eligibility or payments.  (Ex. 6, Agency's Position Description for Social Insurance Specialist/Claims Representative (Bilingual) GS-9, at 2); Ex. 7, Agency's Position Description for Social Insurance Specialist/Claims Representative (Bilingual) GS-11 level, at 2-3).

5.     Plaintiff was assigned as a Title 16 Claims Representative at the Postal Plaza Field Office.  (Ex. 8, Memorandum to Ms. Friends from Robin Wells dated June 28, 2004).  Title 16 pertains to individuals eligible for disability benefits based on financial need, otherwise known as SSI benefits under Section XVI of the Social Security Act.

6.     Between October 2002 and March 2003, Plaintiff received formal classroom training for her position as a claims representative.  (Ex. 8, at 1-2).  This training was presented via Interactive Video Technology (IVT), which allows employees nationwide to simultaneously

2

watch live and/or taped broadcasts by television. (Id.). Plaintiff was the only student in the IVT class, which was "closed captioned." (Id. at 1).

7.    In addition, Plaintiff was provided with assistance from her assigned Mentor, Michelle Ward. (Ex. 8, at 1; Ex. 4, Walker Aff. ¶ 3). Ms. Ward is an experienced Title 16 Claims Representative who is also deaf and able to communicate in ASL. (Ex. 8, at 1; Ex. 4, Walker Aff. ¶ 4). Ms. Ward spent "4 days per week" with Plaintiff during "off air" activities, reviewing Plaintiff's IVT lesson and answering any questions Plaintiff had. (Ex. 8, at 1).

8.    In addition, Plaintiff was provided with an ASL interpreter every day during the IVT broadcast, from 8:30 - 12:30 p.m. (Ex. 8, at 1). Ms. Ward continued to assist Plaintiff in the afternoon. (Id.).

9.    Ms. Ward and the ASL interpreter continued in their respective roles until March 2003, when Ms. Ward left on maternity leave and Monte Walker, a Management Support Specialist, became Plaintiff's mentor until Ms. Ward returned and resumed her role as Plaintiff's mentor. (Ex. 4, Walker Aff. ¶ 3; Ex. 8, at 2).

10.    After returning to her role as Plaintiff's mentor, in September 2003, Ms. Ward requested that she cease in her role because of the difficulties she had training Plaintiff and because Plaintiff would repeatedly ask the same questions. (Ex. 8, at 1).

11.    Mr. Walker was reappointed as Plaintiff's mentor, but he too found that Plaintiff was difficult to work with as she committed many errors and would repeatedly ask him the same questions. (Ex. 4, Walker Aff. ¶ 4).

12.    In September 2003, Robin Wells became the District Manager of the Postal Plaza Field Office. (Ex. 9, Affidavit of Robin Wells dated March 9, 2005 ("Wells' Aff.") ¶¶ 1-2).

Shortly thereafter, Gayle Syphax, another experienced claims representative, volunteered to mentor Plaintiff, but within two weeks, Ms. Syphax told Ms. Wells that she could no longer mentor Plaintiff, citing the same problems as Ms. Ward.  (Id. ¶ 5).

13.    Mr. Walker was re-assigned as Plaintiff's mentor, but he continued to find "blatant errors" in her work that would have resulted in incorrect payments if not caught before final processing.  (Id.).  On March 11, 2004, Plaintiff told Ms. Wells that she did not want Mr. Walker assigned as her mentor anymore.  (Id.).  Thereafter, Ms. Wells decided to take on the role as Plaintiff's mentor since she had "considerable Title 16 SSI experience" and so she could evaluate Plaintiff's performance first-hand.  (Id. ¶ 6).

14.    In her role as Plaintiff's mentor, Ms. Wells was able to witness Plaintiff's inability to perform the duties of a claims representative satisfactorily.  Early on, Ms. Wells noticed that Plaintiff had "considerable difficulty" asking the right questions in a manner that claimants could understand.  (Id.).  Plaintiff herself did not appear to understand what responses she was being given.  (Id.).  Plaintiff also appeared to have difficulties with the technical aspects of her position.  (Id.).

15.    Plaintiff told Ms. Wells that she had difficulty understanding African-Americans when they speak, which was the reason for the mistakes she made during the interviews.  (Id. ¶ 7).  However, Plaintiff was able to understand Ms. Syphax and Ms. Wells, both of whom are African-American.  (Id.; see also Plaintiff's Statement of Material Facts in Support of her Motion for Summary Judgment ("Pl.'s Stmt.") ¶ 24).  Plaintiff stated that the problem was solely in her interviews with the public, however, she also told Ms. Wells that she had difficulties understanding White claimants as well.  (Id.).  Ms. Wells also witnessed Plaintiff having "the

4

same problems and errors in comprehending, understanding, and applying what was being said[
]" when Plaintiff interviewed deaf claimants.  (Id.).

16.     On June 8, 2004, Ms. Wells issued a written memorandum to Plaintiff
summarizing Plaintiff's "frequent and persistent disrespectful and discourteous conduct . . . ."
(Ex. 10, Letter to Ms. Friends from Robin Wells dated June 8, 2004).  Ms. Wells documented
several incidents where Plaintiff was rude and impudent towards her co-workers.  (Id. at 5).  In
her letter, Ms. Wells warned Plaintiff that unless she was "able to fully demonstrate [her] fitness
and qualifications for continued employment [her] excepted service appointment [would] likely
be terminated."  (Id.).

19.     On June 28, 2004, Ms. Wells issued a second written memorandum to Plaintiff in
which she summarized Plaintiff's performance problems during her probationary period.  (Ex.
8).  In particular, Ms. Wells documented the many mistakes Plaintiff made during her interviews
with claimants and the processing of claimant applications.  (Id. at 2-3).  Ms. Wells noted that
despite constant mentoring, almost every case Plaintiff worked on "must be returned due to some
type of error, oftentimes resulting in a payment error or disadvantage to claimants."  (Id. at 3).

20.     In a memorandum dated September 10, 2004, Lorna Walters, the District
Manager of the Washington M Street Field Office, and Plaintiff's second level supervisor,
informed Plaintiff that Plaintiff was being terminated effective September 17, 2004.  (Ex. 11,
Memorandum to Ms. Friends from Lorna Walters dated September 10, 2004).  Ms. Walters
noted that, despite "one year and six months of mentoring and assistance, [Plaintiff] continued to
require assistance with basic, fundamental issues relating to SSI claims."  (Id. at 1).  Notably,
Ms. Walters documented that Plaintiff's performance had not improved since Ms. Wells' June

5

28, 2004 memorandum and, in fact, Plaintiff had made errors in all of the nineteen subsequent interviews she had conducted.  (Id. at 2-7).

21.    Ms. Walters' decision to terminate Plaintiff was "based on [Plaintiff's] failure to fully demonstrate her fitness and qualifications for continued employment" beyond her two-year trial or probationary period (Ex. 2, Walters' Aff. ¶ 8).  On September 16, 2004, before the effective date of her termination, Plaintiff resigned from her position as claims representative at the Postal Plaza Field Office.  (Ex. 12, Email to Lorna Walters from Alice Ann Friends dated September 16, 2004).

**Plaintiff's Request for a Full-Time ASL Interpreter**

22.    On March 11, 2004, Plaintiff requested that the Agency provide a full-time interpreter, refresher training, effective mentoring, and other adjustments to her work environment including relocation (Ex. 13, Request for Reasonable Accommodation dated March 11, 2004) .  In her request, Plaintiff stated that "lack of interpreter services has made it difficult to participate in training and mentoring as well as interaction with fellow employees."  (Id.) Plaintiff did not specifically request an interpreter to assist her in conducting interviews with the public.  (Id.).  The Agency denied Plaintiff's request for a full-time interpreter in a letter dated April 29, 2004.  (Ex. 14, Letter to Ms. Friends from Doug France dated April 29, 2004).

23.    Plaintiff wrote to Doug France in an email dated May 4, 2004, inquiring about her right to request a reassessment of the denial of her request.  (Ex. 15, Emails to/from Ms. Friends and Doug France dated May 4, 2004).  Specifically, Ms. Friends inquired about the time for filing a request for a reassessment, and Mr. France informed her that a request for reassessment had to "be initiated within a reasonable period of time, i.e., 30 days after you[r]

receipt of the initial denial letter." (Id.). Mr. France also indicated:

> Please note: A request for reassessment or an independent review <u>does not stop</u> the forty-five (45) days regulatory timeframe for filing a request for EEO counseling.

(Id.).

24.    In letter dated May 11, 2004, Bruce Williams, Plaintiff's union representative, submitted a request for reassessment of the denial of Plaintiff's request for a full-time interpreter. (Ex. 16, Letter to Doug France from Bruce Williams, Area Coordinator, AFGE Local 923). In an email dated June 4, 2004, Mr. France re-affirmed the denial of Plaintiff's request for a full-time interpreter, however, he informed Plaintiff that she could receive up to 32 hours of interpreter services per week which she could use during mentoring, training, staff meeting, progress/performance discussions with your supervisor, and any other business related need." (Ex. 17, Email from Doug France to Ms. Friends dated June 4, 2004). However, Mr. France informed Plaintiff that interpreter services could not "be used to conduct interviews and/or other business with the public." (Id.).

25.    Mr. France denied Plaintiff's request for a full-time interpreter because it would have been "unduly burdensome" for the Agency to have provided a full-time interpreter to assist Plaintiff in conducting interviews with claimants. (Ex. 18, Affidavit of Doug France dated March 18, 2005 ("France Aff."), at 4). Specifically, multiple ASL interpreters would be required to conduct most of the face-to-face interviews that Plaintiff had to perform as part of her job responsibilities. (Id.). "Such an arrangement would result in three (3) individuals performing a job function (face-to-face interviewing) normally requiring only one (1) [claims representative]." (Id.). In addition, use of an ASL interpreter during her interviews would increase the time needed for each interview. (Id.). Interpreters would also have to be trained "in the meaning and

7

use of SSA terminology and application of programmatic policy and procedure." (Id.).

26.    Mr. Williams wrote an email dated June 23, 2004, contending that Plaintiff was entitled to a full-time interpreter. (Ex. 19, Emails to/from Bruce Williams dated June 23, 2004). In a letter dated July 6, 2004, Linda Jackson, Director, Center for Disability Services, Office of Civil Rights and Equal Opportunity, stated that the 32 hours of interpreter services being provided to Plaintiff was "a sufficient accommodation." (Ex. 20, Letter to Ms. Friends from Linda Jackson dated July 6, 2004).

**Plaintiff's EEO Counseling**

27.    Plaintiff first sought EEO counseling on June 15, 2004. (Ex. 21, EEO Counseling Report). She contended that the date of the first occurrence of discrimination was June 8, 2004. (Id.). Plaintiff contended that she had been discriminated against because of her disability because she had been denied: "a full time interpreter, refresher training, effective mentoring, and relocation to another SSA office specifically Frederick, Maryland." (Id. at 2). She also contended that her work environment was hostile. (Id.).

32.    Plaintiff field her formal EEO complaint on September 17, 2004. (Ex. 22, Individual EEO Discrimination Complaint Form dated September 17, 2004).

Respectfully submitted,

___/s/ Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

___/s/ Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

8

_/s/ Michelle N. Johnson_
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANT


Of Counsel:

Nicholas R. Cerulli
Craig Ormson
Assistant Regional Counsel
Social Security Administration
Office of the General Counsel – Region III
P.O. Box 41777
Philadelphia, PA 19101

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| | ) |
| **ALICE ANN FRIENDS**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    **Civil Action No.: 06-1762 (ESH)** |
| | ) |
| **JOANNE B. BARNHART**, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

_____)

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT[1]

Pursuant to LCVR 56.1 and 7(h), Defendant Joanne B. Barnhart, hereby files her response to Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment.

1.    Defendant does not dispute that Plaintiff is deaf.  The remaining statements in Paragraph 1 are not material to the resolution of this case.

2.    The statement contained in paragraph 2 is not in dispute.

3.    The statement in contained in paragraph 3 is not in dispute.

4.    Defendant disputes that Plaintiff can speak English fluently because she demonstrated serious problems performing her job, which involved communicating in English with members of the public.  (See Ex. 11, Letter to Ms. Friends from Lorna Walters dated

_____

[1] Defendant presumes that Plaintiff's Statement of "Material Facts" is in fact her Statement of "Material Facts as to Which There is no Genuine Issue" as required by LCvR 56.1.

1

September 10, 2004, at 8). Defendant does not dispute that Plaintiff is unable to fully control her intonations.

5.      The statement contained in paragraph 5 is not in dispute.

6.      The statement contained in paragraph 6 is not in dispute.

7.      The statement contained in paragraph 7 is not in dispute.

8.      The statement contained in paragraph 8 is hearsay and, therefore, not proper for consideration for purposes of summary judgment. To the extent a response is necessary, Defendant states that pursuant to 5 C.F.R. § 315.709, employees, such as Plaintiff, who are hired under 5 C.F.R. § 213.3102(u) are required to "[c]omplete 2 or more years of satisfactory service" before they can be converted to career or career-conditional appointments.

9.      The statement contained in paragraph 9 is not in dispute.

10.      The statement contained in paragraph 10 is not in dispute.

11.      Defendant does not dispute that Plaintiff was provided with an ASL interpreter during training. The remaining statements contained in paragraph 11 are hearsay and, therefore, not proper for consideration for purposes of summary judgment.

12.      The statement contained in paragraph 12 is not in dispute.

13.      Defendant disputes the statement in paragraph 13. Plaintiff was provided with an ASL interpreter every day during her IVT training class, which ended in March of 2003. (Ex. 8, at 2).

14.      The statement contained in paragraph 14 is not in dispute.

15.      The statement contained in paragraph 15 is not in dispute.

16.      The statement contained in paragraph 16 is not in dispute, although Defendant

refers the Court to Exhibits 6 and 7 for the pertinent position descriptions as the documents speak for themselves.

17.     This statement contained in paragraph 17 is not material to this case because it involves an administrative claim not involving Plaintiff, and therefore, it is not properly before this Court for purposes of summary judgment.

18.     The statement contained in paragraph 18 is not in dispute.

19.     The statements contained in paragraph 19 are not proper for consideration on summary judgment, as they are hearsay and Ms. Gallagher has not been certified as an expert in this case.

20.     The statement contained in paragraph 20 is hearsay and, therefore, not proper for consideration in summary judgment. To the extent a response is necessary, Defendant admits that Plaintiff contends that the claimants she "met with often failed to do the things which are necessary for effective speech-reading . . . ."

21.     The statement contained in paragraph 21 is hearsay and, therefore, not proper for consideration in summary judgment. To the extent a response is required, Defendant disputes Ms. Gallagher's conclusion that "it would be virtually impossible for . . . almost any other deaf person, to fully comprehend what the claimants were saying . . . ." and notes that Ms. Ward, who was also deaf, was capable of performing claimant interviews satisfactorily. (Ex. 8).

22.     The statement contained in paragraph 22 is not in dispute.

23.     The statement contained in paragraph 23 is not material because Plaintiff's subjective feelings and beliefs are not proper for consideration on summary judgment.

24.     The statement contained in paragraph 24 is not material because Plaintiff's

3

subjective feelings and beliefs are not proper for consideration on summary judgment.

25.    Defendant disputes the statement contained in paragraph 25 because Defendant contends that providing a full-time ASL interpreter to assist Plaintiff in her job duties would not have been a reasonable accommodation and would have posed an undue hardship on Defendant.

26.    Defendant disputes the statement contained in Paragraph 26 because Defendant granted Plaintiff's request, in part, by providing an interpreter for up to 32 hours per week for any work-related functions, except to conduct interviews or other business with the public. (Ex. 18, at 2).

27.    The statement contained in paragraph 27 is not material to resolution of this matter. To the extent a response is required, Defendant notes that the record evidence Plaintiff cites to does not contain a "qualification" section; rather it appears that Plaintiff is referring to the job requirements section (See Plaintiff's Ex. 7, at 3; Ex. 8, at 4). Furthermore, the job requirements Plaintiff refers to are both related to the Social Insurance Specialist position (one for the GS-9 level, one for the GS-11 level) and thus they naturally contain some of the same job requirements.

28.    The statement contained in paragraph 28 is not proper for consideration on summary judgment as it derived from a wholly separate administrative ruling and does not concern Plaintiff.

29.    The statement contained in paragraph 29 is disputed to the extent there are other differences between the positions not reflected in the excerpt cited by Plaintiff.

30.    The statement contained in paragraph 30 is disputed to the extent that  Mr. France was not specifically referring to the pertinent position description at the time he made his

statement.  Rather, Mr. France stated, in part:

> [T]he Bi-lingual Claims Representative (CR) position . . . requires
> the incumbent to understand multiple languages, in this case
> English and American Sign Language (ASL).  Even though Ms.
> Friends was hearing impaired, the duties of this position require
> the ability to communicate (speak and understand spoken words)
> in English.

(Plaintiff's Ex. 10, at 2).

31.     The statement contained in paragraph 31 is not in dispute.  Defendant notes that at

the time she was interviewed, Plaintiff stated that she was fluent in American Sign Language

(ASL) and "professed to read lips very well" (Ex. 4, Walker Aff ¶ 2).

32.     The statements contained  in paragraph 32 are not in dispute, although Defendant

does not contend that Plaintiff could resolve "all but the most unusual problems."  Defendant

contends that Plaintiff had difficulty resolving even basic, fundamental issues.  (Ex. 8).

33.     The statements contained in paragraph 33 are not proper for consideration on

summary judgment as they were made in reference to a separate administrative proceeding not

involving Plaintiff.

34.     The statement contained in paragraph 34 is disputed to the extent that Defendant

was providing Plaintiff with a "reassessment" of the decision to deny her request for a full-time

interpreter.  Plaintiff initially submitted her request for a full-time interpreter on March 11, 2004

(see Ex. 13), which was denied in a letter dated April 29, 2004.  (Ex.14).

35.     The statement contained in paragraph 35 is disputed because Plaintiff did not

initiate EEO counseling on June 9, **2003**.  Rather, EEO counseling was initiated on June 15,

2004, although Plaintiff contended she first sought counseling on June 9, 2004.  (Ex. 21).

36.     The statement contained in paragraph 36 is not disputed.

37.    The statement contained in paragraph 37 is disputed to the extent that Plaintiff was provided with other letters detailing the reasons why her request was being denied.  (Ex. 14).

38.    The statement contained in paragraph 38 is disputed because it was not made in the context of a job offer to Plaintiff.  (Pl.'s Ex. 3).  However, this statement is not material to resolution of this matter.

39.    The statement contained in paragraph 39 is disputed to the extent that the statement was made in an email, not a formal job offer.  However, this statement is not material to resolution of this matter

40.    The statement contained in paragraph 40 is disputed to the extent that Plaintiff did not submit requests for an ASL interpreter, aside from the request submitted on March 11, 2004. (Ex. 13).

Respectfully submitted,

     /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

     /s/ Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


     /s/ Michelle N. Johnson
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

6

COUNSEL FOR DEFENDANT

Of Counsel:

Nicholas R. Cerulli
Craig Ormson
Assistant Regional Counsel
Social Security Administration
Office of the General Counsel – Region III
P.O. Box 41777
Philadelphia, PA 19101

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALICE ANN FRIENDS**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 06-1762 (ESH) |
| | ) |
| **JOANNE B. BARNHART**, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |
| | ) |

<u>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT OF HER
CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

Defendant, Joanne B. Barnhart, hereby files her opposition to Plaintiff's motion for

partial summary judgment and her cross-motion for summary judgment. Dismissal of Count I of

Plaintiff's complaint is required because Plaintiff did not timely exhaust her administrative

remedies. In addition, Plaintiff is not entitled to relief under Count I because she was not an

otherwise qualified individual with a disability and the accommodation she sought was

unreasonable as a matter of law. Furthermore, as to Count II, Plaintiff has failed to assert a claim

of discriminatory discharge or constructive discharge as a matter of law. For these reasons,

Defendant contends that summary judgment is warranted in her favor and Plaintiff's complaint

should be dismissed with prejudice.

I.      BACKGROUND

Plaintiff Alice Ann Friends ("Plaintiff") was hired as a Social Insurance

1

Specialist/Claims Representative (Bilingual), Grade Series (GS) - 9, at the Postal Plaza Field

Office in Washington, D.C., with an effective date of September 22, 2002  (Exhibit ("Ex.") 1,

Letter to Ms. Friends from Nancy Beadle dated September 17, 2002 ).  She was hired under the

Schedule A appointing authority for persons with disabilities (Ex. 2, Affidavit of Lorna Walters

dated March 10, 2005 ("Walters Aff.") ¶ 3).  Plaintiff is deaf in both of her ears "with

understandable speech" and is legally blind in her left eye.  (Ex. 3, Affidavit of Alice Ann

Friends dated March 2, 2005 ("Friends Aff.") at 2).  During her interview for the claims

representative position, she stated that she was fluent in American Sign Language (ASL) and

"professed to read lips very well" (Ex. 4, Affidavit of Monte Walker ("Walker Aff.") ¶ 2).

Employees, such as Plaintiff, that are hired under the Schedule A appointing authority

must satisfactorily perform his or her duties during a two-year trial or probationary period before

becoming a permanent employee (Ex. 2, Walters' Aff. ¶ 3; Ex. 5, Notification of Personnel

Action).  As a claims representative, the essential functions of Plaintiff's job included

the following: (1) conducting interviews with claimants to obtain, clarify, and verify information

about individual applicants' initial and continuing eligibility for various benefit programs

administered by the Agency; (2) adjudicating claims for benefits and eligibility to all programs

administered by the Agency; (3) authorizing payment of claims for benefits; and (4) conducting

interviews, developing, investigating, and resolving post entitlement actions, which may involve

suspension, resumption, or termination of eligibility or payments.  (Ex. 6, Agency's Position

Description for Social Insurance Specialist/Claims Representative (Bilingual) GS-9, at 2); Ex. 7,

Agency's Position Description for Social Insurance Specialist/Claims Representative (Bilingual)

GS-11 level, at 2-3).  Plaintiff was assigned as a Title 16 Claims Representative at the Postal

Plaza Field Office. (Ex. 8, Memorandum to Ms. Friends from Robin Wells dated June 28, 2004).

Title 16 pertains to individuals eligible for disability benefits based on financial need, otherwise

known as SSI benefits under Section XVI of the Social Security Act.

In order to enable her to perform her job satisfactorily, Plaintiff was provided with

extensive training and assistance. Between October 2002 and March 2003, Plaintiff received

formal classroom training for her position as a claims representative. (Ex. 8, at 1-2). This

training was presented via Interactive Video Technology (IVT), which allows employees

nationwide to simultaneously watch live and/or taped broadcasts by television. (Id.). Plaintiff

was the only student in the IVT class, which was "closed captioned." (Id. at 1). Additionally,

Plaintiff was provided with assistance from her assigned Mentor, Michelle Ward. (Ex. 8, at 1;

Ex. 4, Walker Aff. ¶ 3). Ms. Ward is an experienced Title 16 Claims Representative who is also

deaf and able to communicate in ASL. (Ex. 8, at 1; Ex. 4, Walker Aff. ¶ 4). Ms. Ward spent "4

days per week" with Plaintiff during "off air" activities, reviewing Plaintiff's IVT lesson and

answering any questions Plaintiff had. (Ex. 8, at 1). In addition, Plaintiff was provided with an

ASL interpreter every day during the IVT broadcast, from 8:30 - 12:30 p.m. (Ex. 8, at 1). Ms.

Ward continued to assist Plaintiff in the afternoon. (Id.). Ms. Ward and the ASL interpreter

continued in their respective roles until March 2003, when Ms. Ward left on maternity leave and

Monte Walker, a Management Support Specialist, became Plaintiff's mentor until Ms. Ward

returned and resumed her role as Plaintiff's mentor. (Ex. 4, Walker Aff. ¶ 3; Ex. 8, at 2).

However, as a result of Plaintiff's uncooperative behavior, Ms. Ward, after returning to

her role as Plaintiff's mentor in September 2003, requested that she no longer mentor Plaintiff

because of the difficulties she had training Plaintiff, such as Plaintiff's need to repeatedly ask the

same questions.  (Ex. 8, at 1).  So as not to deprive Plaintiff of a mentor, Mr. Walker was

reappointed as Plaintiff's mentor, but he too found that Plaintiff was difficult to work with as she

committed many errors and would repeatedly ask him the same questions.  (Ex. 4, Walker Aff. ¶

4).

 In September 2003, Robin Wells became the District Manager of the Postal Plaza

Field Office.  (Ex. 9, Affidavit of Robin Wells dated March 9, 2005 ("Wells' Aff.") ¶¶ 1-2).

Shortly thereafter, Gayle Syphax, another experienced claims representative, volunteered to

mentor Plaintiff, but within two weeks, Ms. Syphax told Ms. Wells that she could no longer

mentor Plaintiff, citing the same problems as Ms. Ward.  (Id. ¶ 5).  Mr. Walker was re-assigned

as Plaintiff's mentor, but he continued to find "blatant errors" in her work that would have

resulted in incorrect payments if not caught before final processing.  (Id.).  On March 11, 2004,

Plaintiff told Ms. Wells that she did not want Mr. Walker assigned as her mentor anymore.  (Id.).

Thereafter, Ms. Wells decided to take on the role as Plaintiff's mentor since Ms. Wells had

"considerable Title 16 SSI experience" and so she could evaluate Plaintiff's performance first-

hand.  (Id. ¶ 6).

 In her role as Plaintiff's mentor, Ms. Wells was able to witness first-hand Plaintiff's

inability to function satisfactorily as a claims representative.  Early on, Ms. Wells noticed that

Plaintiff had "considerable difficulty" asking the right questions in a manner that claimants could

understand.  (Id.).  Plaintiff herself did not appear to understand what responses she was being

given.  (Id.).  Plaintiff also appeared to have difficulties with the technical aspects of her

position.  (Id.).  Plaintiff told Ms. Wells that she had difficulty understanding African-Americans

when they speak, which was the reason for the mistakes she made during the interviews.  (Id. ¶

4

7).  However, Plaintiff was able to understand Ms. Syphax and Ms. Wells, both of whom are

African-American.  (Id.).  Plaintiff stated that the problem was solely in her interviews with the

public, however, she also told Ms. Wells that she had difficulties understanding White claimants

as well.  (Id.).  Ms. Wells also witnessed Plaintiff having "the same problems and errors in

comprehending, understanding, and applying what was being said[ ]" when Plaintiff interviewed

deaf claimants.  (Id.).

On June 8, 2004, Ms. Wells issued a written memorandum to Plaintiff summarizing

Plaintiff's "frequent and persistent disrespectful and discourteous conduct . . . ."  (Ex. 10, Letter

to Ms. Friends from Robin Wells dated June 8, 2004).  Ms. Wells documented several incidents

where Plaintiff was rude and impudent towards her co-workers.  (Id. at 5).  In her letter, Ms.

Wells warned Plaintiff that unless she was "able to fully demonstrate [her] fitness and

qualifications for continued employment [her] excepted service appointment will likely be

terminated."  (Id.).  Having not shown improvement, on June 28, 2004, Ms. Wells issued a

second written memorandum to Plaintiff in which she summarized Plaintiff's performance

problems during her probationary period.  (Ex. 8).  In particular, Ms. Wells documented the

many mistakes Plaintiff made during her interviews with claimants and the processing of

claimant applications.  (Id. at 2-3).  Ms. Wells noted that despite constant mentoring, almost

every case Plaintiff worked on "must be returned due to some type of error, oftentimes resulting

in a payment error or disadvantage to claimants."  (Id. at 3).

Despite the June 8th and 28th memoranda, Plaintiff's performance failed to improve.  In

a memorandum dated September 10, 2004, Lorna Walters, the District Manager of the

Washington M Street Field Office, and Plaintiff's second level supervisor, informed Plaintiff that

5

Plaintiff was being terminated effective September 17, 2004. (Ex. 11, Memorandum to Ms. Friends from Lorna Walters dated September 10, 2004). Ms. Walters noted that, despite "one year and six months of mentoring and assistance, [Plaintiff] continued to require assistance with basic, fundamental issues relating to SSI claims." (Id. at 1). Notably, Ms. Walters documented that Plaintiff's performance had not improved since Ms. Wells' June 28, 2004 memorandum and, in fact, Plaintiff had made errors in all of the nineteen subsequent interviews she had conducted. (Id. at 2-7).

Ms. Walters' decision to terminate Plaintiff was "based on [Plaintiff's] failure to fully demonstrate her fitness and qualifications for continued employment" beyond her two-year trial or probationary period (Ex. 2, Walters' Aff. ¶ 8). On September 16, 2004, before the effective date of her termination, Plaintiff resigned from her position as claims representative at the Postal Plaza Field Office. (Ex. 12, Email to Lorna Walters from Alice Ann Friends dated September 16, 2004).

**Plaintiff's Request for a Full-Time ASL Interpreter**

Through-out her two-year trial or probationary period, Plaintiff submitted several requests for reasonable accommodation, some of which were granted. (France Aff. at 2-4).

On March 11, 2004, Plaintiff requested that the Agency provide a full-time interpreter, refresher training, effective mentoring, and other adjustments to her work environment including relocation (Ex. 13, Request for Reasonable Accommodation dated March 11, 2004) . In her request, Plaintiff stated that "lack of interpreter services has made it difficult to participate in training and mentoring as well as interaction with fellow employees." (Id.) Plaintiff did not specifically state that she was having problems conducting claimant interviews.

The Agency denied Plaintiff's request for a full-time interpreter in a letter dated April 29, 2004.

(Ex. 14, Letter to Ms. Friends from Doug France dated April 29, 2004).

Ms. Fields wrote to Doug France in an email dated May 4, 2004, inquiring about

her right to request a reassessment of the denial of her request.  (Ex. 19, Emails to/from Ms.

Friends and Doug France dated May 4, 2004).  Specifically, Ms. Friends inquired about the time

for filing a reassessment, and Mr. France informed her that a request for reassessment had to "be

initiated within a reasonable period of time, i.e., 30 days after you[r] receipt of the initial denial

letter."  (Id.).  Mr. France also indicated:

> Please note: A request for reassessment or an independent review does not
> stop the forty-five (45) days regulatory timeframe for filing a request for EEO
> counseling.

(Id.).

In letter dated May 11, 2004, Bruce Williams, Plaintiff's union representative,

submitted a request for reassessment of the denial of Plaintiff's request for a full-time interpreter.

(Ex. 16, Letter to Doug France from Bruce Williams, Area Coordinator, AFGE Local 923).  In

an email dated June 4, 2004, Mr. France re-affirmed the denial of Plaintiff's request for a full-

time interpreter, however, he informed Plaintiff that she could receive up to 32 hours of

interpreter services pers week which she could use during mentoring, training, staff meeting,

progress/performance discussions with your supervisor, and any other business related need."

(Ex. 17, Email from Doug France to Ms. Friends dated June 4, 2004).  However, Mr. France

informed Plaintiff that interpreter services could not "be used to conduct interviews and/or other

business with the public."  (Id.).

Mr. France denied Plaintiff's request for a full-time interpreter because it would

have been "unduly burdensome" for the Agency to have done so.  (Ex. 16, France Aff., at 4).

Specifically, multiple ASL interpreters would be required to conduct most of the face-to-face interviews that Plaintiff had to perform as part of her job responsibilities. (Id.). "Such an arrangement would result in three (3) individuals performing a job function (face-to-face interviewing) normally requiring only one (1) [claims representative]." (Id.). In addition, use of an ASL interpreter during her interviews would increase the time needed for each interview. (Id.). Interpreters would also have to be trained "in the meaning and use of SSA terminology and application of programmatic policy and procedure." (Id.).

Mr. Williams wrote an email dated June 23, 2004, contending that Plaintiff was entitled to a full-time interpreter. (Ex. 19, Emails to/from Bruce Williams dated June 23, 2004). In a letter dated July 6, 2004, Linda Jackson, Director, Center for Disability Services, Office of Civil Rights and Equal Opportunity, stated that the 32 hours of interpreter services being provided to Plaintiff was "a sufficient accommodation." (Ex. 20, Letter to Ms. Friends from Linda Jackson dated July 6, 2004).

**Plaintiff's EEO Counseling**

Plaintiff first sought EEO counseling on June 15, 2004. (Ex. 21, EEO Counseling Report). She contended that the date of the first occurrence of discrimination was June 8, 2004. (Id.). Plaintiff alleged that she was discriminated against on the basis of her disability because she had been denied "a full time interpreter, refresher training, effective mentoring, and relocation to another SSA office specifically Frederick, Maryland." (Id.). She also contended that her work environment was hostile. (Id.).[2] Plaintiff field her formal EEO complaint on

---

[2]In the EEO Counselor's notes, it is indicated that Plaintiff notified the EEO counselor on September 10, 2004 that she had been terminated effective September 17, 2004.

September 17, 2004.  (Ex. 22, Individual EEO Discrimination Complaint Form dated September 17, 2004).

## II.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In determining whether a genuine issue of material fact exists, the trier of fact must view all the facts, and the reasonable inferences to be drawn from them, in a light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.  If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50.  In order to withstand summary judgment, the non-moving party is not at liberty to rest upon mere allegations or denials but must come forth with evidence establishing a material issue of fact for trial.  Id. at 248.  The mere existence of some factual dispute is insufficient to withstand summary judgment; there must be a genuine issue of material fact.  Id. at 247-48.

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  See Anderson, 477 U.S. at 248.  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  Laningham v. United States Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987);

Anderson, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment."  Williams v. Callaghan, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  Id. at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial."  Morgan v. Fed. Home Loan Mortgage Corp., 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting Calhoun v. Johnson, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), aff'd, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); see also Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases).  "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy

and inexpensive resolution of every case." <u>Marshall</u>, 276 F. Supp. 2d at 47 (quoting <u>Celotex</u> <u>Corp.</u>, 477 U.S. at 327).

Defendant seeks dismissal of Count I of Plaintiff's complaint because it appears that Plaintiff failed to exhaust her administrative remedies and dismissal is required.  In any event, Plaintiff is not entitled to relief under Count I because she cannot establish that she was a qualified individual with a disability or that the accommodations she sought were reasonable.  In addition, Defendant seeks summary judgment on Count II of Plaintiff's complaint  because Plaintiff cannot establish a viable claim for discriminatory or constructive discharge. Accordingly, the complaint should be dismissed with prejudice.

## III.    ARGUMENT

### A.    PLAINTIFF FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES.

Prior to seeking relief in federal court pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701, a federal employee must timely exhaust all available administrative remedies.  <u>See</u> 42 U.S.C. § 2000e-16(c)); 29 C.F.R. § 1614.407; <u>Kizas v. Webster</u>, 707 F.2d 524, 544 & n.99 (D.C. Cir. 1983); <u>see, e.g.</u>, <u>Robinson v. Chao</u>, 403 F. Supp. 2d 24, 28 (D.D.C. 2005); <u>Raines v.</u> <u>United States Dep't of Justice</u>, 424 F. Supp. 2d 60, 65 (D.D.C. 2006).[3]  Before a complainant can file a formal discrimination complaint, she must first consult an EEO counselor to try to resolve the matter informally.  29 C.F.R. § 1614.105(a).  Contact with an EEO counselor must occur

---

[3]"Section 501 is the exclusive remedy for federal employees alleging disability discrimination by a federal agency."  <u>Raines</u>, 424 F. Supp. at 65 (citations omitted).  Regulations promulgated by the Department of Labor require federal courts to use the standards applicable to claims brought pursuant to the Americans with Disabilities Act in determining whether section 501 of the Rehabilitation Act has been violated.  29 C.F.R. § 1614.203.

"within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).  If the matter is not resolved informally, the complainant may then file a formal complaint against the agency within 15 days of receipt of notice from the EEO counselor.  29 C.F.R. § 1614.105(d).

Courts have strictly enforced the time deadlines throughout the complaint process. Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985) ("A plaintiff who fails to comply, to the letter, with administrative deadlines ordinarily will be denied a judicial audience."); see also Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 152 (1994); Raines, 424 F. Supp. 2d at 65-66 ("Dismissal results when a plaintiff fails to exhaust administrative remedies.") (citations omitted); Carter v. Rubin, 14 F. Supp. 2d 22, 32 (D.D.C. 1998) (holding that federal employees may not file employment discrimination actions outside applicable time deadlines).

In order to exhaust her administrative remedies regarding her request for a full-time ASL interpreter, Plaintiff was required to timely contact an EEO officer within 45 days of the alleged discriminatory incident.  Harris v. United States Attorney General, 400 F. Supp. 2d 24, 27 (D.D.C. 2005).  Plaintiff first requested a full-time interpreter on March 11, 2004.  (Ex. 17). Specifically, in her March 11, 2004, request Plaintiff stated:

> My job requires me to meet and deal with the hearing public,
> Deaf customers, fellow employees and members of management.
> Interpreter services facilitate effective communication.  Lack of
> interpreter services has made it difficult to participate in training and
> mentoring as well as interaction with fellow employees.  Relocation to
> an office with an atmosphere more conducive to learning will make
> it easier to learn the job.

(Id.).  The Agency denied Plaintiff's request for a full-time interpreter on April 29, 2004.  (Ex. 18).  Plaintiff thereafter sent an e-mail on May 4, 2004, to Mr. France inquiring about her right to

12

request a "reassessment" of the denial of her request. (Ex. 15). Mr. France stated that such a

request should be submitted within a "reasonable time." (Id.). However, Mr. France specifically

advised Plaintiff:

> Please note: A request for reassessment or an independent review
> does not stop the forty-five (45) days regulatory timeframe for filing
> a request for EEO counseling.

(Id.). Plaintiff did not seek EEO counseling until June 15, 2004. (Ex. 21). Because Plaintiff

did not contact an EEO counselor within 45 days of the denial of her request, dismissal is

required. Wilderness v. Snow, No. Civ.A. 04-0708, 2006 WL 571930, at *3 (D.D.C. Mar. 4,

2006) (holding that plaintiff's request for a "work at home" accommodation under the

Rehabilitation Act was untimely because she did not contact an EEO counselor within 45 days of

the denial of that request).

Undoubtedly, Plaintiff would have the Court find that the denial of her request was not

made until the denial of the reassessment in June, 2004.[4] The Second Circuit has held that "[t]he

rejection of a proposed accommodation is a single completed action when taken . . . ."

Elmenayer v. ABF Freight System, Inc., 318 F.3d 130, (2d Cir. 2003). Thus, Plaintiff's request

was denied on April 29, 2004, more than 45 days prior to the time she contacted an EEO officer.

Furthermore, this Court has held that a request for a reinstatement, similar to Plaintiff's request

for a "reassessment," does not stop the time in which to contact an EEO counselor. Raines v.

United States Dep't of Justice, 424 F. Supp. 2d 60, 66 (D.D.C. 2006) (rejecting plaintiff's

---

[4]It is not clear why Plaintiff has chosen the June 4, 2004 date as the date of the denial
when, after Mr. France's email, Plaintiff's representative continued to pursue Plaintiff's request
by writing to the SSA's Center for Disability Services. That subsequent request was denied on
July 6, 2004. (Ex. 20).

argument that his claim regarding his termination was timely because he contacted an EEO officer within 45 days of the denial of his request for reinstatement).  Similar to the claims in Elmenayer and Raines, Plaintiff's request for a "reassessment" of the denial of her request for an interpreter did not toll the 45-day period in which she had to contact an EEO counselor.  Plaintiff had 45 days after receiving the denial of her request on April, 29, 2004.  She did not contact an EEO counselor until June 15, 2004, more than 45 days after the denial of her request.  Therefore, she failed to exhaust her administrative remedies as it pertains to this claim.

> **B.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CLAIM OF DISCRIMINATION UNDER THE REHABILITATION ACT FOR FAILURE TO ACCOMMODATE.**

To establish a prima facie case of discrimination under the Rehabilitation Act for failure to accommodate, a plaintiff must show (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.  Edwards v. U.S. E.P.A., 456 F. Supp. 2d 72, 97 (D.D.C. 2006); Thompson v. Rice, 422 F. Supp. 2d 158, 165-66 (D.D.C.2006).  Thus, the two-fold threshold question under the Rehabilitation Act is (1) whether a plaintiff is an individual with a disability who (2) is "otherwise qualified" to perform his or her job.  Mack v. Strauss, 134 F. Supp. 2d 103, 109 (D.D.C.), aff'd, 2001 WL 1286263 (D.C. Cir. 2001).  See also 29 U.S.C. § 794(a).

In this case, assuming plaintiff can establish that she is disabled under the Act, undisputed, material facts establish that she was not "otherwise qualified."  Therefore, she cannot establish a prima facie case and her claims under the Rehabilitation Act should be

14

dismissed.  Finally, even if plaintiff could establish a prima facie case under the Rehabilitation

Act, defendant had legitimate, non-discriminatory reasons for its actions and plaintiff cannot

establish pretext.

### 1.    Plaintiff was Not "Otherwise Qualified" to Perform Her Job.

To prove a failure to accommodate a disability under the Rehabilitation Act, plaintiff

must establish that: (1) she was an individual with a disability within the meaning of the Act; (2)

her employer had notice of her disability; (3) with reasonable accommodations she could

perform the essential functions of her position; and (4) her employer failed to provide such

reasonable accommodations.  Lester v. Natsios, 290 F. Supp. 2d 11, 23 (D.D.C. 2003) (citing

Scarborough v. Natsios, 190 F. Supp. 2d 5, 19 (D.D.C. 2002)).  While an agency is required to

approve a request for a reasonable accommodation that is consistent with the Americans with

Disabilities Act of 1990, see 29 U.S.C. § 791(g) (incorporating 42 U.S.C. § 12111(8); 29 C.F.R.

§§ 1614.203(b) (incorporating 29 C.F.R. § 1630.4), an accommodation is only required to be

provided if the employee is a "qualified" individual with a disability, i.e., an individual who can

perform the essential functions of her position with or without reasonable accommodation.  See

29 C.F.R. § 1630.2(m).  It is the employee's burden to prove that she can perform the essential

functions of her position with or without reasonable accommodation.

The unrefuted evidence in this case amply establishes that Plaintiff was not qualified,

with or without a reasonable accommodation, to perform the essential functions of the claims

representative position.  Both the Plaintiff and the Agency agree that one of the essential

functions of Plaintiff's job was to conduct interviews with claimants, something she could not

do.  (Pl.'s Stmt. ¶ 16; Ex. 6 & 7).  In addition, Plaintiff was required to adjudicate claims for

benefits and eligibility.  (Id.).  However, she had fundamental issues applying Title 16 disability

policy.  (Ex. 8; Ex. 11).  To assist her in performing the essential functions of her job, the

Agency conducted a formal six-month IVT training course regarding substantive Title 16

disability policy; provided mentors who were all well-versed in Title 16 disability policy; and

authorized up to 32 hours of interpreter services every week to assist Plaintiff.  (Ex. 8).

      Despite this extensive assistance, Plaintiff was unable to perform, in a satisfactory

manner, the duties of the claims representative position.  Plaintiff's supervisor, District Manager

Robin Wells, observed many of Plaintiff's claimant interviews first hand and testified that

Plaintiff "was having difficulties with the technical aspects of the job."  (Id. at 2).  It was not just

that Plaintiff did not understand claimants' speech; it was that she had great difficulties asking

the correct or appropriate questions to obtain the necessary information from all claimants –

whether they were African-American, Caucasian, or even deaf.  (Id.).  Furthermore, Plaintiff

demonstrated a fundamental lack of knowledge regarding the application of Title 16 disability

policy.  (Id.).  All of Plaintiff's mentors stated that Plaintiff constantly made the same errors on

very "basic, fundamental issues . . . ."  (Id.).  Despite receiving a written memorandum outlining

these issues on June 28, 2004 (Ex. 8), Plaintiff was not able to remedy the errors that Ms. Wells

and others had witnessed.  (Ex. 11).

      In her motion for partial summary judgment, Plaintiff does nothing to establish that she

was in fact capable of performing her job.  Rather, she concedes that she "could not perform the

client interview function of her position without an ASL interpreter."  (Pl.'s Mem. at 18).  She

neglects to mention the substantive issues that she had performing her job, aside from the client

interview function.

Because Plaintiff could not perform one of the essential functions of her job without an accommodation, "Plaintiff has the burden of identifying what reasonable accommodation would have enabled her to perform the essential functions of her employment . . . ." Chinchillo v. Powell, 236 F. Supp. 2d 18, 23-24 (D.D.C. 2003).  As discussed below, Plaintiff cannot satisfy this burden.

> **2.    A Full-Time ASL Interpreter Would Not Have Enabled Plaintiff to Perform the Essential Functions of Her Job.**

For failure to accommodate cases under the Rehabilitation Act, the plaintiff "carries the burden of proving by a preponderance of the evidence that she has a disability, but with a reasonable accommodation (which she must describe), she can perform the essential functions of [her] job." Flemmings v. Howard Univ., 198 F.3d 857, 861 (D.C. Cir.1999); Pantazes v. Jackson, 366 F. Supp. 2d 57, 66 (D.D.C. 2005).

Plaintiff contends that "[a]n ASL interpreter would have allowed [her] to know everything that her hearing claimants said to her."  (Pl.'s Stmt. ¶ 25).  What Plaintiff fails to realize, however, is that an interpreter would not have not have assisted her in her fundamental lack of understanding of Title 16 disability policy.  As Ms. Wells set forth in her June 28th letter to Plaintiff, Plaintiff was "having an especially difficult time understanding the fundamentals of the SSI program, to the extent that incorrect eligibility determinations were being made that disadvantaged the customers to various degrees."  (Ex. 8, at 2).  Thus, it is clear that Plaintiff's work-related problems went far beyond her communication difficulties.  Plaintiff lacked a fundamental understanding and ability to apply Title 16 disability policy and therefore, she was unable to ask the appropriate questions during interviews as well as use the information that she gathered from the interview to make a determination.

Furthermore, Defendant had already accommodated Plaintiff, with no results.  Plaintiff was provided with interpreter services for up to 32 hours, as well as extensive mentoring, and those services did not improve her performance.  (Ex. 18).  Given that her request for a full-time interpreter could not have improved Plaintiff's knowledge and application of disability policy, she has failed to prove that she could have performed the essential functions of the claims representative position even if her request for a full-time interpreter was granted.  See Chinchillo, 236 F. Supp. 2d at 25 (concluding that there was "no evidence in the record that extending plaintiff's probationary period or granting him [leave without pay, as he requested] would have allowed him to make decisions more effectively, to gain initiative, or to complete simple tasks such as producing memoranda within a reasonable time. . . . Because there was no reasonable assurance that plaintiff's performance was likely to improve-immediately or even in the distant future-even with the accommodation of time off for treatment and recovery, defendant was not required to provide such an accommodation."); Dorchy v. Washington Metropolitan Area Transit Auth., 45 F. Supp. 2d 5 (D.D.C. 1999) ("Mr. Dorchy's failure to establish that he can perform the essential functions of his job, with or without a reasonable accommodation, negates his ability to establish a prima facie case of discrimination . . . under the Rehabilitation Act necessary to survive summary judgment.") (citation omitted); Adrain v. Alexander, 792 F. Supp. 124, 127 (D.D.C. 1992) (holding that employer did not violate the Rehabilitation Act by denying employee's request for a full-time writer/assistant where "[t]he evidence . . . shows that providing plaintiff with a full-time writer/assistant would not have cured plaintiff's inadequate performance . . . .").

## 2.    The Accommodation Plaintiff Requested was Unreasonable.

In addition to not being qualified to perform her position, the accommodation Plaintiff requested was unreasonable. Plaintiff has the burden of requesting and identifying an accommodation that is reasonable. Scarborough, 190 F. Supp. 2d at 25. The only accommodation at issue in this case is whether or not Plaintiff was entitled to a full-time ASL interpreter to assist her with communicating with clients. (Pl.'s Mem. at 6).[5] This request was not reasonable.

An agency is not required to make a reasonable accommodation if the accommodation would impose an undue hardship on the operations of the agency's business. See 29 C.F.R. § 1630.9(a). "Undue hardship" means significant difficulty or expense incurred by an agency, when considered in light of several factors. See 29 C.F.R. § 1630.2(p)(1). Factors to be considered include the nature and net cost of the accommodation; the agency's operations; the impact of the accommodation upon the agency's operations, including the impact on the agency's ability to conduct business. See 29 C.F.R. § 1630.2(p)(2)(I), (iv)-(v).

As Mr. France explained, the Agency did not provide a full-time interpreter to assist Plaintiff in interviewing the public because it would have been "unduly burdensome" for the Agency. (Ex. 18, at 4). In particular, multiple ASL interpreters would have been required to

---

[5]Because Plaintiff's argument centers solely on her request for a full-time interpreter, Defendant has not addressed the remainder of the items – i.e., her request for refresher training, effective mentoring, and relocation – Plaintiff had requested. However, Defendant notes that the Agency did authorize Plaintiff to receive 32 hours per week of interpreter services, and provided Plaintiff with extensive mentoring. (Ex. 18, at 2-3). In any event, because Plaintiff has failed to establish that she was "otherwise qualified" for the claims representative position, Defendant maintains that she had no duty to provide Plaintiff with any accommodations.

assist Plaintiff in conducting face-to-face interviews with the public, and those interpreters

would have to be provided with extensive training in Title 16 policy so that they would be able

provide proper guidance during the interview.  (Id.)  In addition, the need to transmit information

through an interpreter during each of Plaintiff's interviews would also lengthen the amount of

time needed to conduct an individual interview, thereby reducing the number of interviews

Plaintiff could perform per day.  (Id.).  Because the accommodation Plaintiff sought would have

placed an undue burden on the Agency, summary judgment is warranted on this claim.  See

Rosell v. Kelliher, No. Civ.A. 05-0502, 2006 WL 1102833, at *3 (D.D.C. Mar. 31, 2006)

(holding that "even if plaintiff could have partially performed his duties with [his doctor's]

accommodations in place, such accommodations would have been unduly burdensome to the

defendant and thus were unreasonable . . . .");  Adrain, 792 F. Supp. at 129 (holding that

providing a full-time writer/assistant to an employee who had cerebral palsy would be "unduly

burdensome" where "[t]he agency cannot afford and is not required to hire a full-time assistant

for every handicapped employee regardless of the employee's level of productivity.").

## C.    PLAINTIFF CANNOT ESTABLISH THAT SHE WAS TERMINATED IN VIOLATION OF THE REHABILITATION ACT.

In adjudicating Plaintiff's claim that she was unlawfully discharged in violation of the

Rehabilitation Act, the burden-shifting standard used in McDonnell Douglas v. Green, 411 U.S.

792 (1973) is applied.  See Rosell, 2006 WL 1102833, at *3 (D.D.C. Mar. 31, 2006).  This

standard places the initial burden on Plaintiff to establish a prima facie claim of discrimination.

Id.  Assuming plaintiff can make such a showing, the burden shifts to Defendant to show "some

legitimate nondiscriminatory reason for the adverse employment action."  Id. (internal citations

and quotation marks omitted).  Once defendant produces such a non-discriminatory reason, the

20

issue becomes

> whether the jury could infer discrimination from the combination
> of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff
> presents to attack the employer's proffered explanation for its actions;
> and (3) any further evidence of discrimination that may be available to
> the plaintiff (such as independent evidence of discriminatory statements
> or attitudes on the part of the employer, or any contrary evidence that
> may be available to the employer . . . .

Id. (citation omitted).

In this case, Defendant has already established that Plaintiff cannot establish a prima
facie case of discrimination under the Rehabilitation Act. To do so, Plaintiff must have shown
that she is a qualified individual with a disability, that she could, with or without reasonable
accommodation, perform the essential functions of the position, and that she suffered an adverse
employment action due to her disability. Baloch v. Norton, 355 F. Supp. 2d 246, 255 (D.D.C.
2005). As argued, supra, at 16-17, Plaintiff cannot demonstrate that she could with or without
reasonable accommodation perform the essential duties of the claims representative position.
See Rosell, 2006 WL 1102833, at *6 (holding that no further analysis of plaintiff's unlawful
discharge claim on the basis of disability in violation of the Rehabilitation Act was required once
the Court had "determined that plaintiff is not a 'qualified individual under the Rehabilitation
Act . . . .'").

However, even assuming Plaintiff could establish that she could perform the essential
functions of her position, the undeniable evidence is that the decision to terminate Plaintiff was
"based on [her] failure to fully demonstrate her fitness and qualifications for continued
employment . . . ." (Ex. 2, Walters' Aff. ¶ 8). As the memoranda from Ms. Wells, Plaintiff's
supervisor, amply demonstrated, Plaintiff had serious behavioral, attitude, and performance

issues and was warned on at least two occasions that her failure to remedy these issues could

result in her termination.  (Ex. 8; Ex. 10).   This justification for Plaintiff's termination is a

legitimate, non-discriminatory reason that precludes her from recovering under the

Rehabilitation Act.

### D.    PLAINTIFF CANNOT ESTABLISH A VIABLE CLAIM OF CONSTRUCTIVE DISCHARGE.[6]

In Count II of her complaint, Plaintiff also appears to allege that she was forced to resign

because her work environment was so hostile towards her.  (Pl.'s Mem. at 3; Compl. ¶¶ 13-22).

In essence, Plaintiff contends that the failure to accommodate her disability, in conjunction with

the retaliation she suffered, resulted in her tendering her resignation prior to the effective date of

her termination.  In the context of employment discrimination cases, the Plaintiff has made what

courts have called a "constructive discharge claim" in which she alleges that [s]he was

discriminated against and . . . was forced to quit as a result of the discrimination and aggravating

circumstances.  Russ v. Van Scoyoc Associates, Inc.,122 F. Supp. 2d 29, 35 (D. D. C. 2000).

For a plaintiff to recover on a constructive discharge theory she must show (1) the

existence of intentional discrimination, (2) that the employer "deliberately made working

conditions intolerable and drove the employee to . . .  involuntary quit," and (3) that the

constructive discharge was justified by the existence of aggravating factors.  Clark v. Marsh, 665

F.2d 1168, 1173-74 (D.C. Cir. 1981) (internal modifications and citation omitted); see also

Bishopp v. District of Columbia, 788 F.2d 781, 790 (D.C. Cir. 1986).  The inquiry focuses on

---

[6]Plaintiff does not appear to allege a separate hostile work environment claim.  Therefore, Defendant has interpreted Count II of the Complaint to allege a discriminatory and/or constructive discharge claim.

whether the employer "creates or condones discriminatory working conditions that would drive a reasonable person to quit." Katradis v. Dav-El, 846 F.2d 1482, 1485 (D.C. Cir. 1988) (citation omitted).

A finding of intentional discrimination, however, is a necessary predicate for a finding of constructive discharge. Bishopp, 788 F.2d at 790. Here, because Defendant has already established that Plaintiff was terminated for a legitimate, non-discriminatory reason, her claim for constructive discharge must also fail. Rosell, 2006 WL 1102833, at *8.

In any event, nothing Plaintiff presents can satisfy the standard of constructive discharge. "Constructive discharge requires the plaintiff to show working conditions 'so intolerable that a reasonable person would have felt compelled to resign.'" Id. (citation omitted). However, "[t]he normal and everyday stress associated with working is not enough to amount to constructive termination." Id. (citation omitted). There must be 'aggravating factors,' such as continuous and pervasive discriminatory treatment spanning a substantial period of time. Lake v. Baker, 662 F. Supp. 392, 404 (D.D.C. 1987) (citations omitted); Ramsey v. Derwinski, 787 F. Supp. 8, 10 (D.D.C. 1992).

In support of her constructive discharge argument, Plaintiff has alleged that she was retaliated against for requesting accommodations (Compl. ¶ 15) and  that she was denied accommodations to assist her with performing her job (id. ¶¶ 17-21). These allegations do not amount to a viable claim for constructive discharge. Notably, Plaintiff did not resign until after she had received notice that she would be terminated. (Ex. 11; Ex. 12). Thus, it was not the result of intolerable working conditions that resulted in her resignation. Rather, it appears Plaintiff, in evaluating her choices, made the decision to resign. She cannot be heard now to

23

complain that she was forced to do so.  Rosell, 2006 WL 1102833, at *8 (holding that plaintiff

was not forced to resign but rather, given "his declining health and deteriorating job

performance" he made a decision to resign").

**IV.    CONCLUSION**

For the reasons set forth above, Plaintiff's motion for summary judgment as to Count I of

her complaint should be denied, Defendant's motion for summary judgment should be granted,

and Plaintiff's complaint should be dismissed in its entirety with prejudice.


Respectfully submitted,

   /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


   /s/ Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


   /s/ Michelle N. Johnson
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANT

Of Counsel:
Nicholas R. Cerulli
Craig Ormson

Assistant Regional Counsel
Social Security Administration
Office of the General Counsel – Region III
P.O. Box 41777
Philadelphia, PA 19101

# EXHIBIT 1

# SOCIAL SECURITY

Regional Office III
P. O. Box 8788
Philadelphia, PA    19101

September 17, 2002

*1998*
*17*
*131003*

Ms. Alice Ann Friends
183 Posting Way
Charles Town, WV  25414

Dear Ms. Friends:

Congratulations and welcome to the Federal Service! The Social Security Administration is a dynamic, service-oriented organization of People Serving People.

**I am pleased to confirm your selection for an Excepted Appointment to the position of Social Insurance Specialist (Claims Representative), GS-105-09 step 01 $38,406 per annum, (developmental to GS-11) with the Social Security Administration, Washington, DC. The effective date of your appointment is September 22, 2002.**

**Please report on Monday, September 23, 2002 at 8:00 a.m. to the Social Security Administration, 1905B 9th St NE, Washington, DC 20018-100. Any questions regarding your appointment, please contact Mary Pastorius, Personnel Staffing Specialist, in the SSA Center for Human Resources on (215) 597-9269. If you have any questions concerning completion of the entrance on duty forms , please contact Cassandra Harris on 215-597-1938.**

We have enclosed a package of forms which are part of our orientation process for new employees. These forms should be reviewed and completed to the best of your ability and brought with you when you report for duty. Your are reminded that you must bring proof of your identity and employment eligibility by submitting either one proof from List A or one proof from List B and one proof from List C as indicated on Form I-9 (Employment Eligibility Verification) enclosed.

All employees of the Social Security Administration are required to have their salary checks deposited directly to a financial institution. Included in the package is a Direct Deposit Sign Up Form (SF-1199A). Please be sure it is completed and bring it with you when you report

EXHIBIT *13 a*
Page *11* of *13*

for duty.

The Social Security Administration is a service-oriented organization of "People Serving People". I am confident that you will find your new position to be both challenging and rewarding.

I would like to take this opportunity to welcome you to Social Security and wish you success in your career goals.

Sincerely,

Nancy Beadle
Director, Center for Human Resources

Enclosures.

EXHIBIT 13 a
Page 12 of 13

# EXHIBIT 2

## AFFIDAVIT

Alice A. Friends, Complainant )
)
       v. )    Case No. 04-0452-SSA
)
Social Security Administration )

I, Lorna Walters, make the following statement freely and voluntarily to Donald W. Mirsch, who has identified himself to me as an Independent Contractor/EEO Investigator. I hereby solemnly swear that the following information is true and complete to the best of my knowledge and belief, so help me God.

1.    My name is Lorna Walters and I am the Level 1 District Manager for Washington, DC. I have no physical disabilities. I am not represented.

2.    I have held this position since November 2000. I am the immediate supervisor of Robin Wells, the District Manager of the Postal Plaza District Office. Accordingly, I am the 2nd-level supervisor of all staff at the Postal Plaza office, and I was Ms. Friends' 2nd-level supervisor when she was employed there.

3.    I knew Ms. Friends to be an employee of the Postal Plaza office. Ms. Friends was initially appointed to the Federal service under Schedule A appointing authority (Excepted Service) for persons with disabilities. I knew Ms. Friends to be deaf. New employees hired under Schedule A are subject to successful completion of a two-year trial period, during which time the Agency must make a decision whether to retain the employee beyond the trial period. The decision to retain an employee beyond the trial period is not taken lightly, and is made based on management's consideration that the employee has demonstrated the necessary traits and ability to independently perform the duties of her position.

4.    I was aware that Ms. Friends had submitted some requests for reasonable accommodation from time to time. Normally, I would not be involved in those matters, and any requests Ms. Wells could not handle in her discretion, she would forward to the Regional Office in Philadelphia for further consideration. I know that Ms. Friends was provided a TTY instrument and had part-time interpreter service for all training, meetings and other events in the office.

5.    Ms. Wells came to the District Manager's position at the Postal Plaza office after Ms. Friends was hired. Some time after she came to her position, Ms. Wells began to review the work and level of performance of all her employees, including Ms. Friends. Based on regular and recurring conversations we had about her staff, I recall that Ms. Wells sat in on many interviews Ms. Friends conducted with the claimants at the office.

Initials _X̄t̄k̄_ '

Page _/_ of _2_

**EXHIBIT 6**

Page _/_ of _2_ pages.

Since Ms. Wells has considerable SSI knowledge, she was able to evaluate Ms. Friends' progress in the Claims Representative job.

6.    Ms. Wells kept me apprised of Ms. Friends' progress in her position, much as she kept me apprised of the performance of other staff members. This was normally done through telephone calls. I was told Ms. Friends was not doing well – she was not able to make the connection between application of the SSI policy and information she obtained by interviewing the claimants.

7.    Ms. Friends had not progressed far enough along to show that she could work as independently as a journeyman Claims Rep is expected to work. There was much discussion between Ms. Wells, myself and the Human Resources people in the Regional Office. The decision to terminate Ms. Friends during her trial period was made after considerable thought; it was made with recognition that we had done everything we could to help her to be successful in her job. Having made the decision to terminate Ms. Friends' employment, the Human Resources staff prepared the termination letter for my signature, and based the text on specifics that were provided by Ms. Wells, the immediate supervisor. I signed the letter and forwarded it to Ms. Wells for her to issue to Ms. Friends. Some days later, Ms. Friends sent me an email in which she tendered her resignation from the position.

8.    I did not terminate Ms. Friends because she is deaf; rather, the decision to terminate her was based on her failure to fully demonstrate her fitness and qualifications for continued employment.

I have read the above statement consisting of two pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties to this complaint.

_Lorna Walters_
Lorna Walters

Subscribed and sworn to before me in _ELLICOTT CITY, MD_, this _10th_ day of
_MARCH_, 2005

_Donald W. Mirsch_
Donald W. Mirsch
Contract EEO Investigator

Initials _LW_                                Page _2_ of _2_

EXHIBIT _6_
Page _2_ of _2_ pages.

# EXHIBIT 3

**AFFIDAVIT**

Alice Ann Friends, Complainant )

)

v. )                    Case No. 04-0452-SSA

)

Social Security Administration )

I, Alice Ann Friends, make the following statement freely and voluntarily to Donald W. Mirsch, who has identified himself to me as an Independent Contractor/EEO Investigator. I hereby solemnly swear/affirm that my answers to the following questions are true and complete to the best of my knowledge and belief.

Q1    What is your name, current address and home telephone number?

Alice Ann "Alli" Friends
182 Posting Way
Charles Town, WV 25414
711 (Relay number) then 304-728-0482 TTY

Q2    Who is your representative, by name, address and daytime telephone number.

    Bruce Williams AFGE L1923
    c/o SSA
    2100 M St. NW
    Washington, DC 20037
    (202) 653-2002 ext 3019



**EXHIBIT 5**
Page _1_ of _14_ pages

Q3    What is the specific nature of your disability?

Deaf in both ears with understandable speech.

Legally blind in left eye

Q4    When were you employed by the Social Security Administration, and where was your duty station? Were you aware that your continued employment was subject to your satisfactorily completing a probationary/trial period?

I was employed by SSA as of 9/22/02.

My duty station was the Postal Plaza, Washington DC Branch office of the Washington DC District Office Complex.

I was aware that I had a probationary period but it was not clear how long I was on probationary period. I thought I was on 1 year probation but again, I was never told that I was on 2 years probation CLEARLY explained.

Q5    Did you provide appropriate medical document to your supervisors/managers to ensure they were aware of the nature and extent of your disability? If yes, to whom did you submit this medical documentation and when did you submit it? Please provide a copy of such medical documentation.

I provided all requested documentation to SSA officials as it was asked for. They will be able to provide copies as needed.

Q6    When did you submit your request(s) for reasonable accommodation, and to whom did you submit it/them? Please provide a copy of the request(s) that you submitted, and include management's actions at successive steps of the approval/denial process.

I made a formal request for Reasonable Accommodation    on March 11, 2004. It was submitted to my manager at Postal Plaza, Robin Wells. I had previously made a   request for Reasonable Accommodation on January 5, 2004. I made subsequent requests for Reasonable Accommodation on July 22, 2004 and August 11, 2004.

EXHIBIT 5
Page 2 of 14 pages

The March 11, 2004 request, which included a request for interpreter services was denied in a memo dated April 29, 2004 from Doug France, Disability Services Team Leader, SSA, Baltimore, MD

Q7    What accommodations (if any) were provided to you during your employment, and how did those accommodations fall short of what you considered to be your actual needs?

When I started training at the Postal Plaza Social Security Office on October 28, 2002 I attended IVT training. IVT stands for Interactive Video Training. The students watch live and taped video broadcasts on a TV monitor. During the broadcasts there are opportunities (for hearing individuals) to phone in questions for the instructor. Normally there are several students and a "mentor" in the room. In my case I was in the room alone. I watched the training broadcasts on the "big screen" set. There was "closed captioning" appearing at the bottom of the screen. The captioning must have been done live by a person unfamiliar with any of SSA's jargon and acronyms and this was very confusing. For example when the instructor used the acronym "MSSICS" (Modernized Supplemental Security Income Claims System) the caption read "MISS SEX". This accommodation of closed captioning was further flawed in that the captioning would cover or obscure important data being shown on the screen. IVT isn't just a video of a talking instructor. Many times while the instructor is speaking the screen shows a reproduction of a page of text, or computer printouts and endless alpha-numeric coding sequences; line after line, filling the screen. Whenever the captioning was on I could not read what was behind it, so I was struggling to keep up with the illogical captioning and simultaneously trying to see what was being represented behind it. This was also very stressful for my one functioning eye after several hours.

During IVT I had a mentor; Michelle Ward, but she was also working full time as a Claims Representative in the office outside the door, with her own workload and interviews to deal with so she was never there enough to provide full-time mentoring, the was most classes do. (I was told by the Office of Training that I was supposed to have 4 hours of mentoring, but this almost never happened).

EXHIBIT 5
Page 3 of 14 pages

After complaining about the need for interpreters during the training SSA finally provided this accommodation starting around December 20, 2002. The interpreters helped me in IVT sessions, but they were told to leave after the Video session was over, although they had been scheduled to stay until 4:30. Typically they left at 12:30.

The IVT course ended February 28, 2003 and I assumed a full workload on March 3, 2003. I had interpreters for the first two weeks only.

Interpreters were provided supposedly as an accommodation to me around July of 2004. They were specifically barred from being used to communicate with my clients, as they would normally be used. At this time I was being observed, mentored and documented by the office manager, Ms Robin Wells. She would watch me struggle through an interview with a customer, trying to read his lips, then she would use the interpreter to tell me about the mistakes I made. Ms. Wells would not let the interpreter see or hear any names or Social Security numbers of the customers, stating a privacy regulation. This made the interpreters' job harder, because I could not always tell whom we were referring to. Ms. Wells also would attempt to stop the interpreter from doing his/her job when she didn't want me to "hear" what she was saying. She seemed to be using the interpreter as just another tool at her disposal to document my shortcomings. Ms. Wells failed or refused to realize that these interpreters are certified, licensed, and bound by legal ethics to keep subject matter confidential, and further didn't understand that an interpreter should be viewed as "invisible"; they are there for the use of the Deaf individual and will relay by ASL (American Sign Language) every audible speech or noise they hear. I became anxious and fearful when the interpreter told me Ms. Wells had told him not to communicate to me what she was saying to other people. It was disturbing to see how Ms. Wells manipulated the interpreting services instead of letting them do their job and help me carry out interviews and develop my skills. This accommodation seemed to be more for the benefit of Ms. Wells and SSA rather than to me and my customers.

SSA hired me to interview applicants for Federal needs based assistance (SSI). They knew I was Deaf when they hired me yet repeatedly, adamantly refused to provide me with the reasonable accommodation of an interpreter to assist with communication with the public I was hired to serve.

EXHIBIT 5
Page 4 of 14 pages

Q8    Who was responsible for denying a full-time interpreter, and what is your understanding of the stated reason for that denial?

I was never allowed interpreting services for a full 40 hour work week.  I was intermittently allowed to have an interpreter during some of my training and towards the end of my probation period when Ms. Wells appeared to be documenting me for termination.  I was supposedly accommodated during this time period by having an interpreter for 32 hours per week, but he was never there for that long.  I would also have an interpreter present for some staff meetings and formal discussions.  During the intermittent occasions when an interpreter was present for part of the day they were specifically forbidden to be used in any communication with the public.  The person responsible for this decision was, I believe, Doug France from the SSA Center for Disability Services.  In allowing the use of an interpreter for 32 hours per week I was told by Linda Jackson, Director of Center for Disability Services that since I spent part of each day, in theory, reading research material, reviewing files and doing computer inputs that an interpreter would not be needed on a full-time basis.  The problem was that they not only did not have interpreters around for 32 hours, they did not allow the interpreters to help me where I needed it most, communicating with the public.  Interpreters could also have facilitated my communications with co-workers.  Many instances of confusion, misunderstandings, hurt feelings and overt hostile reactions could have been avoided if I had the services of an interpreter throughout the day, not just when interviewing.  I got neither.


Q9    What was the nature of the harassment and hostile work environment that you allege you encountered, and who was responsible for that?  Please be as specific as possible in your explanation.


There were daily instances when my co-workers and I could not communicate effectively due to my Deafness.  I can read lips fairly well, sometimes, given the individual and the circumstances and can usually get the basics of the conversation.  I can also speak quite well for a person who is Deaf.  SSA offices are extremely busy, high pressure workplaces.  It seemed that many times co workers and management would become impatient with me as I tried to understand them.  If they turned their heads, mumbled or spoke too fast I could not lip-read them very well.  I also have to stare intently at the person to attempt to lip read them and I think this may have made some of them uncomfortable.

EXHIBIT 5
Page 5 of 14 pages

One co worker apparently thought he observed me reacting to some music or noise he was making and abruptly and excitedly accused me of "faking" Deafness. Both my manager Ms. Wells and supervisor Mr. Buddy Walker became angry with me for using the phrase "whatever" when they gave me instructions. They immediately assumed I was being flip and disrespectful. I can't, of course, tell how my voice sounded to them but they assumed the worst and did not give me the benefit of a doubt. In my culture (Deaf culture) I would have been indicating, "whatever it is you wish me to do, I will do it". Mr. Walker told me to "Be honest with your self" when I told him I did not think he said something he was sure he had told me before. Mr. Walker would appear to be quite angry at times like this. On October 7, 2003, I think it was, Mr. Walker said "Maybe you didn't understand because you are Deaf" Both he and Ms. Gayle Syphax, a co-worker, said this to me more than once: "Maybe you didn't understand _____(fill in name of employee or supervisor) because you are Deaf". Mr. Walker was supposed to be a mentor for me yet he seemed to get frustrated and tell me to "..solve it yourself, you are a GS-11.."

I had been hired by Ms. Judy Nease who was the manager of the Postal Plaza office at the time. She seemed very understanding and willing to help me. She determined that I should attend training to become a Title II Claims Rep (Social Security) as opposed to a Title XVI (SSI) Claims Rep. This was discussed and decided in a meeting with Mr. Walker present. Ms. Nease retired in July of 2003 I believe. Immediately after Ms. Nease (in August) has retired formally, when I asked about being trained in Title II, Mr. Walker, then the acting manager, told me that I would be working in Title XVI only (SSI). When I reminded him what Ms. Nease had said he said he was in charge and he had only gone along with Ms. Nease because she was the boss.

Mr. Walker used language I felt was harsh and intimidating. He said "Maybe you don't hear what I am saying", or "You don't hear because you are Deaf" When I spoke to Ms. Wells about this and told her how it made me feel, she just said he didn't mean it. Mr. Walker continually used phrases like "Needless to say..." followed by some criticism of my work. Neither Ms. Wells nor Mr. Walker seemed to notice (or they did not care) that there were frequent frictions between my coworkers and myself due to lack of communication due to my Deafness and lack of understanding of Deaf culture. On about March of 2004 a unit meeting was held with the SSI Claims Reps, including myself. We all packed into a small office. I had to sit in the back because other seats were filled. When Ms. Syphax had a question she stood with her back to me to speak. I asked her to turn around so I could lip read her questions, but she ignored me. I had to quickly move up to the front side of the room so I could tell what was being said by Ms. Syphax and others. Even then, she refused to look my way when speaking. On March 31, 2004 most of the rest of the office got together for a lunch celebration for another employee's birthday. I asked Ms. Wells if this

EXHIBIT 5
Page 6 of 14 pages

gathering was for everyone, and she said she thought every one was asked. I was not invited to join them and this made me feel left out. It is possible that they announced it over the PA system and I did not hear.

Because I have a Master's Degree, I was hired at a higher GS level than usual for a new Claims Representative, and as a result was promoted to Journeyman level much earlier than usual (GS-11). Typically, an "off the street" hire (no previous relevant SSA experience) would come in at a GS-5 level Claims Rep and then proceed to GS-7 after a year, GS-9 after another year, and GS-11 after yet another year. (Some will enter as GS-7 depending on education and experience). I was hired at the GS-9 level effective 9/22/02 and promoted to GS-11 a year later. Unfortunately, Mr. Walker and Ms. Wells repeatedly warned me that I was not measuring up to the GS-11 job requirements. I kept trying to tell them that they expected too much and were not supporting me enough. In most other circumstances they would have been talking to an employee who was only a GS-7 or at most, a GS-9 and the critical job elements they have to be proficient in are much more lenient than the GS-11 elements, since they would still be regarded as a trainee. If I had not had such poor training and mentoring and if I had interpreter services when I needed them most I feel I could have met their expectations, even if they were unreasonable. At any rate, they missed no opportunity to harass me by telling me "You are a GS-11, you should be doing this without help" This created enormous pressure on me and it continued to build in intensity as the end of my 2 year probation approached. They seemed all to willing to have me sink or swim on the basis of getting the GS-11 grade so soon.

Q10    On June 8, 2004, a memorandum was signed by Robin Wells and, presumably, issued to you. Did you receive that memorandum, and is Ms. Wells' summary of past conversations/counselings as she referenced them in that memo reasonably accurate? If not, please explain.

Yes, I did receive this letter from Mrs. Wells dated from June 8, 2004. Her conversations/counseling as she referenced them in the memo were not reasonably accurate, there were a lot of incorrect information.

Mrs. Wells wrote that letter based on my "behavior" rather than my career experience at Social Security Administration employee as a Claim Representative. I find that letter inappropriate to based on the behaviors she felt it was wrong. She does not have any knowledge in my culture or in Deaf culture.

EXHIBIT 5
Page 7 of 14 pages

And she did not ask me why I behaved that way.

What Mrs. Wells wrote on that letter was inappropriate to punish me for my behaviors without asking me why or learning about my Deaf culture. She wrote it to punish me and made me more fear of losing my job. She should have written more about my work not my behaviors. She wrote a very poor letter in her defense.

I am responding to all the disagreements with the letter dated June 8, 2004.

On Page 1        I did not know or I did not have the understanding that I was on 2 years probation. It was unclear to me at the time. I thought I was on one-year probation. And I have never heard of 2 years probation. I learned in approximately June 2004 that I was actually on 2 YEARS of probation.    I did not know that Schedule A has to do with it.   I did not know that there were laws about Schedule A with two years probation.  This information was not clear when I was hired at SSA. I spoke with a few Deaf members in Deaf community and I asked them if they knew that Schedule A was 2 years probation.  Their responses were no. So it was new information to me and the Deaf community.  It was not clear to me at all that I was actually on 2 years probation.

I did pass my first year of probation and I thought I was done with the probation but still get the trainings I need to be able to do my job. Mrs. Wells signed that paper saying that I did well on 1st year of my job with Mr. Walker's support. Mrs. Wells allowed Mr. Walker to make the decision on my one-year formal review of how much I have progressed and how much I have improved. So I disagreed that I did not "successfully pass 2 years of probation" I did pass my first year of probation then Mrs. Wells discovered that I was in "trouble" and I was contacting Mr. Bruce Williams about the reasonable accommodation and what are my rights back in February 2004. Once the management has found that I contacted the "UNION REPRESENTATIVE", things has escalated to a new higher level and I felt that my job was in jeopardy. As Mrs. Wells has been a new manager in our office, my job quickly changed and things got very hasty about it. I tried very hard to remain calm at all times. I could not understand Mrs. Wells' and Mr. Walker's retaliation against me like "You are GS 11" expecting me to be on my own with the level of everyone else has. They did not care about why I was or how I arrive at GS 11.

Page 2:  I did say "whatever" in a nice calm way. I only referred as "whatever" as it is to me; I will do whatever you want me to do. I wanted to keep my job and do what they wanted me to do.  It was not to disrespect any one. I never believed in disrespecting the managements. I would not feel very good if I did disrespect my



managements.

Mr. Walker was repeatedly harassing me by making me feel stupid or little that he does not understand why I came to him for assistance. So I got very offended by his comments or actions so therefore, I did not want to listen to his offensive remarks and I said ok. "Whatever" as I would do what he wants. I did not want to tolerate standing there listening to him verbally abuse me. So it was my way of saying and walk away because there was nothing else I could do if he does not kindly help me in a positive way as a mentor.

About the black bag, I have never said or accuse anyone about taking the Black bag. That was incorrect. I asked Ms. Syhpax has seen it or take it thinking it might be hers. She replied no. So I send a broadcast message asking if anyone has take the black bag that was placed on file cabinet, would please kindly return it back to me.    I did not accuse of anyone taking it. I was worried that it was missing as it was for me to return it to someone that very day.

Now (February 2005) that I have been out of SSA, I now can't honestly recall Mrs. Wells calling me in office to seek guidance from her how to approach to my coworkers. I believe that is incorrect. I believed she asked me at that time and said "Have you found your black bag?" and my respond was "no". I don't think there was any discussion on her advising me to come to her for guidance.

Again, Mrs. Wells felt offended that I made a remark "Whatever", again I repeat it is to do what as she asked me to do. It is not my intention to disrespect her. She thought the worst in me thinking I was disrespecting her.

Page 3: I did say that I felt that I was oppressed by one of my coworkers by her actions that happened earlier this year. Mrs. Wells asked me if I wanted a meeting on this incident. And I thought it was "the only issue" to discuss, not a discussion to talk about the other issues in the past. So I wanted to solve the problem that she did wrong treating me that very particular day. I was not planning to talk to her about other issues.   I was expecting to talk about that on incident that happened. I was not planning to apologize to her for other old incidents. Mrs. Wells was expecting me to apologize to her on "old incidents" and I was only expecting Ms. Syphax to apologize to me because what she did was wrong was to take away and walk away from me then she told Mrs. Ward something "Uh no" then Mrs. Ward told me, have I spoke with Mr. Walker about this. I was so fed up that Mrs. Syphax treated me this way. She literally took it out of my hands and not explains it to me. I didn't appreciate that behavior from Ms. Syphax. Mrs. Wells forced me to apologize to her on OLD incidents and I was only thinking to work on that recent incident so I did not appreciate Mrs. Wells forcing me to apologize to Mrs. Syphax.

EXHIBIT 5
Page 9 of 14 pages

About the creamer, again Mrs. Wells did not ask me or no one clarified to me what I meant. I asked a blunt question if I were to bring my own creamer, would people respect that is my creamer? The reason why I asked this blunt question is because everyone pigged out when Mrs. Judy Nease provided us wonderfully with treats that everyone was enjoying. So this is where I learned to ask if people would respect not to take mine without asking.

Page 4: Mrs. Wells was incorrect that I was ungrateful for what Mrs. Ward has done. I did appreciate that. I was just frustrated that I could not work with Mrs. Ward on the cases that were turned to her. Mrs. Wells has planned to put me with Mrs. Ward to work on the 300 days old case. Then Mrs. Wells changed her mind and decided not to put me on that workload with Mrs. Ward. Mrs. Ward told me that she could not understand why I could not learn with her as we work together. Mrs. Ward told me that I had very simple minor mistakes and they were easy to fix. Mrs. Ward felt that I was doing a good job so far as I have progressed. On the following Monday after the weekend, I became upset with Mrs. Wells who did not inform me that the cases were moved. I gave all of the cases to Mrs. Wells then Mrs. Wells gave it to Mrs. Ward. Then when I came back on Monday discovering that my desk was rearranged and moved after giving ALL of the 300 DAYS old case.

When Mrs. Ward asked me for information on the 5 cases, which I don't remember how many cases exactly. I have fully cooperated with her. I would not shrug at my coworker or show any disrespectful manner. I am not that kind of person to do this to anyone. I disagree with Mrs. Wells or Mrs. Ward's comments on this. I gave the fullest cooperation with Mrs. Ward on my cases and I had no indication that Mrs. Ward was upset with my behavior or response. I believe that Mrs. Wells was incorrect on this and she made this up and instructed Mrs. Ward not to ask me any more questions.

Again I have fully cooperated and wanted to get all of my cases take care of immediately but I was falling behind because I had to follow up with Mr. Walker's writebacks to discuss the cases before I could work on others. Plus I had my own workload to deal with. This method was not successful in learning while doing claims with clients everyday. I MOST certainly did appreciate for what Mrs. Ward has done except that I was frustrated and disappointed how they put me on the job training and have no mentor helping me along where I should be.

Why again is Mrs. Wells thinking that I was not grateful for Mrs. Ward's help. I was happy that the clients were getting their cases taken care of properly and immediately. I was just disappointed that my training and workload did not help me to learn all of the tools I needed on the job and so forth.

Again, Mrs. Wells is incorrect about my sadness that the claimants who has


EXHIBIT 5
Page 10 of 14 page

passes away. I am sensitive about when people become sick, sad, or even deep touch by when someone dies. How could she say that I was not sad when they died? Again she was not there when Mrs. Ward and I spoke. I disagreed with Mrs. Wells' comments on this. Again she might be making this up just to make her case look stronger and makes me look bad.

Lastly of all, I most certainly thanked her for her help on my 300 days old cases. I told Mrs. Wells that I did appreciate Mrs. Ward. Mrs. Wells asked me if it was ok for her to tell Mrs. Ward. I said yes. This was before I went on vacation for 3 weeks in June 2004. I don't know if Mrs. Wells told Mrs. Ward my appreciation.

Page 5: Ms. Sanders and I have our names on the cases (Ms. Sanders' name was on the VIP (appt schedule) and my name was on the MSSICS) and it was unsure of who took it or not. When Mr. Walker came to ask me about the case. And I did ask Ms. Sanders if she has it or not because both of our names were on the cases and I was trying to solve the case and get it taken care of. When Mr. Walker asked me where is it or what is going on with it. I responded to him "I looked for that file and I asked Stephanie (Ms. Sanders) if she has it and she said no and I don't have it either. So what do you suggest do we about it." Mr. Walker came to me the next day saying how unapproiate for me to use someone's name and said that I was accusing Stephanie. I told Mr. Walker. I disagree. All I make a comment and answer your questions. I did not accuse anyone or Stephanie. Mr. Walker got very angry at my response and he said you just did. I said "No I did not. I am not the kind of person to accuse of anyone."

I know my desk pretty well and I would put my cases in the right places, like this " new initial claims, cases approved (PERC) pile, Redeterimination cases pile (follow up reviews) and others areas in piles. Well, somehow this case was in the wrong pile and I didn't think it would be there. I do not know how it arrived there. Either that someone else planted it there on purposely at the wrong place or that I unconsciously put it there but I know in my heart I did not put it there. So either I put it there or someone put it there without informing me.

I was bothered that Mr. Walker did not ask me why do I use people's name. I use people name in defense and I am an honest person who tell the truth. I do not go around and backstab anyone. In my culture, Deaf people use the people name bluntly and say that "so so" has it or did not have it... Deaf people use people's name to identify, as it is not to accuse anyone. That is my experience in Deaf culture as I have been involve in Deaf community for many years. Again, Mr. Walker thought the worst of me thinking that I ACCUSE Ms. Sanders and I wasn't. I was giving facts.

If I wanted to accuse Ms. Sanders, I would have said something like this... "Ms. Sanders has it, I saw her working on it". I said nothing like what I gave you an


EXHIBIT 5
Page 11 of 15 page

example. I repeat I said, ". I looked for that file and I asked Stephanie (Ms. Sanders) if she has it and she said no and I don't have it either. So what do you suggest do we about it."

Again, why do the people think the worst of me? I am far from what they know about me and any knowledge in Deaf culture. Mrs. Ward has ruined the reputation in Deaf culture when I came onboard. The whole office expected me to be like Mrs. Ward. That was a mistake that the office based on Mrs. Ward and expected me to be like her and do what she can do.

Lastly in Mrs. Well's letter, she was basing my behavior as a dismissal in my career which is not right for her to based on my behavior which she and the entire office has the wrong concept of my culture and I am far from the "worst" behavior that they thought of.

Q11    On September 10, 2004, District Manager Lorna Walters signed and issued to you the memorandum by which you were notified of the decision to terminate your employment during your trial period. In that document, the reasons for the decision to terminate your employment were presented and discussed. Is it your belief that those reasons are not the true reasons for the decision to terminate you? If yes, please explain.

The Social Security Administration failed to provide me with Reasonable Accommodations in type and manner that would have facilitated my assimilation of necessary job skills. SSA Management not only failed to prevent the development of a hostile work environment but also contributed to the hostility themselves. SSA Management was unwilling or unable to take into account that there are significant differences in Deaf culture and community versus the hearing community. Being Deaf made me different and rather than making any effort to understand the differences SSA Management fostered the feelings amongst themselves and many of my peers that my "behavior" was somehow defective and wrong. SSA Management appeared to have already made a decision that I and my "behavior" were problems before they set about documenting me for termination. I feel that SSA completely, deliberately ignored the fact that they set me up to fail, by refusing to provide Reasonable Accommodation, allowing for a hostile work environment to flourish and setting unreasonable expectations for me. I have no doubt that SSA Management feels the reasons cited in the memo are the true reasons for the decision to terminate me. They have to believe this or accept the fact that they did not bother to get to know and understand me as a Deaf person and failed to do their job by providing me with the reasonable accommodations I was entitled to under law.

Q12    In lieu of termination, you resigned your position by means of your electronic (email) message to Ms. Walters, dated September 16, 2004. Why did you resign your position?

I had to do this rather than let Ms. Walters fire me and have to explain to future potential employers how I was treated by the Social Security Administration. I had to do this to protect myself.

Q13    Is there anything else you wish to add?

I could have become an excellent Claims Representative, an asset to the Social Security Administration, and I would have served the public very well. By failing to provide Reasonable Accommodation and allowing an atmosphere of hostility and ignorance to develop at the Postal Plaza DC SSA Office the Agency denied me the opportunity to reach my potential and denied the public the benefit of my service and compassion.

My experience with the Social Security Administration has been devastating emotionally. I thought that getting a job with SSA would be the opportunity of a lifetime. The way SSA treated me, however, has left me bitterly disappointed, saddened and disillusioned. Despite this I would welcome the chance to resume my career with SSA. With a little more compassion and understanding and with the proper accommodations in place I know I can succeed as a Claims Representative. No problem. I deal with adversity every day of my life.

EXHIBIT 5
Page 13 of 14

**AFFIDAVIT**

Alice Ann Friends, Complainant                    )

*alice ann friends*

                                                   )

         v.                                        )        Case No. 04-0452-SSA

                                                   )

Social Security Administration              )

*alice ann friends*
I, Alice Ann Friends, make the following statement freely and voluntarily to
Donald W. Mirsch, who has identified himself to me as an Independent
Contractor/EEO Investigator. I hereby solemnly swear/affirm that the answers I
have provided below are true and complete to the best of my knowledge and
belief.

A1

Signed: *Alice Ann Friends*    3/2/05

*received  3/9/05*
*Mirsch*
*Contract EEO Investigator*

EXHIBIT 5
Page 15 of 15 pages

# EXHIBIT 4

## AFFIDAVIT

Alice Ann Friends, Complainant )
                               )
                               ) Case No. 04-0452-SSA
      v. )
                               )
Social Security Administration )

I, Monte Walker, make the following statement freely and voluntarily to Donald W. Mirsch, who has identified himself to me as an Independent Contractor/EEO Investigator. I hereby solemnly swear that the following information is true and complete to the best of my knowledge and belief, so help me God.

1.    My name is Monte Walker and I am the Management Support Specialist at the Postal Plaza Field Office, Washington, DC. I claim no physical disabilities. I am not represented at this time.

2.    I've been in this non-supervisory position for about 2-½ years. I had recently come to this position when I had the opportunity to participate in some interviews, including Ms. Friends' interview, to fill the position she was ultimately offered. She professed to read lips very well. She was hired as a Claims Representative (Bi-lingual), with fluency in sign language.

3.    As the only MSS in our office, I'm always available to everyone on the staff to offer guidance and direction as they perform their duties. Ms. Ward, who is also deaf, was initially Ms. Friends' mentor, until Ms. Ward went on maternity leave. I took on the one-on-one mentoring duties for Ms. Friends for some months until Ms. Ward returned to duty and she re-assumed the mentor duties at that time. That lasted for a short while.

4.    When I mentored Ms. Friends, I spent a lot of time showing her how to do the tasks associated with the CR work. I put everything in writing for her, as I would with other trainees, pointing out her errors and how they should have been handled, but she never showed that she was able to take over these tasks and work independently on those tasks to a successful conclusion. I wrote step-by-step instructions on all the claims she would handle. Yet, everything came to me with errors, large and small. I made some of her phonecalls for her just to get to the point that we could close-out some old cases. She did not understand the system and how the data she entered for various claims resulted as it did. She did not make independent decisions and was always at my desk with the same questions.

5.    At that point, Ms. Wells decided she needed to assure, for herself, whether Ms. Friends could perform the research of policy and all the other tasks associated with the work of a CR.

Initials 𝑀𝑊

Page ___ of ___

EXHIBIT _9_
Page _1_ of _2_ pages.

I have read the above statement consisting of ___ pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties to the complaint.

Monte Walker

Subscribed and sworn before me in _ELLICOTT CITY, MD_, this _9th_ day of _MARCH_, 2005.

Donald W. Mirsch
Contract EEO Investigator

Initials _MW_

Page ___ of ___

EXHIBIT ___9___
Page _2_ of _2_ pages

# EXHIBIT 5

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Data |
|---|---|---|---|
| ENDS, ALICE ANN | 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 | 11/04/70 | 09/22/02 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature Of Action | 6-A. Code | 6-B. Nature of Action |
| 170 | EXC APPT | | |
| 5-C. Code | 5-D. Legal Authority | 6-C Code | 6-D. Legal Authority |
| WUM | SCH A, 213.3102(U) | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | SOCIAL INSURANCE SPEC (BLNGL) CLMS REP (BLNGL) S2D3MZ012    03C363A |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GS | 0105 | 09 | 01 | $ 38406 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | $ 34451 | $ 3955 | $ 38406 | $ 0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | ORC OFC REGNL COMM PHILADELPHIA AREA DIR #3 FO, WASHINGTON, DC FO, WASHING (POSTAL PLAZA), DC |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 | 1 - None   3 - 10-Point/Disability   5 - 10-Point Other<br>2 - 5-Point   4 - 10-Point Compensable   6 - 10-Point/Compensable/30% | 2 | 0 - None   2 - Conditional<br>1 - Permanent   3 - Indefinite | F   SEX | YES   X   NO |

| 27 | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| BASIC ONLY | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K   FERS & FICA | 09/22/02 | F   FULL-TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2 | 1 - Competitive Service   3 - SES General<br>2 - Excepted Service   4 - SES Career Reserved | N | E - Exempt<br>N - Nonexempt | 4007563 | 1535 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. VET-STAT | 42. EDUC LVL | 43. SUPV LVL | 44. POSITION SENSITIVITY |
|---|---|---|---|---|
| CLS   00 | X | 17 | 8 | NONSENSITIVE/LOW RI |

45. Remarks

APPOINTMENT AFFIDAVIT EXECUTED 00-00-00.
CREDITABLE MILITARY SERVICE: 00-00-00
PREVIOUS RETIREMENT COVERAGE: 00-00-00
UPON COMPLETION OF 2 YEARS CONTINUOUS SATISFACTORY SERVICE AT
ACCEPTABLE LEVEL OF PERFORMANCE EMPLOYEE MAY BE NONCOMPETITIVELY
CONVERTED TO CAREER OR CAREER CONDITIONAL APPOINTMENT
SCHEDULE A APPOINTMENT ELIG FOR LIFE AND HEALTH BENEFITS
EMPLOYEE IS AUTOMATICALLY COVERED UNDER FERS.

EXHIBIT 13a
13 of 13 pages

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| SZ - SOCIAL SECURITY ADMIN | NANCY BEADLE DIRECTOR, CENTER FOR HUMAN RESOURCES 021118529 |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| SZ00 | 1166 | 09/24/02 | |

2. OPF Copy - Long-Term Record - DO NOT DESTROY

# EXHIBIT 6

| /*+-POSITION DESCRIPTION | | (Please Read Instructions on the Back) | | | | 1. Agency Position No. 3C363A |

**/*+-POSITION DESCRIPTION**          (Please Read Instructions on the Back)

| 1. Agency Position No. |
| 3C363A |

| 2. Reason for Submission | | 3. Service | | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|---|---|
| Redescription [X] New | | Hdqtrs. [X] Field | | Regional Offices | Field Offices | |
| Reestablishment ☐ Other | | | | | | |

Explanation (*Show any positions replaced*)

| 7. Fair Labor Standards Act | 8. Financial Statements Required |
|---|---|
| Exempt [X] Nonexempt | Executive Personnel ☐  Employment and ☐ Financial Disclosure  Financial Interests |

| 10. Position Status | 11. Position is: | 12. Sensitivity | | 13. Competitive Level |
|---|---|---|---|---|
| [X] Competitive | Supervisory [X] | 1-Non-Sensitive | 4-Special Sensitive | 00 |
| ☐ Excepted (Specify in Remarks) | Non-Supvry. [X] | 2-Nonsensitive Moderate Sensitive | 5-Moderate Risk | 14. Agency Use |
| ☐ SES (Gen.) ☐ SES (CR) | | 3-Critical Sensitive | 6-High Risk | |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | Social Insurance Specialist (BLNGL) | GS | 105 | 9 | RS | 8/17/90 |
| c. Recommended by Supervisor or Initiating Office | | | | | | |

| 16. Organizational Title of Position (if different from official title) | 17. Number of allocations |
|---|---|
| Claims Representative (Bilingual) | V-' * (See Remarks #23) |

| 18. Department, Agency or Establishment | |
|---|---|
| Social Security Administration | c. Third Subdivision  Office of the Area Director |
| a. First Subdivision  Office of the Deputy Commissioner, Operations | d. Fourth Subdivision  Field Offices |
| b. Second Subdivision  Office of the Regional Commissioner | e. Fifth Subdivision |

| 20A. Supervisor Certification. I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that the false or misleading statements may constitute violations of such statutes and their implementing regulations. | 20B. Allocation Certification I certify that each incumbent will perform the grade controlling duties and responsibilities of this position for a substantial amount of time (i.e., 25% or more). |
|---|---|
| 20a1. Typed Name and Title of Immediate Supervisor | 20b. Typed Name and Title of Delegated Authorizing Official for Non-Supervisory GS-14 and Be (Required) |
| Signature:                          |Date: | Herbert R. Doggette, Jr.  Deputy Commissioner, Operations |
| 20a2 Typed name of higher level management concurrence (Optional if 20a1 is signed) | Signature /s/ | Date 3/5/90 |
| Signature                            |Date | | |

| 21. Classification/Job Grading Certification. I certify that this position has been classified/graded as required by Title 5, U. S. Code, in conformance with standards published by the Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards. | |
|---|---|
| 21a. Typed Name and Title of Official Taking Action  Robert Sunderland  Personnel Management Specialist | 21b. Typed Name and Title of Delegated Authorizing Official for GS-15/SES |
| Signature /s/        |Date 8/17/90 | Signature                       |Date |

| 22. The standards, and information on their application, are available in the personnel office. Position Classification Standards Used in Classifying/Grading Position: |
|---|
| GS-105-0 |

| 23. Remarks |
|---|
| *Allocations included in GS-105-11-#3C363. |

| 24. Description of Major Duties and Responsibilities (See Attached) |
|---|
| Form SSA-801 (October 2001)  (former OF-8) |

Social Insurance Specialist
(Claims Representative-Bilingual)
GS-105-09-#3C363A

This position is different from position # 3C361A in that the incumbent is required to possess and use bilingual skills to assist the non-English speaking public in conducting necessary Social Security business.

---

Social Insurance Specialist
(Claims Representative)
GS-105-09-#3C361A

Amended:  2/27/78, 8/7/80, 6/24/91

Duties

This is the senior level training position leading to the journeyman claims representative position. The incumbent will be responsible for performing the following duties:

- Conducts interviews to obtain, clarify, and verify information about individual applicants' initial and continuing eligibility for retirement, survivors, disability, black lung, health insurance benefits, and eligibility to supplemental security income payments including State supplements. (CRITICAL ELEMENT)

- Finally adjudicates claims for benefits and eligibility to all programs administered by SSA. (CRITICAL ELEMENT)

- When so designated, authorizes for payment, with limited review, claims for benefits and eligibility to all SSA programs. (CRITICAL ELEMENT)

- Conducts interviews, develops, investigates, and resolves post entitlement actions which may involve suspension, resumption, or termination of eligibility or payments. (CRITICAL ELEMENT)

- Provides some technical guidance to lower grade employees involved in the claims process.

- As designated, conducts case reviews and informal and formal conferences to reconsider initial decisions and post eligibility decisions affecting an individual's eligibility, continuing eligibility, or amount of payment under the SSI program.

- As designated, makes final non medical decisions on SSI reconsideration's.

- Determines finally, if applicants for, or recipients of, disability insurance benefits and disability payments under the SSI program are engaging in substantial gainful activity.

- Provides referral services to individuals needing the services of other programs or organizations.

- Participates in training sessions as a student and, as designated, as an instructor.

- Develops, investigates, and resolves discrepancies in earnings and determines amounts to be posted or deleted from individual records.

- Identifies the need for and approves the selection of representative payees for individuals unable to handle their own benefits.

- Determines whether income is wages or self employment income and whether it is covered income under the Social Security Act.

- Authorizes advance SSI payments in specified case situations and requests onetime payments as necessary.

- Protects the rights of individuals by assuring that claimants and/or their personnel representatives understand the claimants' legal rights and obligations under the Act and its relationship to other social welfare and benefit programs.

I. Job Requirements

- Understanding of the philosophies, principles, and objectives of social insurance and welfare programs.

- Knowledge of the policies and specific provisions of the retirement, survivors, disability, and health insurance programs, and the black lung and SSI programs.

- Knowledge of State laws involving descent, welfare payments and social service programs, Medicaid, workmen's compensation, etc. and various Federal laws, such as parts of the Internal Revenue Code, Railroad Retirement Act, Veterans Administration laws, Immigration and Nationality Act, and others having a relationship to SSA programs.

- General understanding of the relationships of SSA programs to other programs addressed to the same or similar issues and problems.

- General ability to communicate with individuals for the purpose of obtaining information, motivating individuals to appropriate courses of action, and conveying and understanding of complex requirements of particular programs.

- General ability to evaluate evidence and the facts of situations, to draw sound conclusions, and to explain the basis for the conclusions.

- Knowledge of the SSA-integrated data processing system and the ability to use the systems input and output methodology, forms, and data, as well as the ability to recognize and resolve systems input alerts, edits, and rejects.

II. Difficulty of Work

This training position covers the full range of the job. This includes the communicative, adjudicative, authorization, and SSI reconsideration functions involved with claims and post entitlement activities.

Subjects and issues covered in interviewing work include the complete range of substantive issues and procedural matters of the several social insurance programs and the black lung and SSI programs. The development and adjudicative functions involve quasi-legal matters which must be related to the individual circumstances of the general public in the district, and this involves intricate situations needing careful distinctions.

Claims that are authorized for payment must be carefully reviewed and evaluated. Claims that are authorized may be reviewed by a supervisor or journeyman employee. Case reviews, informal and formal conference interviews in SSI reconsideration cases may be extremely sensitive due to the legal tenor or the conference interview. The incumbent must be able to deal with the majority of issues with a high level of expertise.

The guidelines consist principally of the legal regulations and procedural requirements associated with the respective social insurance programs and the black lung and supplemental security income programs. These guides are numerous, extensive, and complex; however, their communication and application to individual cases and circumstances impose demands for judgment in selecting applicable provisions, interpreting their intent and adaptation, their use, together with ingenuity in explaining how these requirements serve the needs of the persons concerned.

III. Responsibility

The communicative functions are normally not subject to review. The technical adequacy of information provided is assured through complaints made by claimants as to the service provided, or through a review of applications, records, letters, or other documents originated by the representative on an intermittent basis. Neither the interviews conducted nor the claims adjudicated are segregated as to type or level of difficulty.

The representative is expected to resolve, with a minimum of supervisory consultation, all but the most unusual problems; e.g., those which may be of a precedent setting or a delicate public relations nature, or of unresolved policy issues. Technical assistance is available from the supervisor; however, it is normally expected to be requested only where precedent decisions or policy are not available. Authorized claims are subject to a limited review. Supervisors may designate a sample case for review to determine training needs and the individual's progress towards the journeyman level. SSI reconsideration's through case review or informal or formal conference interviews will require high caliber expertise. This is true both from the standpoint of the persons being interviewed as well as from the subject matter involved in the issues to be resolved. SSI reconsideration decisions are subject to review only through the SSA appeals process.

The work performed is a vital part of the functions through which the organization directly informs members of the general public about the concerned programs and extends benefits of these programs to them.

Work is performed under the general supervision of the district manager, assistant district manager, branch manager, or operations supervisor.

IV. Personal Relationship

These relationships are important in that much of the work consists of conducting interviews. Many members of the general public in the area are likely to be subjects of interviews over a period of time in their capacity as applicants, beneficiaries, claimants, legal representatives, employers, and sources of information. In the interviews the purposes include eliciting specific items of information, explaining substantive and procedural requirements, and interpreting program concepts. Because the coverage of the program is so broad, individuals from all strata of society will come in contact with the representatives.

Due to the highly sensitive nature of the SSI reconsideration conferences the incumbent must exercise a high degree of skill in the interpersonal exchange which surrounds these conferences.

V. Other

The incumbent's official duty station may be district office branch office, or other established field facility. Duties assigned may be performed in contact stations, other temporary locations, or in an institution, hospital, or other service location.

# AMENDMENT TO POSITION DESCRIPTION (OF-8)
(Use only for revisions not requiring major rewriting)

VIL SERVICE TITLE

Social Insurance Representative

ORGANIZATIONAL TITLE

Claims Representative

| NAME OF INCUMBENT (If any) | SCHEDULE, SERIES, GRADE, AND POSITION NUMBER |
|---|---|
| | GS-105-~~10 #1901~~ |
| | 11-30361 |

ORGANIZATIONAL LOCATION

| DIVISION | BRANCH |
|---|---|
| Office of Program Operations | Office of the Assistant Regional Comm., FO |
| SECTION | UNIT |
| Office of the Regional Commissioner | District/Branch Offices |

REASON FOR AMENDMENT

To show the supervisory resident representative as an alternative supervisor
for this position.

AMENDMENT(S): (Use reverse side if needed)

III.  Difficulty of Work

Change the last sentence to read:

Work is performed under the general supervision of a district manager,
assistant district manager, branch manager, operations supervisor, or
supervisory resident representative.

Milton R. Johnson  Dir., OHAP
(PK)          3/23/78

| APPROVED: | DATE |
|---|---|
| Robert Bynum | 2/10/78 |
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST | DATE |
| Mike C Williams Jr | 2/27/78 |
| SIGNATURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL | DATE |
| C. P. Bennett | 2/27/78 |

FORM OAAD-413
(1-61)

## AMENDMENT TO POSITION DESCRIPTION (OF-8)
### (Use only for revisions not requiring major rewriting)

CIVIL SERVICE TITLE

Social Insurance Representative

ORGANIZATIONAL TITLE

Claims Representative

| NAME OF INCUMBENT (If any) | SCHEDULE, SERIES, GRADE, AND POSITION NUMBER |
|---|---|
| | GS-105-10-81901 |

ORGANIZATIONAL LOCATION

| DIVISION | BRANCH |
|---|---|
| ORC, ARC/FO, Office of Area Director | District/Branch Offices |
| SECTION | UNIT |

REASON FOR AMENDMENT

To include the food stamp function in the PD.

AMENDMENT(S): (Use reverse side if needed)

Duties

Add as a duty, on page 2, immediately before "Performs other duties as assigned . . .": "Receives and directs the processing of food stamp applications per current procedures and policies."

| APPROVED: Herbert R. Doggette, Jr. Deputy Commissioner, Operations | Herbert R. Doggette, Jr. by Art Solomon | DATE 8/7/80 |
|---|---|---|
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST | | DATE |
| SIGNATURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL Thomas S. Longfield Chief, Classification Management Branch | | DATE 8/7/80 |

FORM SSA-3640 (1-61) (FORMERLY OAAD-410)
PRIOR EDITIONS MAY BE USED UNTIL SUPPLY IS EXHAUSTED

## AMENDMENT TO POSITION DESCRIPTION (OF-8)
### (Use only for revisions not requiring major rewriting)

SERVICE TITLE

Social Insurance Representative

ORGANIZATIONAL TITLE

Claims Representative

| NAME OF INCUMBENT (if any) | SCHEDULE, SERIES, GRADE, AND POSITION NUMBER |
|---|---|
| | GS-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, A, B, C |

ORGANIZATIONAL LOCATION

| DIVISION | BRANCH |
|---|---|
| Deputy Commissioner for Operations | Assistant Regional Commissioner for Field Operations |
| SECTION | UNIT |
| Office of the Regional Commissioner | Field Offices |

REASON FOR AMENDMENT

Add duty.

AMENDMENT(S):(Use reverse side if needed)

"May perform cashier duties through the use of the Third Party Draft System for the payment of certain administrative expenses (such as claims evidence, local travel, small purchases, etc.). Maintains accurate receipts and controls to account for all draft activity and is responsible for safeguarding drafts. Ensures drafts are issued only for authorized purposes. Inputs payment information into the Agency's central accounting system via PC Email."

| APPROVED: *Janice L. Warden* | DATE 6/17/91 |
|---|---|
| Janice L. Warden, Acting Deputy Commissioner for Operations | |
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST *Fred Frank* | DATE 6/24/91 |
| S. TURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL | DATE |

FORM SSA-3640 (1-61)

# EXHIBIT 7

# POSITION DESCRIPTION   (Please Read Instructions on the Back)

| | |
|---|---|
| 1. Agency Position No. | 3C363 |

**2. Reason for Submission**
- [ ] Redescription
- [X] New
- [ ] Reestablishment
- [ ] Other

Explanation (*Show any positions replaced*)

**3. Service**
- [ ] Hdqtrs.
- [X] Field

**4. Employing Office Location** Regional Offices

**5. Duty Station** Field Offices

**6. OPM Certification No.**

**7. Fair Labor Standards Act**
- [ ] Exempt
- [X] Nonexempt

**8. Financial Statements Required**
- Executive Personnel Financial Disclosure
- Employment and Financial Interests

**10. Position Status**
- [X] Competitive
- [ ] Excepted (Specify in Remarks)
- [ ] SES (Gen.) [ ] SES (CR)

**11. Position is:**
- [ ] Supervisory
- [X] Non-Suprvy.

**12. Sensitivity**
- [X] 1-Non-Sensitive
- [ ] 2-Noncritical Sensitive
- [ ] 3-Critical Sensitive
- [ ] 4-Special Sensitive
- [ ] 5-Moderate Risk
- [ ] 6-High Risk

**13. Competitive Level** 00

**14. Agency Use**

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | Social Insurance Specialist (BLNGL) | GS | 105 | 11 | RS | 8/17/90 |
| c. Recommended by Supervisor or Initiating Office | | | | | | |

**16. Organizational Title of Position (if different from official title)** Claims Representative (Bilingual)

**17. Number of allocations** V- ~~438~~ * (See Remarks #23)

**18. Department, Agency or Establishment** Social Security Administration

**a. First Subdivision** Office of the Deputy Commissioner, Operations

**b. Second Subdivision** Office of the Regional Commissioner

**c. Third Subdivision** Office of the Area Director

**d. Fourth Subdivision** Field Offices

**e. Fifth Subdivision**

**20A. Supervisor Certification.** I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that the false or misleading statements may constitute violations of such statutes or their implementing regulations.

**20B. Allocation Certification.** I certify that each incumbent will perform the grade controlling duties and responsibilities of this position for a substantial amount of time (i.e., 25% or more).

**20a1. Typed Name and Title of Immediate Supervisor**
Signature:                Date

**20b. Typed Name and Title of Delegated Authorizing Official for Non-Supervisory GS-14 and Below (Required)**
Herbert R. Doggette, Jr.
Deputy Commissioner, Operations

**20a2. Typed name of higher level management concurrence (Optional if 20a1 is signed)**
Signature                Date

Signature /s/   Date 3/5/90

**21. Classification/Job Grading Certification.** I certify that this position has been classified/graded as required by Title 5, U. S. Code, in conformance with standards published by the Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.

**21a. Typed Name and Title of Official Taking Action**
Robert Sunderland
Personnel Management Specialist
Signature /s/   Date 8/17/90

**21b. Typed Name and Title of Delegated Authorizing Official for GS-15/SES**
Signature   Date

**22.** The standards, and information on their application, are available in the personnel office. Position Classification Standards Used in Classifying/Grading Position:
GS-105-0

**23. Remarks**

| BOS | NY | PHI | ATL | CHI | DAL | KC | DEN | SF | SEA |
|---|---|---|---|---|---|---|---|---|---|
| 200 | 700 | 115 | 181 | 109 | 75 | 20 | 35 | 800 | 115 |

*Allocations includes use of GS-105-9/7/5-#3C363A/B/C.

(462) IA, memo, 7/10/00 - Total: ~~900~~
(1450) IA, survey, 5/8/03 - Total: 2350

**24. Description of Major Duties and Responsibilities (See Attached)**

Form SSA-801 (October 2001) (former OF-8)

Social Insurance Specialist
(Claims Representative-Bilingual)
GS-105-11-#3C363

This position is different from position #3C361 in that the incumbent is required to possess and use bilingual skills to assist the non-English speaking public in conducting necessary Social Security business.

---

Social Insurance Specialist
(Claims Representative)
GS-105-11-#3C361

Amended 2/27/78, 8/7/80, 6/24/91

DUTIES

This is the keystone position in the Social Security Administration through which the major operating objective of bringing direct personal service to the public is achieved. The incumbent:

--Conducts interviews to obtain, clarify, and verify information about individual applicants' initial and continuing eligibility for retirement, survivors, disability, black lung, health insurance benefits, and eligibility for supplemental security income payments, including State supplements where required; (CRITICAL ELEMENT)

--Examines evidence to evaluate its validity and acceptability in establishing entitlement to benefits, and, when necessary, takes the required developmental action to insure that all available relevant evidence has been obtained. Assists the applicant in securing evidence, and prepares special determinations of fact to resolve evidentiary discrepancies;

--Finally adjudicates and finally authorizes for payment, without subsequent review, claims for benefits and eligibility to all programs administered by SSA and finally disallows, without subsequent review, a full range of all types of SSI claims, RSDHI claims lacking in insured status, RSDHI claims previously denied, disabled widow's benefits claims not meeting the prescribed period; (CRITICAL ELEMENT)

--Makes final reconsideration decisions on disability insurance and disabled widows cases involving reaffirmations of initial or subsequent denials of benefits not involving medical issues;

--Conducts interviews, develops, investigates, and resolves postentitlement actions; (CRITICAL ELEMENT) including SSI redeterminations, which may involve suspension, resumption, or termination of eligibility or payments;

--Provides technical guidance to other employees involved in the
  claims process;

--Assists individuals in filing for administrative appeals in matters
  concerning entitlement to benefits or coverage under the various
  programs;

--Conducts case reviews, informal and formal conferences to reconsider
  initial decisions and posteligibility decisions affecting an
  individual's eligibility, continuing eligibility, or amount of
  payment under the supplemental security income program and makes
  final decisions on nonmedical issues in SSI reconsiderations;

--Determines finally if applicants for or recipients of disability
  insurance benefits and disability payments under the SSI program are
  engaging in substantial gainful activity;

--Recognizes the need for and approves the selection of representative
  payees for individuals unable to handle their own benefits;(CRITICAL
  ELEMENT)

--Protects the integrity of SSA programs through identification,
  investigation, and resolution of potential program abuse situations;

--Provides referral services to individuals needing the services of
  other programs or organizations;

--Participates in training sessions both as student and instructor;

--Authorizes advance SSI payments and requests one-time payments as
  necessary;

--As assigned and as necessary contributes to the office
  information-public relations programs by making public speeches and
  assists in public information projects; informs superiors of trends
  in public reaction to social security programs;

--Protects the rights of individuals by assuring that claimants and/or
  their personal representative understand the claimants' legal rights
  and obligations under the Act and its relationship to other social
  welfare and benefit programs;

--Develops, investigates, and resolves discrepancies in earnings and
  determines amounts to be posted or deleted from individual records;

--Determines whether income is wages or self-employment income and
  whether it is covered income under the Social Security Act; and

--Performs other duties as assigned and assumes new responsibilities
  dictated by legislative or policy changes.

## JOB REQUIREMENTS

--Understanding of the philosophy, principles, objectives, and
  specific provisions of all programs administered by SSA and the
  relationship of these programs to others which are related.

---Knowledge of State laws involving descent, welfare payments and
  social service programs, Medicaid, workman's compensation, etc., and
  various Federal laws, such as parts of the Internal Revenue Code,
  Railroad Retirement Act, laws concerning veterans' benefits,
  Immigration and Nationality Act, and others having a relationship to
  SSA programs.

--Knowledge of the SSA-integrated data processing system and the
  ability to use the systems input and output methodology, forms, and
  data, as well as the ability to recognize and resolve systems input
  alerts, edits, and rejects.

--Ability to communicate with individuals for the purposes of
  obtaining information, motivating individuals to appropriate courses
  of action, and conveying an understanding of complex requirements of
  particular programs. --Ability to evaluate evidence and the facts of
  situations, draw sound conclusions, and explain the basis for the
  conclusions.

## DIFFICULTY OF WORK

Assignments cover the communicative, adjudicative, final
authorization, and SSI reconsideration functions through the full
range of claims and postentitlement activities.

Subjects and issues covered in interviewing work cover the complete
range of substantive issues and procedural matters of the various
social insurance programs and the black lung and supplemental security
income programs. The development and adjudicative functions involve
quasi-legal matters which must be related to the individual
circumstances of each applicant.

The incumbent must carefully evaluate all facets of the claims being
finally authorized.

Informal and formal conference interviews in SSI reconsideration cases
may be extremely sensitive. Due to the legal tenor of the conference
interview, the incumbent must be able to deal with all issues with a
high level of expertise.

The guidelines consist, principally, of the legal regulations and
procedural requirements of the various social insurance, black lung,
and supplemental security income programs. These guides are numerous,
extensive, and complex. Their application to distinctive cases and
circumstances requires judgment and insight in applying the
requirements to the needs of the individuals concerned. Work is

performed under the general supervision of a district manager,
assistant district manager, branch manager, or operations supervisor.

RESPONSIBILITY

The work performed is a vital part of the functions through which the
organization directly informs members of the general public about the
concerned programs and extends benefits of these programs to them.

The communicative functions are normally not subject to review. The
technical adequacy of information provided is assured through
occasional spot checks or observations made by the supervisor, through
complaints made by claimants as to the service provided, or through a
review of applications, records, letters, or other documents
originated by the representative on an intermittent basis. Neither the
interviews conducted nor the claims adjudicated and authorized are
segregated as to type or level of difficulty.

The representative is expected to resolve, without benefit of
supervisory consultation, all but the most unusual problems; such as,
those which may be precedent setting, of a delicate public relations
nature, or unresolved policy issues. Technical assistance is available
from the supervisor, however, it is normally expected to be requested
only where precedent decisions or policy are not available.

Claims that are finally authorized are not subject to a subsequent
review. A sample of cases may be evaluated through the SSA quality
appraisal system either during processing or at the end of line after
payment is effectuated. SSI reconsideration decisions are subject to
review only through the SSA appeals process.

PERSONAL RELATIONSHIPS

These relationships are important in that much of the work consists of
conducting interviews. Coverage of the programs is so general that all
segments of the general public will be encountered as potential
applicants, beneficiaries, claimants, legal representatives,
employers, and sources of information. In the interviews, the purposes
include eliciting specific items of information, explaining
substantive and procedural requirements, and interpreting program
concepts. Interviews must be conducted in a tactful and courteous
manner.

OTHER

The incumbents' official duty station may be a district office, branch
office, or other established field facility. Duties assigned may also
be performed in contact stations, other temporary locations, or in
institutions, hospitals, or other locations as designated by
supervisors.

AMENDMENT TO POSITION DESCRIPTION (OF—8)
(Use only for revisions not requiring major rewriting)

VIL SERVICE TITLE

Social Insurance Representative

ORGANIZATIONAL TITLE

Claims Representative

| NAME OF INCUMBENT (If any) | SCHEDULE, SERIES, GRADE, AND POSITION NUMBER |
|---|---|
| | GS-105-~~10-#1901~~ |
| | 11- 3C361 |

| ORGANIZATIONAL LOCATION | |
|---|---|
| DIVISION | BRANCH |
| Office of Program Operations | Office of the Assistant Regional Comm., FO |
| SECTION | UNIT |
| Office of the Regional Commissioner | District/Branch Offices |

REASON FOR AMENDMENT

To show the supervisory resident representative as an alternative supervisor
for this position.

AMENDMENT(S): (Use reverse side if needed)

III.  Difficulty of Work

Change the last sentence to read:

Work is performed under the general supervision of a district manager,
assistant district manager, branch manager, operations supervisor, or
supervisory resident representative.

Milton R. Johnson  Dir, ORAP
(PK)  3/23/78

| APPROVED: | DATE |
|---|---|
| *Robert L Bynum* | 2/10/78 |
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST | DATE |
| *Willie C Williams Jr* | 2/27/78 |
| ..CNATURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL | DATE |
| *C. P. Bennett* | 2/27/78 |

FORM OAAD-410
(1-61)

## AMENDMENT TO POSITION DESCRIPTION (OF-8)
(Use only for revisions not requiring major rewriting)

CIVIL SERVICE TITLE
Social Insurance Representative

ORGANIZATIONAL TITLE
Claims Representative

| NAME OF INCUMBENT (if any) | SCHEDULE, SERIES, GRADE, AND POSITION NUMBER |
|---|---|
| | GS-105-10~#1901 |
| | H-3C361 |

ORGANIZATIONAL LOCATION

| DIVISION | BRANCH |
|---|---|
| ORC, ARC/FO, Office of Area Director | District/Branch Offices |
| SECTION | UNIT |
| | |

REASON FOR AMENDMENT

To include the food stamp function in the PD.

AMENDMENT(S): (Use reverse side if needed)

Duties

Add as a duty, on page 2, immediately before "Performs other duties as
assigned . . ." : "Receives and directs the processing of food stamp
applications per current procedures and policies."

| APPROVED: | | DATE |
|---|---|---|
| Herbert R. Doggette, Jr. Deputy Commissioner, Operations | Herbert R. Doggette, Jr. by Art Solomon | 8/7/80 |
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST | | DATE |
| | | |
| SIGNATURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL | | DATE |
| Thomas J. Langley Chief, Classification Management Branch | | 8/7/80 |

FORM SSA-3640 (1-61) (FORMERLY OAAO-410)
PRIOR EDITIONS MAY BE USED UNTIL SUPPLY IS EXHAUSTED

## AMENDMENT TO POSITION DESCRIPTION (OF-8)
### (Use only for revisions not requiring major rewriting)

SERVICE TITLE

Social Insurance Representative
ORGANIZATIONAL TITLE

Claims Representative

| NAME OF INCUMBENT (if any) | SCHEDULE, SERIES, GRADE, AND POSITION NUMBER |
|---|---|
|  | 7 - 30 361 |
|  | GS-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, A, B, C |

ORGANIZATIONAL LOCATION

| DIVISION | BRANCH |
|---|---|
| Deputy Commissioner for Operations | Assistant Regional Commissioner for Field Operations |
| SECTION | UNIT |
| Office of the Regional Commissioner | Field Offices |

REASON FOR AMENDMENT

Add duty.

AMENDMENT(S):(Use reverse side if needed)

"May perform cashier duties through the use of the Third Party Draft System for the payment of certain administrative expenses (such as claims evidence, local travel, small purchases, etc.). Maintains accurate receipts and controls to account for all draft activity and is responsible for safeguarding drafts. Ensures drafts are issued only for authorized purposes. Inputs payment information into the Agency's central accounting system via PC Email."

| APPROVED: *Janice L. Warden* | DATE 6/17/91 |
|---|---|
| Janice L. Warden, Acting Deputy Commissioner for Operations | |
| SIGNATURE OF CLASSIFICATION AND WAGE SPECIALIST *Fred Frank* | DATE 6/24/91 |
| S.   TURE OF CHIEF, CLASSIFICATION BRANCH, OFFICE OF PERSONNEL | DATE |

FORM SSA-3640 (1-61)

# EXHIBIT 8

# SOCIAL SECURITY

**MEMORANDUM**

Date:   June 28, 2004

To:    Alice Ann Friends
       Claims Representative (Bilingual)
       GS-105-11
       Postal Plaza Field Office
       Area 3
       Washington, DC

From:  Robin Wells
       District Manager
       Postal Plaza Field Office
       Area 3
       Washington, DC

Subject:  Status as Excepted Service Trial Period Employee

The purpose of this memorandum is to remind you of your current Excepted Service Appointment trial period status and to summarize the performance discussions that have occurred thus far during your appointment.

The SF-50 Notification of Personnel Action that placed you in this appointment, effective September 22, 2002, stated, "UPON COMPLETION OF 2 YEARS CONTINUOUS SATISFACTORY SERVICE AT ACCEPTABLE LEVEL OF PERFORMANCE EMPLOYEE MAY BE NONCOMPETITIVELY CONVERTED TO CAREER OR CAREER CONDITIONAL APPOINTMENT". This means that if you fail to fully demonstrate your fitness or qualifications for continued employment, your excepted service appointment will be terminated during your trial period. Your work record thus far fails to fully demonstrate your fitness or qualifications for continued employment.

Upon your entrance on duty, you were given clerical work to do while awaiting the start of your formal classroom training. The IVT training began during October of 2002 in the Postal Plaza DC office. You were the only student in the IVT class and the IVT was closed captioned. Michelle Ward who had been a T16 Claims Representative (bilingual in English and American Sign Language) for 9 years, was your mentor. She spent 4 days per week with you during the off-air activities period reviewing the IVT lesson and answering any questions that you had plus the required off air activities. During

Page 1 of 4

EXHIBIT **12b**
( of __4__ pages.

November of 2002, an ASL interpreter was provided to you. The interpreter was present every day during the IVT broadcast, 8:30 – 12:30. Ms. Ward continued as your mentor in the afternoon. The ASL interpreter and Ms. Ward continued in their respective roles throughout the duration of the IVT class, which ended in March of 2003. Ms. Ward went out on maternity leave in March of 2003 and you were mentored part time by Management Support Specialist, Monte Walker, from March of 2003 through July of 2003. When Ms. Ward returned to duty in July 2003, she resumed mentoring you.

In September of 2003, Ms. Ward requested that she cease mentoring you because of conflicts between the two of you. She stated that you had difficulty retaining information and would repeatedly ask her the same questions for which Ms. Ward had already provided the answers. She stated that she felt undermined, because you would often seek the advice of another Claims Representative because you felt that Ms. Ward was providing incorrect information.

I reported to the Postal Plaza, Washington DC Social Security office as the District Manager in September of 2003. I began observing all of my employees, especially the trainees, to determine their level of expertise and make any adjustments to the mentoring that they were receiving. I realized almost immediately that you were having an especially difficult time with understanding the fundamentals of the SSI program, to the extent that incorrect eligibility determinations were being made that disadvantaged the customers to various degrees. I felt that you were not utilizing the resources available to you that would have aided you in rendering the proper decision. I personally spent time with you, training you about how to use policy net to resolve outstanding issues. It was difficult to determine if you truly researched, because you continued to process claims improperly. Even when I provided the answers to move the case along, you did not comprehend well enough to take the claim and resolve it.

When I reported to the Field Office, Mr. Walker was your mentor. At that time, you indicated to me that you were having difficulty with his mentoring and you requested to have another mentor. Another T16 Claims Representative, Gayle Syphax offered to mentor you. I accepted this offer, because I believed that you continued to need ongoing assistance and mentoring and Ms. Syphax is an excellent T16 technician. You agreed to this new mentor. Shortly afterward, you indicated to me that the mentoring was not working well and during October of 2003, Ms. Syphax also told me that she wished to end the mentoring because of difficulties she was having with you. As you know, at the time the only available experienced individual was Mr. Walker. I felt that you needed to have more assistance with him, and following my conversation with him regarding the direction of his mentoring I believed that you would benefit. During November of 2003, I requested that Mr. Walker resume mentoring you because you were having continued difficulty with your initial claims and adjudicating claims. Mr. Walker became the full-time mentor for you and has remained so through the present.

EXHIBIT _12b_
Page _2_ of _4_ pages

3

I continued to observe you making basic errors. For example, in March 2004, you came to me and asked if another Claims Representative could take over an interview, because your claimant spoke with a stutter and you were unable to clearly understand what he was saying. In my assessment as to who to turn this case over to, I asked you how far along you were with the claim and what actions had you taken thus far. You stated to me that you conducted a pre-interview and that you asked the claimant to begin completing the 8-page disability interview form. I asked you what your findings were with respect to the pre-interview and you stated that the claimant said he was receiving a monthly payment of $938.00. I asked you what type of payment this was and you showed me a piece of paper where the claimant wrote "annuity". I was astounded by this because, if this was accurate, then there was no need for you or another Claims Representative to continue this interview. I explained to you that I wanted to speak with the claimant and when I approached him and introduced myself, he immediately apologized for the length of time it was taking him to complete the disability form and he humbly explained that he could not read nor write. I verified with him that he was indeed receiving a $938.00 monthly annuity and I apologized to him that we had asked him to complete a form that was not needed. I asked you to complete the interview with an informal denial. Afterward I spoke with you about the importance of the pre-interview in determining almost immediately whether or not a claimant will be eligible. I elaborated that you should have been more observant and aware that the claimant's monthly income precludes eligibility for SSI, therefore, you could have eliminated his struggle and embarrassment in attempting to complete the disability form

I conducted the midyear discussion with you during April of 2004. During that discussion, I told you the following. I had serious concerns regarding your work performance. Since you completed the T16 IVT training course, you had 3 different mentors. Your work performance was not where it should have been given the length of time you had been here and the continuous mentoring and assistance that had been provided. Even at that date, you continued to require assistance on basic, fundamental issues relating to your SSI claims. I had repeatedly asked that you conduct thorough research on issues in order to determine the proper development; and even though you said that you had researched these issues, you continued to make the same errors.

Mr. Walker continues to work with you almost every day and almost every case must be returned due to some type of error, oftentimes resulting in a payment error or disadvantage to claimants.

Given all of the performance counseling and given all of the formal training, refresher training, and one-on-one assistance you have been given, unless your performance shows dramatic improvement, and you are able to successfully perform the essential functions of your position, your excepted appointment will likely be terminated.

EXHIBIT 12-b
Page 3 of 4 pages

4

*Robin W. Wells)*    6/28/04

Robin Wells    Date

cc:
SF-7B Extension File

*Employee refused to sign*

I acknowledge receipt of this memorandum. My signature does not signify agreement.
but merely acknowledgement of receipt.

_____    _____
Employee's Signature    Date

Page 4 of 4

EXHIBIT /2 b
Page 4 of 4 pages.

# EXHIBIT 9

## AFFIDAVIT

Alice A. Friends, Complainant )
)
v. )
)    Case No. 04-0452-SSA
)
Social Security Administration )
)

I, Robin Wells, make the following statement freely and voluntarily to Donald W. Mirsch, who has identified himself to me as an Independent Contractor/EEO Investigator. I hereby solemnly swear that the following information is true and complete to the best of my knowledge and belief, so help me God.

1.    My name is Robin Wells and I am the District Manager of the Postal Plaza Field Office in Washington, DC. I have no physical disabilities, and I am not represented.

2.    I came to this position in September 2003, and the staff consisted of about 14 employees at that time, including Ms. Friends. Based on information shared with me, I came to understand that Ms. Friends, who is deaf, had previously requested some accommodations before I arrived, and after I arrived she made other requests for accommodations. I do not know the nature of these prior requests, nor do I know their final outcome. To the extent that I have the authority to approve employee requests for certain reasonable accommodations, and if we are able to provide those accommodations, I handle those matters locally. In those cases when an employee's request for reasonable accommodation cannot be handled on-site, the request is forwarded to the Regional Office in Philadelphia, and perhaps to the Disability Services Team (DST) in the Office of Civil Rights and Equal Opportunity in Baltimore headquarters, depending on the nature of the accommodation requested. I believe one of Ms. Friends' requests was for a hearing aid, and I believe it was denied by DST.

3.    As the only supervisor at this office, I soon became very familiar with everyone's performance and their capabilities in the work we do. I focused especially on the work and progress of our trainees, including Ms. Friends. Her assigned mentor was Michele Ward, who is an experienced Claims Representative (CR) who is also deaf, and who happened to be pregnant at the time. After some time, Ms. Ward went on maternity leave and Monte Walker, our sole Management Support Specialist, filled in as Ms. Friends' mentor. When Ms. Ward returned to duty she re-assumed the mentor duties once again. Ms. Ward was frustrated in her dealings with Ms. Friends. She explained to me that when she reviewed Ms. Friends' work and pointed out errors she had made, with explanations of how she made the errors and how to avoid them in the future, Ms. Friends too often said that she had tried to research the question but could not find it, or that she (Ward) had told her something different before. She also said that Ms. Friends often went to someone else on the staff to try to elicit a different answer that Ms. Ward had given her. Ms. Ward asked to be relieved of her assignment as Ms. Friends' mentor.

Initials _RW_

Page ___ of ___



EXHIBIT _8_
Page _1_ of _3_ pages.

4.      Another experienced CR (Gayle Syphax) came forward to volunteer to mentor Ms. Friends. I met first with Ms. Friends to tell her, and she was appreciative. I then met with Ms. Friends and Gayle to discuss the mentoring process and what Gayle would focus on. That included researching policy and procedures, and I made a point of saying that if Gayle was unavailable for any reason, Ms. Friends should go to Mr. Walker. Within two weeks Gayle came to me to say she could not go on as Ms. Friends' mentor. She cited the same problems that Ms. Ward had complained of. I decided to appoint Mr. Walker, who is also very experienced in SSI, as her mentor. I met with him to discuss how the mentoring would take place, and asked that he define in writing the steps for required actions in her cases. Ms. Friends again seemed pleased with the decision that Mr. Walker would be her mentor.

5.      Mr. Walker found numerous errors on the most basic of issues, and there were blatant errors that would have led to incorrect payments if they had not been caught before final processing. In some cases, Ms. Friends had determined that claimants were eligible when they were not, in other cases she ruled claimants ineligible when they actually were eligible for benefits. And, too often, she authorized the wrong dollar amounts for eligible claimants. On March 11, 2004, Ms. Friends announced to me she did not want Mr. Walker to be her mentor anymore. On that same date, she gave me a request for reasonable accommodation.

6.      I decided to take on the mentor role, since I had considerable Title 16 SSI experience, and I needed to evaluate the situation first-hand. Again, Ms. Friends said she was pleased. I decided to sit in on many of her interviews. This approach was what we had done with the other CR trainees, as well. Early on, it became apparent to me that she had considerable difficulty asking the right questions in a way the claimant could understand so as to provide complete and accurate answers. In many cases, when their responses came, it seemed to me she could not understand what they had said. That was the same problem in her interviews, time after time. Over a period of time, I decided I needed to sit in on all of her interviews. I believed she was having difficulties with the technical aspects of the job.

7.      Finally, she told me she had difficulty understanding African-Americans when they speak, and that was why she made all those mistakes during interviews. When I asked her if she understood me and Ms. Syphax, both of us being African-American, she said, "yes," she did; she said the problem was solely in her interviews with the public. Then, during some of the interviews she had with White claimants, she interrupted the interview and took me aside to tell me she could not understand them either. I also recall instances when she interviewed deaf claimants while signing, and she exhibited the same problems and errors in comprehending, understanding and applying what was being said.

8.      With regard to Ms. Friends' request for reasonable accommodation that she submitted on March 11, 2004, she requested a full-time interpreter, refresher training, effective mentoring and "other adjustments to work environment," including relocation.

Initials _____                                    Page ___ of ___

EXHIBIT ___8___
Page 2 of 3 pages

I had already been providing an interpreter 2 hours a day for the mentoring sessions I had with her, and there had been no change in her demonstrated ability to do the work of her CR position. Her request for reasonable accommodation had to go forward to DST for decision because of the request for a full-time interpreter, which was outside my discretion. Her request was denied by DST as was her appeal of that denial.

9.      I had given Ms. Friends progress reviews, and I was keeping Lorna Walters informed of Ms. Friends' progress – she is the District Manager at the "M" Street office in Washington, and my supervisor. It was my opinion that Ms. Friends had shown no improvement and that she would continue to show no improvement. I recommended to Ms. Walters that Ms. Friends be terminated during her trial period. Ms. Walters agreed. The letter was signed by Ms. Walters and I issued it to Ms. Friends on September 10, 2004. Of course, she was very upset. She called in sick the next business day and thereafter, and never returned to work before the stated effective date of her termination. She e-mailed her resignation later in the week, opting to resign rather than be terminated.

10.     It is my belief that she understood what I was saying to her because she read lips. We always made it a point to speak with her directly in front of her so that she could see us speaking. I always repeated what I said to her and I always asked if she had any questions.

11.     I proposed her termination during her 2-year trial period because she had not demonstrated the ability to do the work of the CR position, despite the one-on-one mentoring, and refresher training. I did not recommend her termination because she is deaf.

I have read the above statement consisting of ____ pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties to this complaint.

*Robin Wells*

Robin Wells

Subscribed and sworn to before me in *ELLICOTT CITY, MD*          , this *9th* day of
          *MARCH*                    , 2005

*Donald W. Mirsch*

Donald W. Mirsch
Contract EEO Investigator

Initials *RDW*

Page ____ of ____

EXHIBIT  *8*
Page *3* of *3* pages

# EXHIBIT 10

# SOCIAL SECURITY

**MEMORANDUM**

Date: June 8, 2004

To:     Alice Ann Friends
        Claims Representative (Bilingual)
        GS-105-11
        Postal Plaza Field Office
        Area 3
        Washington, DC

From: Robin Wells
      District Manager
      Postal Plaza Field Office
      Area 3
      Washington, DC

Subject: Status as Excepted Service Trial Period Employee

The purpose of this memorandum is to remind you of your current Excepted Service
Appointment trial period status and to summarize the conduct discussions that have
occurred thus far during your appointment.

The SF-50 Notification of Personnel Action that placed you in this appointment stated,
"UPON COMPLETION OF 2 YEARS CONTINUOUS SATISFACTORY SERVICE
AT ACCEPTABLE LEVEL OF PERFORMANCE EMPLOYEE MAY BE
NONCOMPETITIVELY CONVERTED TO CAREER OR CAREER CONDITIONAL
APPOINTMENT". This means that if you fail to fully demonstrate your fitness or
qualifications for continued employment, your excepted service appointment will be
terminated during your trial period. Your work record thus far fails to fully demonstrate
your fitness or qualifications for continued employment. For example, I have had to
spend an inordinate amount of time very frequently counseling you about how to handle
your interactions with coworkers and claimants and how to treat your coworkers and
management personnel, including me, with respect. The guidance and advice provided
to you by management has been taken in an offhanded manner and you have not
demonstrated that you have made sustained corrections to your conduct. Some
examples are described below.

Mr. Buddy Walker, Management Support Specialist, has also served as your mentor at
various times. Mr. Walker had reported to me that on numerous occasions, when

Page 1 of 6

EXHIBIT  12a
1 of 6 pages.

attempting to help you learn the correct method of processing certain claims actions, you became extremely defensive and argumentative. Your final reply to him had been "whatever" and walking away from him during the middle of the conversation. After this occurred several times, Mr. Walker explained to you, during October of 2003, that your attitude was unacceptable and that your behavior was disrespectful to him as your MSS and mentor. Although you ceased using the term "whatever" when talking with him, you continued to walk away from him during the middle of his instruction. During most of these instances, he called you back immediately to continue the instruction, telling you that you and he were not finished with the conversation, and during the remaining instances he allowed you some time and resumed the instruction later.

During November of 2003, you came into my office and asked me if I saw your black bag. I told you that I had not seen your bag and asked where you had it and when you last saw it. You insisted that you had the bag on your desk and when you returned, it was missing. You asked several of your coworkers if they saw your bag, and from the way you phrased your question, it was implied that one of your coworkers took your bag. Several of them felt offended by the way you inquired about the bag. You later reported to me that you found your bag. I verbally counseled you shortly thereafter about how you should have chosen a different approach in trying to find out what may have happened to your bag. I explained that the manner in which you said to several of your coworkers, "have you seen my bag" and then insisting that the bag had been on your desk, was tantamount to an accusation. I reminded you that I had advised you before that in the future you should come and seek my guidance about how to approach your coworkers and communicate differently with them so as to avoid your coworkers feeling that you are accusing them.

As you know, I began to periodically review some of your initial claims. During a review of one case, during February of 2004, I discovered an error that you made. I proceeded to explain to you the consequences of the error on the payment amount to the claimant and reiterated how important is to utilize your resources to ensure that claims issues are appropriately addressed and resolved. Your response to me was "whatever". I was quite taken aback by that remark and told you that the remark was disrespectful and unacceptable to me. I asked that you refrain from using that term with me in the future.

On a second occasion, during February of 2004, I had a similar discussion with you regarding the proper processing of your workload. The Management Support Specialist, Mr. Buddy Walker, was present during this discussion. Following my explanation to you, you remarked "whatever". I reminded you of my request to refrain from using that term with me and reiterated that it is a disrespectful remark to use with management.

On March 22, 2004, you approached me and stated that one of your coworkers was

EXHIBIT 12a
Page 2 of 6 pages.

3

disrespectful to you and made you feel "oppressed". I asked you to explain exactly what happened and, following your explanation, I asked if you would be willing to discuss this with the coworker so that this matter could be resolved and the two of you could find a way to agree on how to better communicate with each other. I said that I would act as the mediator. You said that you would like to have this happen. The coworker also agreed. The meeting took place the next day. I gave you the opportunity to express to the coworker what took place and how her reaction/response to you made you feel. Your coworker listened and then immediately offered an apology to you. If you recall she said that it was not her intention to make you feel "oppressed" or disrespected. In turn, your coworker expressed how your communication with her has made her feel disrespected by you. Rather than apologize to her, you said that you never did any of the things she was citing. I spent a great deal of time during that meeting attempting to help you see that your coworker made basically the same allegations about your behavior toward her that you did about her behavior toward you. I also pointed out to you that while your coworker understood that it was important to offer an apology and said that she would be more conscious of how you might perceive her behavior; you would not in turn give her the same consideration. You repeatedly said that you did not believe you did anything wrong. It was only after my on-going discussion of how each person could perceive behavior differently and that we must respect each other's perception and try to come to a happy medium to allow us to work professionally together for the benefit of our customers, that you finally apologized. However, your last statements were that you still did not believe you did anything wrong.

When the office wanted to establish a coffee club, a message was sent to the entire staff inviting anyone who wished to join to come to the meeting. Even though you did not want to join the coffee club, you came to the meeting and announced to everyone in the room that you were not a coffee drinker and you did not want to join the club, however you wanted to make sure that everyone at the meeting would not use the milk that you purchase for your tea. Several individuals expressed some concern that your remark was a veiled accusation that you coworkers would use your personal product.

During April of 2004 you came to me with concerns about the number of SSI claims you had awaiting adjudication and you said that you were having difficulty finding the time to process them. In addition, our Regional Commissioner has a major initiative to reduce the backlog of cases that are over 300 days old. This initiative filtered down through the Area Director to the Level 1 Manager to me, in the form of email directives that these cases must be completed. Therefore, I asked one of your coworkers, Ms. Michelle Ward, Title 16 Claims Representative, to take a considerable amount of your 300 day old cases to her desk to review and adjudicate. Ms. Ward began working on your cases on a Saturday overtime period. When you came to work the following Monday, you came into my office extremely upset because your cases were moved. After some investigation, I discovered that Ms. Ward had, in fact, worked on your cases

EXHIBIT 12-a
Page 3 of 6 pages.

4

on Saturday and that was why they had been moved. You said that you did not want that to happen. I reminded you that you had previously requested assistance and I pointed out that when I made that happen, you became upset (because the cases were moved) rather than grateful for the help with alleviating your workload.

Because Ms. Ward had done such a good job, I asked Ms. Ward that Monday to review and adjudicate an additional 17 of your SSI Claims for payment effectuation and to suspend her own interviews.

Ms. Ward later reported the following to me. When she went to your desk to obtain the folders, you handed them to her without a hint of appreciation. As she reviewed the claims, she found 5 cases where it was not clear, from looking at the folders, what had already been done. Therefore, she went to you with her specific questions about these 5 cases. When Ms. Ward asked you about the rent amount information in 1 file, you took the folder, pulled out a query, flipped the paper over and pointed out the rent information. When she told you that there was no way she would have found that rent information on the back of the query, you shrugged your shoulders and did not say anything. When she tried to ask you more questions about the 5 cases, you said that you did not know anything about the cases and that she needed to look into it. Ms. Ward said that she then decided not to ask you any of her remaining questions. Consequently, cleaning up the cases took longer than it should have. Ms. Ward brought this problem to my attention. I asked Ms. Ward if she would continue to adjudicate your cases throughout the remainder of the week.

I also verbally counseled you by reviewing what had happened and what should have happened. I reminded you that I had had strong concerns about the fact that you had a lot of old cases awaiting adjudication and that the customers were waiting for their payments. Therefore, I had asked Ms. Ward to assist with your old claims. I explained that Ms. Ward had come to me and stated that she had felt as if you did not appreciate the assistance that she was providing to you. I told you that you should cooperate with Ms. Ward, that she was there to help your customers who had been waiting for a long time, and that if you had information, you should share it rather than be defensive. I explained that those folks were waiting for their checks and how important it was that we get them their checks quickly. You said that you did not believe you had reacted defensively. I again reiterated that Ms. Ward had offered her assistance in helping you with your workload and that you should be grateful for that.

Ms. Ward was able to complete 15 of the original 17 cases by Wednesday or Thursday of that week. The other 2 cases were terminated because the claimants had passed away while waiting for their payment to be released. Ms. Ward reported to me that when she shared this information with you, you did not show any concern or sadness for the claimants; you merely said "Oh well" and you shrugged your shoulders and resumed typing on your computer. Ms. Ward also reported to me that after she completed the

EXHIBIT 12a
Page 4 of 6 pages

S

work on all 17 cases, you did not show any appreciation or thank her for helping you catch up on your workload.

On or shortly before April 28, 2004, a claimant that you were working with contacted you and asked when he could expect to receive his first check. In order to determine what was needed, you needed to look at his file. When you could not locate his file on your desk, you told him that you would get back to him. Rather than search your entire desk, you looked only at the location where you normally kept that type of file. Because you could not locate it, you checked the appointment system to see who had worked on his records previously. You found only an old appointment with Ms. Stephanie Sanders, another Claims Representative. You asked Ms. Sanders to check if she had the file. She did so, and told you that she did not have it, nor did she remember working on the case in the recent past. A few days later you sent Ms. Sanders an email message asking her to look for the file again, and you sent a copy to Mr. Walker. A few weeks later the claimant called and requested Mr. Walker's assistance because the claimant had not heard from you. When Mr. Walker asked you about the status of the case, you said something similar to, "Remember, this is the case that Stephanie worked on and could not find." You made this statement within earshot of Ms. Sanders. Mr. Walker asked you if he could search your desk. You began showing him what was on your desk. Mr. Walker was able to find the file on your desk with other folders. Both the file and the MSSICS system revealed that you had, in fact, completed the last interview and application with this claimant. When Mr. Walker informed you of where on your desk he found the file, you said that you did not understand why it was there instead of the location where it should have been on your desk.

My evaluation of this incident is that, after Ms. Sanders told you she did not have the file (and especially because you had clearly handled the case more recently than Ms. Sanders), you should have searched your entire desk, rather than maintain that Ms. Sanders had it and that she should search her entire desk; and you should have continued to search rather than fail to respond to the claimant.

Ms. Friends, the frequent and persistent disrespectful and discourteous conduct that you have displayed toward management and your coworkers has affected the morale of this field office. Despite my ongoing counseling, you have not shown a concerted effort to learn how to behave professionally in an office setting and be a team player. Therefore, this is notice that, given all of the counseling you have already been given, unless you are able to fully demonstrate your fitness and qualifications for continued employment, your excepted service appointment will likely be terminated.

_____    6/8/04
Robin Wells                        Date

cc:
SF-7B Extension File

**EXHIBIT** 12a
Page 5 of 6 pages

6

I acknowledge receipt of this memorandum.  My signature does not signify agreement, but merely acknowledgement of receipt.

_Alice Ann Friends_   6/8/04
Employee's Signature    Date

EXHIBIT 12-a
Page 6 of 6 pages

# EXHIBIT 11



# SOCIAL SECURITY

MEMORANDUM

Date:    September 10, 2004

To:      Alice Ann Friends
         Claims Representative (Bilingual)
         GS-105-11
         Postal Plaza Field Office
         Area 3
         Washington, DC

From:    Lorna Walters
         District Manager
         Washington M Street Field Office
         Area 3
         Washington, DC

Subject: Trial Period Termination for Post-Appointment Reasons

This is notice that you are being terminated from your position of Claims Representative
(Bilingual) (in English and American Sign Language) and from the Federal Service during your
trial period. Your termination will be effective at close of business Friday, September 17,
2004. The reason for this action is your failure to fully demonstrate your fitness or
qualifications for continued employment.

You are currently serving under an excepted service appointment. The SF-50
Notification of Personnel Action that placed you in this appointment, effective
September 22, 2002, stated, "UPON COMPLETION OF 2 YEARS CONTINUOUS
SATISFACTORY SERVICE AT ACCEPTABLE LEVEL OF PERFORMANCE
EMPLOYEE MAY BE NONCOMPETITIVELY CONVERTED TO CAREER OR
CAREER CONDITIONAL APPOINTMENT".

During April of 2004, Ms. Robin Wells, Postal Plaza Field Office District Manager,
conducted a midyear performance discussion with you. During the discussion, Ms.
Wells told you that she had serious concerns regarding your work performance. She
stated that since completing the Title 16 IVT training course in March of 2003, you had
been provided with almost continuous one-on-one mentoring and assistance. Despite
this one year and six months of mentoring and assistance, you continued to require
assistance with basic, fundamental issues relating to SSI claims. Ms. Wells also
pointed out that she had repeatedly asked you to conduct thorough research on issues in
order to determine the proper development of your cases, and even though you had

EXHIBIT 12c
Page 1 of 10 pages

2

claimed that you had researched these issues, you continued to make the same errors.

On June 28, 2004, Ms. Wells issued you a memorandum, Subject: Status as Excepted Service Trial Period Employee, that reviewed your performance up to that point. This memorandum stated that Mr. Monte Walker continued to work with you almost every day and almost every case had to be returned to you due to some type of error, often involving a payment error or a disadvantage to claimants. This memorandum further stated that, given all of the performance counseling, formal training, refresher training, and one-on-one assistance you had been given, unless your performance showed dramatic improvement, and you were able to successfully perform the essential functions of your position, your excepted appointment would likely be terminated.

Prior to the June 28, 2004 memorandum, you had received almost continuous mentoring from three different mentors, and you eventually complained about each mentor. After Ms. Wells issued you the June 28, 2004 memorandum, and you complained about Mr. Walker's mentoring, Ms. Wells offered to mentor you herself, due to your receptiveness to the many counseling sessions she had previously conducted with you. When Ms. Wells made this offer, you told her that you would like that. Ms. Wells began mentoring you almost daily on June 28, 2004. Since July 19, 2004, an ASL interpreter was also present during these 2 hour per day mentoring sessions. Twice during these mentoring sessions, Ms. Wells asked you if these mentoring sessions were helping you, so that she could learn if there was anything further she could do. You answered that these mentoring sessions were definitely helping you and that you were learning a lot. However, this knowledge did not result in successful performance results.

Your performance record since Ms. Wells' June 28, 2004 memorandum shows the following. Between June 28, 2004 and July 23, 2004, you conducted four initial claim interviews. In each of these cases, you either did not obtain the necessary information or you incorrectly posted information to the claims screens, which would have resulted in incorrect payment determinations or processing as described below. Ms. Wells gave you performance feedback about each of these claims interviews.

During one interview, a mother was filing for her minor child who was 17 years old. You did not ask the mother if the child had any income. If Ms. Wells had not been observing the interview, the child's gross monthly salary of $480.00 would have been overlooked, resulting in an overpayment.

During a PERC interview, a mother began to cry during the interview. When you asked her what was wrong, she told you that her husband passed away one week previously. Ms. Wells had to step away from this interview. After she did so, you updated the MSSICS record, entering data indicating that the disabled child was deceased rather than the father. If Ms. Wells had not later noticed this error, the result would have been an incorrect death termination on the record for the claimant.

EXHIBIT 12

Page 2 of 10 pages.

3

During another interview, a claimant showed you the cover page of a life insurance policy that had been purchased in March of 2004 with a face value of $5,000.00. Although you asked the claimant if the policy had a cash surrender value, and the claimant correctly told you that it did not because it had been recently purchased, you posted the MSSICCS resource screen with a cash surrender value of $5,000.00. If Ms. Wells had not been observing the interview, this error would have been overlooked, resulting in the claimant being incorrectly found ineligible due to excess resources.

During another interview, you incorrectly posted the mailing address as the claimant's resident address. When the claimant told you that he was blind in one eye, although you correctly found the POMS definition of legally blind as 20/200 or less in one eye, you took an inordinate amount of time trying to locate a next step in the POMS. Ms. Wells had to suggest that you simply ask the claimant if his vision was 20/200 or less, so that after the claimant responded "no" you were able to progress through the interview. Although you had been processing claims via signature proxy for approximately 5 weeks, you had difficulty printing and sending the claim to ONRS to store electronically, because you did not receipt the claim on the DW01 before attempting to print it.

You were relieved from handling a normal workload of initial claim interviews, in order to allow you time to try to correct and complete your pending cases, because some of these claimants had been waiting months for payment. Therefore, the remainder of your time, since June 28, 2004, was spent trying to correct records and complete the processing of your pending cases. Ms. Wells reviewed these claims and discussed with you the steps you needed to take in order to correct the record and complete the processing of each case. Ms. Wells painstakingly covered all of the issues with you and followed up with you to ensure you understood the instructions. Despite this, you repeatedly returned to Ms. Wells' office to ask the same questions that were covered during previous mentoring sessions. As of July 26, 2004, Ms. Wells had not witnessed any improvement, let alone dramatic improvement in your performance, and she continued to have strong concerns about your ability to be able to successfully perform the essential functions of your position.

Between July 26, 2004 and August 17, 2004, you conducted ten initial claim interviews. Ms. Wells sat with you during seven of these interviews. Ms. Wells tried to refrain from interrupting these interviews, unless refraining from doing so would have caused the serious errors of incorrect determinations, incorrect payments, and/or inaccurate information being given to the claimant. In each of these cases, Ms. Wells had to interrupt the interview several times in order to prevent serious errors. Ms. Wells has not seen any improvement in your ability to independently determine eligibility and payment. These problems occurred because you: did not obtain enough information from the claimant, you did not ask necessary questions, you did not input the same information the claimant gave you (even when the information was in written form and/or you clearly understood what the claimant told you verbally), or you did not handle the data according to procedure. These repeated errors with basic procedures continued despite Ms. Wells' considerable efforts to mentor you. For

EXHIBIT 12 C
Page 3 of 10 pages

4

example:

During one interview, a mother showed you her pay stubs. When you input the information concerning her two children into the system, you input the mother's full salary under each child's claim. Ms. Wells corrected you during that interview. During the mentoring session that afternoon, Ms. Wells pulled the POMS procedure and located the section explaining this procedure. You both read the procedure together and discussed it afterward. Despite this, and the appearance that you seemed to understand this point during the mentoring session, the next day you made the exact same error.

During another interview, a claimant came into the office based upon a letter you had sent to conduct a PERC. However, once the claimant was at the Field Office, you discovered that the PERC was already completed by another Claims Representative. The claimant was pleased and asked you when she would receive her payment and how much the amount would be. You reviewed the SSID record and stated to her that she would receive her first payment in about 2 weeks and that the amount of the payment was $3207.00. The claimant was very pleased with this news. Ms. Wells had to interrupt at that point to remind you that the claimant would not receive $3207.00. Ms. Wells further reminded you that the 1st payment was sent to the Department of Human Services to repay the Grant Reimbursement and that DHS would take the amount she owed them and send her the remainder, which in fact may not be $3207.00. Ms. Wells was very surprised that you had given the incorrect information to the claimant, because you had conducted PERC's for quite some time that involved Grant Reimbursement. Additionally, Michelle Ward, Title 16 Claims Representative, had given a training session to all of the Title 16 Claims Representatives on the interim assistance reimbursement process. During the training facsimile SSID records were passed on to each Claims Representative to view and discuss the various coding of Grant Reimbursement information. You were present during this training session held on May 6. If Ms. Wells had not been present during the interview, the claimant would have been left with incorrect information regarding her payments. After the interview, Ms. Wells explained to you how important it is to provide the correct information regarding payment amount and expected receipt dates to the claimants, because quite often they make financial plans based upon the information we provide.

During another interview, the claimant wanted to file for Title 16 disability benefits. He was accompanied by a social worker to assist him with filing. During the interview you gathered information regarding his living arrangements. The claimant and social worker stated that he was incarcerated and recently released from jail. You asked him where he was residing and he reported that he was at a halfway house. The social worker confirmed this statement. You asked him if he was still part of the prison system and the claimant and social worker clearly stated "yes". However, you were confused about what to do next. You began searching in POMS and after some time Ms. Wells asked you what you were searching for. You said that you were looking to see if the halfway house was shown with a living arrangement. Because this was all taking an inordinate amount

EXHIBIT 12 c
Page 4 of 10 pages

5

of time, Ms. Wells decided to help you understand the claimant's ineligibility by asking the claimant the following simple questions. Ms. Wells asked the claimant if he was still under the prison system and he said "yes". Ms. Wells then asked him if he was free to come and go when he wanted and he said "no". Ms. Wells then asked him what date his incarceration would end and both he and the social worker said October 2004. The social worker also presented a document which indicated that he would be on probation until 2007. It was clearly evident from his responses and the affirmation by the social worker that the claimant was still under prison system supervision and therefore, not eligible for Title 16 payments. Although you then seemed to indicate that you understood this, by stating, "I know, I know. He would be N02 or N22," you proceeded to complete the MSSICS screens reflecting that he was eligible. Ms. Wells stopped you and explained to you that the information was incorrect. It was apparent to Ms. Wells that both the claimant and the social worker clearly understood that he was not eligible when they walked into the Field Office, they were upfront about this, and the reason they came into the Field Office to apply, was so that they could obtain a formal denial that they could bring to their appointment at the Department of Human Services office the next day, so they could apply for Medicaid. They also clearly understood that they would return to the Field Office to reapply for Title 16 disability benefits in October of 2004. At the end of the interview, you proceeded to give them an informal denial and Ms. Wells had to remind you that the claimant needed a formal denial to bring to the Department of Human Services office (which you knew how to process).

Between August 18, 2004 and September 3, 2004, you conducted five initial claim interviews. Ms. Wells sat with you during all five of these interviews. Ms. Wells tried to refrain from interrupting these interviews, unless refraining from doing so would have caused the serious errors of incorrect determinations, incorrect payments, and/or inaccurate information being given to the claimant. As shown in the examples described below, you continue to make serious and sometimes basic errors that affect eligibility and payment amount. These problems occurred because you: you did not ask necessary questions (even when the question was clearly listed in POMS or in MSSICS as a required question), you did not obtain enough information from the claimant (even when the question was clearly required by POMS procedure), you did not follow a procedure that I recently reviewed with you carefully (sometimes after you had made the same mistake), you had difficulty completing MSSICS screens, or you did not acknowledge documentation of a fact that was already in the file. For example:

A mother came into office to complete a PERC for her disabled child whose claim was finally approved. Ms. Wells located the file for you which contained a letter from District of Columbia Child and Family Services in the front of the file, confirming that the mother had been given legal custody of the child. In addition, another Claims Representative had spoken with the caseworker at DC CFS and had also confirmed that the mother was now the legal custodian of the child. However, when you began the interview, you asked the mother if she had custody papers. After the mom said no, you began to prepare a letter

EXHIBIT 12-c
Page 5 of 10 pages

6

requesting that the mom bring in the custody papers and stating that only then would we be able to do the PERC. You were going to send her away without conducting the PERC -- until Ms. Wells stopped you. You also had difficulty completing the income public assistance screens in MSSICs.

A claimant came into the office to complete a PERC based upon your request. Ms. Wells did not sit in on this interview due to another obligation, however she had requested that you obtain the information and then share with her your findings immediately afterward regarding the basic eligibility issues, i.e. income, resources and living arrangement determination. You went into Ms. Wells' office a while later and stated that based upon your interview and assessment that the claimant would be in a living arrangement of - B7. which would reduce her SSI payment. Ms. Wells asked you what information you obtained from the claimant that resulted in making this living arrangement determination. You responded that the claimant lived with her sister and other relatives and that the claimant did not pay toward food and shelter expenses. However, when Ms. Wells reviewed the information with the claimant, Ms. Wells learned that the claimant resided in a public assistance household (all members of the household were receiving some form of public assistance or had a claim pending for public assistance). Therefore, the correct living arrangement would in fact be A/Z which could result in a higher payment amount. During Ms. Wells' questioning of the claimant and yourself, Ms. Wells discovered that you did not ask the question "Is this a public assistance household?" Ms. Wells explained to you that you must do this with every claim, but especially with this claim, because this claimant had already presented verification that she was receiving public assistance for herself and her children, and she had said her sister received Section 8 for her rent of $1400.00. Ms. Wells explained to you that, given this information that you already had, it was almost a given that all household members were receiving public assistance. If Ms. Wells had not re-interviewed the claimant on this issue she would have received less SSI payment than what she was truly eligible to receive.

Another claimant requested to file for disability benefits. Ms. Wells observed you during the interview and determined that you asked the pre-interview questions to ascertain eligibility for SSI benefits. The claimant stated that she received unemployment benefits totaling $720.00 per month. You determined that she would not be eligible for SSI, however, you did not take the abbreviated application to provide a formal denial notice. Ms. Wells explained to you that this is a requirement and that this was a replica of a similar case you had several weeks ago (which was one of the examples described above). You began to take the application, however, you did not process it under the signature proxy procedure. Ms. Wells explained that this type of case is not an exclusion from signature proxy and she pointed out the list of exclusions on the intranet site. Ms. Wells was very surprised that you failed to recognize that a) the ABAP must be taken and b) that it must be taken with signature proxy, because Ms. Wells had sat with you on a similar claim and had spent a great deal of time explaining the importance of closing out a lead with a formal denial and using the proper attest process.

EXHIBIT 12-c
Page 6 of 10 pages

7

Another claimant came into the office to complete the PERC interview. You had difficulty completing the living arrangements screen to support the bona-fide loan determination. On numerous previous occasions, Ms. Wells had reviewed with you the issue of determining if a claimant has a bona-fide loan and how to complete the MSSICS screens. Ms. Wells had spent time with you during the 2-hour daily mentoring sessions explaining how to ask the questions to determine if the claimant has a bona-fide loan. Ms. Wells had also accessed and printed and reviewed the POMS reference that speaks on the issue of the development required to determine if a claimant has a bona-fide loan. Therefore, Ms. Wells was very surprised to see that you continued to struggle with this issue. You did not ask the claimant if he had an agreement to repay for the shelter he received, even though it is a mandatory question on MSSICS. The claimant provided you with a letter from his father which said "I have deferred $75.00 rent until he received funds." You told Ms. Wells that this letter proved that there was a loan agreement. Ms. Wells explained that this was not enough supporting documentation to render a determination of a bona-fide loan. If Ms. Wells had not been present to point this out your living arrangement determination of AZ would have resulted in an overpayment. Ms. Wells explained to you the documentation that we would need and following the interview continued to discuss this important issue with you. When Ms. Wells reminded you of the previous cases that you and she had discussed and the POMS reference you and she had used, etc, you said that you did remember and you told Ms. Wells the forms that were required to make the proper determination.

In addition, this claimant said that he had a bank account that he co-owned with his daughter. He asked you if he could have his SSI check go to this account and you immediately said yes. Ms. Wells interrupted the interview at that time and explained that policy says that an SSI check cannot be commingled with any other funds. Your answer to the claimant came as a surprise to Ms. Wells because during previous mentoring sessions, just days before, you and she had discussed at length the issue of commingling of funds. During one of these previous mentoring sessions, Ms. Wells had accessed the POMS reference, printed it and given you a copy after you reviewed it together. If Ms. Wells had not been present during the current interview, and SSA had deposited his check into the co-owned account, it would have had a devastating affect on his continued eligibility, due to excess resources.

A review of your work record shows that you have been given extensive and almost continuous performance assistance and reasonable accommodations for 1 year and 11 1/2 months. This performance assistance included the following. You received almost continuous one-on-one mentoring from October of 2002 through the present. Your first mentor was a very successful Title 16 Claims Representative, with eight years of Claims Representative experience, who was also certified as bilingual in English and American Sign Language. She began mentoring you in October of 2002, when the formal Claims Representative IVT training began. (Prior to that time, you were assigned clerical duties.) The IVT training was closed captioned. During the

EXHIBIT _12 c_
Page _7_ of _10_ page

8

IVT training, all students had the opportunity to ask questions interactively with the instructor and you frequently used this opportunity. The IVT training sessions occurred during the mornings and were taped, so that during the afternoons, you had an additional opportunity to ask questions of your mentor and to watch portions of the tape, as needed. You were offered the services of an interpreter during the IVT training and you initially declined the offer. During December of 2002, your test scores began to deteriorate, and management explored ways to further assist you. You indicated that you were having trouble keeping pace with the IVT training, and an interpreter was provided to you during the morning IVT broadcasts. Your mentor continued in her role during the afternoons and through the end of the IVT training, which concluded in March of 2003. During February of 2003, you requested and were provided with TTY configuration. The one-on-one mentoring continued through the present. During October of 2003, you were given a reduced and targeted workload consisting of initial claims and pre-effectuation review cases (PERCs) only, in order to allow you to focus and hopefully learn these basic processes. Between October of 2003 and January of 2004, your mentor continued to review all of your claims, gave you feedback about your errors and instruction about how to correct them. During January of 2004, Ms. Wells also gave you her individual attention and instruction. She noted that you continued to struggle with developing eligibility information and making correct determinations. Ms. Wells requested that you use the following process:

1. Conduct a thorough pre-interview with the claimant to accurately determine eligibility for SSI benefits.
2. Prior to taking the application, discuss with the Management Support Specialist or Ms. Wells the pre-eligibility determination.
3. Use the appropriate tools and resources that would guide you in making determinations and obtaining correct documentation to support your decision, including the following: Use PolicyNet/POMS, SSI Desk Guide. Complete an SSI Review Flag and affix the flag to both the claims folder or non-claims file, and immediately route the claim to the Management Support Specialist for review and feedback.

Because the Review Flag sequentially lists the factors used to determine eligibility and payment amount, Ms. Wells believed that by using this guide repeatedly with each and every claim, you would begin to focus on, develop, and document each issue separately and ultimately you would be able to make appropriate decisions.

Despite all of the efforts described above, you continued to repeat the same errors and repeatedly ask the same questions and you were not able to independently gather the necessary information, input the correct information into the system, and make the correct eligibility and payment determinations. Based upon all of the above, I have concluded that you are not able to independently perform the essential functions of the position of Claims Representative (Bilingual). I have also concluded that you have not fully demonstrated your fitness or qualifications for continued employment.

EXHIBIT 12c
Page 8 of 10

1.    If you believe this termination is based on partisan political reasons or marital status, you have the right to file an appeal with the Merit Systems Protection Board (MSPB).  You may also appeal your termination to the Board based on the types of discrimination listed in paragraph 2 below, provided the claim of discrimination is raised in addition to a contention that your termination was based on partisan political reasons or marital status.  An appeal must meet the regulations of the Merit Systems Protection Board, at 5 C.F.R. 1201.  A copy of that regulation is attached to this notice.

You must file an appeal during the period beginning with the day after the effective date of this action, but not later than thirty (30) calendar days after the effective date.  However, the time limit for filing an appeal can be extended for an additional thirty (30) calendar days where all parties mutually agree in writing to first attempt an Alternative Dispute Resolution (ADR) process.  5 C.F.R. 1201.23 of the attached regulation contains an explanation of the method for computing the time for filing an appeal.

Any MSPB appeal you file must be in writing.  You may file either by submitting a hardcopy appeal or by filing electronically.

If you choose to file by submitting a hardcopy appeal, you may submit either MSPB Form 185 (copy attached) or some other written format.  In either case, the content of any appeal must meet the requirements specified in the applicable MSPB regulation, usually 5 C.F.R. 1201.24.  You may file by regular mail, facsimile, commercial overnight delivery, personal delivery during normal business hours or by certified mail to the:

Merit Systems Protection Board
Washington Regional Office
**PJ Winzer**
Regional Director and Chief Administrative Judge
1800 Diagonal Road
Suite 205
Alexandria, VA 22314-2840

If you choose to file electronically, you may do so by visiting the MSPB website—www.mspb.gov—and following the link to e-Appeal.

2.    If you believe your termination is based on discrimination because of your race, color, religion, sex, national origin, physical or mental handicap, or age, you have the right to file a complaint through the agency's Equal Employment Opportunity (EEO) procedure.  To initiate this process, you must contact an EEO counselor within 45 calendar days of the effective date of your termination.  If you wish to know the name of an EEO counselor, you must contact Ms. Agnes Sampson, CREO Manager, at 215-597-1694.  You may have an attorney or other representative assist you in filing a discrimination complaint.

EXHIBIT 12-c
Page 9 of 10

To assist in processing an appeal, you should complete Part 1 Block 4 with the following address: Social Security Administration, Center for Human Resources, Employee Relations Team, P.O. Box 8788, Philadelphia, PA 19101-8788.

Terminations initiated during a trial period are not grievable matters.

Additionally, an employee facing termination may resign freely, and according to existing regulations, any time before the effective date.

If you have any questions regarding the procedures followed or your rights, please contact Donna Bentley, Employee Relations Specialist, PO Box 8788, Philadelphia, PA 19101. Ms. Bentley's telephone number is 215-597-3899.

_Lorna Walters_          9-10-04
Lorna Walters            Date

Attachments:
**I. MSPB Regulations, 5 CFR Part 1201**
**II. MSPB Form 185**

cc:
Center for Human Resources
SF-7B Extension File


I acknowledge receipt of this memorandum. My signature hereon does not signify agreement with its contents, but merely acknowledgment of receipt.


Employee Signature                          Date

OR          _Employee Refused to sign_
            _Robin D. Wells, DM_  9/10/04

On _____, one copy of this memorandum with attachments was sent to employee's address via Overnight Mail and one copy with attachments was sent via First Class Mail.


Mailer                    Date

EXHIBIT 12-c
Page 10 of 10 pages
TOTAL P. 11

# EXHIBIT 12

**From:** Whblcat <whblcat@adelphia.net>
**Date:** September 16, 2004 4:14:15 PM EDT
**To:** Lorna.walters@ssa.gov
**Cc:** Elaine Gardner <Elaine_Gardner@washlaw.org>, Sue Huhta
<Sue_Huhta@washlaw.org>, Whblcat <whblcat@adelphia.net>, Bruce
Williams <Bruce.Williams@ssa.gov>, Robin.Wells@ssa.gov
**Subject: Resignation for Sept 17, 2004**

TO: Lorna Walters District Manager, Social Security Administration
FROM: Alice Ann (Alli) Friends
DATE: September 16, 2004
SUBJECT: Resignation

Mrs. Walters,

This is to notify you that I am resigning my position as a Claims
Representative at the Postal Plaza DC SSA Field Office because
although SSA hired me for a job requiring interviewing of the
hearing public they would not provide me with the Reasonable
Accommodation in the form of an Interpreter to facilitate interviews
with the hearing public. As you know I am Deaf and cannot
communicate with the hearing public accurately enough without an
interpreter. This resignation is effective as of SEPTEMBER 17,
2004. Please let me know if you need any other paperwork
completed.

Sincerely,

*Alice Ann (Alli) Friends*
ALICE ANN (ALLI) FRIENDS

EXHIBIT _13b_
_1_ of _4_ pages

# EXHIBIT 13

See Administrative Instructions Manual 19.01.00

## PRIVACY ACT STATEMENT
### Read this statement before submitting your request

The Social Security Administration is authorized to collect the information requested on this form by title 5, USC 4501 et seq. Disclosure of this information is voluntary, however, failure to fully complete the form may make it impossible for SSA to process the request. The information provided by you will be used to facilitate the processing of your request.

SSA will not make any disclosure of this information to agencies or individuals outside this department unless required by law or with your written consent.

Disclosure by you of your Social Security number (SSN) is required under Executive order 9397 and is necessary to obtain the services, benefits or processes that you are seeking. The SSN is used as an identifier in the Federal Service because of the large number of present and former federal employees and applicants whose identity can only be distinguished by use of the SSN.

| 1 | TO (Immediate Supervisor)<br>Robin Wells | | March 11, 2004 | |
|---|---|---|---|---|
| 2 | HANDICAPPED EMPLOYEE | | | |
| | NAME<br>Alice Ann Friends | SOCIAL SECURITY NO.<br>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 | PHONE (Include Area Code)<br>711 then 202-233-2046 | |
| | POSITION TITLE AND GRADE<br>Claim Representative GS 11 | | ORGANIZATIONAL UNIT<br>Social Security Administration | |
| | OFFICE ADDRESS<br>1905 B 9th St NE<br>Washington DC 20018 | PHONE (Include Area Code)<br>202-233-2011 | | |
| 3 | DISABLING CONDITION<br>Deaf, Legally Blind in Left eye | | DISABILITY (Enter code from page 3) 16 & 24 | |
| 4 | ACCOMMODATION REQUESTED<br>1. Full time interpreter.<br>2. Refresher training.<br>3. Effective mentoring.<br>4. Other adjustments to work environment as needed, to include relocation. | | | |
| 5 | JUSTIFICATION :Briefly describe your current employment situation and state the reason you need the accommodation you are requesting.<br>I am a T16 Claim Representative. My job requires me to meet and deal with the hearing public, Deaf customers, fellow employees and members of management. Interpreter services facilitate effective communication. Lack of interpreter services has made it difficult to participate in training and mentoring as well as interaction with fellow employees. Relocation to an office with an atmosphere more conducive to learning will make it easier to learn the job. | | | |

**EXHIBIT** 7d
Page 2 of 17 pages.

FORM SSA-501-F3 (8-84)

| 6. | SIGNATURE | *alice ann friends* |
|----|-----------|---------------------|

---

## DISPOSITION OF REQUEST

INSTRUCTIONS: This portion should be completed for each written request for reasonable accommodation submitted by handicapped individual. The management official with the authority to approve or deny the request is the "Approving Official." For guidance, see AIMS Instruction 19.01.

| REQUEST RECEIVED BY (Name of Supervisor) | TITLE OF SUPERVISOR | DATE RECEIVED |
|---|---|---|
| | | |

| 7 | ACTION BY IMMEDIATE SUPERVISOR |
|---|---|

Where the immediate supervisor has the authority, he/she will either approve or deny the request. If the request is denied, this form should be submitted to the next higher supervisor for concurrence or reversal before a final decision is given to the requester. If the immediate supervisor does not have final authority a brief recommended decision is made to the next higher supervisor. The individual with final authority (Approving Official) should sign and date this form in the appropriate space below.

Approved     Recommend Approval
Denied      Recommend Denial

COMMENTS (Explain the reason for denial or recommend action to the next higher supervisor.)

| SIGNATURE | DATE |
|---|---|

| 8 | ACTION BY SUBSEQUENT REVIEWERS |
|---|---|

Concur     Recommend Approval
Non-concur    Recommend Denial

COMMENTS

| SIGNATURE | TITLE | DATE |
|---|---|---|

Concur     Recommend Approval
Non-concur    Recommend Denial

COMMENTS

| SIGNATURE | TITLE | DATE |
|---|---|---|

Approved     Denied

## DATE ACCOMMODATION PROVIDED

### SPECIFIC DISABILITY CODES

INSTRUCTION: Use the code numbers below to identify your disability on page 1 item 3. If you have more than one disability, use the code which best describes the disability for which your accommodation is being requested. If you have a "hidden" disability which is not known to your supervisor, your request must be accompanied by medical proof of disability. In addition, if you have a disability which does not fall within one of the categories listed below, medical proof of disability should be provided.

| | |
|---|---|
| **SPEECH IMPAIRMENTS** Severe speech malfunction or inability to speak; hearing is normal (Examples: defects of articulation [unclear language sounds]; stuttering; aphasia [impaired language function]; laryngectomy [removal of the "voice box"]) | 13 |

| HEARING IMPAIRMENTS | | | |
|---|---|---|---|
| Hard of hearing (Total deafness in one ear or inability to hear ordinary conversation, correctable with a hearing aid) | 15 | Total deafness in both ears, with understandable speech. | 16 |
| | | Total deafness in both ears, and unable to speak clearly. | 17 |

**VISION IMPAIRMENTS**

| | | MISSING EXTREMITIES | |
|---|---|---|---|
| Ability to read ordinary size print with glasses, but with loss of peripheral (side) vision. (Restriction of the visual field to the extent that mobility is affected, "Tunnel vision".) | 22 | One hand. | 27 |
| | | One arm. | 28 |
| | | One foot. | 29 |
| | | One leg. | 32 |
| Inability to read ordinary size print, not correctable by glasses (can read oversized print or use assisting devices such as glass or projector modifier. | 23 | Both hands or arms. | 33 |
| | | Both feet or legs. | 34 |
| | | One hand or arm & and one foot or leg. | 35 |
| Blind in one eye. | 24 | One hand or arm & both feet or legs. | 36 |
| | | Both hands or arms and one foot or leg. | 37 |
| Blind in both eyes (No usable vision, but may have some light perception. | 25 | Both hands or arms and both feet or legs. | 38 |

**NONPARALYTIC ORTHOPEDIC IMPAIRMENTS**

(Because of chronic pain, stiffness, or weakness in bones or joints, there is some loss of ability to move or use a part or parts of the body.)

| | |
|---|---|
| One or both hands. | 44 |
| One or both feet. | 45 |
| One or both arms. | 46 |
| One or both legs. | 47 |
| Hip or pelvis. | 48 |
| Back. | 49 |
| Any combination of two or more parts of the body. | 57 |

TIAL PARALYSIS

(Because of a brain, nerve, or muscle problem, including palsy and cerebral palsy, there is some loss of

FORM SSA-S01-F3 (8-84)

**EXHIBIT 7d**
Page 4 of 17 pages.

| | |
|---|---|
| One hand. | 61 |
| One arm, any part. | 62 |
| One leg, any part. | 63 |
| Both hands. | 64 |
| Both legs, any part. | 65 |
| Both arms, any part. | 66 |
| One side of body, including one arm and one leg. | 67 |
| Three or more major parts of the body (arms and legs). | 68 |

| COMPLETE PARALYSIS (Because of a brain, nerve, or muscle problem, including palsy and cerebral palsy, there is a complete loss of ability to move or use a part of the body, including legs, arms, and/or trunk.) | | | |
|---|---|---|---|
| | | One arm. | 72 |
| | | Both arms. | 73 |
| | | One leg. | 74 |
| | | Both legs. | 75 |
| | | Lower half of body, including legs. | 76 |
| One hand. | 70 | One side of body, including one arm and one leg. | 77 |
| Both hands. | 71 | Three or more major parts of the body (arms and legs.) | 78 |

| OTHER IMPAIRMENTS | |
|---|---|
| Heart disease with no restriction or limitation of activity (History of heart problems with complete recovery) | |
| Heart disease with restriction or limitation of activity | 80 |
| Convulsive disorder (e.g. epilepsy) | 81 |
| Blood diseases (e.g., sickle cell disease, leukemia, hemophilia) | 82 |
| Controlled diabetes with no restriction of activity | 83 |
| Diabetes with limitation of activity due to complications such as retinitis, neuritis, etc. | 84 |
| Pulmonary or respiratory disorders (e.g. tuberculosis, emphysema, asthma) | 85 |
| idney dysfunctioning (e.g.. if dialysis [Use of an artificial kidney machine] is required) | 86 |
| ancer--a history of cancer with complete recovery | 87 |
| Cancer--undergoing surgical and/or medical treatment | 88 |
| Mental retardation (A chronic and lifelong condition involving a limited ability to learn, to be educated, and to be trained for useful productive employment as certified by a State Vocational Rehabilitation agency under section 213.3102(t) of Schedule A) | 89 90 |
| Mental or emotional illness (A history of treatment for mental or emotional problems) | 91 |
| Severe distortion of limbs and/or spine (e.g., dwarfism, kyphosis [severe distortion of back]) | 92 |
| Disfigurement of face, hands, or feet (e.g., distortion of features on ski such as those caused by burns, gunshot injuries, and birth defects [gross facial birthmarks, club feet, etc.]) | 93 |

**EXHIBIT 7d**
Page 5 of 12 pages

# EXHIBIT 14



# SOCIAL SECURITY

April 29, 2004

Ms. Alice Ann Friends
Social Security Administration
1905 B 9th Street NE
Washington DC 20018

Dear Ms. Friends:

The Office of Civil Rights and Equal Opportunity, Disability Services Team has evaluated your request for a full time interpreter as a reasonable accommodation. Unfortunately, your request cannot be provided for the reason shown below. Your request for refresher training, effective mentoring and other adjustments to your work environment will be evaluated by your component (office) management.

SSA provides sign language interpreter service as a reasonable accommodation for employees who are deaf or hard of hearing on an as needed basis. Interpreter service is provided for meetings, training, mentoring, progress reviews, conference attendance, and other work-related events, whenever requested. Full-time interpreter services are not needed to facilitate communication for events of this kind.

If you disagree with this decision you may ask for a reassessment. If you have additional information to provide in support of your request, the additional information and the request for reassessment should be forwarded to:

Disability Services Team Leader
2571 Annex Building
6401 Security Boulevard
Baltimore, MD 21235-6401

I will respond to your request for reassessment within 5 business days of receipt of the new information. If the decision is not reversed, you can request an independent review. Your request for an independent review must be made in writing and sent to:

Social Security Administration
Office of Civil Rights and Equal Opportunity
Mr. Rogelio Gomez,
Deputy Associate Commissioner
P.O. Box 47698-7698
Baltimore, MD 21244

**EXHIBIT 7d**
6 of 17 pages

Your request letter may include additional information to support your claim and must be postmarked no later than fifteen (15) calendar days after receipt of the reassessment response letter.

If you feel you have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, sexual orientation, parental status, marital status, political affiliation or non-job related conduct you also have the right to request equal employment opportunity (EEO) counseling within forty-five (45) calendar days after receipt of this letter. You can request EEO counseling by contacting SSA's Dispute Resolution Team at (410) 966-1229. Please note: A request for reassessment or an independent review does not stop the forty-five (45) days regulatory timeframe for filing a request for EEO counseling.

Any questions that you have regarding your request for reasonable accommodation should be directed to the Disability Services Team at (410) 965-7778 or TDD (410) 597-0548.

Sincerely,

Doug France
Team Leader
Disability Services

cc: Robin Wells
    Janet Kern

EXHIBIT  7d
Page  7  of  12

# EXHIBIT 15

Message                                                                      Page 1 of 1

## France, Doug

| | |
|---|---|
| **From:** | France, Doug |
| **Sent:** | Tuesday, May 04, 2004 11:03 AM |
| **To:** | Friends, Alli |
| **Subject:** | RE: Clarification of appeal |

Ms. Friends,

No, the deadline to initiate a request for reassessment is not 5/5/04. A request for reassessment does not need to be initiated within 5 days. A request for reassessment should, however, be initiated within a reasonable period of time; i.e., 30 days, after you receipt of the initial denial letter.

Please note: A request for reassessment or an independent review does not stop the forty-five (45) days regulatory timeframe for filing a request for EEO counseling.

Doug France
Disability Services Team Leader
410-965-7778

> ----Original Message----
> **From:** Friends, Alli
> **Sent:** Tuesday, May 04, 2004 10:25 AM
> **To:** France, Doug
> **Cc:** Friends, Alli
> **Subject:** Clarification of appeal
>
> Mr. France,
>
> I want to understand your letter that I received from you about my reasonable accommodation request. Are you saying that if I wish to file and I have to respond to the letter 5 days counting from April 29th request a reassessment? So the deadline would be May 5th? Please advise.
>
> Thank you.
>
> Mrs. Friends
>
> P.s I just got this letter today. So does it count from today or from the letter dated April 29th?

EXHIBIT 7d
Page 8 of 12 pages

3/8/05

# EXHIBIT 16

TO: Doug France, Team Leader
    Disability Services
FROM: Bruce Williams, Area Coordinator
     AFGE Local 1923
DATE: May 11, 2004
SUBJECT: Reasonable Accommodation Reassessment Request

Mr. France,

This is a request for reassessment of the request for reasonable accommodation filed by Alice (Alli) Friends on March 11, 2004. Alli is a TXVI (SSI) Claims Representative in the Postal Plaza, DC Field Office. From the time she started her IVT training on 10/28/02 she was in the room by herself with no interpreter until about 12/20/02. While it is true there was closed captioning on the TV it was often fading into the background, or obscuring important text behind it on the screen. During this time period she was also unable to participate in the interactive Q & A portion where students call in with questions and comments. Besides being deaf, Alli has very limited vision in her left eye. Her eye doctor describes acuity in the left eye as "count fingers". This makes the eye useless for reading, including closed captioning. Alli found it extremely tiring trying to follow the IVT lessons due to the concentration required of her. After this she had interpreters for the IVT training off and on for half days.

Alli had difficulties utilizing what mentoring was offered because of communication problems between her and the mentor(s) which lead to frustration on her part and outright hostility on the mentors' part. If a sign language interpreter had been available during these crucial times when she was taking on the enormous task of the Claims Representative training program she would not find herself struggling as much as she does to succeed in the job.

We are asking that you to reassess the reasonable accommodation request. Alli is asking for refresher training and effective mentoring and only the presence of a sign language interpreter can allow her to make the most of the learning process. While Alli has some skills at lip-reading there is another issue that complicates communication with her mentor and management staff. Mentors and some members of management seem unable or unwilling to recognize that their language is a deaf person's second language. Deaf people communicate using different methods and concepts. When they are speaking to a hearing person they are translating their language into English. Without a deaf interpreter there can be misunderstandings of a critical nature. Her mentor(s) have reacted to their own misunderstandings of Alli's translation with ignorance and hostility. They have frequently criticized the way she speaks, attacking her inability to fully modulate the volume of her speech and its tonal quality. The presence of a deaf interpreter would alleviate these conflicts and reduce stress all around. Only then will the employee feel free to utilize an effective mentor.

Management frequently confers with Alli to give her assessments of her progress verbally. An interpreter is needed during these times.

EXHIBIT 7d
128 of 17

This request is for a full time deaf interpreter ( or for an amount of weekly hours mutually agreed upon) during the time Alli will be taking refresher training and seeking help from an effective mentor as well as participating in progress discussions. The mentor would also be available during interviews and discussions with fellow employees during this time. At this time our request is not for a full-time interpreter for an indefinite length of time.

Thank you for your attention to this matter.

Bruce Williams
AFGE Local 1923
(202) 653-2002 ext. 3019
2100 M St. NW
Washington, DC 20037
(SSA Field Office address)

EXHIBIT 7 d
Page 13 of 17 pages

# EXHIBIT 17

**France, Doug**

From:       France, Doug
Sent:       Friday, June 04, 2004 1:54 PM
To:         Friends, Alli
Cc:         Wells, Robin; Lieberman, AnnJoy; Kahan, Barbara
Subject:    Your Request for Reassessment--INFO

Ms. Friends,

We have evaluated the information you provided in conjunction with your request (Mr. Bruce Williams' letter dated May 11, 2004) for a reassessment of our decision to deny your reasonable accommodation (RA) request for a full time interpreter.  I apologize for the delay in responding to this request.

As you know interpreter service is routinely provided, as a reasonable accommodation for deaf employees with disabilities, on an as needed basis.  And to our knowledge, the Agency has been providing interpreter service whenever you requested it.  Although we cannot authorize full time interpreter services, the Center for Disability Services does authorize up to 32 hrs of interpreter service, per week, while you continue to be mentored.  These services can, of course, also be used for any type of training, staff meetings, progress/performance discussions with your supervisor, and any other business related need.

At no time, however, can sign language interpreter service be used to conduct interviews and/or other business with the public.

Please contact me if you have any other questions regarding this matter.

Sincerely,

Doug France
Center for Disability Services
Voice: 410-965-7778
Fax: 410-966-8120

EXHIBIT 7d
17 of 17 pages

1

# EXHIBIT 18

# AFFIDAVIT

| | |
|---|---|
| Alice Ann Friends, Complainant | ) |
| | ) |
| v. | )    Case No. 04-0452-SSA |
| | ) |
| Social Security Administration | ) |

I, Doug France, make the following statement freely and voluntarily to Donald W. Mirsch, who has identified himself to me as an Independent Contractor/EEO Investigator. I hereby solemnly swear/affirm that my answers to the following questions are true and complete to the best of my knowledge and belief.

Q1    What is your name, position title, organization and duty station. How long have you been in this position?

A1-1:  Doug France, Equal Employment Specialist, SSA, Office of Civil Rights and
       Equal Opportunity (OCREO), Center for Disability Services (CDS)
A1-2:  2 years, 7 mos.


Q2    Do you have any physical disabilities? Are you represented in this matter?

A2-1:  No.
A2-2:  No.


Q3    Do you know the Complainant, Alice Ann Friends, and/or are you aware of her physical disability(ies)? What is your understanding of her physical disability(ies) and how do you come to have that awareness?

A3-1:  I do not personally know Ms. Friends, nor have I ever met here in person, but am
       aware that she is disabled.
A3-2:  As I understand it, Ms. Friends has a hearing impairment which I became aware
       of as a result of her request for reasonable accommodation.


Q4    Based on your official duties, is Ms. Friends a "qualified handicapped individual" who is entitled to reasonable accommodation under the law?

A4:    Whether a person is a "qualified individual with a disability" depends on the
       position which the person holds. To be a "qualified individual with a disability,"
       a person must be able to perform the essential duties of the position, with or
       without reasonable accommodation.

Initials: _____    Page __1__ of __4__


EXHIBIT 7
Page __1__ of __4__ pages.

Based on the accommodation requests we received from Ms. Friends, I doubt that she is able to perform the essential duties of the Bi-lingual Claims Representative (CR) position even with accommodation. This position requires the incumbent to understand multiple languages, in this case English and American Sign Language (ASL). Even though Ms. Friends was hearing impaired, the duties of this position require the ability to communicate (speak and understand spoken words) in English. Communicating with the English speaking public does not require the use of an ASL interpreter. If, therefore, she was not fluent in the English language because she can not hear, read lips and/or did not have audible/understandable speech, she is not qualified to perform the duties of the Bi-lingual CR position.

My doubt as to her qualification is further supported by Ms. Friends' reasonable accommodation request for hearing aids. She asserted that her hearing aids were malfunctioning and had "reached the life expectancy". She requested the Agency to provide her with new ones because hearing aids were required to do her job as a CR. The EEOC's Enforcement Guidance on Reasonable Accommodation says that employers are not required to provide employees with devices that are also personal in nature, and specifically mentions hearing aids as being an assistive device that is personal in nature. The EEOC's Guidance says that "if an employee with a disability, with or without reasonable accommodation, cannot perform the essential functions of the position . . . in the absence of . . . an assistive device; then s/he is unqualified."

Also noteworthy is the fact that the EEOC's Guidance states that if a "probationary employee has never adequately performed the essential functions, with or without reasonable accommodation, then s/he is not entitled to reassignment because s/he was never 'qualified' for the original position."

Finally, I would like to add that even though the Agency did not provide Ms. Friends with the requested hearing aids, it did provide her with the services of an interpreter for up to 32 hours a week. This accommodation was provided because she claimed that her hearing impairment and inadequate hearing aids made it difficult to hear what was being said during training or mentoring sessions. And, the interpreter service would "facilitate effective communication". We did, however, prohibit Ms. Friends from using ASL interpreter services when interviewing members of the hearing public since such services are unnecessary to communicate with the hear public in English.

Q5    According to established Agency procedures, what kinds of requests for reasonable accommodation must be submitted to your office for consideration, approval or disapproval?

Initials ____    Page _2_ of _4_

EXHIBIT __7__
Page _2_ of _4_ pages.

A5:    Evaluation of reasonable accommodation requests for the following is the
        jurisdiction of CDS:
        1.  Assistive technology (adaptive hardware devices and assistive software
            applications);
        2.  Assistive software refresher training;
        3.  Full-time equivalent (FTE) Pool Readers, Personal Assistants and/or
            Interpreters; and
        4.  As needed request for Interpreter Services

Q6    According to official files maintained at your office, were any of Ms. Friends'
requests for reasonable accommodation forwarded to your office for consideration and
final disposition?  If yes, please discuss (with specific reference to hearing aid and full-
time interpreter).

A6-1:  Yes.
A6-2:  CDS received and evaluated the following reasonable accommodation requests
        from Ms. Friends:
        1.  WINTALK (integrated TTY) computer software configuration;
        2.  Full-time interpreter; refresher training; effective mentoring; other
            adjustments to work environment (including relocation);
        3.  Hearing aids;
        4.  iCommunicator (text-to-speech) device; and
        5.  Sorenson Video Relay Service (VRS)

Q7    Were any of these request for reasonable accommodation denied by your office?
If yes, was "undue hardship" the reason for denial?  If yes, please discuss fully.

A7-1:  Yes.  Ms. Friends request for a full-time interpreter (A6-2.2 above) was
        "partially" denied.  Her request for hearing aids (A6-2.3 above) was denied
        because hearing aids are personal assistive devices also needed/used off the job.
        Her request for the iCommunicator device and Sorenson VRS (A6-2.4 and 5
        above) were denied because use of the iCommunicator device was not practical
        (required voice training by each user; i.e., claimants) and VRS would require
        changes to SSA systems that could not be implemented at the present time.
A7-2:  Although CDS did authorize funding for up to 32 hrs of interpreter services per
        week for mentoring, training, unit meetings, progress review and other work
        related activities, this authorization did not allow the use of interpreter services to
        conduct interviews with the hearing public.

        The Agency believes it is an undue hardship to provide interpreter services for a
        deaf or hard-of-hearing employee (who cannot speak English and read lips)
        because use of an interpreter would require a fundamental alteration in the duties
        of Ms. Friends' position.

Initials _____                                    Page $\underline{3}$ of $\underline{4}$

The ability to communicate with the English speaking-hearing public is an essential function of her position; i.e., Bi-lingual CR.

I would also note that it would generally be unduly burdensome for the Agency to provide full-time interpreters for employees in the CR position. The services of an interpreter would be needed to assist Ms. Friends with virtually all aspects of her claim taking function. Multiple ASL interpreters (each with an hour pay rate equivalent to or greater then the Agency employee they are assigned to assist) would be needed to conduct most face-to-face claim interviews. Such an arrangement would result in three (3) individuals performing a job function (face-to-face interviewing) normally requiring only one (1) CR. Furthermore, the use of an ASL interpreter would lengthen the time required to conduct these interviews. Additionally, contract interpreters would need to be trained in the meaning and use of SSA terminology and the application of programmatic policy and procedure. When the ASL interpreter did not report to work the office's interviewing schedule would be severely impacted and public service disrupted.

I have read the above statement consisting of **4** pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties to the complaint.

Doug France

Subscribed and sworn/affirmed before me in ELLICOTT CITY, MD
this **18** day of MARCH, 2005.

Donald W. Mirsch

Initials _____                              Page **4** of **4**

EXHIBIT **7**
Page **4** of **4** pages.

# EXHIBIT 19

## Jackson, Linda   HQ DCHR

| | |
|---|---|
| `rom: | Gomez, Rogelio |
| ent: | Wednesday, June 23, 2004 9:22 AM |
| To: | Williams, Bruce |
| Cc: | Jackson, Linda   HQ DCHR |
| Subject: | RE: Reasonable Accommodation |

Mr. Williams,
I am referring your e-mail to Ms. Linda Jackson, Center Director for Disability Services, OCREO for necessary action.

I am no longer involved in the review and reconsideration process for OCREO as I now work for the Office of International Programs.
Regards,

Rogelio Gomez
Associate Commissioner
Office of International Programs

    -----Original Message-----
**From:** Williams, Bruce
**Sent:** Wednesday, June 23, 2004 9:06 AM
**To:** Gomez, Rogelio
**Cc:** McMahon, Linda S.
**Subject:** Reasonable Accommodation


TO: Rogelio Gomez, OCREO
FROM: Bruce Williams AFGE Local 1923
DATE: June 23, 2004
RE: Reasonable Accommodation: Alice Ann Friends


Mr. Gomez,

We have received a denial of Reasonable Accommodation from Doug France for Ms. Alice(Alli) Friends, a Claims Representative in the Postal Plaza, DC FO. Ms. Friends is a qualified disabled individual in that she is deaf. We are requesting your review and reconsideration of this decision. If outside a timeframe for appeal, please consider this a new request for the same accommodations. It would appear that not only did Mr. France choose to ignore the ADA, CFR, and several other laws and regulations, and EEO decisions but he also had the audacity to state '..under no circumstances will an interpreter be used to communicate with the public..' or words to that effect. This is an absurd thing to say since readers and interpreters are facilitating employee contact with the public all over the Federal Government. Even if this reflects his personal bias he should know better than to put it in writing. Tip of the day to Mr. France; Never Say Never.

This Agency, which prides itself on its record of hiring disabled individuals, seems to be paying lip service to Ms. Friends and others in her position. The Agency hired her, fully aware of her disability, then turned its back on her when she asked for the accommodations she is entitled to under law.

There is an urgency here, Mr. Gomez. Since Ms. Friends is deaf she has had a much harder time picking up the skills needed in her job. She finds herself a few months short of her 2-year probation period only to have management threatening to terminate her employment because they can't understand her. There is a lot they don't understand. They won't provide the interpreter she needs to communicate with them, then they are rude and outright hostile to her when she tries to determine what they are saying by lip reading. They are being ignorant and judgmental of Ms. Friends' speech because it isn't like theirs. I certainly hope they aren't mocking the disabled customers we serve.

Once again, Mr. Gomez, the Agency seems to have set up the disabled employee to fail, by refusing to provide the support they need to succeed. Ms. Friends has overcome significant obstacles to get where she is today and the Agency owes her better than to kick the ladder out from under her now. Your prompt attention to this matter is

EXHIBIT 7A
Page 15 of 17 pages

# EXHIBIT 20



# SOCIAL SECURITY

July 6, 2004

Ms. Alice Ann Friends
Social Security Administration
1905 B 9th Street NE
Washington, DC 20018

Dear Ms. Friends:

On June 23, 2004 your representative asked for an independent review of Mr. France's decision on your request for a full time interpreter during refresher training and mentoring. As Director of the Center for Disability Services, I am responsible for conducting the independent review.

Mr. France informed you in a message dated June 4, 2004 that the Center for Disability Services will provide you with 32 hours per week of interpreter services to be used for mentoring, training, staff meetings, progress/performance discussions and related business. I agree that 32 hours of sign language interpreter services is a sufficient accommodation. Part of your day is spent reading research material, evaluating information in claims files and doing computer inputs. None of these activities requires the need for a sign language interpreter.

This decision relates to your request for interpreter services as a reasonable accommodation. You were notified in a letter dated April 29, 2004, that your need for additional training and mentoring must be determined by your management staff and not by the Center for Disability Services. Your management staff also has the delegated authority to make determinations concerning your job performance.

Linda Jackson

*Linda Jackson*

Director,
Center for Disability Services
Office of Civil Rights and Equal Opportunity

cc:    Bruce Williams
       AFGE Local 1923
       SSA
       2100 M Street NW
       Washington, DC 30037

EXHIBIT 7d

Page 12 of 12

SOCIAL SECURITY ADMINISTRATION    BALTIMORE MD 21235-0001

# EXHIBIT 21

# SOCIAL SECURITY ADMINISTRATION
## EEO COUNSELING REPORT

| 1. TO:<br><br>Agnes P. Sampson, CREO MGR<br><br>300 Spring Garden ST.<br>Philadelphia, PA. 10106 | 2. FROM:<br><br>Victoria Monroe-Panckeri<br>EEO Counselor,<br>Office of Hearings and Appeals<br>2 North Second St., 8th Fl.<br>Harrisburg, PA 17101 | 3. DATE COUNSELING FIRST SOUGHT:<br><br>6/15/04 *(w/phc)*<br>*creo w/g*<br><br>4. DATE OF FIRST INTERVIEW:<br><br>8/10/04 |
| --- | --- | --- |

**5. EMPLOYEE/APPLICANT NAME AND ADDRESS:**

Alice Ann Friends
182 Postings Way
Charleston, W.VA 25414

TELEPHONE: 304-728-0482      SSN: 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

POSITION/TITLE: Claims Representative      SERIES/GRADE: GS-11

| 6. ORGANIZATION AND ADMINISTRATIVE CODE OF OFFICE WHERE ALLEGED DISCRIMINATORY ACT OCCURRED:<br><br>Social Security Adminsitration<br>Postal Plaza, 1905B 9th St.NE<br><br>Washington, D.C. 20018<br><br>*Relay (911) 202-233- 2046*<br>*Work 202 - 233-2011* | 7. CHECK IF EMPLOYEE ELECTS A REPRESENTATIVE: ☒<br><br>REPRESENTATIVE NAME, ADDRESS:<br><br>Bruce Williams, SSA, AFGE REP<br><br>2100 M.ST.NW<br>Washington, DC 200 39<br><br>EMPLOYEE? (Check One) ☒ YES ☐ NO<br>TELEPHONE: 202-653-2002 |
| --- | --- |

| 8. TYPE OF DISCRIMINATION (Basis) – Select from one or more of the following: | 9. MATTER CAUSING COMPLAINT (Issue) – Select from one or more of the following: |
| --- | --- |
| ☐ Age ___ years    ☐ Race – Black<br>☐ Color    ☐ Race – White<br>☐ Mental Disability    ☐ Race – Amer. Indian<br>☒ Physical Disability    ☐ Race – Asian/Pac. Is.<br>☐ National Origin – Hispanic    ☐ Race – Other<br>   ☐ Religion<br>☐ Sex – Male    ☐ Retaliation/Reprisal<br>☐ Sex – Female    ☐ Other: | ☐ Assignment of Duties    ☐ Reassignment<br>☐ Awards    ☐ Reinstatement<br>☐ Conversion to FT/CC    ☐ Reprimand<br>☐ Duty Hours    ☐ Non-selection<br>☐ Evaluation/Appraisal    ☐ Retirement<br>☐ Examination/Test    ☐ Separation<br>☐ Initial Appointment    ☒ Harassment (Non-sexual)<br>☐ Pay (Including Overtime)    ☐ Sexual Harassment<br>☐ Equal Pay Act    ☐ Suspension<br>☐ Promotion    ☐ Time/Leave Attendance<br>☒ Reasonable Accommodation (Handicap)    ☐ Training<br>☐ Reasonable Accommodation (Religion)    ☐ Work Conditions |

*EXHIBIT 2*
*Page 1 of 11 Pages.*

*Hostility*

COMPLAINANT'S NAME: Alice Ann Friends                    SSN: 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

10. HAS COMPLAINANT FILED A GRIEVANCE UNDER THE NEGOTIATED GRIEVANCE PROCESS? ☐ YES ☒ NO (Check One)
    IF YES, PROVIDE A COPY AND GIVE DATE GRIEVANCE FILED:  withdrew

    HAS COMPLAINANT FILED AN APPEAL WITH THE MERIT SYSTEMS PROTECTION BOARD?  ☐ YES ☒ NO (Check One)
    IF YES, PROVIDE A COPY AND GIVE DATE APPEAL FILED:

11. CHECK HERE IF COMPLAINANT WISHES TO REMAIN ANONYMOUS DURING COUNSELING:  ☐    N/A

12.  DETAILED DESCRIPTION OF COMPLAINT (Include specific allegation(s) with date(s) of
     occurrence and the date(s) complainant became aware of the incident(s) from which the
     complaint arose.  Also indicate relief desired.)

     DATE(S) OF OCCURRENCE (See Instructions):  6/8/04

Reference is made to attached documentation, including and specifically the attached June 8,2004 memorandum.

Ms. Friends first sought counseling on 6/9/04 after receiving this memo. There is also reference made to the May
18, 2004 memorandum for Reasonable Accomodation from Ms. Wells. Ms. Friends feels that she has been discriminated
against due to her disability. She has not received a full time interpreter, proper training, effective mentoring
and feels that the work environment as been hostile to her. The attachments show that it was a struggle for her
to be assigned an interpreter. She states that the initial training was IVT with bad captioning and poor
references to POMS; it was inadequate! Further, she feels that the mentoring was done in a hostile manner with
derogatory comments made, and no positive directives. Mr. Walker had also made reference to her work as a mess,
his notes with directives were not clear or legible. Presently, she is being mentored or reviewed by Ms. Wells
and feels a great deal of stress. Her representative questions where this review was being done to terminate Ms.
Friends. Ms. Friends seeks: a full time interpreter, refresher training, effective mentoring and relocation to
another SSA office specifically Frederick, Maryland.

Ms. Friends indicated that Ms. Wells had questioned her about whether she was happy working there; indicated that
as a GS-11 Ms. Well had certain expectations of Ms.Friends. Ms. Friends stated that she was only there for 2
~rs. That she is a employee with a master's degree who loves this job, wants to continue in the job, and has
   ~d hard/struggled to attain it. She is thankful to be a CR, proud to be there, is up to the challenge and
   ~s to continue with it. She was frustrated and stressed because of the lack of proper training and help.

     She also wondered if she'd be a better title II CR!

CHECK HERE IF CONTINUED ON ATTACHED FORM ☒

| 13. COMPLAINANT'S SIGNATURE ACKNOWLEDGING RECEIPT OF RIGHTS AND DESCRIPTION OF ISSUES TO BE COUNSELED: | 14. COUNSELOR'S SIGNATURE (Initial Interview) *Interview 8-10-04* |
|---|---|
| *Alice Ann Friends* | *Victoria Morse-Parker* |
| SIGNATURE AND DATE | SIGNATURE AND DATE  9-10-04 |

-2-

EXHIBIT 2
Page 2 of 11 pages

COMPLAINANT'S NAME: Alice Ann Friends                          SSN: 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

DETAILED DESCRIPTION OF COMPLAINT (Continued)

LIST OF THOSE CONTACTED PER COMPLAINANT REQUEST:

1) Ms. Robin Wells, SSA Manager, Washington,DC Postal Plaza Field Office, GS-13
Phone:202-233-2012

2) Mr. Monte Buddy Walker, Management Support Specialist, GS-12
Washington DC Postal Plaza Field Office
Phone 202-233-2012

3) Jeff Landes, SSA Labor Relations Specialist, Philadelphia, PA #215-597-4006 and Ms. Judy Nease,retired former
manager of SSA Washington DC Postal Plaza Field Office phone 410-848-8137. Ms. Nease hired Ms. Friends

TODAY 9-10-04, MS. Friends contacted me and advised that she was terminated effective 9/17/04.

EXHIBIT 2
Page 3 of 11 pages.

COMPLAINANT'S NAME: Alice Ann Friends                SSN: 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

15. CONTACTS DURING EEO COUNSELING INQUIRY:

| E(S) OF CONTACT | NAME, TITLE, GRADE, TELEPHONE, MAILING ADDRESS | REASON FOR CONTACT | TIME SPENT |
|---|---|---|---|
| | NAME:  TITLE:  GRADE:<br>ADDRESS:<br><br>TELEPHONE: LIST ABOVE | Complainant | |
| | NAME:  TITLE:  GRADE:<br>ADDRESS:<br><br>TELEPHONE: | Complainant | |
| | NAME:  TITLE:  GRADE:<br>ADDRESS:<br><br>TELEPHONE: | Complainant | |
| | NAME:  TITLE:  GRADE:<br>ADDRESS:<br><br>TELEPHONE: | Complainant | |

*see list Previous Page*

CHECK HERE IF CONTACTS CONTINUED ON ATTACHED FORM ☐

16. INFORMATION DEVELOPED DURING INQUIRY:

There has been several e-mails between the complainant, representative and counselor on this case, as well as contacts to CREO regarding this matter-dates not listed. Interview with Ms. Wells, Manager, on September 7,2004, she indicated that she is now mentoring Ms. Friends herself, and that she is well versed in Title 16 program. We discussed the request for a full time interpreter which she stated was initially denied by SSA disability services and then reassessed and approved. SSA policy is not more than 32 hours a week during mentoring, training and meetings but not in interviews. Ms. Wells stated that Ms.Friends was provided an interpreter in training and meetings from the beginning. She stated she has daily session with her with an interpreter since March 2004. She is mentoring her because Ms. Friends had difficulty with her prior mentor. She has had 3 mentors. Ms. Wells stated that there are expectations of a CR at a GS -11. She discussed this with her so she realized the expectations but did not expect her to operate as a CR who has been there for years. As a manager, this discussion took places as it would routinely when a promotion takes places as a routine review of the necessary critical elements of a position. She further stated that Ms. Friends has difficulty with the fundamentals of the SSI program.SEE ATTACHED

*See Attached*

9/10/04 *Spoke to Ms. Friends on Relay today but not w/Representative he was unavailable*

CHECK HERE IF CONTINUED ON ATTACHED FORM ☒

| 17. DATE OF FINAL INTERVIEW | 18. TOTAL HOURS SPENT COUNSELING | 19. REPORT ☐ MAILED ☐ DELIVERED |
|---|---|---|
| ✱ *9-10-04* | *9 hrs* | EXHIBIT 2<br>Page 4 of 11 pages. |
| SIGNATURE OF COUNSELOR AND DATE OF REPORT | 21. EMPLOYEE/APPLICANT ACKNOWLEDGES RECEIPT OF FINAL COUNSELING REPORT (Signature and Date) | |
| *Victoria Monroe-Panekeri* | *Alice Ann Friends  9/17/04* | |

-3-

✱ *will do another next week with Representative*
*& w/Ms. Friends w/Relay today re:Report*

CONTINUATION- ALICE ANN FRIENDS EEO COMPLAINANT     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

MS. WELLS INTERVIEW- continued:

Alice Ann Friends had another mentor prior to Mr. Walker. The mentor was also a deaf CR familiar/sound with the SSI program and familiar with sign language. Prior to that, there was another mentor who was proficient in Title 16. There was a conflict with all the mentors and allegations of improper training. Ali did not want to take the responsibility for her work. Therefore, there was no else to train Ms. Friends but Ms. Wells who is familiar with the program. This is not a campaign to fire her. Ms. Wells also mentions that this is a small office with limited time and personnel. Upon review of the cases, Ms. Wells discovered that every single case had a payment or determination error. All customers of SSA who applied would receive incorrect payment or eligibility determinations. She wants Ms. Friends to be trained and understand the fundamentals to progress to be a successful CR and stop claimant's from being disadvantaged. Ms. Wells notes upon daily review of the claims, Ms. Friends was not getting correct information from the claimants to render correct determinations so she sat in on interviews. She has received refresher mentoring and all of her cases were reviewed. She does not think that she's capable of doing the CR job in any program, when I inquired about Title II CR Positions. Ms. Friends does not refer to the agency mandate of POMs and Policy Net as references since she does not seem to comprehend the text.

We discussed office hostility toward Ms. Friends and Ms. Wells has not observed it. She has made other employees uncomfortable with her communication. She has also stated to management upon direction-"whatever". The MSS Mentoring and style that she alleges was problematic was discussed with her and Mr. Walker with Ms. Wells and corrected to Ms. Friend's satisfaction.

Regarding full time interpreters or the same individual interpreter- this is not an agency policy! Ms. Friends has the use of an interpreter during mentoring, meetings and training (Appx. 2 hrs. a day). There is no option for relocation to Frederick, MD since this is not a local decision. Ms. Wells states that she is receiving refresher training and mentoring now!

Bruce Williams, her AFGE representative stated that the agency demonstrated on going discrimination to her. She was initially not provided with an interpreter for her disability/ deafness. Reasonable accommodation was not provided and training was inadequate for her. The June 8, 2004 Memorandum to her was a lack of good faith and demonstrated hostility by management.

Monte Buddy Walker, MSS, Washington Postal SSA Office, was her former mentor. I spoke to him on September 10, 2004. There were two prior mentors before him. She had problems with them and one was also deaf. He tried to assist her for 4 months. He has an SSI background and tried to provide support. He has not seen evidence of hostility to her, but notes she has been hostile to others. There have been payment problems with her caseload. He did not feel that he was derogatory to her and has tried to be helpful. He does not feel that she would be better as a Title II CR. He was present at her initial interview, and states that she stated she could read lips and understands clearly- there was no impression that she would need a full time interpreter. He further states that there is 100% review of all of her cases and that they are incorrect, deficient in basic SSI standards. (Never once had any case returned that was write-back).

Jeff Landis, SSA, RO, Philadelphia, Labor Management/Team Leader, he was responsible for the reasonable accommodations, specifically for interpreters and provides the Agency policy to assist management.

September 9, 2004, I spoke to Judy Nease, retired former SSA Manager who stated that Ms. Friends was hired by her. She feels that possibly she was not given a fair shake by the agency or given the full opportunity to become a competent CR. She states that the initial IVT training has poor captioning, and that she would have needed more hands on training -not being alone in a room. The Interpreter was only available for 4 weeks. Ali is from a deaf community, and does not have the same understanding as the other deaf CR who was raised in a hearing community. There were personality clashes with the mentors and that the office is short staffed and time is an issue. She states that to be competent in a CR position takes at least 2 years. Possibly with relocation and proper training Ms. Friends

EXHIBIT   2
Page 5 of 11 pages.

*a friends continued*

has the potential to be a competent CR. She does not think that Ms. Friends can be hostile but maybe frustrated. She also stated that Ms. Robin Wells was a competent manager.

EXHIBIT   2
Page  6  of  11  pages.

*Ms. Fu*

# NOTICE OF RIGHTS

Informal pre-complaint EEO counseling is voluntary. It is, however, a mandatory requirement for filing a formal EEO complaint. You must contact an EEO Counselor within 45 calendar days of the incident, decision, event or action giving rise to the complaint. You have the right to remain anonymous during informal EEO counseling. Anonymity may unduly restrict the EEO Counselor in achieving an informal resolution of the claim(s) you have raised. If you choose to remain anonymous, your name will appear only on this form and the EEO Counseling Report, of which only you and the EEO Manager where your counseling matter(s) arose will have a copy. However, if you file a formal complaint there is no right to anonymity and the formal complaint will not be regarded as confidential.

The EEO Counselor is a neutral party in the discrimination complaint process and does not serve as a representative for you or management. You have the right to be accompanied, represented, and advised by a representative of your choosing at every stage of your complaint. You, your representative, and your witness shall be free from restraint, intimidation, interference, coercion, discrimination, or reprisal in the presentation and processing of a complaint, including EEO counseling, or any time thereafter. If you have a representative, it is your responsibility to provide written notice of his/her name, address, and business telephone; and it is also your responsibility to provide written notice of all changes in your representation.

If you do not receive EEO counseling beyond the initial interview, nothing more will be done than that which is reported to you today. If you do receive further EEO counseling, the Counselor will have 30 calendar days from the date of your initial contact to attempt to informally resolve your claim(s). The 30-day period may be extended to 90 days if you agree. On or before the 30th day, the EEO Counselor shall inform you of the right to file a formal discrimination complaint if you have not agreed to an extension.

You have the right to choose between Alternative Dispute Resolution (ADR) and EEO counseling, where the Agency agrees to offer ADR in the particular case. Participating in ADR is voluntary and if both parties (you and management) elect ADR, the pre-complaint process period will be extended to 90 calendar days or until completion of the ADR process. After ADR or EEO counseling is complete, you will have the right to file a formal complaint. If you file a formal complaint, ADR may also be available.

Your or your representative will receive the investigative file within 180 days from the date your formal complaint is accepted, or if your complaint is amended, within 180 days after the last amendment, not to exceed 360 days. You will have 30 days from the date your or your representative receive the file to request a hearing and decision from an administrative judge (AJ) or an immediate final agency decision. Your request for a hearing should be made directly to the appropriate Equal Employment Opportunity Commission (EEOC) office.

## Notice to Members of Collective Bargaining Units

Members of collective bargaining units may be entitled to elect between filing a formal EEO complaint and filing a grievance. If the agreement with your union covers equal employment and discrimination matters, you may elect to file a formal EEO complaint of discrimination under 29 CODE OF FEDERAL REGULATIONS (CFR) PART 1614 or to file a grievance in writing, under the negotiated grievance procedure. You may not do both. Whichever one you file first will constitute your election.

When you file a formal discrimination complaint with the Agency; i.e., the Office of Civil Rights and Equal Opportunity, or when you file a grievance with your union, you have exercised your election. Consequently, merely obtaining EEO counseling will not indicate your election of the EEO complaint process instead of the grievance process. However, if the contract with your union allows, you may omit pre-complaint EEO counseling and file your grievance in writing without EEO counseling; or, you may file your grievance in writing while EEO counseling is in progress. In either case, filing your grievance in writing will constitute your irrevocable election to give up the right to file an EEO complaint of discrimination on the same matter, whether or not you allege a protected discriminatory basis. The election to file a formal EEO complaint or grievance, as described, applies only to bargaining unit members; it does not apply to employees who must file grievances under 5 CFR Part 771 and who are not bargaining unit employees.

## Mixed Case Complaint

If you have been subjected to an action appealable to the Merit Systems Protection Board (MSPB), and you believe the basis for that action is discriminatory, you may elect to file a mixed case complaint with MSPB. You have 20 calendar days from the date of the alleged discriminatory act to file a mixed case appeal with MSPB or 15 calendar days from the date of the final counseling interview or 30 calendar days from the date of your initial contact with the EEO counselor. You may not file both an MSPB and a formal EEO complaint on the same matter. Whichever one you file first will constitute your election.

EXHIBIT    2
Page  7  of  11  pages.

## Right to File a Civil Action Under the Age Discrimination in Employment Act (ADEA)

If you believe you have been subjected to prohibited age discrimination, you may file either a grievance if appropriate, an administrative complaint, or a civil action in the appropriate U.S. District Court. If you file an administrative complaint based on age alone, you must exhaust the administrative processing of your complaint before filing a civil action; and, the administrative processing and appeal cannot include attorney fees should you prevail. If you elect to file a civil action initially, you must, within 180 calendar days of the alleged discriminatory act, give the EEOC at least 30 calendar days prior notice of your intent to sue before filing the civil action.

### Equal Pay Act

You have the right to file directly with a U.S. District Court on claims of sex-based wage discrimination under the Equal Pay Act even though such claims are cognizable under Title VII. (Sex-based claims of wage discrimination may also be raised under Title VII; individuals so aggrieved may thus claim violations of both statutes simultaneously.)

### Right to Court-Appointed Attorney

If you elect to file a civil action under ADEA, Title VII, or the Rehabilitation Act, you may appeal to the U.S. District Court for appointment of an attorney to represent you in the court proceeding. The court may appoint an attorney to represent you and may permit commencement of the civil action without payment of fees, costs or security.

### Privacy Act Notice

### General

This information is provided pursuant to the Privacy Act of 1974 for individuals supplying information for inclusion in a system of records.

### Authority

The authority to collect the information requested by the EEO Counselor is derived from one or more of the following: 42 USC 2000e; 29 USC 633a; PL 95-602 as amended; 5 USC 1303 and 1304; 5 CFR 5.2 and 5.3; 29 CFR 1614.105; and Executive Order '478 as amended.

### Purposes and Uses

The information supplied will be used to resolve the EEO counseling matter(s) you have raised during counseling. This information may be discussed with designated officers and employees of SSA in order to resolve the matters you have raised. If you file a formal EEO complaint, this form and all enclosures will be made part of your EEO complaint file and will be available to any person having a need to know its contents. Formal complaints are neither anonymous nor confidential. Whether or not you file a formal EEO complaint, this form and enclosures, if any, may be used in a depersonalized manner as a database for program analysis, review, evaluation, and statistics. If you have not chosen anonymity and there is a need to disclose information from your EEO counseling report(s) for reasons other than those which have been cited or for reasons cited in the Privacy Act (5 USC 522 a (b)), your prior consent will be solicited.

### Effects of Non-disclosure

Disclosure of the information sought is voluntary. However, since informal pre-complaint EEO counseling is mandatory, failure to disclose information may result in rejection of the formal EEO complaint in whole or in part.

*The signatures affixed below affirm complainant has been given his/her rights and a notice of ADEA rights.*

Complainant : _____   Date: 8/19/04

Representative : _____   Date: 8/19/04

EO Counselor : _____   Date: _____

# EXHIBIT 22

## INDIVIDUAL EEO DISCRIMINATION COMPLAINT FORM

ou may use the form below to file your complaint. <u>Use of the form is not required.</u> However, to file a discrimination complaint, **you must submit a** **py of the EEO Counseling Report, including all attachments.**

1. Complainant:

_Alice Ann Friends_
Name

_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_
Social Security Number

_182 Posting Way_
Home Address – Street, RD, P.O. Box

_Charles Town WV 25414_
City, State Zip Code

1st fll then
2nd
Home Phone : Area Code ( _301_ )   _738_  - _0482_

Business Phone: Area Code ( _____ ) _____ - _____

2. Complainant's Representative:

_Bruce Williams_
Name

_2100 H St NW_
Business Address – Street, RD, P.O. Box

_Washington DC 200_
City, State Zip Code

Business Phone: Area Code ( _202_ )  _663-2002 ext 3019_

If representative is employed by SSA, state where and give telephone number to be used during normal working hours.

3. I wish to file a formal EEO Complaint, a copy of the completed **EEO Counseling Report outlining the issues and bases in my complaint** **is attached.**

4. **I have / have not** (circle one) filed a complaint under the negotiated grievance procedure or filed an appeal with the Merit Systems Protection Board on the same issues(s)

5. **I am / am not** (circle one) interested in participating in the Agency's ADR Process.

_Alice Ann Friends_
Complainant's Signature

_9/17/04_
Date

**EXHIBIT** _1_
Page _2_ of _2_ pages.

TO: Associate Commissioner for Civil Rights and Equal Opportunity
FROM: Alice Ann Friends
DATE: September 17, 2004
RE: Formal EEO Complaint


I wish to file a FORMAL EEO COMPLAINT against the Social Security
Administration. During the time I was employed by SSA at the Postal
Plaza, DC Social Security Field Office as a Claims Representative I was
discriminated against on the basis of my disability (Deafness). I asked
repeatedly for Reasonable Accommodation in the form of a full-time
Interpreter, better mentoring, refresher training and other adjustments in
the work environment to include relocation. SSA through its managers,
Lorna Walters, Robin Wells and Buddy Walker denied my requests for
Reasonable Accommodation in a flagrant violation of numerous laws and
regulations and SSA's stated policies concerning assistance to handicapped
employees. Management staff also allowed a hostile workplace to exist
which caused me tremendous emotional distress and impeded my ability to
be an effective Claims Representative.

SIGNED  _Alice Ann "Alli" Friends_
DATE  _Sept. 17, 2004_

182 Posting Way
Charles Town, WV 25414
Email: whblcat@adelphia.net
Phone number: 1st - 711 (Relay)
                2nd -home number, 304 728-0482

EXHIBIT 1
Page 1 of 2 pages.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALICE ANN FRIENDS**,                          ) | |
|                       Plaintiff,     ) | |
| v.                               ) | **Civil Action No.: 06-1762 (ESH)** |
| **JOANNE B. BARNHART**,         ) | |
| Commissioner of the Social Security   ) | |
| Administration,                 ) | |
|                      Defendant.    ) | |

**[PROPOSED ORDER] GRANTING DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

This matter having come before the Court on Plaintiff's Motion for Partial Summary Judgment, Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross-Motion for Summary Judgment, it is hereby

**ORDERED** that Defendant's Cross-Motion for Summary Judgment is granted. It is further

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment is denied. It is further

**ORDERED** that Plaintiff's complaint is dismissed with prejudice.

**SO ORDERED** on this _____ day of _____, 2007.


_____

_____UNITED STATES DISTRICT JUDGE