UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
ALICE ANN FRIENDS,            )
          Plaintiff,          )
                              )
          v.                  )
                              )  06-CV01762-ESH
JOANNE B. BARNHART,           )
          Defendant.          )
                              )
_____)


PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S CROSS-

MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF'S REPLY TO

DEFENDANT'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT.



Phillip R. Kete
General Counsel, AFGE Local 1923
G-314 West Highrise
6401 Security Blvd.
Baltimore, MD  21235
D.C. Bar No. 375724
(410) 966-6500


March 8, 2007

SUMMARY OF THE ARGUMENT .................................. 1

STATEMENT OF THE CASE .................................... 4

I    BECAUSE MS. FRIENDS FIRST SOUGHT COUNSELING ON JUNE 9,
2004, SHE TIMELY INITIATED HER COMPLAINT OVER THE DENIAL OF
HER ACCOMMODATION REQUEST THAT WAS MAILED TO HER ON APRIL
29, 2004. ............................................... 8

II   MS. FRIENDS WAS WRONGFULLY DENIED AN INTERPRETER FOR
CLAIMANT INTERVIEWS, IN VIOLATION OF THE REHABILITATION
ACT. ................................................... 11

   A. MS. FRIENDS NEEDED AN ASL INTERPRETER TO CONDUCT
   CLAIMANT INTERVIEWS, WHICH WAS AN ESSENTIAL FUNCTION OF
   HER JOB. ............................................. 14

   B. AN ACCOMMODATION IS REASONABLE IF IT IS NECESSARY FOR
   PERFORMANCE OF AN ESSENTIAL FUNCTION OF THE POSITION, EVEN
   IF ITS PROVISION DOES NOT ENSURE SUCCESSFUL PERFORMANCE OF
   THE POSITION AS A WHOLE. ............................. 16

   C. PROVISION OF THE ACCOMMODATION WOULD NOT HAVE IMPOSED
   AN UNDUE HARDSHIP ON THE SOCIAL SECURITY ADMINISTRATION. 17

   D. DISABLED EMPLOYEES ARE ENTITLED TO OTHERWISE
   REASONABLE ACCOMMODATIONS EVEN BEFORE DEMONSTRATING AT THE
   END OF THE PROBATIONARY PERIOD THAT THEY CAN SUCCESSFULLY
   PERFORM ALL ELEMENTS OF THE JOB. ...................... 20

III  SUMMARY JUDGMENT ON COUNT II IS PRECLUDED BECAUSE A
JURY COULD REASONABLY FIND THAT MS. FRIENDS' INABILITY TO
TELL WHAT CLAIMANTS SAID, WITHOUT AN ASL INTERPRETER, WAS A
MOTIVATING FACTOR IN HER DISCHARGE. ...................... 24

IV   SUMMARY JUDGMENT ON COUNT II IS PRECLUDED BECAUSE A
JURY COULD REASONABLY FIND THAT MS. FRIENDS PROVED A PRIMA
FACIE CASE OF DISCRIMINATION AND THAT DEFENDANT'S
ARTICULATED REASON WAS A PRETEXT FOR DISCRIMINATION. ..... 28

   A. DEFENDANT'S FAILURE TO SUBMIT ADMISSIBLE EVIDENCE
   CONTRADICTING THE EVIDENCE THAT MS. FRIENDS WAS A
   QUALIFIED EMPLOYEE FORECLOSES AN ARGUMENT THAT A JURY
   COULD NOT FIND, BY A PREPONDERANCE OF THE EVIDENCE, THAT
   MS. FRIENDS WAS QUALIFIED. ........................... 29

1.   The record contains substantial evidence that Ms. Friends was a qualified employee........................ 30

2.   Defendant does not rely on admissible evidence that Ms. Friends was not a qualified employee.............. 32

B. A JURY COULD FIND UNWORTHY OF CREDENCE DEFENDANT'S EVIDENCE THAT MS. FRIENDS WAS FIRED BECAUSE OF HER FAILURE TO DEMONSTRATE HER FITNESS AND QUALIFICATIONS FOR CONTINUED EMPLOYMENT. .................................. 33

1.   In the federal sector, findings of unsatisfactory performance must be based on standards and preceded by specific forms of assistance, not on conclusory statements about performance issues................... 34

2.   Defendant cites no evidence that Ms. Friends failed to meet the applicable performance standards.......... 38

3.   Defendant cites no evidence that management informed Ms. Friends of the standards she had to meet, or that management offered the assistance that was necessary........................................... 38

4.   Even if a jury found that Ms. Friends failed to meet the GS 11 performance standards, it could find the claim that Ms. Friends had failed to demonstrate fitness and qualifications for continued employment to be a pretext for discrimination.......................... 39

CONCLUSION ............................................ 45

SUMMARY OF THE ARGUMENT

Dismissal

Defendant's motion to dismiss is premised on a claim
that Ms. Friends had to initiate her complaint within 45
days of April 29, 2004, and that she failed to do so until
June 15, 2004.  Defendant's own exhibits establish that Ms.
Friends received the April 29 letter on May 4, and that she
initiated her complaint on June 9.  Using either of the
correct dates, the administrative complaint was timely
filed.

Accommodation

On the merits, it is clear that management hired Ms.
Friends in the mistaken belief that she could conduct
claimant interviews through speechreading, and that,
therefore, she would not require an ASL interpreter for
that purpose.

Once management became aware that Ms. Friends could
not conduct claimant interviews without an ASL interpreter,
it had several choices.  One was that it could provide an
ASL interpreter, as it had done in the case of other deaf
employees.  Its failure to do so is the subject to count I

-1-

of the complaint.  Another option was to fire her.
Defendant's selection of this option is the subject of
count II of the complaint.

Regarding the first option, defendant's cross-motion
for summary judgment effectively concedes that the actual
reasons given for denying the accommodation were invalid.
Instead, defendant relies on a claim that employers have no
duty to accommodate newly hired disabled employees until
and unless the employee completes probation.  Since
defendant fired Ms. Friends before she completed probation,
defendant's argument is that she had never had any
entitlement to any accommodation whatsoever.  That
interpretation of the law is incorrect.


Discharge

After illegally refusing to provide an accommodation
essential to successful performance of Ms. Friends'
position, defendant fired her for not being able to
successfully perform the duties of her position.

Defendant says that he fired Ms. Friends because of
conduct and performance deficiencies, and does not deny
that one those performance deficiencies was the inability
to tell what claimants said during interviews.  That would

make defendant liable under *Desert Palace Inc. v. Costa*, 539 U.S. 90 (2003).

Although it is undisputed that Ms. Friends had performed satisfactorily at the GS 9 level, defendant claims that she was not even covered by the Rehabilitation Act because she was not qualified for the claims representative position, as measured against the GS 11 performance standards.  Alternatively, or additionally, defendant argues that Ms. Friends' alleged lack of qualifications was the true reason for her discharge. There is, however, evidence that Ms. Friends was qualified, and defendant cites no admissible evidence that she was not.  The fact that defendant did not follow civil service regulations and the union contract in responding to Ms. Friends' perceived performance problems, including providing her training that she requested, as well as the fact that defendant did not even consider reassigning her to a position or grade for which she was indisputably qualified, could lead to a conclusion that the stated reason for discharge was a pretext for discrimination.

STATEMENT OF THE CASE

Defendant recruited Ms. Friends, who is totally deaf, for a claims representative position in September 2003. Although defendant hired her under an authority limited to the severely disabled, 5 C.F.R. § 213.3102(u), Pl.Fact ¶ 6, he did so in the belief that Ms. Friends would not need an ASL interpreter to communicate with non-deaf claimants, that she could successfully rely on speechreading for this purpose:

> [T]he essential reason for a bilingual claims representative is that an individual is able to conduct interviews with the general public in two languages.  Complainant was hired because she stated to the Agency during her job interview that she was fluent in ASL and could "read lips very well."

Agency motion at 13 (emphasis added).

Stated otherwise, Ms. Friends would not have been hired had defendant not mistakenly understood her to have said she could read lips well enough to conduct claimant interviews without an ASL interpreter.

Defendant insists that the agency had no duty, at any time during Ms. Friends' two years of employment, to provide her any accommodation whatsoever.  Nevertheless, during those two years he in fact granted those accommodation requests which he felt Ms. Friends was

entitled to and denied those which he felt she was not entitled to. Among those that were granted were close-captioned interactive video training, and ASL interpreters in certain situations.

Ms. Friends spent her first year in training. Pl. Fact ¶ 10. In September 2003, defendant formally determined that Ms. Friends was performing satisfactorily. Pl. Fact ¶ 14. In October 2003, defendant promoted Ms. Friends to GS 11, which is the full-performance level of the job. Fact ¶ 15.

Beginning in October 2003, Ms. Friends reported to management that because she was deaf she could not understand what speaking claimants were saying to her, and she requested various accommodations to this fact. Pl. Fact ¶ 40. Ms. Friends made a written request for an ASL interpreter on March 11, 2004, Def.Fact ¶ 22. That request was denied in writing in a letter dated April 29, 2004, Def.Fact ¶ 22, which Ms. Friends received on May 4, 2004. Def. Exh. 15; Pl. Reply Exh. 1 ¶ 9.

Although defendant denied the accommodation request, his reasons for doing so had nothing to do with Ms. Friends' conduct or her technical competence. Def. Fact ¶ 25. The two reasons were, first, Ms. Friends' position description required that she conduct interviews without

reliance on an interpreter, Pl. Fact ¶ 26; second, providing interpreters would impose an undue hardship on the Social Security Administration,[1] Def. Exh. 18. Defendant has totally abandoned the first reason, and she makes the second argument only *pro forma*.

On June 8, 2004, Ms. Wells gave Ms. Friends a memorandum threatening to fire her if her conduct did not improve.[2] Def. Exh. 10. The memorandum alleged several acts of misconduct or bad attitude. Defendant has provided no evidence that any of the allegations was true.

On June 9, Ms. Friends initiated her administrative complaint of discrimination by contacting a counselor in the agency's Office of Civil Rights and Employment Opportunity. Pl. Reply Exh. 1 ¶ 11; Reply Exh. 3 at 1, 2, 9.

On June 28, Ms. Wells gave Ms. Friends a memorandum threatening to fire her if her performance did not improve. Def. Exh. 8. The memorandum provided only one example of poor performance, involving a claimant who Ms. Friends could not understand because he stuttered. The memorandum

---

[1] There is no claim that defendant ever told Ms. Friends that her accommodation request was denied because of her alleged lack of technical competence.

[2] Def. Exhs. 8, 10 and 11 are not admissible as evidence of the truth of the statements contained in them. They are, however, admissible to show what management said at the time.

did not identify the performance standards Ms. Friends had failed to meet, nor did it tell Ms. Friends what she had to do in order to keep her job.

In September 2004, management fired Ms. Friends, with the sole stated reason being performance, not conduct.[3] Def.Exhs. 2, 11.

---

[3]  Defendant claims that the June 28 memorandum was issued because Ms. Friends had not shown improvement in response to the June 8 memorandum. Def. Memo. at 5.  That is unlikely, because the two memorandum address different subjects, and the later memorandum does not even refer to the earlier one.

I      BECAUSE MS. FRIENDS FIRST SOUGHT COUNSELING ON JUNE 9,

        2004, SHE TIMELY INITIATED HER COMPLAINT OVER THE

        DENIAL OF HER ACCOMMODATION REQUEST THAT WAS MAILED TO

        HER ON APRIL 29, 2004.


        Defendant notes that he denied Ms. Friends' accommoda-

tion request in a letter he mailed to Ms. Friends on April

29, 2004, and he alleges that Mr. Friends did not seek

counseling on the matter until forty-seven days later, on

June 15, 2004.  According to defendant, Ms. Friends thus

missed the 45 day deadline established by 29 C.F.R. §

1614.105(a)(1).  Def. Memo. at 12.

        There are two equally fatal flaws in defendant's case.

First, defendant submitted to the court a document dated

May 4, 2004, in which Ms. Friends states, with respect to

the April 29 letter, "I just got this letter today."  Def.

Exh. 15.  Ms. Friends has confirmed the accuracy of that

statement under oath.  Pl. Reply Exh. 1 ¶ 9.  Initiation of

the complaint on June 15 would have occurred within 45 days

of Ms. Friends receiving the April notice.

        Second, Ms. Friends initiated her complaint on June 9,

in a telephone discussion she had with Debra Harrison of

the agency's Office of Civil Rights and Equal Opportunity. Pl. Reply Exh. 1 ¶ 11. The date of initiation for purposes of 29 C.F.R. § 1614.105(a)(1) is the date the employee contacts the agency's EEO office. *McDonald v. Mineta*, Appeal No. 01A03321 (April 30, 2002).

Defendant's evidence that the complaint was not initiated until June 15 is the EEO counselor's report. Def. Exh. 21. On page 9 of the report (somehow missing from the document presented as an exhibit with defendant's motion), the counselor informs Ms. Friends unequivocally that all deadlines were calculated on the premise that Ms. Friends first sought counseling on June 9:

> This voluntary agreement means that counseling on the matter(s) you first brought to my attention on 6-9-04 (1st request) will be completed no later than 9-9-04, 90 calendar days from initial contact.

Pl. Reply Exh. 2 at 9.

The same report states the same initiating date on its page 2:

> Ms. Friends first sought counseling on 6/9/04 . . .

Pl. Reply Exh. 2 at 2.

It appears that defendant is relying on a third entry in the report, in which the counselor notes that while Ms. Friends contacted the office of civil rights and equal op-

portunity ("CREO") on June 9, Ms. Friends and the counselor
did not talk directly until June 15:

>  6/15/04 (w/me)
>  Creo 6/9

Pl. Reply Exh. 2 at 1.

In context, the page 1 entry is not even ambiguous,
but even if it were, the ambiguity is resolved by the page
2 and page 9 statements, which plainly state that the June
9 date identified on page 1 is the date used by the agency
itself as the initiation date.

Since it is absolutely clear from defendant's own
exhibits that Ms. Friends met the 45 day time limit, her
complaint should not be dismissed for failure to meet it.

II    MS. FRIENDS WAS WRONGFULLY DENIED AN INTERPRETER FOR
      CLAIMANT INTERVIEWS, IN VIOLATION OF THE
      REHABILITATION ACT.

When defendant hired Ms. Friends as a deaf claims
representative, he believed, for two reasons, that he would
not have to provide an ASL interpreter for Ms. Friends' use
in claimant interviews.  First, defendant believed that Ms.
Friends has assured him that she could read lips very well,
and he apparently interpreted that as meaning she could,
through speechreading, conduct claimant interviews without
an ASL interpreter;  second, defendant believed that he had
defined the position of bi-lingual claims representative in
such a way that a deaf person who had to rely on an ASL
interpreter for claimant interviews would not be qualified
for the position.

Thus, the agency official who made the accommodation
decision under challenge made a distinction between
providing an ASL interpreter for claimant interviews, which
he denied, and providing an interpreter for other
interactions, which he granted.  According to that
official, the distinction was that the nature of the job
required the incumbent, if deaf, to be able to conduct

-11-

claimant interviews without an ASL interpreter, while the bar on reliance on interpreters apparently did not extend to other situations where the deaf employee could not understand speech:

> Even though Ms. Friends was hearing impaired, the duties of this position require the ability to communicate (speak and understand spoken words) in English. . . . If . . . she was not fluent in the English language because she can not hear [or] read lips . . . she is not qualified to perform the duties of the Bi-lingual CR position.
>
> *                    *                    *
>
> [T]he Agency . . . did provide [Ms. Friends] with the services of an interpreter for up to 32 hours a week. This accommodation was provided because she claimed that her hearing impairment and inadequate hearing aids made it difficult to hear what was being said during training or mentoring sessions. And the interpreter service would "facilitate effective communication." We did, however, prohibit Ms. Friends from using ASL interpreter services when interviewing members of the hearing public since such services are unnecessary to communicate with the hearing public in English.

Def. Exh. 18 at 2.

Our opening motion, at 19-20, argued that this was not a sufficient ground under the Rehabilitation Act for denying an ASL interpreter for claimant interviews. Defendant's cross-motion does not defend this reason, nor even allude to it. Defendant effectively admits that if this were the only reason the accommodation request was denied, then the Rehabilitation Act was violated.

In fact, defendant suggests that the Mr. France's only reason for denying the request was that it would impose an undue hardship on the agency:

> Mr. France denied Plaintiff's request for a full-time interpreter because it would have been "unduly burdensome" for the Agency to have done so.

Def. Memo. at 7.

Although defendant does quote Mr. France's reasons for believing there would be an undue hardship, Def. Memo. at 8, 19-20, defendant does not make even the slightest effort to show that the standards for proving undue hardship have been met.

Thus, defendant has effectively abandoned the reasons relevant to denying the specific accommodation that was requested. In their place, he has asserted a defense which, if valid, would have let him refuse all of Ms. Friends' accommodation requests from the day she was hired. That defense is that the agency "had no duty to provide Plaintiff with any accommodations," Def. Memo. at 19 n. 5, whatsoever. If defendant is correct, then no employer has any duty to provide any disabled employee with any accommodations during that employee's first or second year of employment. That is, the only way the Social Security Administration can win this case is to convince the court

-13-

to eviscerate the accommodation requirements of the ADA and
the Rehabilitation Act.

Fortunately, defendant's post-hoc rationalization of
counsel is no more persuasive than the original arguments
that have been discarded.

A.    MS. FRIENDS NEEDED AN ASL INTERPRETER TO CONDUCT

CLAIMANT INTERVIEWS, WHICH WAS AN ESSENTIAL FUNCTION

OF HER JOB.

A reasonable accommodation is a modification to the
work environment that enables the disabled employee to
perform the essential functions of the position.  5 C.F.R.
§ 1630.2(o)(1)(ii).  Provision of a qualified interpreter
is an example of a reasonable accommodation.  5 C.F.R. §
1630.2(o)(2)(ii).

Defendant admits in the clearest possible terms that
Ms. Friends could not successfully perform the essential
function of interviewing claimants unless she had an ASL
interpreter:

> Both the plaintiff and the Agency agree that one
> of the essential functions of Plaintiff's job was
> to conduct interviews with claimants, something
> she could not do.

-14-

　　　　　*　　　　　　　*　　　　　　　*

> . . . Plaintiff could not perform one of the
> essential functions of her job without an
> accommodation . . .

Def. Memo. at 15, 17.

Defendant's statement accurately reflects Ms. Wells'

acknowledgment that Ms. Friends could not understand what

claimants tried to tell her:

> In many cases, when [the claimants'] responses
> came, it seemed to me she could not understand
> what they had said.

Def. Exh. 9 at 2, ¶ 6.

That is, Ms. Friends' attempts to rely on

speechreading to know what claimants were saying simply did

not suffice to provide her sufficient information upon

which to serve them properly, particularly at the GS 11

level.  Pl.Fact ¶¶ 23, 31.[4]  Provision of an ASL interpreter

would have overcome this problem.  Pl.Fact ¶ 25.

---

[4]  The truth of these proposed facts are not effectively disputed.  Our
fact ¶ 31 is not disputed at all.  Our fact ¶ 23 is objected to on the
ground that Ms. Friends cannot be a witness as to how well she
comprehended what claimants said or how the difficulty in comprehension
affected her ability to process their claims.  Defendant does not
explain why Ms. Friends is not a competent witness to these facts.

B.   AN ACCOMMODATION IS REASONABLE IF IT IS NECESSARY FOR
     PERFORMANCE OF AN ESSENTIAL FUNCTION OF THE POSITION,
     EVEN IF ITS PROVISION DOES NOT ENSURE SUCCESSFUL
     PERFORMANCE OF THE POSITION AS A WHOLE.

     As defendant points out, successful performance of the
claims representative position had at least two elements,
interviewing claimants and applying Title 16 policy:

> Both the plaintiff and the Agency agree that one
> of the essential functions of Plaintiff's job was
> to conduct interviews with claimants . . . .  In
> addition, Plaintiff was required to adjudicate
> claims for benefits and eligibility.  However,
> she had fundamental issues applying Title 16
> disability policy.
>
>             *           *           *
>
> [Plaintiff] neglects to mention the substantive
> issues that she had performing her job, aside
> from the client interview function.

Def. Memo. at 16 (emphasis added).

     Obviously, provision of any reasonable accommodation
necessary to perform some element of the job is no
guarantee that the employee will be able to successfully
perform the other essential elements of the job.  Providing
a wheelchair ramp or a wheelchair-accessible restroom to
someone in a wheelchair does not guarantee that he or she
will meet the position's performance standards.  Providing
Ms. Friends an accommodation sufficient to allow her to

interview claimants, in the sense of being able to know what their responses to her questions were, would not guarantee that Ms. Friends could then successfully apply Title 16 policy, or even that she would understand the implications of what was said.  That would not mean, however, that the requested accommodation is not necessary.

We will discuss below defendant's argument that an accommodation needed for the performance of one element of the employee's job can be withheld until she proves she can successfully perform all the other elements of her job.

C.    PROVISION OF THE ACCOMMODATION WOULD NOT HAVE IMPOSED
      AN UNDUE HARDSHIP ON THE SOCIAL SECURITY
      ADMINISTRATION.

Of the two reasons defendant actually relied on to deny the accommodation request, the only one he argues in his cross-motion is that providing the accommodation would impose an undue hardship on the agency.

'Undue hardship' is an affirmative defense, to be pled and proven by the defendant.  *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C.Cir. 1993).  There are three factors to be considered:

(1)  The overall size of the agency's program

-17-

> with respect to the number of employees, number
> and type of facilities and size of budget;
> (2)  the type of agency operation, including the
> composition and structure of the agency's work
> force;  and
> (3)  the nature and the cost of the accommoda-
> tion.

29 C.F.R.  1613.704(c).

Defendant asserts an undue hardship would be created

by the following factors:

> In particular, multiple ASL interpreters would
> have been required to assist plaintiff in
> conducting face-to-face interviews with the
> public, and those interpreters would have to be
> provided with extensive training in Title 16
> policy so that they would be able to provide
> proper guidance during the interview.  In addi-
> tion, the need to transmit information through an
> interpreter during each of Plaintiff's interviews
> would also lengthen the amount of time needed to
> conduct an individual interview, thereby reducing
> the number of interviews Plaintiff cold perform
> per day.

Def. Memo at 20.

Defendant does not, however, say how much money this

would cost, nor does he say what resources were available

to cover that cost.  Indeed, defendant argues that the

EEOC's findings about the agency's resources are not even

material to the question of whether, in light of those

resources, providing the accommodation would impose an

undue hardship.  Def. Response to Plaintiff's Fact ¶ 33.

Defendant's statement is the equivalent of an employer

pointing out that hiring a wheelchair-bound applicant would

-18-

require putting in a wheelchair ramp.  Whether that fact
constitutes an undue hardship depends on what the ramp
would cost and what the employer's resources are.

       With respect to cost, we know that defendant admits
that no undue hardship was imposed by providing ASL
interpretation services for 32 hours per week, even though,
as he now points out, this required paying two interpreters
at a time.  But defendant provides no data to support a
claim that providing ASL coverage for forty hours would
bring the cost over the line into the category of undue
hardship.

       The EEOC has found that the cost data submitted in a
different case established that the provision of an ASL
interpreter for claimant interviews does not impose an
undue hardship on the Social Security Administration.[5]
*Vitale v. Massanari*, Pl. Exh. 13.  Ms. Friends' case is
much stronger than that of the complainant in *Vitale*,
because here defendant already allocated up to 32 hours per
week of interpretation time to tasks other than claimant
interviews.  Even if there were evidence that 32 hours was
the most the agency could pay for, it is obvious that since
Ms. Friends could understand Ms. Wells but not the

_____

[5]  Defendant does not dispute the facts found by the EEOC;  he objects
only to their materiality.

-19-

claimants without an interpreter, Pl.Fact ¶ 24, Def.Fact ¶
15, interpreters could be shifted from Ms. Wells to the
claimants.

The court should therefore reject the undue hardship
defense as a matter of law, even if the rest of the case is
allowed to go to trial.  Rule 56(c).


D.    DISABLED EMPLOYEES ARE ENTITLED TO OTHERWISE
      REASONABLE ACCOMMODATIONS EVEN BEFORE DEMONSTRATING AT
      THE END OF THE PROBATIONARY PERIOD THAT THEY CAN
      SUCCESSFULLY PERFORM ALL ELEMENTS OF THE JOB.


The only argument defendant attempts to support is a
post-hoc rationalization of counsel according to which no
disabled employee is entitled to any accommodation until he
or she successfully completes whatever probationary period
the employer imposes.  According to that argument, at no
point during her two years of employment at the Social
Security Administration was Ms. Friends ever entitled to
any accommodation whatsoever to her deafness:

> [B]ecause Plaintiff has failed to establish that
> she was "otherwise qualified" for the claims
> representative position, Defendant maintains that
> she had no duty to provide Plaintiff with any
> accommodations.

Def. Memo. at 19 n. 5.

"[N]o duty to provide Plaintiff with <u>any</u>
accommodations" is perfectly clear.  On this theory,
defendant had no duty, for example, to provide training in
a format that Ms. Friends could understand, or to provide
interpreters to allow Ms. Friends to participate in staff
meetings, or—the point at issue here—to provide
interpreters so she could perform the function of claimant
interviews.

Defendant's theory obviously is not limited to deaf
employees or Ms. Friends personally.  If defendant is
correct, when an employer hires a person in a wheelchair,
there is no requirement to provide wheelchair accessible
restrooms until and unless the employee proves he or she
can successfully perform all the functions of the position;
when an employer hires a blind person, the seeing eye dog
can be barred until the new employee completes a two year
probation without use of the dog.

Obviously, a new employee is not expected to be able
to perform all the functions of the position immediately
upon being hired.  That is the reason for a training
period, which in this case lasted one year, and a
probationary period, which in this case ran for a second
year.  Indeed, the extra-long probationary period for
disabled employees is designed as a favor for them:  it

-21-

gives them additional time to develop the skills necessary
successfully perform.

Defendant's theory would be possible only if
'employee' were defined to exclude probationary employees,
but it is not.  29 C.F.R. § 1630.2(f).

The five cases defendant cites in support of his
argument do not support his contention that an
accommodation needed for the performance of one function
can be withheld until the employee in fact successfully
performs all the other essential functions of the job.

The first case merely holds that an employee who has
been given sufficient accommodation to his disability
cannot avoid discharge for incompetence by demanding
additional accommodation to that disability.  *Adrain v.
Alexander*, 792 F.Supp. 124 (D.D.C. 1992).

The second case holds that an employer need not
provide a requested accommodation which would not overcome
the effects of the disability.  *Chinchillo v. Powell*, 236
F.Supp.2d 18 (D.D.C. 2003).  There, the employee was fired
when his clinical depression made it impossible for him to
work.  The employee requested to either remain on the
payroll or be placed on leave without pay until treatment
and medications allowed him to recover.  The court ruled
against the employee by finding that neither of the

-22-

accommodations was likely, in fact, to overcome the effects of the employee's disability.  236 F.Supp.2d at 25.

In the third case relied on by defendant, the parties agreed that the employee's disability  could not be accommodated sufficiently to allow him to perform heavy physical labor.  *Dorchy v. WMATA*, 45 F.Supp.2d 5 (D.D.C. 1999).  The court found that performing heavy physical labor was an essential function of the position, and therefore ruled against the employee.  45 F.Supp.2d at 13.

The plaintiff in the fourth case, *Flemmings v. Howard Univ.*, 198 F.3d 857 (D.C.Cir. 1999), lost because she did not request the accommodation at issue.

The fifth case is no help for defendant, because there the employer admitted that with the disputed accommodation the plaintiff would have been able to perform the essential functions of his position.  *Pantazes v. Jackson*, 366 F.Supp.2d 57, 67-8 (D.D.C. 2005).

There is absolutely no basis for defendant's claim that otherwise necessary and reasonable accommodations can be withheld until, through successful completion of a probationary period, the employee successfully performs all the elements of the job not affected by the disability. [6]

---

[6]  There is another way to interpret defendant's claim, which is that although new employees are entitled to reasonable accommodation during their probationary periods, their standing to enforce that right is

-23-

III  SUMMARY JUDGMENT ON COUNT II IS PRECLUDED BECAUSE A
     JURY COULD REASONABLY FIND THAT MS. FRIENDS' INABILITY
     TO TELL WHAT CLAIMANTS SAID, WITHOUT AN ASL
     INTERPRETER, WAS A MOTIVATING FACTOR IN HER DISCHARGE.


     As explained in support of the accompanying Rule 56(f)
motion, Ms. Friends should not be required to oppose
summary judgment on the merits until she has had an
opportunity to discover evidence necessary to establish her
position and oppose defendant's.  The following argument is
presented because of the possibility that the court might
disagree with her on the discovery argument.

     Employment discrimination plaintiffs can, of course,
prove their cases through direct evidence.  *Swierkiewicz v.
Sorema*, 534 U.S. 506, 511-2 (2002).  In the present case,
that will depend on successful discovery.

     Even without direct evidence, plaintiffs can prevail
in either of two ways:

     Generally speaking, a plaintiff can avert summary
     judgment and establish a claim for intentional
     sex or age discrimination through two avenues of

---

forfeited if they fail to successfully complete that period.  Under
this theory, had Ms. Friends completed her two years probation, she
would be entitled to damages for the failure to accommodate her
disability during her second year;  however, her failure to complete
probation means the agency is immune from damages.  That, however, does
not appear to be defendant's actual theory.

proof.

First, a plaintiff may establish a claim of
discrimination by demonstrating through direct or
circumstantial evidence that sex or age
discrimination motivated the employer's adverse
employment decision.  The employee, however, need
not demonstrate that the prohibited
characteristic was the sole motivating factor to
prevail, so long as it was a motivating factor.
In such cases, historically referred to as "mixed
motive cases," it is sufficient for the
individual to demonstrate that the employer was
motivated to take the adverse employment action
by both permissible and forbidden reasons. . . .

            *                *                *

The second method of averting summary judgment is
to proceed under a "pretext" framework, under
which the employee, after establishing a prima
facie case of discrimination, demonstrates that
the employer's proffered permissible reason for
taking an adverse employment action is actually a
pretext for discrimination.

*Hill v. Lockheed Martin*, 354 F.3d 277, 284-5 (4th Cir.

2004), applying *Desert Palace Inc. v. Costa*, 539 U.S. 90

(2003).  Although *Desert Palace* arose under Title VII, it

applies equally to disability cases.  *Baird v. Rose* 192

F.3d 462, 470 (4th Cir. 1999).

The evidence currently available would suffice to

allow a jury to conclude that defendant would have fired

Ms. Friends for being unable to know that claimants said to

her, even if Ms. Friends had met all the other performance

standards.

-25-

First, defendant has a practice of discharging disabled employees during their probationary periods if they are unable to perform all the essential duties of their positions:

> New employees hired under Schedule A are subject to a two-year trial period, during which time the Agency must make a decision whether to retain an employee beyond the trial period.  The decision to retain an employee beyond the trial period is not taken lightly, and is made based on management's consideration that the employee has demonstrated the necessary traits and ability to independently perform the duties of her position.

Def. Exh. 2 at 1 ¶ 3.

Second, absent the accommodation that was denied Ms. Friends, she was not able to perform the duties of her position:

> Both the Plaintiff and the Agency agree that one of the essential functions of Plaintiff's job was to conduct interviews with claimants, something she could not do.

Def. Memo. at 15.

Indeed, defendant's officer who actually denied the accommodation request stated explicitly that Ms. Friends was not even qualified for the position unless she could perform the interview function either by hearing or by reliance on speech-reading:

> If . . . [Ms. Friends] was not fluent in the English language because she cannot hear, read lips and/or did not have audible/understandable speech, she is not qualified to perform the

-26-

duties of the Bi-Lingual CR position.

Def. Exh. 18 at 2.

Consistent with this, defendant cites as material the alleged fact that Ms. Friends said in the job interview that she could read lips very well.  Def. Fact ¶ 2, Def. Memo. at 2.  The reason this is material is that had defendant known that Ms. Friends could not speechread sufficiently so that she would not need an ASL interpreter for claimant interviews, he would not have hired her:

> [T]he essential reason for a bilingual claims representative is that an individual is able to conduct interviews with the general public in two languages.  Complainant was hired because she stated to the Agency during her job interview that she was fluent in ASL and could "read lips very well."

Pl. Reply Exh. 4 at 13.

A jury could easily infer that if Ms. Friends' inability to interview without an ASL interpreter would have led defendant to not hire her, that same inability would have led defendant to fire her.

Defendant's summary judgment motion should be denied, and a finding should be made under Rule 56(c) that one of the reasons Ms. Friends was fired was her inability to conduct claimant interviews without the assistance of an ASL interpreter.

IV    SUMMARY JUDGMENT ON COUNT II IS PRECLUDED BECAUSE A
      JURY COULD REASONABLY FIND THAT MS. FRIENDS PROVED A
      PRIMA FACIE CASE OF DISCRIMINATION AND THAT
      DEFENDANT'S ARTICULATED REASON WAS A PRETEXT FOR
      DISCRIMINATION.

      As with the previous argument, this argument is
presented without prejudice to our Rule 56(f) motion.

      Defendant argues, first, that a reasonable jury could
not find Ms. Friends to be 'qualified,' as an element of
her prima facie case.  The plaintiff has to prove elements
of the prima facie case by a preponderance of the evidence.
If the jury does find, by a preponderance of the evidence,
that Ms. Friends was qualified, defendant next argues that
no reasonable jury could fail to agree that the true reason
Ms. Friends was fired was because defendant believed she
was not qualified.

      Defendant's approach in having qualification assessed
as part of Ms. Friends' prima facie case and then re-
assessed during the pretext phase of the case is
inconsistent with *McDonnell Douglas* and its progeny.  *Cline
v. Catholic Diocese of Toledo*, 206 F.3d 651,  660-666 (6th
Cir. 1999); *Johnson v. Dong Moon Joo*, 2006 U.S.Dist LEXIS
13022 at 64 (D.D.C. March 12, 2006).

Nevertheless, because there does not appear to be a D.C. Circuit decision directly on point, we will respond to defendant's argument as it is presented.

A.    DEFENDANT'S FAILURE TO SUBMIT ADMISSIBLE EVIDENCE CONTRADICTING THE EVIDENCE THAT MS. FRIENDS WAS A QUALIFIED EMPLOYEE FORECLOSES AN ARGUMENT THAT A JURY COULD NOT FIND, BY A PREPONDERANCE OF THE EVIDENCE, THAT MS. FRIENDS WAS QUALIFIED.

Defendant claims that it is undisputed that Ms. Friends cannot prove a prima facie case of illegal discharge.  That claim is based solely on the argument that defendant's evidence indisputably establishes that Ms. Friends could not perform the essential duties of her position, i.e., that she is not a qualified employee.  Def. Memo. at 21.

In order to prevail on this point at trial, Ms. Friends would have to prove, by a preponderance of evidence, that she was, indeed qualified.  To avoid summary judgment, she has to demonstrate that a reasonable jury could find that the evidence preponderates in her favor.[7]

---

[7]  As will be discussed below, defendant's claim to have fired Ms. Friends because of her lack of fitness and qualifications for continued employment is a mere pretext for discrimination.

1.  <u>The record contains substantial evidence</u>

<u>that Ms. Friends was a qualified employee.</u>

It is apparently now undisputed that for at least her
first year of employment, and presumably for some time
following, Ms. Friends was a qualified employee.  Indeed,
management officials signed an official document certifying
that for the year ending September 30, 2003, Ms. Friends
had met the performance standards for the claims
representative position at the GS 9 level.  Pl. Fact ¶ 14.
She was, at the same time, promoted to GS 11.  Pl. Fact ¶
15.

A jury could reasonably infer that an employee who has
been rated satisfactory and has been promoted continues to
work satisfactorily until there is evidence that she is not
meeting the established performance standards.  For
example, even where the articulated reason for a discharge
is poor performance, an employee's prior successful record,
including having been promoted, suffices to demonstrate
qualifications for prima facie purposes.  *Paquin v. FNMA*,
119 F.3d 23, 27 (D.C.Cir. 1997).

In the present case, the union-management contract
continues the presumption of successful performance during

---

the first 90 days after an employee is informed of serious

performance deficiencies:[8]

> If data clearly points to significant performance
> related problems of an individual employee, the
> supervisor will schedule a meeting with the
> employee . . .  The supervisor [and] employee . .
> . will meet to identify the specific problem,
> determine a root cause, and develop a written
> assistance plan to resolve the problem.  . . . .
> The assistance plan will afford the employee a
> reasonable opportunity of at least 90 days to
> resolve the identified performance related
> problem.  . . .  <u>During this period, the employee
> will be deemed to be performing at a Successful
> level for purpose of any performance-related
> personnel actions</u> and will not be subject to
> adverse action for performance-related problems.

Pl. Reply Exh. 2 at 143-4 (emphasis added).

On the present record, either Ms. Wells' June 28,

2004, memorandum, Def. Exh. 8, constitutes the sort of

notice contemplated by the contract, or it does not.  In

either case, the presumption of successful performance

created by the October 2003 performance evaluation remained

in effect as of mid-September 2004.

---

[8]  To be clear, we are not suing for violation of the union contract.
We are merely arguing that a jury could take account of the contract
provision in determining whether Ms. Friends was qualified for purposes
of the Rehabilitation Act at the time she was fired.

2.   <u>Defendant does not rely on admissible
evidence that Ms. Friends was not a qualified
employee.</u>

In arguing on page 21 of his memorandum that a jury
could not, by a preponderance of the evidence, find that
Ms. Friends was qualified for her position, defendant
simply refers to his argument on pages 16 and 17.  The only
evidence cited on those pages are defendant's exhibits 8,
10, and 11.

> *    Def. Exh. 8 is an unsworn June 28, 2004,
> memorandum from Robin Wells to Ms. Friends.
> *    Def. Exh. 10 is an unsworn June 10, 2004,
> memorandum from Robin Wells to Ms. Friends.
> *    Def. Exh. 11 is an unsworn September 10, 2004
> memorandum from Lorna Walters to Ms. Friends.

Because these documents are unsworn, they are not
admissible as evidence for the truth of the statements
contained in them to support a motion for summary judgment
under Rule 56.  *Martin v. John W. Stone Oil Distributor,
Inc., 819 F.2d 547,* 549 (5th Cir. 1987).  In addition, Def.
Exh. 11 is further inadmissible because Ms. Walters later
admitted that it was drafted by some unidentified staff
member, who based the text on information provided by Ms.
Wells.  Def. Exh. 2 at 2.  A court may not properly

consider hearsay evidence, even if it is contained in affidavits and depositions. *Automatic Radio Mfg Co., Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831 (1950).

In sum, at the point defendant filed his summary judgment motion, the record contained evidence that Ms. Friends was qualified (i.e., Pl. Exh. 5), and defendant cites to zero admissible evidence to contradict that fact. The court should, therefore, not only deny defendant's motion, but make a finding under Rule 56(c) that Ms. Friends has established a prima facie case of discrimination.

B.   A JURY COULD FIND UNWORTHY OF CREDENCE DEFENDANT'S EVIDENCE THAT MS. FRIENDS WAS FIRED BECAUSE OF HER FAILURE TO DEMONSTRATE HER FITNESS AND QUALIFICATIONS FOR CONTINUED EMPLOYMENT.

Defendant does rebut our prima facie case of discrimination by relying on an affidavit from the officer who fired Ms. Friends, which states that the decision to terminate her was "based on [her] failure to fully demonstrate her fitness and qualifications for continued employment . . ." Def. Memo. at 21, quoting Def. Exh. 2 ¶ 8.

-33-

Ms. Friends' burden is to show that, assuming defendant relies only on the admissible evidence he submitted with his motion, a reasonable jury could find the stated reason to be unworthy of credence and a mere pretext for discrimination.

1.    In the federal sector, findings of unsatisfactory performance must be based on standards and preceded by specific forms of assistance, not on conclusory statements about performance issues.

Federal agencies cannot justify firing employees based on conclusory statements that the employee is unable to satisfactorily perform the duties of her position, Def. Memo. at 16, or that the employee "was having difficulties with the technical aspects of the job," Def. Exh. 8 at 2, or that the employee had great difficulties asking the correct or appropriate questions, Def. Memo. at 16, or that she "made the same errors on very 'basic, fundamental issues,'" Def. Exh. 8 at 2, or that despite receiving a memorandum "outlining these issues," she was "not able to remedy the errors that Ms. Wells' and others had witnessed."  Def.Memo at 16.

It is necessary at this point to highlight the law and regulations governing how agencies are to treat perceived performance deficiencies of probationary non-preference eligible excepted service employees.

Title 5 U.S.C. Chapter 43, as a whole, applies to excepted service employees except to the extent they are excluded from coverage by OPM regulations:

For the purposes of this subchapter—

(2) "employee" means an individual employed in or under an agency, but does not include –

      *            *            *

(G)  an individual occupying a position not in the competitive service excluded from coverage of this subchapter by regulations of the Office of Personnel Management.

5 U.S.C. § 4301.

The only exclusion from chapter 43 as a whole made by OPM is for extremely short term employees.  5 C.F.R. § 430.202(c).

The specific section of the law governing actions based on unacceptable performance excludes excepted service employees with less than one year of service:

(f)  This section does not apply to—

      *            *            *

(3) the reduction in grade or removal of an employee in the excepted service who has not completed 1 year of current continuous employment

-35-

in the same or similar positions.

5 U.S.C. § 4303.

Thus, because she had more than one year of service during the months leading up to her discharge, Ms. Friends was entitled to the pre-termination[9] protections established by law and regulation for almost all other employees.

The regulations authorized by 5 U.S.C. Chapter 43 require agencies to appraise performance against written performance standards.  5 C.F.R. § 430.204, § 430.208.  The regulations also establish strict requirements to be followed by agencies before removing employees for poor performance:

> At any time during the performance appraisal cycle that an employee's performance is determined to be unacceptable in one or more critical elements, the agency shall notify the employee of the critical element(s) for which performance is unacceptable and inform the employee of the performance requirement(s) or standard(s) that must be attained in order to demonstrate acceptable performance in his or her position.  The agency should also inform the employee that unless . . . As part of the employee's opportunity to demonstrate acceptable performance, the agency shall offer assistance to the employee in improving unacceptable performance.

5 C.F.R. § 432.104.

---

[9]   Despite being covered by these provisions, Ms. Friends arguably did not have the right to appeal her removal to the Merit Systems Protection Board even if that removal violated the law.  5 U.S.C. § 4303(e)(3).

In addition, the union-management contract at SSA requires that once performance problems are detected the employee and the manager are to meet and develop a written performance plan to resolve the problem:

> If data clearly points to significant performance related problems of an individual employee, the supervisor will schedule a meeting with the employee . . .  The supervisor [and] employee . . . will meet to identify the specific problem, determine a root cause, and develop a written assistance plan to resolve the problem.  . . . . The assistance plan will afford the employee a reasonable opportunity of at least 90 days to resolve the identified performance related problem.  . . .  During this period, the employee will be deemed to be performing at a Successful level for purpose of any performance-related personnel actions and will not be subject to adverse action for performance-related problems.

Reply Exh. 2 at 143-4.

If this process does not succeed, management develops a formal Performance Enhancement Plan (PEP) identifying the standards, the deficiencies, the actions the employee must take, and provisions for counseling, training or other appropriate assistance.  "The goal of this PEP is to return the employee to successful performance as soon as possible."  Reply Exh. 2 at 144.

2.    <u>Defendant cites no evidence that Ms. Friends</u>
       <u>failed to meet the applicable performance</u>
       <u>standards.</u>

It is clear from Ms. Walters' affidavit that her
conclusion that Ms. Friends failed "to fully demonstrate
her fitness and qualifications for continued employment"
was premised on a belief that Ms. Friends had "not
progressed far enough along to show that she could work as
independently as a journeyman Claims Rep is expected to
work."  Def. Exh. 2.

However, defendant's motion submits no evidence of the
performance standard for journeyman Claims Representative
nor of the degree to which Ms. Friends fell short of the
standard.

3.    <u>Defendant cites no evidence that management</u>
       <u>informed Ms. Friends of the standards she had to</u>
       <u>meet, or that management offered the assistance</u>
       <u>that was necessary.</u>

There has never been a claim that management informed
Ms. Friends of the performance requirement that had to be
attained in order to demonstrate acceptable performance in
her position, as required by the civil service regulations.

Neither the June 28 warning nor the September 10 discharge decision identifies the performance standards nor offers assistance.  Nor is there a claim that management and Ms. Friends developed a written assistance plan to resolve the performance problems identified by management, as required by the union contract.

    4.    <u>Even if a jury found that Ms. Friends failed to meet the GS 11 performance standards, it could find the claim that Ms. Friends had failed to demonstrate fitness and qualifications for continued employment to be a pretext for discrimination.</u>

For at least three reasons, a jury could find pretextual the claim that Ms. Friends was fired because her inability to meet GS 11 performance standards meant she failed to demonstrate fitness and qualifications for continued employment.  First, failure to meet GS 11 claims representative performance standards implies reassignment to a different job, not discharge.  Second, defendant's failure to allow a cost-free trial of the effect an ASL interpreter would have on Ms. Friends' performance renders

-39-

incredible defendant's claimed belief that Ms. Friends'
performance difficulties were unrelated to the fact that
she could not hear what claimants were saying.  Third,
defendant's failure to grant Ms. Friends request to review
the GS 9 IVT training tapes eliminates any credibility that
management was interested in Ms. Friends' being able to
overcome her alleged technical deficiencies.

1.   Defendant made two, not necessarily
contradictory, determinations:  that since being hired Ms.
Friends had  progressed far enough along to show she could
work at the GS 9 level, Pl. Fact ¶ 14, with its limited
independence, but had not progressed far enough along to
show she could work with the independence required at the
GS 11 level.  Def. Exh. 2 at 2.

The civil service regulations and the union contract
contemplate consideration of reassignment or demotion
rather than discharge when performance deficiencies have
not been overcome:

A.   Should all remedial action fail and the
employee's performance is determined to be
unacceptable, the supervisor will issue a
certification of unacceptable performance the
employee and the employee may be liable for
adverse action.  On the following actions may be
pursued:

1.   When the employee is capable of

-40-

> performing another position of the same
> grade, the supervisor may propose to
> reassign the employee to such a position.
>
> 2.  When the employee is not capable of
> performing another position at the same
> grade but is capable of performing a
> position at a less grade, the supervisor may
> propose a demotion to a position at the next
> lower grade.

Pl. Reply Exh. 3 at 145, authorized by 5 C.F.R. §

432.105(i)(B)(5).

In light of this, a jury could find that Ms. Walters'

determination that Ms. Friends had not progressed far

enough along to show that she could work as independently

as a journeyman Claims Rep is expected to work would have

rationally led to demoting her back to the GS 9 level for

further seasoning, but not to a conclusion that Ms. Friends

had not demonstrated fitness and qualifications for any

employment at all.

Ms. Walters' statement, because unaccompanied by any

explanation why she did not reassign Ms. Friends to a

different position, is simply a non-sequitur rather than a

credible explanation for firing her.


2.  A jury could also find the discharge rationale to

be a pretext for discrimination because defendant did not

even try to see whether Ms. Friends' technical performance

would improve if she were able to tell what claimants said
to her, especially when it would have cost defendant
exactly zero money.

     For two hours each day from July 19 through September
10, 2004, Ms. Wells, accompanied by an ASL interpreter,
talked with Ms. Friends:

> Ms. Wells began mentoring you almost daily on
> June 28, 2004.  Since July 19, 2004, an ASL
> interpreter was also present during these 2 hour
> per day mentoring sessions.

Def. Exh. 11 at 2.

     A jury could reason as follows.  Defendant provided
an ASL interpreter two hours a day to interpret between Ms.
Friends and Ms. Wells, notwithstanding his belief that Ms.
Friends was not entitled to any accommodation to her
deafness, and notwithstanding the fact that an interpreter
was not needed for this reason.  Def. Facts ¶ 15.  It would
have cost nothing additional for defendant to allow that
interpreter to translate between Ms. Friends and the
claimants, which was necessary.  If defendant genuinely
believed that Ms. Friends' interviewing deficiencies were
independent of her inability to know that people said in
the interviews, it would have cost absolutely nothing
(beyond what the agency was already paying) to let Ms.
Friends have an ASL interpreter for two hours, or even one

hour, a day, so that Ms. Wells could compare Ms. Friends'
proficiency with and without an interpreter.


3.    Finally, a jury could find Ms. Walters'
conclusion to be unworthy of credence, and a pretext for
discrimination, because of the failure to rationally
respond to Ms. Friends' requests to make up for the lack of
training caused by the agency's earlier failure to
accommodate her deafness.  The regulations quoted require
the agency to offer assistance to the employee in improving
unacceptable performance.  5 C.F.R. § 432.104.

This was particularly important in Ms. Friends' case,
because she specifically requested the opportunity to
review the IVT training she had received as a GS 9.  Reply
Exh. 1 ¶ 21.

As defendant notes, the formal training consisted of
'interactive video training,' or IVT.  Unlike the other
trainees around the country, Ms. Friends was shut up in a
room by herself, unable to interact with colleagues.  Reply
Exh. 1 ¶ 2.  Although defendant states correctly that the
IVT production was close-captioned, there were two
problems.  First, the captions often obscured material that
was to be read on the screen.  Second, the captions were
often simply wrong:  for example, "Miss Sex" replaced

"MSSICS," and "palms" replaced "POMS." *Ibid.*
Unfortunately, both MSSCS and POMS are extremely important
terms of art within SSA, and it was impossible for Ms.
Friends to understand what was being discussed when totally
different words were showing up on the TV screen.

Ultimately, defendant gave in, and provide an ASL
interpreter for the last few months of the video training,
Reply Exh. 1 ¶¶ 2, 4, but Ms. Friends was still left with
the learning deficit caused by the original incompetent
captioning. When Ms. Friends later asked to review the IVT
tapes from the beginning, once she had a correct overview
of the subject, they were not provided. Reply Exh. ¶ 21.
The agency offered no substitute training.

A jury could find this failure to provide this
requested training meant that firing Ms. Friends because of
performance deficiencies was a pretext for discrimination.

CONCLUSION

Plaintiff's motion for summary judgment as to count I should be granted and defendant's motion for summary judgment as to counts I and II should be denied.

If judgment is not granted plaintiff on count I, a Rule 56(c) finding rejecting the undue hardship defense should be made.  Regarding count II, Rule 56(c) findings should be made holding that this is a mixed case under *Desert Palace* and that Ms. Friends made out a prima facie case of discrimination under *McDonnell Douglas.*

Respectfully submitted,

/s/

Phillip R. Kete
General Counsel, AFGE Local 1923
G-314 West Highrise
6401 Security Blvd.
Baltimore, MD  21235
D.C. Bar No. 375724
(410) 966-6500

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
ALICE ANN FRIENDS,             )
         Plaintiff,            )
                               )
         v.                    )
                               )  06-CV01762-ESH
MICHAEL J. ASTRUE,             )
         Defendant.            )
                               )
_____)
```

PLAINTIFF'S STATEMENT OF GENUINE ISSUES, IN RESPONSE TO

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT


Pursuant to LCvR 7(h) and 56.1, plaintiff submits this statement identifying those facts submitted by defendant which are in genuine dispute.


Def. ¶ 1: Undisputed.

Def. ¶ 2: Undisputed except for last clause. That clause, which claims that at her job interview Ms. Friends "professed to read lips very well," is contradicted by Pl. Reply Exh. 1 ¶ 1.

Def. ¶ 3: Nothing in either of the exhibits relied on by defendant refers to a person becoming a permanent employee. The question of whether all employees hired

under Schedule A (e.g., every attorney employed by the U.S. government) is subject to a two-year trial or probationary period, the completion of which leads to 'permanent' status, is purely one of law.

Def. ¶ 4.  Undisputed.

Def. ¶ 5.  Undisputed.

Def. ¶ 6:  The implicit claim that Ms. Friends was given the same training as hearing employees by virtue of the training broadcasts being close-captioned is contradicted by Pl. Reply Exh. 1  ¶ 2.  The rest of the paragraph is undisputed.

Def. ¶ 7:  The first two sentences are undisputed. The last sentence, to the extent is suggests that Ms. Ward mentored Ms. Friends throughout the "off-air" time four days a week, is contradicted by Pl. Reply Exh. 1  ¶ 3.

Def. ¶ 8:  The first sentence is contradicted by Pl. Reply Exh. 1 ¶¶ 2, 4, to the extent the sentence suggests ASL interpretation was provided throughout the classroom training.

Def. ¶ 9:  The claim that Ms. Ward resumed her role as Ms. Friends' mentor upon return from maternity leave is contradicted by Pl. Reply Exh. 1 ¶ 5.

Def. ¶ 10:  This paragraph cites an unsworn memorandum by Ms. Wells as evidence for Ms. Ward's alleged reasons for

ceasing to serve as Ms. Friends' mentor.  For purposes of
supporting a motion for summary judgment, an unsworn
document is not admissible as evidence for the truth of the
statements contained in it.  *Martin v. John W. Stone Oil
Distributor, Inc., 819 F.2d 547,* 549 (5th Cir. 1987).  In
addition, on a motion for summary judgment a court may not
properly consider hearsay evidence, even if it is contained
in affidavits and depositions.  *Automatic Radio Mfg Co.,
Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831 (1950).

Def. ¶ 12:  The claimed statement by Ms. Syphax to Ms.
Wells are inadmissible hearsay.  *Automatic Radio Mfg Co.,
Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831 (1950).

Def. ¶ 13.  The claim in the first sentence about Mr.
Walker finding errors is inadmissible hearsay.  *Automatic
Radio Mfg Co., Inc. v. Hazeltine Research, Inc.*, 339 U.S.
827, 831 (1950).

Def. ¶ 15.  The statement in the last sentence that
Ms. Friends has the same problem comprehending and
understanding deaf claimants, who communicated through ASL,
as she had with non-deaf claimants, is contradicted by Pl.
Reply Exh. 1 ¶ 6.  The balance of the paragraph is
undisputed.

Def. ¶ 16:  It is undisputed that on June 8, 2004, Ms.
Wells gave Ms. Friends a memorandum on the subject of

conduct, and that it threatened to fire Ms. Friends if her conduct did not improve.  The memorandum, Def.Exh. 10, cannot be used as evidence of the truth of the accusations contained in it.  *Martin v. John W. Stone Oil Distributor, Inc., 819 F.2d 547,* 549 (5th Cir. 1987).

Many of the accusations were simply false.  Pl. Reply. 7.

Def. ¶ 19:  It is undisputed that on June 28, 2004, Ms. Wells gave Ms. Friends a memorandum on the subject of performance, and that it threatened to fire Ms. Friends if her performance did not improve.  The memorandum, Def.Exh. 8, cannot be used as evidence of the truth of the accusations contained in it.  *Martin v. John W. Stone Oil Distributor, Inc., 819 F.2d 547,* 549 (5th Cir. 1987).

Def. ¶ 20:  It is undisputed that on September 10, 2004, Ms. Walters gave Ms. Friends a memorandum firing her for alleged poor performance.  Def. Exh. 11.  The memorandum cannot be used as evidence of the truth of the accusations contained in it.  *Martin v. John W. Stone Oil Distributor, Inc., 819 F.2d 547,* 549 (5th Cir. 1987).  In addition, as Ms. Walters acknowledged, the letter was written by an unidentified member of the personnel staff, who allegedly gathered the content from statements made by Ms. Wells.  On a motion for summary judgment a court may

not properly consider hearsay evidence, even if it is contained in affidavits and depositions. *Automatic Radio Mfg Co., Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831 (1950).

A number of the specific accusations in the September 10 letter are erroneous. Pl. Reply Exh. 1 ¶ 8.

Def. ¶ 21: What Ms. Walter's reasons for firing Ms. Friends are is one of the ultimate issues in this litigation, and they are addressed at length in the accompanying memorandum.

Def. ¶ 22: It is undisputed that on March 11, 2004, Ms. Friends made a written request for a full-time ASL interpreter and several other accommodations. It was clear to the agency official who denied the request that Ms. Friends was asking for an interpreter for claimant interviews. Def. Exh. 17; Def. Exh. 18 at 2-4.

Ms. Friends did not receive the April 29, 2004, letter until May 4, 2004. Def. Exh. 15; Pl. Reply Exh. 1 ¶ 9.

Def. ¶ 23: Undisputed.

Def. ¶ 24: Undisputed.

Def. ¶ 25: It is undisputed that one of the reasons given by Mr. France for denying the interpreter requests was that it would impose an undue hardship on the agency. It is not true that use of an ASL interpreter would

increase the time needed for each interview.  Pl. Reply
Exh. 1 ¶ 10.

Def. ¶ 26:  Undisputed:

Def. ¶ 27:  The statement that Ms. Friends first
sought EEO counseling on June 15, 2003, is contradicted by
the EEO counseling report at pages 1, 2, and 9.  Pl. Reply
Exh. 3.

As reflected in the first full paragraph of the
counseling report, Ms. Friends told the counselor that "she
has been discriminated against due to her disability.  She
has not received a full time interpreter . . ." Def. Exh.
21 at 1.  Thus, the single date recorded by the counselor
as the date of occurrence of the discrimination as June 8,
2004, is misleading.

Def. ¶ 32:  Undisputed.


Respectfully submitted,

/s/

Phillip R. Kete
General Counsel, AFGE Local 1923
G-314 West Highrise
6401 Security Blvd.
Baltimore, MD  21235
D.C. Bar No. 375724
(410) 966-6500


March 8, 2007

PLAINTIFF'S REPLY EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALICE ANN FRIENDS,                          )
          Plaintiff,                        )
                                            )
          v.                                )
                                            )    06-CV01762-ESH
MICHAEL J. ASTRUE,                          )
          Defendant.                        )
                                            )
                                            )

DECLARATION OF ALICE ANN FRIENDS IN SUPPORT
REPLY MEMORANDUM

1.    (Re. Def. ¶ 2).    At my employment interview, I
did not "profess to read lips very well."  The subject was
never even brought up.

2.    (Re. Def. ¶ 6).  I was not given training
equivalent to that provided hearing employees.  In contrast
to hearing employees, I was placed alone in a classroom,
unable to interact with peers.

The IVT sessions were not captioned well enough to be
the equivalent of what other students heard or what I could
understand if translated by ASL.  There were days when
there were no captions, and other days when captions were
missing for fifteen minute periods.  I discovered later

- 1 -

that many of the captions were garbled or used the wrong
words.

IVT stands for Interactive Video Training.  The students
watch live and taped video broadcasts on a TV monitor.
During the broadcasts there are opportunities to phone in
questions for the instructor.  I did not obtain that
opportunity until late December, when I was finally given
an ASL interpreter.

Normally there are several students and a "mentor" in
the room.  In my case I was in the room alone.  I watched
the training broadcasts on the "big screen" set.  There was
"closed captioning" appearing at the bottom of the screen.
The captioning must have been done live by a person
unfamiliar with any of  SSA's jargon and acronyms and this
was very confusing.  For example when the instructor used
the acronym "MSSICS" (Modernized Supplemental Security
Income Claims System) the caption read "MISS SEX".  This
accommodation of closed captioning was further flawed in
that the captioning would cover or obscure important data
being shown on the screen.  IVT isn't just a video of a
talking instructor.  Many times while the instructor is
speaking the screen shows a reproduction of a page of text,
or computer printouts and endless alpha-numeric coding
sequences; line after line, filling the screen.  Whenever

- 2 -

the captioning was on I could not read what was behind it,
so I was struggling to keep up with the illogical
captioning and simultaneously trying to see what was being
represented behind it.  This was also very stressful for my
one functioning eye after several hours.

Essentially, I did not have the full benefit of IVT
until late December, when the agency finally provided me an
ASL interpreter.

3.    (Re. Def. ¶ 7).    During the period of IVT, I
almost never had four hours a day of mentoring with Ms.
Ward.  For one thing, other employees often interrupted us.
For another, Ms. Ward was often called out to interpret
between other employees and deaf claimants, as well as to
help in other areas.    Ms. Ward often failed to answer
specific questions I had.

Ms. Ward can understand ASL, but has trouble correctly
using it herself:  specifically, she tends to switch back
and forth between hands, which is not supposed to be done
when signing because it is confusing to the other person.

4.    (Re. Def. ¶ 8).    Shortly after IVT training
began, I requested to be provided an ASL interpreter for
it.  An interpreter was not provided until late December
2002.

- 3 -

5.    (Re. Def. ¶ 10).  Ms. Ward did not resume her role as my mentor when she returned from maternity leave.

6.    (Re. Def. ¶ 15).  It is not true that I had problems and made errors in comprehending, understanding and applying what was being said by deaf claimants.

7.    (Re. Def. ¶ 16).  The June 8 memorandum does not accurately identify any instances in which I was intentionally defensive, argumentative, or disrespectful towards my mentors and supervisors.  Specifically:

(a)  It is not true that I was extremely defensive and argumentative with Mr. Walker.  It is true, however, that Mr. Walker, in contrast to Ms. Wells, often failed to look at me when he spoke, making it almost impossible to read his lips.  In addition, he clearly did not want to be my mentor, and it was extremely difficult for me to get time with him.

(b)  In the November 2003 incident, I did not intend to imply that one of my co-workers had taken my black bag, nor did I intend to accuse any of them of doing so.  It is possible that either my imperfect control of voice tone or the fact that at times I use ASL grammar when speaking may have led to misunderstandings in this incident.  If Ms. Wells and I had been able to discuss this incident with the help

- 4 -

of an ASL interpreter we might have cleared up the understanding.

(c)   In the February 2004 incident, it appears that Ms. Wells interpreted the word "whatever" as dismissive or disrespectful, despite the fact that I intended only to communicate that I was happy to do whatever she wanted me to.  If Ms. Wells and I had been able to discuss this matter with the help of an ASL interpreter we might have cleared up the understanding.

(d)   Coffee club.  I did not intend to accuse any of my co-workers of using the milk in the refrigerator. In fact, at the time of the incident I had never used the refrigerator.  Instead, I merely asked what the rules were when using the refrigerator.

(e)   April 28, 2004 incident:  I did mistakenly believe a file was on a colleague's desk rather than my own, and I acted consistent with that belief.

8.     (Re. Def. ¶ 20).  With respect to the September 10, 2004, letter:

(a)   There was a case in August 2004 where the claimant had a criminal record.  He and his social worker said he was in a halfway house, but they

- 5 -

presented me a document saying he was on parole until
April 2029 (not 2007), but did not indicate that he
was within the prison system. I don't know what Ms.
Walters means when she says I was "looking to see if
the halfway house was shown with a living
arrangement." I did begin looking up the POMS to find
out what to do given the discrepancy between what the
claimant said and what the documents said.

(b) I had been taught by Ms. Ward that I was not to
do the PERC in the type of case referred to in the
paragraph beginning on the bottom of page 5 until the
parent brought in the custody papers.

(c) I did not fail to ask a claimant whether she was
living in a public assistance household, as alleged by
the second paragraph on page 6.

(d) With respect to the allegation in the last
paragraph of page 6, I do not believe it is true that
there had been a similar case a few weeks earlier.


9.   (Re. Def. ¶ 22).   As reflected in Def. Exh. 15,
I did not receive the April 29, 2004, letter until May 4,
2004.

10.   (Re. Def. ¶ 25).   Use of an ASL interpreter
would not increase the amount of time necessary for

- 6 -

conducting claimant interviews. In fact, ASL interpretation is done simultaneously. In my case, use of the interpreter would have reduced the amount of time, by eliminating the need to repeatedly check whether I had correctly understood the claimant, as well as reducing the time lost because of mistakes.

11. (Re. Def. ¶ 27). On June 9, 2004, I called Ms. Debra Harrison in the Office of Civil Rights and Employment Opportunity to initiate counseling regarding, among other things, the agency's failure to provide me an ASL interpreter for claimant interviews.

12. (Re. Def. ¶ 31). As noted above, in ¶ 1, I did not "profess to read lips very well." The subject never even came up.

13. (Re. Def. ¶ 32). As noted above, in ¶ 2, because of the agency's failure to accommodate my deafness, I was not given the same quality training as hearing students were. I had poor captioning on the IVT; for several months I had no ASL interpreter; my mentor was often unavailable.

14. (Re. Def. ¶ 34). Although my first written request for an ASL interpreter was March 11, 2004, I in fact had repeatedly made oral requests for an interpreter for claimant interviews beginning in October, 2003.

- 7 -

15.   (Re. Def. ¶ 40).    See ¶ 12.

16.   After October 2003 Mr. Walker often stated that I
was making mistakes a GS 11 should not make, and asking
questions a GS 11 should not have to ask.  He consistently
criticized my performance against the standards expected of
GS 11 employees.

17.   In February 2004 Ms. Wells told me orally that I
was failing to perform the critical elements of my position
at the GS 11 level.  She did not tell what the performance
standards were or how far I was falling short.  She did not
offer me any assistance in reaching those standards.

18.   Neither Mr. Walker nor Ms. Wells functioned as a
mentor, in the sense of trying to help me.  On the
contrary, both of them repeatedly criticized me for even
asking them questions about how to handle specific
problems.

19.   Ms. Syphax was my mentor for about three days,
not for two weeks.  I believed at the time that she
withdrew from service as my mentor because of the press of
her other assignments.

20.   Reply Exhibit 2 is Article 21 of the SSA-AFGE
contract that was in effect from 2000 to 2005.

21.   In mid-2004 I asked management to provide me a
copy of the tapes of the IVT training, so that I could

- 8 -

review them in light of what I had learned since.   The

tapes were not provided me.

I declare under penalty of perjury that the above
statements are true.

_____Alice Ann Friends_____         3-5-07
ALICE ANN FRIENDS                        DATE

– 9 –

PLAINTIFF'S REPLY EXHIBIT 2

# Article 21
# Performance

## Section 1—Overview

SSA will strive for continuous improvement in agency performance to fulfill SSA's commitment to providing quality public service. Accomplishment of the agency mission is intended to be achieved within an environment that recognizes the interdependence of employee contributions and thus promotes teamwork.

Improvement in agency performance will be sought by analyzing work processes and correcting systemic problems and/or revising processes, as appropriate. Consistent with SSA's commitment to an environment that promotes teamwork, the accomplishment of group or team objectives will be the cornerstone of performance assessment.

To promote teamwork and eliminate employee competition fostered by the agency's traditional 5-level system, a simplified performance assessment system will be employed. The purpose of the performance assessment system agreed to in this article is to provide a framework for honest feedback and open, two-way communications between employees and their supervisors. The system focuses on contributions within the scope of the employee's job description in achievement of SSA's overall service mission. Accomplishment of objectives is intended to be achieved within a teamwork environment. The assessment system includes an annual written certification of achievement for each employee. The main emphasis of this system is day-to-day interaction among employees and supervisors which includes the implementation of modern and flexible work practices where the agency's objectives are emphasized by progressive personnel management.

Clearly, this Article describes an assessment system that is a marked departure from all previous systems. The parties intend for it to be viewed as a positive building block in the foundation of a new relationship based on shared interests and mutual objectives.

The assessment system will emphasize:

    o Employee Development;

    o Administrative Simplicity;

    o The evolution of the supervisor's role to team leader and coach;

    o Overall employee contributions rather than one or more "Generic Job Tasks;"

    o Recognition of special skills and contributions such as translation and interpretive activities done as part of or in addition to regular job duties;

    o Group goals, not generic job tasks.

In short, individuals will be viewed "holistically," in a performance environment that is meant to accentuate the positive.

Article 21

140

The assessment system will not:

> o Be used as a disciplinary tool;
>
> o Foster individual competition--rather it will encourage unit and group achievement of the Agency's Mission;
>
> o Be based on numerical goals and/or numerical performance levels;
>
> o Be punitive, adversarial or labor-intensive.

An annual certification of "successful" assures employees of entitlement to within-grade increases, basic eligibility for promotion consideration, basic eligibility for award consideration and serves as a positive, tangible assertion that the employee is in good standing.

## Section 2--Policy

A. The provisions of this article apply to all bargaining unit employees in the competitive and excepted service, including wage system employees, except employees excluded by law or 430.101 CFR.

B. The employee performance system in its entirety and its application will be fair, equitable, reasonable and related to the employee's position description.

## Section 3--Communications

A. Every bargaining unit employee will receive orientation(s) regarding his or her job functions and responsibilities.

1. The orientation briefing will be provided by the employee's supervisor and will be an oral discussion to explain, clarify and communicate the employee's job responsibilities so there is a clear and common understanding of the duties and responsibilities contained in the employee's position description (PD).

2. At a minimum, each employee will receive an orientation briefing annually, at the beginning of the assessment period or upon entering on duty. The supervisor will assure that the employee has an up-to-date position description and will initiate a dialogue with the employee to discuss the employee's duties and responsibilities in relation to SSA's mission.

3. Critical job duties and responsibilities will be identified from each PD in accordance with Article 4, Section 3. The critical job duties and responsibilities will be annotated on the written PD. The PD will be presented to and discussed with the employee in the orientation session. The critical job duties and

responsibilities communicated will be consistent for standard or like positions, to the maximum extent feasible. Variations from the standard or like position will be based on real differences in the job.

4. Subsequent orientation sessions should be held when there is a change in the work situation such as:

    o a change in the supervisor of record,

    o when detailed,

    o a change in the component's goals or objectives,

    o a change in assignments,

    o a change in the work process or product of the component,

    o a change in the composition of the work team,

    o when seasonal employees return to duty, or

    o when an employee returns from an extended absence of 90 days

    or more.

B. Informal discussions are a standard part of supervision and should occur throughout an assessment period.

1. Discussions may be initiated by the supervisor or employee. Discussions may be held one-on-one or between a supervisor and a work group.

2. Discussions should be a candid, forthright dialogue between the supervisor and employee(s) aimed at improving the work process or product. The discussion will provide the opportunity to assess accomplishments and progress and identify and resolve any problems in the employee's or work team's work product. Where indicated, the supervisor should provide additional guidance aimed at developing the employee(s) and improving the work product or outcome. Discussions will provide the employee the opportunity to seek further guidance and understanding of his or her work performance.

## Section 4—Mechanics

A. All "successful" bargaining unit employees will receive an annual performance certification for the period October 1 through September 30, thereby certifying that the critical job duties and responsibilities have been performed at an acceptable level. The certification will be issued in writing to the employees within 30 days of the end of the assessment period. New employees to the Agency will receive a certification upon

completion of 90 days.

B. When assessing performance, the employer will consider factors which affect performance that are beyond the control of the employee.

C. Formal progress reviews will not be required unless the supervisor believes the employee is not performing in a successful manner.

## Section 5--Uses of the Performance Assessment System

This performance assessment system is used for making a basic determination that an employee is in "good standing." It is also the basis for making certain personnel-related decisions.

A. Within-Grade Increases - An employee who has attained an assessment of "Successful," has achieved an "acceptable level of competency," and will be entitled to appropriate within-grade increases.

B. An assessment of "Successful" will be used as the initial factor in determining basic eligibility for consideration of appropriate awards, promotions, and other personnel actions.

C. This performance assessment will be considered in making determinations regarding reductions-in-force (RIFs) within the Agency in accordance with Article 14 of this agreement.

## Section 6--Performance Assistance

The parties understand that determining unit, office, and/or component success may require the collection and analysis of data. The focus of data collection will be on the processes and not on the individual employee. However, the data may indicate repeated problems at a particular point in the process attributable to a specific job family and/or individual employee.

A. If data clearly points to significant performance-related problems of an individual employee, the supervisor will schedule a meeting with the employee and inform the employee of the purpose of the meeting and that he/she may request the assistance and presence of a union representative at this meeting.

B. The supervisor, employee, and, if requested, a union representative, will meet to identify the specific problem, determine the root cause, and develop a written assistance plan to resolve the problem. Travel and per diem expenses for union representation will be paid. Local representatives will be used to the maximum extent possible.

C. The assistance plan will afford the employee a reasonable opportunity of at least 90 days to resolve the identified performance-related problem. For seasonal employees, this period will be not less than 90 days in non-furlough status. During this period, the

C. At any time during the PEP period, the supervisor may conclude that the employee's performance has improved to the Successful level and the PEP can be terminated. In that event, the supervisor will notify the employee in writing.

## Section 8--Adverse Action

A. Should all remedial action fail and the employee's performance is determined to be unacceptable, the supervisor will issue a certification of unacceptable performance to the employee and the employee may be liable for adverse action. One of the following actions may be pursued:

1. When the employee is capable of performing another position of the same grade, the supervisor may propose to reassign the employee to such a position.

2. When the employee is not capable of performing any position at the same grade but is capable of performing a position at a lesser grade, the supervisor may propose a demotion to a position at the next lower grade.

3. If neither (1) nor (2) above is feasible, the supervisor may propose a removal or demotion to a lesser grade.

B. An employee who is reassigned or demoted to a position at a lower grade will be issued a performance assessment certification 90 days after assignment to the new position.

C. An employee whose reduction in grade or removal is proposed for unacceptable performance is entitled to:

1. 30 days advance written notice of the proposed action which identifies the specific basis (i.e., the critical job duties and responsibilities) for the proposed action including specific instances of unacceptable performance.

2. A representative. The employee must inform the deciding official, in writing, of the representative's name.

3. A reasonable time, not to exceed 20 days, to answer orally and in writing.

The decision to retain, reduce in grade, or remove an employee shall be made within thirty (30) days after the date of expiration of the notice period.

D. The employee will be given a written decision which :

1. specifies directly or by reference the instances of unacceptable performance on which the decision is based; and

Article 21

145

2. unless proposed by the Head of Agency, has been concurred in by the superior of the proposing official; and

3. specifies the effective date, the action to be taken, and the employee's right to appeal the decision.

E. The employee may appeal to either the Merit Systems Protection Board in accordance with applicable law, or the Union, on behalf of the employee, may timely file a written request to invoke arbitration under the terms of this article. The choice of appeal forum is irrevocable. An employee shall be deemed to have exercised the appellate option at such time as the employee timely initiates an appeal under the statutory procedure or the Union, on behalf of the employee, timely files a written request to invoke arbitration, whichever occurs first. Arbitration must be invoked no later than 30 days after the effective date of the action unless EEO counseling is initiated pursuant to Article 24, Section 8.

PLAINTIFF'S REPLY EXHIBIT 3

# SOCIAL SECURITY ADMINISTRATION
## EEO COUNSELING REPORT

| | | |
|---|---|---|
| 1. TO:<br><br>Agnes P.Sampson,CREO MGR<br><br>300 Spring Garden ST.<br>Philadelphia, PA. 10106 | 2. FROM:<br><br>Victoria Monroe-Panckeri<br>EEO Counselor,<br>Office of Hearings and<br>Appeals<br>2 North Second St.,8th Fl.<br>Harrisburg,PA 17101 | 3. DATE COUNSELING FIRST SOUGHT:<br><br>6/15/04 *(w/pre)*<br><br>*creo 4/9* |
| | | 4. DATE OF FIRST INTERVIEW:<br><br>8/10/04 |

**5. EMPLOYEE/APPLICANT NAME AND ADDRESS:**

Alice Ann Friends
182 Postings Way
Charleston,W.VA 25414

TELEPHONE: 304-728-0482          SSN: 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

POSITION/TITLE: Claims Representative          SERIES/GRADE:GS-11

| | |
|---|---|
| 6. ORGANIZATION AND ADMINISTRATIVE CODE OF OFFICE WHERE ALLEGED DISCRIMINATORY ACT OCCURRED:<br><br>Social Security Adminsitration<br>Postal Plaza,1905B 9th St.NE<br><br>Washington, D.C. 20018<br><br>*Relay (711) 202-233- 2046*<br>*Work 202 - 233-2011* | 7. CHECK IF EMPLOYEE ELECTS A REPRESENTATIVE: ☒<br><br>REPRESENTATIVE NAME, ADDRESS:<br><br>Bruce Williams,SSA,AFGE REP<br><br>2100 M.ST.NW<br>Washington, DC 200 37<br><br>EMPLOYEE? (Check One)  ☒ YES     ☐ NO<br>TELEPHONE: 202-653-2002 |

**8. TYPE OF DISCRIMINATION (Basis) –** Select from one or more of the following:

| | |
|---|---|
| ☐ Age ___ years | ☐ Race - Black |
| ☐ Color | ☐ Race - White |
| ☐ Mental Disability | ☐ Race - Amer. Indian |
| ☒ Physical Disability | ☐ Race - Asian/Pac. Is. |
| ☐ National Origin - | ☐ Race - Other |
| Hispanic | ☐ Religion |
| ☐ Sex - Male | ☐ Retaliation/Reprisal |
| ☐ Sex - Female | ☐ Other: |

**9. MATTER CAUSING COMPLAINT (Issue) –** Select from one or more of the following:

| | |
|---|---|
| ☐ Assignment of Duties | ☐ Reassignment |
| ☐ Awards | ☐ Reinstatement |
| ☐ Conversion to FT/CC | ☐ Reprimand |
| ☐ Duty Hours | ☐ Non-selection |
| ☐ Evaluation/Appraisal | ☐ Retirement |
| ☐ Examination/Test | ☐ Separation |
| ☐ Initial Appointment | ☒ Harassment (Non-sexual) |
| ☐ Pay (Including Overtime) | ☐ Sexual Harassment |
| ☐ Equal Pay Act | ☐ Suspension |
| ☐ Promotion | ☐ Time/Leave Attendance |
| ☒ Reasonable Accommodation (Handicap) | ☐ Training |

*Hostility*

**EXHIBIT 2**
**Page 1 of 7 pages.**

SS. 84-48-6282

COMPLAINANT'S NAME: Alice Ann Friends

10. HAS COMPLAINANT FILED A GRIEVANCE UNDER THE NEGOTIATED GRIEVANCE PROCESS? ☐ YES ☒ NO (Check One)
   IF YES, PROVIDE A COPY AND GIVE DATE GRIEVANCE FILED: withdrew

   HAS COMPLAINANT FILED AN APPEAL WITH THE MERIT SYSTEMS PROTECTION BOARD? ☐ YES ☒ NO (Check One)
   IF YES, PROVIDE A COPY AND GIVE DATE APPEAL FILED:

11. CHECK HERE IF COMPLAINANT WISHES TO REMAIN ANONYMOUS DURING COUNSELING: ☐     N/A

12. DETAILED DESCRIPTION OF COMPLAINT (Include specific allegation(s) with date(s) of
   occurrence and the date(s) complainant became aware of the incident(s) from which the
   complaint arose.  Also indicate relief desired.)

   DATE(S) OF OCCURRENCE (See Instructions): 6/8/04

Reference is made to attached documentation, including and specifically the attached June 8, 2004 memorandum.

Ms. Friends first sought counseling on 6/9/04 after receiving this memo. There is also reference made to the May 18, 2004 memorandum for Reasonable Accomodation from Ms. Wells. Ms. Friends feels that she has been discriminated against due to her disability. She has not received a full time interpreter, proper training, effective mentoring and feels that the work environment as been hostile to her. The attachments show that it was a struggle for her to be assigned an interpreter. She states that the initial training was IVT with bad captioning and poor references to POMS; it was inadequate! Further, she feels that the mentoring was done in a hostile manner with derogatory comments made, and no positive directives. Mr. Walker had also made reference to her work as a mess, his notes with directives were not clear or legible. Presently, she is being mentored or reviewed by Ms. Wells and feels a great deal of stress. Her representative questions where this review was being done to terminate Ms. Friends. Ms. Friends seeks: a full time interpreter, refresher training, effective mentoring and relocation to another SSA office specifically Frederick, Maryland.

Ms. Friends indicated that Ms. Wells had questioned her about whether she was happy working there; indicated that as a GS-11 Ms. Well had certain expectations of Ms. Friends. Ms. Friends stated that she was only there for 2 years. That she is a employee with a master's degree who loves this job, wants to continue in the job, and has worked hard/struggled to attain it. She is thankful to be a CR, proud to be there, is up to the challenge and wants to continue with it. She was frustrated and stressed because of the lack of proper training and help.

   She also wondered if she'd be a better title II CR!

CHECK HERE IF CONTINUED ON ATTACHED FORM ☒

13. COMPLAINANT'S SIGNATURE ACKNOWLEDGING
   RECEIPT OF RIGHTS AND DESCRIPTION OF
   ISSUES TO BE COUNSELED:

   _Alice Ann Friends_
   SIGNATURE AND DATE

14. COUNSELOR'S SIGNATURE (Initial Interview)     Interview 8-10-04

   _Victoria Morse-Parker_
   SIGNATURE AND DATE     9-10-04

EXHIBIT 2
Page 2 of 11 pages.

SSN: 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

COMPLAINANT'S NAME: Alice Ann Friends

12.    DETAILED DESCRIPTION OF COMPLAINT (Continued)

LIST OF THOSE CONTACTED PER COMPLAINANT REQUEST:

1) Ms. Robin Wells, SSA Manager, Washington,DC Postal Plaza Field Office, GS-13
Phone:202-233-2012

2) Mr. Monte Buddy Walker, Management Support Specialist, GS-12
Washington DC Postal Plaza Field Office
Phone 202-233-2012

3) Jeff Landes, SSA Labor Relations Specialist, Philadelphia, PA #215-597-4006 and Ms. Judy Nease,retired former
manager of SSA Washington DC Postal Plaza Field Office phone 410-848-8137. Ms. Nease hired Ms. Friends

TODAY 9-10-04, MS. Friends contacted me and advised that she was terminated effective 9/17/04.

EXHIBIT   2
Page 3 of 11 pages.

COMPLAINANT'S NAME: Alice Ann Friends

SSN: 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

## CONTACTS DURING EEO COUNSELING INQUIRY:

| ...E(S) OF CONTACT | NAME, TITLE, GRADE, TELEPHONE, MAILING ADDRESS | REASON FOR CONTACT | TIME SPENT |
|---|---|---|---|
| | NAME:     TITLE:     GRADE: ADDRESS: TELEPHONE: LIST ABOVE | Complainant | |
| | NAME:     TITLE:     GRADE: ADDRESS: TELEPHONE: | Complainant | |
| | NAME:     TITLE:     GRADE: ADDRESS: TELEPHONE: | Complainant | |
| | NAME:     TITLE:     GRADE: ADDRESS: TELEPHONE: | Complainant | |

*see list Previous Page*

CHECK HERE IF CONTACTS CONTINUED ON ATTACHED FORM ☐

16. INFORMATION DEVELOPED DURING INQUIRY:

There has been several e-mails between the complainant, representative and counselor on this case, as well as contacts to CREO regarding this matter-dates not listed. Interview with Ms. Wells, Manager, on September 7, 2004, she indicated that she is now mentoring Ms. Friends herself, and that she is well versed in Title 16 program. We ...ussed the request for a full time interpreter which she stated was initially denied by SSA disability services and then reassessed and approved. SSA policy is not more than 32 hours a week during mentoring, training and ...ings but not in interviews. Ms. Wells stated that Ms.Friends was provided an interpreter in training and meetings from the beginning. She stated she has daily session with her with an interpreter since March 2004. She is mentoring her because Ms. Friends had difficulty with her prior mentor. She has had 3 mentors. Ms. Wells stated that there are expectations of a CR at a GS -11. She discussed this with her so she realized the expectations but did not expect her to operate as a CR who has been there for years. As a manager, this discussion takes places as it would routinely when a promotion takes place as a routine review of the necessary critical elements of a position. She further stated that Ms. Friends has difficulty with the fundamentals of the SSI program. SEE ATTACHED

*See Attached*

*9/10/04 spoke to Ms. Friends on Relay today but not w/Representative he was unavailable*

CHECK HERE IF CONTINUED ON ATTACHED FORM ☒

| 17. DATE OF FINAL INTERVIEW  *9-10-04* | 18. TOTAL HOURS SPENT COUNSELING  *9 hrs* | 19. REPORT ☐ MAILED ☐ DELIVERED |
|---|---|---|
| SIGNATURE OF COUNSELOR AND DATE OF REPORT  *Victoria Monroe-Parekeri* | 21. EMPLOYEE/APPLICANT ACKNOWLEDGES RECEIPT OF FINAL COUNSELING REPORT (Signature and Date)  *Alice Ann Friends  9/17/04* | |

EXHIBIT 2
Page 4 of 11 pages.

-3-

*✱ Will do another next week with Representative*
*...w Ms. Friends w/Relay today re: Report*

CONTINUATION- ALICE ANN FRIENDS EEO COMPLAINANT    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

MS. WELLS INTERVIEW- continued:

Alice Ann Friends had another mentor prior to Mr. Walker. The mentor was also a deaf CR familiar/sound with the SSI program and familiar with sign language. Prior to that, there was another mentor who was proficient in Title 16. There was a conflict with all the mentors and allegations of improper training. Ali did not want to take the responsibility for her work. Therefore, there was no else to train Ms. Friends but Ms. Wells who is familiar with the program. This is not a campaign to fire her. Ms. Wells also mentions that this is a small office with limited time and personnel.  Upon review of the cases, Ms. Wells discovered that every single case had a payment or determination error. All customers of SSA who applied would receive incorrect payment or eligibility determinations. She wants Ms. Friends to be trained and understand the fundamentals to progress to be a successful CR and stop claimant's from being disadvantaged. Ms. Wells notes upon daily review of the claims, Ms. Friends was not getting correct information from the claimants to render correct determinations so she sat in on interviews. She has received refresher mentoring and all of her cases were reviewed. She does not think that she's capable of doing the CR job in any program, when I inquired about Title II CR Positions. Ms. Friends does not refer to the agency mandate of POMs and Policy Net as references since she does not seem to comprehend the text.

We discussed office hostility toward Ms. Friends and Ms. Wells has not observed it. She has made other employees uncomfortable with her communication. She has also stated to management upon direction-"whatever". The MSS Mentoring and style that she alleges was problematic was discussed with her and Mr. Walker with Ms. Wells and corrected to Ms. Friend's satisfaction.

Regarding full time interpreters or the same individual interpreter- this is not an agency policy!  Ms. Friends has the use of an interpreter during mentoring, meetings and training (Appx. 2 hrs. a day). There is no option for relocation to Frederick, MD since this is not a local decision. Ms. Wells states that she is receiving refresher training and mentoring now!

Bruce Williams, her AFGE representative stated that the agency demonstrated on going discrimination to her. She was initially not provided with an interpreter for her disability/ deafness. Reasonable accommodation was not provided and training was inadequate for her. The June 8, 2004 Memorandum to her was a lack of good faith and demonstrated hostility by management.

Monte Buddy Walker, MSS, Washington Postal SSA Office, was her former mentor. I spoke to him on September 10, 2004. There were two prior mentors before him. She had problems with them and one was also deaf. He tried to assist her for 4 months. He has an SSI background and tried to provide support. He has not seen evidence of hostility to her, but notes she has been hostile to others. There have been payment problems with her caseload. He did not feel that he was derogatory to her and has tried to be helpful. He does not feel that she would be better as a Title II CR. He was present at her initial interview, and states that she stated she could read lips and understands clearly-there was no impression that she would need a full time interpreter. He further states that there is 100% review of all of her cases and that they are incorrect, deficient in basic SSI standards. (Never once had any case returned that was write-back).

Jeff Landis, SSA, RO, Philadelphia, Labor Management/Team Leader, he was responsible for the reasonable accommodations, specifically for interpreters and provides the Agency policy to assist management.

September 9, 2004, I spoke to Judy Nease, retired former SSA Manager who stated that Ms. Friends was hired by her.  She feels that possibly she was not given a fair shake by the agency or given the full opportunity to become a competent CR. She states that the initial IVT training has poor captioning, and that she would have needed more hands on training -not being alone in a room. The Interpreter was only available for 4 weeks. Ali is from a deaf community, and does not have the same understanding as the other deaf CR who was raised in a hearing community. There were personality clashes with the mentors and that the office is short staffed and time is an issue. She states that to be competent in a CR position takes at least 2 years. Possibly with relocation and proper training Ms. Friends

EXHIBIT    2
Page 5 of 11 pages.

has the potential to be a competent CR.  She does not think that Ms. Friends can be hostile but maybe frustrated. She also stated that Ms. Robin Wells was a competent manager.

# NOTICE OF RIGHTS

Informal pre-complaint EEO counseling is voluntary. It is, however, a mandatory requirement for filing a formal EEO complaint. You must contact an EEO Counselor within 45 calendar days of the incident, decision, event or action giving rise to the complaint. You have the right to remain anonymous during informal EEO counseling. Anonymity may unduly restrict the EEO Counselor in achieving an informal resolution of the claim(s) you have raised. If you choose to remain anonymous, your name will appear only on this form and the EEO Counseling Report, of which only you and the EEO Manager where your counseling matter(s) arose will have a copy. However, if you file a formal complaint there is no right to anonymity and the formal complaint will not be regarded as confidential.

The EEO Counselor is a neutral party in the discrimination complaint process and does not serve as a representative for you or management. You have the right to be accompanied, represented, and advised by a representative of your choosing at every stage of your complaint. You, your representative, and your witness shall be free from restraint, intimidation, interference, coercion, discrimination, or reprisal in the presentation and processing of a complaint, including EEO counseling, or any time thereafter. If you have a representative, it is your responsibility to provide written notice of his/her name, address, and business telephone; and it is also your responsibility to provide written notice of all changes in your representation.

If you do not receive EEO counseling beyond the initial interview, nothing more will be done than that which is reported to you today. If you do receive further EEO counseling, the Counselor will have 30 calendar days from the date of your initial contact to attempt to informally resolve your claim(s). The 30-day period may be extended to 90 days if you agree. On or before the 30th day, the EEO Counselor shall inform you of the right to file a formal discrimination complaint if you have not agreed to an extension.

You have the right to choose between Alternative Dispute Resolution (ADR) and EEO counseling, where the Agency agrees to offer ADR in the particular case. Participating in ADR is voluntary and if both parties (you and management) elect ADR, the pre-complaint process period will be extended to 90 calendar days or until completion of the ADR process. After ADR or EEO counseling is complete, you will have the right to file a formal complaint. If you file a formal complaint, ADR may also be available.

Your or your representative will receive the investigative file within 180 days from the date your formal complaint is accepted, or if your complaint is amended, within 180 days after the last amendment, not to exceed 360 days. You will have 30 days from the date your or your representative receive the file to request a hearing and decision from an administrative judge (AJ) or an immediate final agency decision. Your request for a hearing should be made directly to the appropriate Equal Employment Opportunity Commission (EEOC) office.

## Notice to Members of Collective Bargaining Units

Members of collective bargaining units may be entitled to elect between filing a formal EEO complaint and filing a grievance. If the agreement with your union covers equal employment and discrimination matters, you may elect to file a formal EEO complaint of discrimination under 29 CODE OF FEDERAL REGULATIONS (CFR) PART 1614 or to file a grievance in writing, under the negotiated grievance procedure. You may not do both. Whichever one you file first will constitute your election.

When you file a formal discrimination complaint with the Agency; i.e., the Office of Civil Rights and Equal Opportunity, or when you file a grievance with your union, you have exercised your election. Consequently, merely obtaining EEO counseling will not indicate your election of the EEO complaint process instead of the grievance process. However, if the contract with your union allows, you may omit pre-complaint EEO counseling and file your grievance in writing without EEO counseling; or, you may file your grievance in writing while EEO counseling is in progress. In either case, filing your grievance in writing will constitute your irrevocable election to give up the right to file an EEO complaint of discrimination on the same matter, whether or not you allege a protected discriminatory basis. The election to file a formal EEO complaint or grievance, as described, applies only to bargaining unit members; it does not apply to employees who must file grievances under 5 CFR Part 771 and who are not bargaining unit employees.

## Mixed Case Complaint

If you have been subjected to an action appealable to the Merit Systems Protection Board (MSPB), and you believe the basis for that action is discriminatory, you may elect to file a mixed case complaint with MSPB. You have 20 calendar days from the date of the alleged discriminatory act to file a mixed case appeal with MSPB or 15 calendar days from the date of the final counseling interview or 30 calendar days from the date of your initial contact with the EEO counselor. You may not file both an MSPB and a formal EEO complaint on the same matter. Whichever one you file first will constitute your election.

## Right to File a Civil Action Under the Age Discrimination in Employment Act (ADEA)

If you believe you have been subjected to prohibited age discrimination, you may file either a grievance if appropriate, an administrative complaint, or a civil action in the appropriate U.S. District Court. If you file an administrative complaint based on age alone, you must exhaust the administrative processing of your complaint before filing a civil action; and, the administrative processing and appeal cannot include attorney fees should you prevail. If you elect to file a civil action initially, you must, <u>within 180 calendar days</u> of the alleged discriminatory act, give the EEOC at least <u>30 calendar days</u> prior notice of your intent to sue before filing the civil action.

### Equal Pay Act

You have the right to file directly with a U.S. District Court on claims of sex-based wage discrimination under the Equal Pay Act even though such claims are cognizable under Title VII. (Sex-based claims of wage discrimination may also be raised under Title VII; individuals so aggrieved may thus claim violations of both statutes simultaneously.)

### Right to Court-Appointed Attorney

If you elect to file a civil action under ADEA, Title VII, or the Rehabilitation Act, you may appeal to the U.S. District Court for appointment of an attorney to represent you in the court proceeding. The court may appoint an attorney to represent you and may permit commencement of the civil action without payment of fees, costs or security.

### Privacy Act Notice

### General

This information is provided pursuant to the Privacy Act of 1974 for individuals supplying information for inclusion in a system of records.

### Authority

The authority to collect the information requested by the EEO Counselor is derived from one or more of the following: 42 USC 2000e; 29 USC 633a; PL 95-602 as amended; 5 USC 1303 and 1304; 5 CFR 5.2 and 5.3; 29 CFR 1614.105; and Executive Order 11478 as amended.

### Purposes and Uses

The information supplied will be used to resolve the EEO counseling matter(s) you have raised during counseling. This information may be discussed with designated officers and employees of SSA in order to resolve the matters you have raised. If you file a formal EEO complaint, this form and all enclosures will be made part of your EEO complaint file and will be available to any person having a need to know its contents. Formal complaints are neither anonymous nor confidential. Whether or not you file a formal EEO complaint, this form and enclosures, if any, may be used in a depersonalized manner as a database for program analysis, review, evaluation, and statistics. If you have not chosen anonymity and there is a need to disclose information from your EEO counseling report(s) for reasons other than those which have been cited or for reasons cited in the Privacy Act (5 USC 522 a (b)), your prior consent will be solicited.

### Effects of Non-disclosure

Disclosure of the information sought is voluntary. However, since informal pre-complaint EEO counseling is mandatory, failure to disclose information may result in rejection of the formal EEO complaint in whole or in part.

*The signatures affixed below affirm complainant has been given his/her rights and a notice of ADEA rights.*

Complainant : _[signature]_     Date: 8/19/04

Representative : _[signature]_     Date: 8/19/04

EEO Counselor : _____     Date: _____

Subject:                Extension of Counseling Agreement

Memorandum For: _Record - A Friends_

From:       EEO Counselor
         _V. monroe-Parker_

1. By signing this agreement, you agree to allow me up to an additional <u>60 calendar days</u> to complete counseling. This will extend the counseling period to a maximum of <u>90 calendar days.</u> At or before the end of this period, the final interview will be conducted and you will be advised of your further rights.

2. This voluntary agreement means that counseling on the matter(s) you first brought to my attention on _6-9-04 (1st Request_ will be completed no later than _9-9-04_ , 90 calendar days form initial contact.


_A. Friends_                          _8/19/04_
_____              _____
Signature of Person Counseled           Date



_Victoria Monroe-Parker_              _8-2-04_
_____              _____
Signature of EEO Counselor              Date

EXHIBIT __2__
Page _9_ of _11_ pages.

TOTAL P.04

# NOTICE OF RIGHT TO FILE A FORMAL COMPLAINT OF DISCRIMINATION

An SSA employee or applicant for employment who believes he or she has been discriminated against on the basis of race, color, religion, sex, national origin, age, physical or mental handicap, reprisal for having participated in the statutory EEO process, or sexual orientation, marital status, political affiliation, parental status* in a matter or condition of employment has the right to file a formal complaint of discrimination under either the statutory procedure or under the negotiated grievance procedure, but not both.

## Requirements for filing under the statutory procedure are as follows:

**Step 1:** If you are not satisfied with the results of the pre-complaint process of your EEO complaint, you may file a formal complaint. Your formal complaint must be filed <u>within fifteen (15) calendar days</u> after the date you receive this Notice of Rights and the EEO Counseling Report. <u>Your complaint must be in writing and signed by you with a copy of the EEO Counseling Report attached.</u> Only claims raised at the pre-complaint stage or claims that are like or related to them may be the subject of a formal complaint. Rejection of an agency's offer of resolution made pursuant to 1614.109(c) may result in the limitation of the agency's payment of attorney's fees or costs. Your complaint must be mailed or delivered to the Associate Commissioner for Civil Rights and Equal Opportunity.

**MAIL TO:**
    Associate Commissioner
    for Civil Rights and Equal Opportunity
    Social Security Administration
    P.O. Box 47698
    Baltimore, Maryland 21244-7698

**DELIVER TO:**
    Associate Commissioner
    for Civil Rights and Equal Opportunity
    Room 2571 Annex Building
    6401 Security Boulevard
    Baltimore, Maryland 21235

**Step 2:** The Office of Civil Rights and Equal Opportunity (OCREO) will acknowledge receipt of your complaint and will identify the issues and allegations accepted for investigation including those in need of special clarification or greater specificity. If your complaint is dismissed, you will be informed as to how you may appeal the dismissal.

**Step 3:** You or your representative will receive the investigative file, including an investigative summary addressing both sides of the issues within 180 days from the date your formal complaint is accepted, or if your complaint is amended, within 180 days of the last amendment not to exceed 360 days. The date of filing is determined by the postmark date if the complaint is mailed or the date of receipt in OCREO if delivered. You will have 30 days from the date the investigative file is received to request a final Agency decision or a hearing and decision from an Equal Employment Opportunity Commission (EEOC) Administrative Judge (AJ). Your request for a hearing should be made directly to the appropriate EEOC office, and you must notify OCREO of your hearing request.

**Step 4:** If you request a final Agency decision, the decision must be issued within 60 days of receipt of the request. If you request a hearing, the EEOC AJ will have 180 days from the date of receiving the request to issue a decision. If the Agency does not issue a final order within 40 days after receiving the AJ decision, the AJ decision becomes the final Agency action. You will be given notice of appropriate appeal rights on the decision on your complaint.

**Step 5:** If you are not satisfied with the Agency decision, you may appeal to EEOC for a final administrative decision. If you are not satisfied with the decision of EEOC, you may file a civil action in a U.S. District Court. Your appeal must be in writing and filed within 30 days of the decision.

**Step 6:** You have the right to appeal to the U.S. District Court 180 calendar days after filing a formal complaint (when the complaint has not been amended) if final action has not been taken. You also have the right to appeal to the U.S District Court 180 days after filing an appeal if a decision has not been issued on the appeal.

    *Processing for complaints on sexual orientation, marital status, political affiliation and parental status discrimination differs from the above described complaint process in that SSA's decision in the matter is final. There is no right to a hearing with an EEOC AJ and there are no appeal rights to the EEOC or the courts.

**EXHIBIT** 2
**Page** 10 **of** 11 **pages.**

## Requirements for filing under the negotiated procedure (excluding adverse actions) are as follows:

**Step 1:** Before filing a grievance which alleges discrimination, an employee may first discuss the allegation with an EEO Counselor. This discussion must be held within 45 calendar days after the event causing the allegation or after the date the employee became aware of the event. If the employee does not elect to use the pre-complaint process, a grievance may be initiated under the negotiated grievance procedure (as described in step 3 below) within 45 calendar days of the event which gave rise to the allegation or after the date the employee became aware of the event. The grievance will be filed with the responsible management official (RMO) or if no RMO is named, it will be filed with the step 1 grievance official designated for the employee's component.

**Step 2:** If an employee uses an EEO Counselor, the counselor has 30 calendar days to attempt to informally resolve the issue(s). The 30-day period may be extended to 90 calendar days, if the counselee agrees. If counseling is not extended or the parties have not agreed to participate in the Alternative Dispute Resolution (ADR) process, the counselor must give the aggrieved individual a final interview and a written report of the efforts the counselor made to resolve the complaint on or before the 30th day. Additionally, the counselor will give the aggrieved individual a written notice of the right to file either a formal complaint under the statutory EEO procedure or a grievance under the negotiated grievance procedure.

**Step 3:** A grievance must be in writing, preferably on the standard grievance form, signed by the employee, with a copy of the counselor's notice attached. For AFGE members, the grievance must be filed within 15 working days after the date of the notice or within 45 calendar days of the event if no counselor was involved.

**Step 4:** The EEO Counselor will advise the employee of the official with whom the grievance is to be initially filed; that is, the official who took the action which gave rise to the complaint. If the RMO is one of the officials designated in the grievance procedure to handle grievances at step 1, 2, or 3, the grievance will be entered into the grievance procedure at that step. If the RMO is not one of the officials designated to handle grievances, he/she will become the first step official on the grievance. If there is no RMO, the grievance will be filed with the step 1 grievance official designated for the employee's component.

**Step 5:** The RMO will attempt to resolve the matter and will issue a decision within the time limits specified in the grievance procedure. If the matter is not resolved, the aggrieving individual may appeal to the next higher grievance official within the time limits specified in the grievance procedure. This process will continue until all the steps in the grievance procedure have been completed. **EXCEPTION:** If the RMO is the step 3 or higher official, that official will have 15 working days to attempt to resolve the matter and issue a decision. If not resolved, the individual has 5 workdays after receipt of the decision to appeal to the higher management official identified by SSA. That official will have 25 workdays to resolve the matter or render a final decision.

**Step 6:** The union may, within 15 workdays of receipt of the final grievance decision, refer the grievance to arbitration.

---

I hereby acknowledge that I have discussed my allegations of discrimination with an EEO Counselor and have been advised of the steps and my rights under both the statutory and negotiated procedures.

_Alice Ann Friends_ _____    _9/17/04_
Complainant's Signature                           Date

_____    _____
Complainant's Representative Signature            Date

_Victoria Monroe-Pantleri_ _____    _9-10-04_
Counselor's Signature                             Date

**EXHIBIT** _2_
Page _11_ of _11_ pages.

PLAINTIFF'S REPLY EXHIBIT 4

BEFORE THE
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

| | | |
|---|---|---|
| Alice Friends, | : | EEOC Hearing No. |
| Complainant | : | 100-2005-00775X |
| | : | |
| vs. | : | |
| | : | |
| Jo Anne B. Barnhart, Commissioner | : | |
| of Social Security, | : | Agency Case No. |
| Agency | : | SSA 04-0452 |

## AGENCY'S MOTION FOR SUMMARY JUDGMENT

Pursuant to 20 C.F.R. § 1614.109(g)(1), the Agency hereby moves for summary judgment

of this case without a hearing.  As discussed more fully in the accompanying memorandum,

Complainant cannot establish that she is a "qualified" individual with a disability because she

could not perform the essential functions of her job as a claims representative with or without

reasonable accommodation.  The Agency provided several forms of reasonable accommodation

to Complainant, however, she could not satisfactorily perform her critical job duties during her

two-year trial or probationary period.  Even if the Agency approved all of Complainant's specific

requests for reasonable accommodation, she still could not perform the essential functions of her

job.  Moreover, some of her specific requests for reasonable accommodation were, in fact,

unreasonable and would impose an undue hardship upon the operation of the Agency's business.

Accordingly, Complainant cannot demonstrate that the Agency intentionally

discriminated against her when it properly denied some of her specific requests for reasonable

accommodation.  Nor can she establish that she was subjected to harassment or a hostile work

environment when the Agency appropriately denied some her specific requests for reasonable

accommodation. The Agency, therefore, is entitled to summary judgment as a matter of law.

Respectfully submitted,

Donna L. Calvert
Regional Chief Counsel

By: _____

Nicholas R. Cerulli, Assistant Regional Counsel
Craig B. Ormson, Assistant Regional Counsel
Social Security Administration
Office of the General Counsel-Region III
P.O. Box 41777
Philadelphia, PA 19101
(215) 597-1862

2

BEFORE THE
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

| | | |
|---|---|---|
| Alice Friends, | : | EEOC Hearing No. |
| Complainant | : | 100-2005-00775X |
| | : | |
| vs. | : | |
| | : | |
| Jo Anne B. Barnhart, Commissioner | : | |
| of Social Security, | : | Agency Case No. |
| Agency | : | SSA 04-0452 |

## MEMORANDUM IN SUPPORT OF THE AGENCY'S MOTION FOR SUMMARY JUDGMENT

Complainant, Alice Friends, alleges that the Agency intentionally discriminated against her when it denied some of her requests for reasonable accommodation. [1] Although the Agency provided several forms of reasonable accommodation, Complainant cannot establish that she is a "qualified" individual with a disability because she could not satisfactorily perform the essential functions of her job with or without reasonable accommodation during her trial or probationary period. She also would not have been above to perform the essential functions of her job even if the Agency approved all of her specific requests for reasonable accommodation. Moreover, some of her specific requests for reasonable accommodation were, in fact, unreasonable and would impose an undue hardship.

---

[1] Complainant further alleges that she was subjected to harassment and a hostile work environment. In response to the Agency's discovery requests, she explained that "[t]he discrimination and harassment this complaint concerns are in the form of the agency's failure to reasonable accommodate by (sic) disability." Her harassment and hostile work environment claims, therefore, are part and parcel of her primary theory of the Agency's alleged failure to reasonably accommodate her disability.

Since the Agency properly denied some of her specific requests for reasonable

accommodation, it did not intentionally discriminate against Complainant under a failure to

accommodate theory, nor did it subject her to harassment or a hostile work environment as she

alleges. Because the material facts in this case are not in genuine dispute, and there is no genuine

issue as to credibility, the Agency respectfully requests that the Administrative Judge enter

judgment in favor of the Agency without a hearing pursuant to 29 C.F.R. § 1614.109(g)(1).

## STATEMENT OF UNDISPUTED FACTS

### Complainant's Work History

1. Complainant was hired as a Social Insurance Specialist/Claims Representative

(Bilingual), Grade Series (GS) - 9, at the Postal Plaza Field Office in Washington, D.C., with an

effective date of September 22, 2002 (Report of Investigation (ROI), Ex. 13a at 11-13).

2. Complainant is deaf in both of her ears "with understandable speech" (ROI, Ex. 5

at 2). During her interview for the claims representative position, she stated that she was fluent

in American Sign Language (ASL) and "professed to read lips very well" (ROI, Ex. 9 at 1).

3. Complainant was hired under the Schedule A appointing authority for persons with

disabilities (ROI, Ex. 6 at 1; Ex. 13a at 13). Employees hired under Schedule A must

satisfactorily perform her duties during a two-year trial or probationary period before becoming a

permanent employee (ROI, Ex. 6 at 1; Ex. 10e at 3 (5 C.F.R. § 213.3102(u)); Ex. 13a at 13).

4. As a claims representative, the essential functions of Complainant's job included the

following: (1) conducting interviews with claimants to obtain, clarify, and verify information

about individual applicant's initial and continuing eligibility for various benefit programs

administered by the Agency; (2) adjudicating claims for benefits and eligibility to all programs

2

administered by the Agency; (3) authorizing payment of claims for benefits; and (4) conducting interviews, developing, investigating, and resolving post entitlement actions which may involve suspension, resumption, or termination of eligibility or payments (Ex. A at 2; Ex. B at 2-3 Agency's Position Description for Social Insurance Specialist/Claims Representative (Bilingual) at GS-9 and GS-11 levels, respectively).

5.  Claimant was assigned as a Title 16 Claims Representative at the Postal Plaza Field Office (ROI, Ex. 12b).  Title 16 pertains to individuals eligible for disability benefits based on financial need, otherwise known as SSI benefits under Title XVI of the Social Security Act.

6.  Between October 2002 and March 2003, Complainant participated in formal classroom training for her claims representative position (ROI, Ex. 12b at 1).  This training was held in the mornings and was presented via Interactive Video Technology (IVT), which allows employees around the nation to simultaneously watch live and/or taped broadcasts by television. She was the only student in her IVT class at the Postal Plaza Field Office, and her IVT sessions were "closed captioned" at the bottom of the televison screen (ROI, Ex. 12b at 1-2).  Starting in November 2002, the Agency provided an ASL interpreter to Complainant during her IVT training sessions (ROI, Ex. 12b at 2).

7.  During this period, Complainant received assistance in the afternoons from her assigned mentor, Michelle Ward (ROI, Ex. 8; Ex. 9 at 1; Ex. 12b at 1-2).  Ms. Ward is an experienced Title 16 Claims Representative who is also deaf and able to communicate in ASL (ROI, Ex. 8; Ex. 9 at 1; Ex. 12b at 1-2).  Ms. Ward answered any questions that Complainant had about her IVT lessons (ROI, Ex. 12b at 1-2).

3

8. In March 2003, when Ms. Ward left the office on maternity leave, Complainant was assigned a new mentor, Monte Walker, a Management Support Specialist who is very experienced in SSI claims (ROI, Ex. 8 at 1-2; Ex. 9 at 1; Ex. 12b at 2). Mr. Walker was Complainant's mentor until July 2003 when Ms. Ward returned to the office from maternity leave and resumed her role as Complainant's mentor (ROI, Ex. 8 at 1; Ex. 9 at 1; Ex. 12b at 2).

9. In September 2003, Ms. Ward became "frustrated in her dealings with Complainant" and asked to be relieved of her mentoring responsibilities because Complainant would repeatedly ask the same questions and would often seek the advice of other co-workers because Complainant believed that Ms. Ward had given her incorrect information (ROI, Ex. 8 at 1; Ex. 9 at 1; Ex. 12b at 2).

10. Mr. Walker was reappointed as Complainant's mentor (ROI, Ex. 12b at 2). During his tenure as Complainant's mentor, Mr. Walker discussed with Complainant in writing — as he does with all trainees — the tasks necessary to perform her job as claims representative (ROI, Ex. 9 at 1). According to Mr. Walker, Complainant never showed that she could perform these tasks successfully on her own (ROI, Ex. 9 at 1). Mr. Walker found numerous errors on the most basic of issues, as well as "blatant errors" that would have led to incorrect payments (ROI, Ex. 8 at 2).

11. In September 2003, Robin Wells became the District Manager of the Postal Plaza Field Office (ROI, Ex. 8 at 1; Ex. 12b at 2). Ms. Wells has considerable SSI knowledge and experience (ROI, Ex. 6 at 2; Ex. 8 at 2).

4

African- American. Ms. Wells observed similar problems during Complainant's interviews with

Caucasian claimants (ROI, Ex. 8 at 2).

17. In fact, Ms. Wells recalled instances when Complainant "interviewed deaf claimants

while signing, and she exhibited the same problems and errors in comprehending, understanding,

and applying what was being said" (ROI, Ex. 8 at 2).

18. On June 8, 2004, Ms. Wells issued a written memorandum to Complainant to

summarize her frequent and persistent disrespectful and discourteous behavior during her trial or

probationary period (ROI, Ex. 12a). Ms. Wells documented several instances when Complainant

was "extremely defensive or argumentative" as well as disrespectful toward her mentors and

supervisors (ROI, Ex. 12a at 2-5).

19. On June 28, 2004, Ms. Wells issued a written memorandum to Complainant to

summarize Complainant's performance during her trial or probationary period (ROI, Ex. 12b

at 3). Ms. Wells specifically documented many of the mistakes made by Complainant during her

interviews with claimants and the processing of these applications (ROI, Ex. 12b at 3).

Ms. Wells stated that many of these mistakes were on "basic, fundamental issues relating to your

SSI claims" (ROI, Ex. 12b at 3). Ms. Wells further stated that Mr. Walker also noticed mistakes

in Complainant's processing of claimant applications (ROI, Ex. 12b at 3).

20. In a written memorandum dated September 10, 2004, Lorna Walters, the Level 1

District Manager who was Complainant's 2nd level supervisor, documented that Complainant's

performance had not improved since June 28, 2004 (ROI, Ex. 6 at 1; Ex. 12c at 2-7).

Ms. Walters' memorandum detailed how Complainant failed to obtain the necessary information

in all of the nineteen subsequent interviews with claimants (ROI, Ex. 12c at 2-7).

6

These mistakes showed that Complainant had great difficulties in all areas of Title 16 areas (ROI, Ex. 12c at 2-7). Although Complainant's workload was reduced and despite extensive instructions from Ms. Wells on how to complete these cases, Complainant continued to ask Ms. Wells the same questions that had been covered in previous mentoring sessions (ROI, Ex. 12c at 2-7).

21. Ms. Walters decided to terminate Complainant "based on her failure to fully demonstrate her fitness and qualifications for continued employment" beyond her two-year trial or probationary period (ROI, Ex. 6 at 2; Ex. 12c at 1). On September 16, 2004, before the effective date of her termination, Complainant resigned from her position as claims representative at the Postal Plaza Field Office (ROI, Ex. 13b at 1, 3-4).

Complainant's Specific Requests for Reasonable Accommodation

22. During her two-year trial or probationary period, Complainant submitted several requests for reasonable accommodation (ROI, Exs. 7b-7e3). In February 2003, the Agency granted her request for an assistive device known as "WINTALK," which is an integrated telecommunications device for the deaf (ROI, Ex. 7 at 3; Ex. 7b at 3).

23. On October 7, 2003 and on January 5, 2004, Complainant asked the Agency to purchase a new hearing aid for her (ROI, Ex. 7 at 3; Ex. 7c at 2, 7-10). As explained by Douglas France, an Equal Employment Specialist in the Agency's Office of Civil Rights and Equal Opportunity, these requests were denied because the Agency is not required to provide employees with personal use items, such as hearing aids, needed in accomplishing daily activities both on and off the job (ROI, Ex. 7 at 2; Ex. 7c at 1, 11-12, 14-15).

7

24. On March 11, 2004, Complainant requested that the Agency provide a full-time interpreter, refresher training, effective mentoring, and other adjustments to her work environment including relocation (ROI, Ex. 7 at 3; Ex. 7d at 2-5). The Agency approved this request in part, authorizing up to 32 hours of interpreter services per week for any work-related functions, except to conduct interviews or other business with the public (ROI, Ex. 7 at 2-3; Ex. 7d at 14, 17). The Agency was also providing effective mentoring, refresher training, and other work adjustments (apart from relocation) to assist Complainant in performing her responsibilities (ROI, Ex. 11a).

25. The Agency did not, however, provide an interpreter to assist Complainant in interviewing the public because it would alter the essential function of her position and create an undue hardship for the Agency (ROI, Ex. 7 at 3-4). As Mr. France explained, the Agency would be required to hire multiple interpreters to assist Complainant in conducting face-to-face interviews with the public and train the interpreters in SSA policy and procedure (ROI, Ex. 7 at 4). It would also lengthen the amount of time needed to conduct an individual interview, which would affect the Agency's ability to serve the public in an efficient manner (ROI, Ex. 7 at 4).

26. On July 22, 2004, Plaintiff requested that the Agency purchase the iCommunicator software program and Sorenson Video Relay Service (VRS) (ROI, Exs. 7e1-7e2). The Agency denied Complainant's request for the iCommunicator software program because it was not practical or possible – it would require the Agency to train SSA claimants or beneficiaries to use the software program before they can conduct business with the Agency (ROI, Ex. 7 at 3; Ex. 7e3 at 1). Regarding Complainant's request for VRS, the Agency was exploring the possible use of

8

VRS technology, however, the Agency had not yet identified the systems changes or testing that would be necessary to integrate this product into the systems network at that time (ROI, Ex. 7 at 3; Ex. 7e3 at 1). As an alternative to VRS, the Agency offered to acquire a Captioned Telephone (CAPTEL), which uses voice recognition software to transcribe the responses of the other individual (ROI, Ex. 7e2; Ex. 7e3).

## ISSUE

Whether the Agency intentionally discriminated against Complainant by denying some of her specific requests for reasonable accommodation where (1) she could not perform the essential functions of her job with or without reasonable accommodation, and (2) some of her specific requests were unreasonable and would impose an undue hardship.

## ARGUMENT

I.    Standard of Review

A request for summary disposition under 29 C.F.R. § 1614.109(g)(1) is similar to a motion for summary judgment filed pursuant to Fed. R. Civ. P. 56.  57 Fed. Reg. 12634, 12635 (1992).  Summary judgment is appropriate where a court determines that, given the substantive legal and evidentiary standards that apply to the case, there exist no genuine issues of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  To deny a motion for summary judgment, the court must satisfy itself that a reasonable jury could return a verdict for the non-moving party.  Id. at 248.

*What burden*

Once the moving party has met its burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.  Id. at 248-50.  To defeat a motion for summary judgment, a party must do more than simply show that there is some

9

metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986). The non-moving party must come forward with "specific facts

showing that there is a genuine issue for trial." Id. at 587.

II.    The Agency Properly Denied Some of Complainant's Specific Requests for Reasonable
       Accommodation.

An Agency must approve a request for reasonable accommodation that is consistent with

the Americans with Disabilities Act of 1990. See 29 U.S.C. § 791(g) (incorporating 42 U.S.C.

§ 12111(8)); see also 29 C.F.R. § 1614.203(b) (incorporating 29 C.F.R. § 1630.4). An employee

is entitled to a reasonable accommodation only if the employee is a "qualified" individual with a

disability, i.e., an individual who can perform the essential functions of her position with or

without reasonable accommodation. See 29 C.F.R. § 1630.2(m). It is the employee's burden to

prove that she can perform the essential functions of the position with or without reasonable

accommodation. Polk v. United States Postal Service, EEOC Petition 01A24767,

2005 WL 22118533, *2-3 (Sept. 4, 2003). If the employee is a "qualified" individual with a

disability, then the Agency is required to make reasonable accommodation for the employee

unless the Agency can demonstrate that the accommodation would cause an undue hardship on

the operations of its business. See 29 C.F.R. § 1630.9(a).

Here, Complainant cannot satisfy her burden of demonstrating that she could perform the

essential functions of her job with or without reasonable accommodation. As discussed below,

the Agency provided several forms of reasonable accommodation to Complainant, yet she could

not satisfactorily perform her critical job duties during her two-year trial or probationary period.

10

In fact, she could not perform the essential functions of her job even if the Agency approved all

of her specific requests for reasonable accommodation. Moreover, some of her specific requests

for reasonable accommodation were unreasonable and would have caused an undue hardship.

A.    Complainant Could Not Perform the Essential Functions of Her Job as a Claims
      Representative With or Without Reasonable Accommodation.

Despite extensive training, constant mentoring, and the availability of interpreter services

for up to 32 hours per week, Complainant was unable to perform all of the essential functions as

a claims representative, such as conducting interviews with claimants and adjudicating claims for

Social Security benefits (Ex. A at 2; Ex B. at 2-3). See 29 C.F.R. § 1630.2(n)(3)(ii) (providing

that an employer's written job description is evidence of whether a particular function is

essential). District Manager Robin Wells, who observed first-hand many of Complainant's

interviews with individual claimants, testified that Complainant "was having difficulties with the

technical aspects of the job" (ROI, Ex. 8 at 2). During interviews with claimants, Complainant

had great difficulties asking the correct or appropriate questions to obtain the necessary

information from African-American, Caucasian, and even deaf claimants (ROI, Ex. 8 at 2).

Furthermore, Complainant was unable to apply Title 16 disability policy. All of Complainant's

mentors stated that Complainant constantly made the same errors, many of which were on "basic,

fundamental issues" (ROI, Ex. 8 at 1-2; Ex. 9 at 1; Ex. 12b at 2-3). These errors continued even

when Complainant was given written instructions in how to adjudicate a claim (ROI, Ex. 8 at 2;

Ex. 9 at 1; Ex. 12c at 2-7).

All of this demonstrates that Complainant was unable to perform the essential functions

of her job as a claims representative with or without reasonable accommodation.

11

Complainant cannot prevail under a failure to accommodate theory because she was not a "qualified" individual with a disability. Nor can she establish that she was subjected to harassing conduct that was sufficiently severe or pervasive as to alter the conditions of her employment because the Agency properly denied some of her specific requests for reasonable accommodation.

B.    Complainant Could Not Have Performed the Essential Functions of Her Job Even if the Agency Approved All of Her Requests for Reasonable Accommodation.

Complainant's specific requests for reasonable accommodation, even if granted, would not have allowed her to perform the essential functions of her job as a claims representative. All of Complainant's requests for reasonable accommodations (i.e. full-time interpreter, iCommunicator software, VRS, and hearing aids) pertain to hearing difficulties that may arise during interviews with claimants. As explained above, Complainant's work-related problems, however, were greater than communication difficulties. Complainant did not understand Title 16 disability policy and, therefore, she was unable to ask the right questions during the interviews and she was unable to apply the information gathered during an interview to adjudicate a claim. None of Complainant's requests for reasonable accommodation would have improved her ability to learn and apply Title 16 disability policy. Given that the requests for reasonable accommodation would not improved Complainant's knowledge and application of disability policy, she has failed to prove that she could have performed the essential functions of a claims representative had her requests for reasonable accommodation been approved. Polk, 2005 WL 22118533 at *2-3. Moreover, the record documented many instances where

12

Complainant displayed frequent and persistent disrespectful behavior to her mentors and supervisors (ROI, Ex. 12a at 2-5).

In fact, Complainant's requests for reasonable accommodation, such as a full-time interpreter, demonstrated that she could not perform the essential functions of a her job as a claims representative. The regulations state that an individual is unable to perform the essential functions of a job when "the reason that the position exists is to perform that function[.]" 29 C.F.R. 1630.2(n)(2)(I). Here, the essential reason for a bilingual claims representative is that an individual is able to conduct interviews with the general public in two languages. Complainant was hired because she stated to the Agency during her job interview that she was fluent in ASL and could "read lips very well" (ROI, Ex. 9 at 1). Complainant's requests for reasonable accommodation, such as a full-time interpreter, suggest that she is not ffuent in two languages, as she reported to the Agency during her job interview. Because Complainant's request for a full-time interpreter would defeat the "reason that the position exists," to wit, that the employee can conduct interviews in two languages, she essentially acknowledged that she cannot perform the essential functions of the position with or without reasonable accommodation.

Accordingly, Complainant cannot meet her burden of showing that she was a "qualified" individual with a disability nor can she establish harassing conduct so severe or pervasive as to alter the conditions of her employment. [2]

---

[2] The Agency was not required to offer reassignment as a form of reasonable accommodation since Complainant was a trial or probationary employee who could not perform the essential functions of her job as a claims representative with or without reasonable accommodation. EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, Question 25 (Oct. 17, 2002).

13

C.    Some of Complainant's Requests for Reasonable Accommodation Were Unreasonable and Would Have Caused an Undue Hardship.

Even if Complainant is a "qualified" individual with a disability, the Agency properly denied some of her specific requests for reasonable accommodation since they were unreasonable and would have caused an undue hardship. An agency is not required to make a reasonable accommodation if the accommodation would impose an undue hardship on the operations of the Agency's business. See 29 C.F.R. § 1630.9(a). "Undue hardship" means, with respect to the provision of an accommodation, significant difficulty or expense incurred by an Agency, when considered in light of several factors. See 29 C.F.R. §1630.2(p)(1). Factors to be considered include the nature and net cost of the accommodation; the type of operation at the Agency; and the impact of the accommodation upon the operation of the facility, including the impact on the facility's ability to conduct business. See 29 C.F.R. §1630.2(p)(2)(i),(iv)-(v).

As Mr. France explained, the Agency did not provide a full-time interpreter to assist Complainant in interviewing the public because the Agency would be required to hire multiple interpreters to assist Complainant in conducting face-to-face interviews with the public and would have to provide extensive training to these interpreters in Title 16 policy so that they would be useful during the interviews (ROI, Ex. 7 at 3-4). The need to transmit information through an interpreter during all interviews would also lengthen the amount of time needed to conduct an individual interview and, thereby, reduce the total number of interviews a field office could perform in one day. Moreover, the Agency would be unable to conduct interviews if the interpreters report to work (ROI, Ex. 7 at 4).

14

Similarly, as Mr. France explained, the iCommunicator and VRS programs were impractical (ROI, Ex. 7 at 3, Ex. 7e3 at 1). Because the iCommunicator program is only effective after it recognizes an individual's speech patterns, which can take up to ninety minutes, the program was impractical because the Agency would be unable to train claimants to use the program prior to an interview, especially given that many of our claimants have intellectual, technological, or physical/mental impairments that would prevent them from even learning how to use the program (ROI, Ex. 7 at 3, Ex. 7e3 at 1). Mr. France also explained that VRS was impractical because the Agency had not yet identified the systems changes that would be necessary to integrate the program into the systems network (ROI, Ex. 7 at 3, Ex. 7e3 at 1).

Finally, as Mr. France explained, the Agency did not have to purchase Complainant a new hearing aid because the Agency is not required to purchase personal use items, such as hearing aids, that are needed to accomplish daily activities both on and off the job (ROI, Ex. 7 at 3; Ex. 7c at 2, 7-10). EEOC's Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans Disabilities Act, General Principles (Oct. 17, 2002).

Because the Agency properly denied some of her specific requests for reasonable accommodation, complainant cannot prevail under a failure to accommodate theory nor can nor can she establish harassing conduct so severe or pervasive as to alter the conditions of her employment.

15

## CONCLUSION

For the reasons set forth above, there exist no genuine issues of material fact in this case.

Therefore, the Agency is entitled to summary disposition of Complainant's claim without a

hearing.

Respectfully submitted,

Donna L. Calvert
Regional Chief Counsel

By: _____

Nicholas R. Cerulli, Asst. Reg. Counsel
Craig Ormson, Asst. Regional Counsel
Social Security Administration
Office of the General Counsel - Region III
P.O. Box 41777
Philadelphia, PA 19101
(215) 597-1862

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Agency's Motion for

Summary Judgment and Supporting Memorandum and Proposed Order was sent via First-Class

Mail on February 22, 2006 to the following:

Phillip R. Kete
Attorney for Complainant
General Counsel
Local 1923, AFGE
6401 Security Blvd.
G-314 West High Rise
Baltimore, MD 21235

Nicholas R. Cerulli
Assistant Regional Counsel